**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

RowVaughn Wells, Individually and as
Administratrix Ad Litem of the Estate of
Tyre Deandre Nichols, deceased.

                      Plaintiff,

                vs.

The City of Memphis, a municipality;
Chief Cerelyn Davis, in her official capacity;
Emmitt Martin III, in his individual capacity;
Demetrius Haley, in his individual capacity;
Justin Smith, in his individual capacity;
Desmond Mills, Jr., in his individual capacity;
Tadarrius Bean, in his individual capacity;
Preston Hemphill, in his individual capacity;
Robert Long, in his individual capacity;
JaMichael Sandridge, in his individual capacity;
Michelle Whitaker, in her individual capacity;
DeWayne Smith, in his individual capacity and
as an agent of the City of Memphis.

                    Defendants.

Case No. 2:23-cv-2224

**Complaint at Law**

**JURY DEMAND**

---

## <u>COMPLAINT AT LAW</u>

      NOW COMES the Plaintiff, RowVaughn Wells, Individually and as Administratrix Ad Litem for the Estate of Tyre Deandre Nichols, by and through her attorneys, and in complaining of the Defendants, pleads and alleges as follows:

## PRELIMINARY STATEMENT

On January 27, 2023, the world bore witness to videos of a gruesome, barbaric display of police brutality on the streets of a quiet neighborhood in Memphis, Tennessee from the night of January 7, 2023. Caught on film for all to see was the abhorrent and reprehensible conduct of the City of Memphis' unqualified, untrained, and unsupervised police officers, acting under the color of law and pursuant to officially sanctioned, unconstitutional policies and practices. The innocent victim was a 29-year-old father of one, who was on his way home to have dinner with his parents. His name was Tyre Deandre Nichols.

The disturbingly tragic events of the night were created and set in motion over a year prior when the Memphis City Council appointed Cerelyn Davis as the new Police Chief. The savage beating of Tyre Nichols was the direct and foreseeable product of the unconstitutional policies, practices, customs, and deliberate indifference of the City of Memphis and Chief Davis, the City's chief policymaker for decisions related to the Memphis Police Department.

In 2021, the City of Memphis hired Davis as its Chief of Police and Shawn Jones as the Assistant Chief of Police. The City did so with full knowledge that both individuals had previously served in the Atlanta Police Department where they played prominent roles in the RED DOG unit: a police unit that was eventually disbanded due to numerous allegations of violations of the Fourth Amendment to the United States Constitution, including—but not limited to—illegal searches and seizures and excessive force. Turning a blind eye to these officials' histories of disregard for the Constitution and the rights of Atlanta citizens, the City of Memphis made a conscious choice to disregard the rights of its own, to bring these two individuals on, and to bestow them with the highest law enforcement authority possible within their police department.

History would repeat itself as Davis and Jones reverted back to their RED DOG days in Atlanta. In late 2021, the two created an identical unit within the Memphis Police Department that

they claimed would root out an alleged crime problem within the City. Instead, it predictably implemented the same unconstitutional mandates, policies, and customs thereby breeding its own insidious and institutionalized corruption that left a multitude of constitutional violations in its wake. Their now-disbanded Memphis unit carried a name that will forever live in infamy for the devastation and carnage it caused: the Street Crimes Operation to Restore Peace In Our Neighborhoods—otherwise known as SCORPION.

Rather than "restore peace" in Memphis neighborhoods, the SCOPRION Unit brought terror. Taking its eponym to the extreme, the SCORPION Unit was designed as a "Sting" unit. In reality, it was an officially authorized gang of inexperienced, untrained, hyper-aggressive police officers turned loose on the Memphis community without any oversight. They were instructed to strike without warning and, many times, without any valid constitutional basis. Consistent with the directives received from Chief Davis, herself, SCORPION Officers carried out untold Fourth Amendment violations with a focus on Black men living in Memphis. The ultimate irony is that the Department and these officers' mission was to enforce the law—not break it.

After a year of doing so and operating with impunity, the SCORPION Unit carried on into 2023 with its sanctioned mission to inflict terror and fear on the community in the name of "stopping crime." Just a week into the new year, on the night of January 7, the SCORPION Unit set its sights on 29-year-old Tyre Nichols for one singular reason: he was a young, black man.

The basis for SCORPION Unit officers stopping Tyre's car on January 7, 2023 has never been substantiated nor could there ever be a basis for the frenzy of force that was about to be unjustifiably unleashed. Two SCORPION Officers baselessly stopped Tyre's car, forcefully dragged him out onto the roadway, and violently apprehended him without ever articulating a

reason for the stop. As the SCORPION Officers escalated the situation with harsh and disgusting profanity and hostility, Tyre attempted to deescalate with measured communication and calmness.

Upon recognizing these officers were operating with seething aggression and unjustified force, Tyre fled the scene toward his home where he lived with his parents. What transpired next can only be described as a pack of wolves attempting to hunt down their wounded prey. Just feet from his parents and the safety of his home, five SCORPION Officers tracked Tyre down and deployed their sting in the form of repeated punches, kicks, and pepper spray to a non-resistant, restrained young man shouting for his mother while they unleashed their physical hostility upon him. When Tyre fell to the ground, he was lifted back up so that officers could continue to tee-off with more punches, strikes, kicks, and chemical sprays—all of this with full knowledge that their body-worn cameras were recording every second. Such a ruthless and brutal beating could only be carried out by officers that were devoid of any fear of discipline or intervention by a supervisor and with a hardened, defined sense of impunity garnered from those running their Department.

To be sure, there was never any attempt to intervene by any officer or Memphis Police Department official at any point as Tyre remained defenseless throughout the onslaught. When it was finished, Tyre's body was propped up against the police car to be displayed like a battered trophy to be touted for the countless Memphis officials that would arrive on the scene. Pictures would be taken, jokes would be made, and medical care would be withheld for over twenty minutes as Tyre's body lay devastated from the beating. Indeed, he was dying and those on scene knew it.

Tyre was eventually transported to the hospital where he battled for nearly three days until his body could not fight any longer. At the time of his death on January 10, 2023, Tyre's condition in the ICU was compared to that of Emmitt Till—a young man brutally beaten and killed in Mississippi in 1955. Like Till nearly 70 years prior, Tyre was left unrecognizable because of the

beating he endured at hands of a modern-day lynch mob. Unlike Till, this lynching was carried out by those adorned in department sweatshirts and vests and their actions were sanctioned—expressly and implicitly—by the City of Memphis.

Far from being the result of the actions of five rogue police officers, the events of January 7, 2023 were the culmination of a Department-ordered and Department-tolerated rampage by the unqualified, untrained, and unsupervised SCORPION Unit carrying out an unconstitutional mandate on the streets of Memphis without any fear of retribution or consequence because of an acceptance of and deliberate indifference to unconstitutional conduct that had been fostered since the Unit's inception.

This lawsuit is a civil indictment under the laws of the United States against the City of Memphis, its Police Department, its Chief of Police, the SCORPION Officers involved, and all those complicit in the deprivation of Tyre Nichol's constitutional rights, his pain and suffering in his last days on this Earth, and his wrongful death on January 10, 2023.



*The picture on the left shows Tyre Nichols in 2021.*

*The picture on the right shows Tyre Nichols swollen, bloody, and bruised in the ICU shortly before his death in January 2023.*

4

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343; 42 U.S.C. §§ 1983, 1988; and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this Court under 28 U.S.C. §1391(a) because all Defendants reside in the State of Tennessee and at least one of the Defendants resides in the Western District of Tennessee.

3.      Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred in Memphis, Tennessee, which is in the Western District of Tennessee.

## PARTIES

4.      At all relevant times and until the time of his death on January 10, 2023, Plaintiff's decedent, Tyre Deandre Nichols, was a citizen of the United States and the City of Memphis, County of Shelby, State of Tennessee.

5.      Plaintiff RowVaughn Wells was appointed Administratrix Ad Litem of the Estate of Tyre Deandre Nichols on March 29, 2023 by the Probate Court of Shelby County, Tennessee.

6.      Plaintiff RowVaughn Wells is a citizen of the United States and the City of Memphis, County of Shelby, State of Tennessee.

7.      Tyre Nichols is survived by his next of kin, including his minor son.

8.      The City of Memphis is and was at relevant times a political subdivision of the State of Tennessee, organized and existing under and by virtue of the laws and the Constitution of the State of Tennessee.

9. Under Article XI, Section 9 of the Constitution of the State of Tennessee, the state law of Tennessee authorizes a city's creation of a charter.

10. The City of Memphis Charter is entitled, "Charter and Related Laws of the City of Memphis."

11. The City of Memphis fulfills its policing functions through the Memphis Police Department, which is and was at all relevant times a law enforcement agency.

12. The Memphis Police Department is led by the Director of Police Services, also known as the "Chief of Police," who is bestowed with the following authority under the City of Memphis Charter's Section on Police Services:

   a. The director of police services shall have general care of the peace of the city, and shall see that all subordinates do their duty in preserving the same. Title 2, Chapter 2-30, Sec. 28-3.

   b. He or she shall have control over the entire police force and see to the execution of every ordinance. Title 2, Chapter 2-30, Sec. 28-3.

   c. He or she shall have general supervision over the subject of nuisances, and the abatement of same, and shall exercise and discharge all such powers and functions as pertain to his or her office and perform such other duties as may be required of him or her by this Code or other ordinance. Title 2, Chapter 2-30, Sec. 28-3.

   d. The director of police services is authorized and empowered to appoint one deputy director, four deputy chiefs and as many chief inspectors, inspectors, captains, lieutenants, sergeants, detectives and patrol officers, together with such emergency police, secretaries, clerks, stenographers, operators, janitors, turnkeys, desk lieutenants, desk sergeants, mechanics, matrons, women police officers and such other help as may be needed to efficiently police the city and to efficiently conduct the police division of the city. Title 2, Chapter 2, Sec. 28-4.

   e. The director of police may, from time to time, promulgate and shall enforce such rules and regulations for the conduct of the police division, not inconsistent with the Charter and ordinances of the city, as may be necessary for the efficient conduct of the division and policing of the city. Title 2, Chapter 2-30, Sec. 2-28-7.

6

13.     The Director of Police Services, also known as the Chief of Police of the Memphis Police Department, is and was at all relevant times the final policymaker as it relates to the implementation of police policies and practices.

14.     The Director of Police Services, also known as the Chief of Police of the Memphis Police Department, is and was at all relevant times the final policymaker as it relates to the implementation of police hiring and assignment to specialized units within the Memphis Police Department.

15.     The Director of Police Services, also known as the Chief of Police of the Memphis Police Department, is and was at all relevant times the final policymaker as it relates to the implementation and oversight of police training.

16.     The Director of Police Services, also known as the Chief of Police of the Memphis Police Department, is and was at all relevant times the final policymaker as it relates to the implementation and oversight of police supervision.

17.     In April 2021, the City of Memphis appointed Cerelyn Davis ("Chief Davis") as the Director of Police Services, also known as the Chief of Police of the Memphis Police Department.

18.     Upon information and belief, Chief Davis is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

19.     At all relevant times, Chief Davis was employed by the City of Memphis as the duly appointed Chief of Police and Director of Police Services, was acting in her official capacity, was acting under color of state law, and was acting within the scope of her employment with the City of Memphis.

20.     Upon information and belief, Memphis Police Officer Emmitt Martin III is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

21.     At all relevant times, Memphis Police Officer Emmitt Martin III (hereinafter "Martin" or "Martin III") was employed by the City of Memphis through the Memphis Police Department as a duly appointed and sworn police officer, was acting in his individual capacity, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

22.     Upon information and belief, Memphis Police Officer Demetrius Haley is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

23.     At all relevant times, Memphis Police Officer Demetrius Haley was employed by the City of Memphis through the Memphis Police Department as a duly appointed and sworn police officer, was acting in his individual capacity, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

24.     Upon information and belief, Memphis Police Officer Justin Smith is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

25.     At all relevant times, Memphis Police Officer Justin Smith was employed by the City of Memphis through the Memphis Police Department as a duly appointed and sworn police officer, was acting in his individual capacity, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

26.     Upon information and belief, Memphis Police Officer Desmond Mills Jr. is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

27.     At all relevant times, Memphis Police Officer Desmond Mills Jr. was employed by the City of Memphis through the Memphis Police Department as a duly appointed and sworn police officer, was acting in his individual capacity, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

28.     Upon information and belief, Memphis Police Officer Tadarrius Bean is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

29.     At all relevant times, Memphis Police Officer Tadarrius Bean was employed by the City of Memphis through the Memphis Police Department as a duly appointed and sworn police officer, was acting in his individual capacity, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

30.     Upon information and belief, Memphis Police Officer Preston Hemphill is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

31.     At all relevant times, Memphis Police Officer Preston Hemphill was employed by the City of Memphis through the Memphis Police Department as a duly appointed and sworn police officer, was acting in his official capacity as a police officer for the Memphis Police Department, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

32.     Upon information and belief, Memphis Fire Department Emergency Medical Technician Robert Long is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

33.     At all relevant times, Memphis Fire Department Emergency Medical Technician Robert Long was employed by the City of Memphis through the Memphis Fire Department as a duly appointed and sworn fire department officer and Emergency Medical Technician (EMT), was

acting in his individual capacity, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

34.     Upon information and belief, Memphis Fire Department Emergency Medical Technician JaMichael Sandridge is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

35.     At all relevant times, Memphis Fire Department Emergency Medical Technician JaMichael Sandridge was employed by the City of Memphis through the Memphis Fire Department as a duly appointed and sworn fire department officer and Emergency Medical Technician (EMT), was acting in his individual capacity, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

36.     Upon information and belief, Memphis Fire Department Lieutenant Michelle Whitaker is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

37.     At all relevant times, Memphis Fire Department Lieutenant Michelle Whitaker was employed by the City of Memphis through the Memphis Fire Department as a duly appointed and sworn fire department officer, was acting in her individual capacity, was acting under color of state law, and was acting within the scope of her employment with the City of Memphis.

38.     At all relevant times, Memphis Police Lieutenant DeWayne Smith was employed by the City of Memphis through the Memphis Police Department as a duly appointed and sworn police officer, was acting in his individual capacity, and was acting within the scope of his employment with the City of Memphis.

39.      Upon information and belief, Memphis Police Lieutenant DeWayne Smith is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

## FACTUAL ALLEGATIONS

40.      At the time of his brutal death and the violation of his constitutional rights by the City of Memphis and its police officers, Tyre Nichols ("Tyre") was a son, a father, a brother, a friend, and a valued employee of FedEx.

41.      Tyre was the 29-year-old father of a five-year-old boy.

42.      Tyre was an employee at FedEx, where he worked second shift with his stepfather.

43.      Tyre loved skateboarding, photography, and was a Starbucks coffee enthusiast.

44.      On January 7, 2023, Memphis Police Department SCOPRION Officers Martin III, Haley, Hemphill, Smith, Mills Jr., and Bean stopped Tyre Nichols without any reasonable, articulable suspicion.

45.      On January 7, 2023, Memphis Police Department SCOPRION Officers Martin III, Haley, Hemphill, Smith, Mills Jr., and Bean detained Tyre Nichols without any probable cause.

46.      On January 7, 2023, five Memphis Police Department SCORPION Officers Martin III, Haley, Hemphill, Smith, Mills Jr., and Bean brutally beat Tyre within an inch of his life, without any legal justification.

47.      On January 7, 2023, at all relevant times, Tyre was unarmed, he was not resisting, he was defenseless, and he was restrained.

48.     On January 7, 2023, numerous other government employees from the Memphis Police Department, the Memphis Fire Department, and the Shelby County Sheriff stood by apathetically as Tyre laid bloodied and battered on the street.

49.     On January 10, 2023, Tyre ultimately died from his injuries as a direct result of the policies and practices of the City of Memphis, which were the moving force behind SCORPION Officers Martin III, Haley, Hemphill, Smith, Mills Jr., and Bean's unconstitutional stop, assault, and use of force upon him.

**I.     The City of Memphis' Decision to Hire Cerelyn Davis as Police Chief with Full Knowledge of Her History with Disbanded Police Suppression Units.**

50.     Chief Davis joined the Memphis Police Department in 2021 after tenures with the Atlanta Police Department, among other departments around the country.

51.     Assistant Chief Jones joined the Memphis Police Department in 2021 after tenures with the Atlanta Police Department, among other departments around the country.

52.     Chief Davis' history with the Atlanta Police Department and her time working on the RED DOG (Run Every Drug Dealer Out of Georgia) Unit should have been a red flag for the City of Memphis prior to hiring Davis as Chief.

53.     Assistant Chief Jones' history with the Atlanta Police Department and his time working on the RED DOG Unit should have been a red flag for the City of Memphis prior to hiring Jones as Assistant Chief.

54.     In early June 2006, Chief Davis was appointed as a Special Enforcement Section Commander for the RED DOG crime suppression and hot spot policing unit.

55.     During her time with the RED DOG unit, Chief Davis was a street-level drug enforcement Commander for the Atlanta Police Department.

56.    Assistant Chief Jones was also involved with the RED DOG hot spot policing unit and served as a Special Weapons and Tactics ("SWAT") Team supervisor.

57.    The RED DOG Unit was comprised of over 30 officers working on larger teams of 4-7 officers whose mission was to engulf high-crime areas.

58.    The RED DOG Unit became infamous for their practices of "jumping out" to ambush Atlanta citizens and aggressively harass them and strip search them in public.

59.    Functioning like a gang, the RED DOG Unit also regularly presented false information to obtain warrants and that they cut corners to make more time for lucrative side jobs providing additional security to businesses, often while on duty, and receiving cash payments.

60.    In 2006, just months into Chief Davis' time as a Commander in the RED DOG Unit, three narcotics officers shot and killed a 92-year-old woman in a drug raid gone wrong.

61.    According to prosecutors of those narcotics officers, their "routine violations of the Fourth Amendment led to the death of an innocent citizen."

62.    The incident caused an overhaul of the RED DOG unit after the light was shed on a pattern and practice of officers lying to obtain search warrants in violation of the Fourth Amendment and other misdeeds.

63.    RED DOG officers' testimony established that they were encouraged by supervisors to engage in searches and seizures when there was no basis to do so in violation of the Fourth Amendment.

64.    RED DOG officer testimony established that officers were encouraged by supervisors to omit written reports if they engaged in searches but found no drugs or weapons to maintain a stronger "hit" rate on their stops.

65.    RED DOG officers were "told to get the job done, by whatever means" necessary.

66.     The final straw came in 2009 when a RED DOG unit stormed into a popular LGBTQ bar wearing black fatigues shouting profanity and homophobic slurs while throwing patrons to the ground and handcuffing them without any probable cause.

67.     The 2009 incident eventually led to a federal civil rights lawsuit under § 1983, which led to the disbanding of the RED DOG unit in 2011.

68.     Numerous other lawsuits were also filed accusing members of the RED DOG unit of hyper-aggressive, violent police tactics violating Atlanta citizen's constitutional rights, specifically those under the Fourth Amendment.

## II.     The City of Memphis' Creation of the SCORPION Unit: An Institutionalized Police Oppression Unit.

69.     Fast forward over a decade and history would repeat itself in the City of Memphis.

70.     Chief Davis was installed as the Police Chief of the Memphis Police Department, also known as the Chief of Police Services, in April 2021.

71.     Chief Davis was the first Black female and first female to serve as Chief of the Memphis Police Department.

72.     Chief Davis was also under immense pressure coming into the Memphis Police Department as an outsider never having worked in the City of Memphis before.

73.     Chief Davis was hired amidst a rising homicide rate in the City of Memphis and the departure of many veteran officers due to changing compensation structures within the Memphis Police Department.

74.     Chief Davis knew that she would be under massive scrutiny in taking on this new role and knew that she had to act decisively.

75.     Less than a year after her appointment, Chief Davis and Assistant Chief Jones resorted to their Atlanta roots and a familiar concept to gain approval: police suppression units.

14

76.     That suppression units, the SCORPION Unit (Street Crimes Operation to Restore Peace In Our Neighborhoods), was formed in November 2021 and was the brainchild of Chief Davis and Assistant Chief Jones.

77.     The SCORPION Unit was established as a special anti-crime policing unit under the Organized Crime Unit umbrella of the Memphis Police Department, with officers hired and assigned by the Chief of Police to patrol higher crime neighborhoods.

78.     Much like the RED DOG Unit, the SCORPION Unit was comprised of four roving teams, with about 10 officers per team, operating 7 days a week and targeting different areas of the city with the goal of addressing violent crime and homicides.

79.     Much like the RED DOG Unit, the SCORPION Unit used unmarked police vehicles, wore tactical clothing, and employed an aggressive "street-style" of policing that was geared toward intimidation and force, rather than policing consistent with the Constitution.

80.     The SCORPION Unit utilized the theory of patrolling purported "hot spot" crime areas with "crime suppression" officers, while others focused on auto thefts and gangs.

81.     Chief Davis instructed SCORPION Officers to focus on an all-out strategy of seizing property from Memphis citizens in complete disregard of the United States Constitution and the Fourth Amendment.

82.     Much like the RED DOG Unit's mandates to stop crime at any cost, Chief Davis instructed the SCORPION Unit and advocated to stop citizens and deprive them of their property unconstitutionally: "Take the car...Even if the case gets dropped in court."

83.     Such instruction from Chief Davis expressly condoned SCORPION Unit Officers depriving Memphis citizens of their property without any due process.

84. Such instruction from Chief Davis expressly condoned SCORPION Unit Officers depriving Memphis citizens of their property without any legal basis.

85. Such instruction from Chief Davis expressly condoned SCORPION Unit Officers disregarding the constitutional rights of Memphis citizens.

86. Such instruction from Chief Davis demonstrated an explicit disregard for the Constitution and, more specifically, the provisions of the Fourth Amendment.

87. Much like the RED DOG Unit's practices, the SCORPION Unit engaged in a practice of "jumping out" to ambush Memphis citizens and aggressively harass them and search them in public.

88. Much like the RED DOG Unit, SCORPION Unit officers were encouraged by the Chief of Police and supervisors to engage in searches and seizures when there was no basis to do so in violation of the Fourth Amendment.

89. Much like the RED DOG Unit, SCORPION Unit officers were encouraged by the Chief of Police and supervisors to omit written reports if they engaged in searches but found no drugs or weapons to maintain a stronger "hit" rate on their stops.

**III.    The SCORPION Unit's Sting is Unleashed on the City of Memphis.**

90. Consistent with Chief Davis' unconstitutional directive, SCORPION Unit Officers engaged in pretextual traffic stops to attempt to find illegal drugs and guns by employing aggressive police tactics to achieve quotas at the cost of the constitutional rights of Memphis citizens.

91.     SCORPION Unit Officers notoriously utilized extreme intimidation, humiliation, and violence in their "investigations."[1]

92.     Over the ensuing year and a half, the SCORPION Unit disproportionately focused on and targeted young Black men, like Tyre.[2]

93.     Like other similar police units utilized throughout the country, most of which have been disbanded, the SCORPION Unit instilled terror in minority communities throughout Memphis by design and directive.

94.     Like its Atlanta-predecessor in the RED DOG Unit, the SCOPRION Unit would instill the same tactics as dictated by the two individuals intimately familiar with both: Chief Davis and Assistant Chief Jones.

95.     Ultimately, SCORPION developed into a gang unit carrying out an oppression-style of policing ratified by the Chief and Assistant Chief of Police with inexperienced, untrained, and unsupervised police officers.

96.     The five officers who beat Tyre on January 7, 2023—Emmitt Martin III, Demetrius Haley, Justin Smith, Desmond Mills Jr., and Tadarrius Bean—were all members of the Memphis Police Department SCORPION Unit.

---

[1] While SCORPION policing under the directive of Chief Davis and Assistant Chief Jones is the focus of the City of Memphis allegations, there were abundant complaints of excessive force against MPD officers in the years proceeding their appointment to MPD, including 1,200 calls to dispatch reporting excessive force in 2021 alone, which is over 3 reports per day.

[2] The New York Times reports that in reviewing a sample of arrest records, "90% of those arrested by the (SCORPION) unit were Black—much higher than the share of the city's population that is Black, about 65%." Steve Eder, Matthew Rosenberg, et. al., *Muscle Cars, Balaclavas and Fists: How the Scorpions Rolled Through Memphis*. New York Times, February 4, 2023, https://www.nytimes.com/2023/02/04/us/memphis-police-scorpion.html

97.     The SCORPION Unit was responsible for Tyre's death just 14 months after its inception.

98.     In the short time that SCORPION existed, it functioned as a notoriously violent policing unit.

99.     Tyre Nichols was not their first victim—though he is their first known fatality.

100.    SCORPION Unit Officers could often be identified by their vehicles, frequently traveling in a pack of unmarked Dodge Chargers.

101.    Their uniforms were equally disguised as they regularly wore black hoodies and ski-masks rather than traditional police garb.

102.    SCORPION Unit Officers routinely utilized a course of conduct endorsed and recommended by their Chief of Police: they would start their hostile and harassing encounters with a traffic stop, sometimes for something minor like a seatbelt or tinted window infraction, or sometimes (as with Tyre) for nothing at all.

103.    Next, they would jump out of their unmarked squad vehicles while barking commands. Those in the stopped vehicle were left confused, concerned, and frightened.

104.    This pattern and practice of violent, aggressive, and unconstitutional policing is demonstrated through the many examples of other community members who experienced similar SCORPION encounters. Victims reported being "subdued" by pepper spray, batons, tasers, or with a hands-on beating by officers unnecessarily.

105.    Other SCORPION victims include, but are certainly not limited to, the following individuals:

a. **Monterrious Harris, age 22**: On January 4, 2023, SCORPION Officers clad in hoodies and ski-masks descended on his car in an apartment complex parking lot where he was waiting to visit his cousin.

   i. Mr. Harris maneuvered into a parking spot in the complex, and officers claimed he was driving rapidly at them before backing away.

   ii. SCORPION Officers yelled at him to get out of his car and threatened to shoot him.

   iii. They punched him, threw him to the ground, and dragged him across the concrete.

   iv. He suffered cuts and a black eye.

   v. The officers only stopped when people from nearby apartments came to check on the noise from Mr. Harris' screams for help.

   vi. Mr. Harris filed a 42 U.S.C. § 1983 lawsuit against the City of Memphis and individual officers based on this interaction, which includes Defendants Martin, Haley, Smith, Mills, and Bean.

   vii. Upon information and belief, no SCORPION officers were disciplined following this encounter.

b. **Cornell Walker:** Just one day earlier, on January 3, 2023, Mr. Walker was sitting in a parked car with his friend when Officer Emmitt Martin III and another SCORPION officer approached the car from an unmarked squad, screaming "I need to see your motherfucking hands or I'll blow your motherfucking heads off!"

19

  i. Walker was at first terrified that he was the victim of a carjacking or robbery, until he saw Officer Martin's badge and "SCORPION" on his shirt.

  ii. Martin pulled Walker out of his car, with his gun drawn and pointed at Walker, and dragged him to the unmarked squad where Walker was met with two more SCORPION Officers with guns drawn—Officer Smith and Officer Haley.

  iii. Walker never learned why he was pulled from his car, and he was never cited or arrested.

  iv. He called the MPD Internal Affairs Unit to complain about the traumatizing incident and was ignored by a sergeant who defended the conduct.

  v. Upon information and belief, no SCORPION officers were disciplined following this encounter.

c. **Maurice Chalmers-Stokes, age 19**: On October 1, 2022, Mr. Chalmers-Stokes was leaving a barbershop on foot when he noticed a car following him aggressively, and the people inside the car were wearing ski-masks.

  i. He was scared, and he started to run.

  ii. He was bumped by the SCORPION Unit unmarked car, and when he got up and continued to run he was tackled by Officer Haley, causing Mr. Chalmers-Stokes to hit his head on a brick.

iii.    Officers later claimed that they approached him because he was walking in the middle of the street, and upon searching his backpack they found a legally obtained pistol that they believed to be stolen.

iv.    Officer Mills, Officer Bean, and Officer Hemphill were all part of this stop with Officer Haley.

v.    Upon information and belief, no SCORPION officers were disciplined following this encounter.

d.  **Sebastian Johnson, age 19 and Kendrick Johnson Ray, age 20**: In August 2022, SCORPION Officers were responding to a call at an apartment complex in Memphis.

i.    A crowd grew at the complex and the officers called in backup.

ii.    Cousins Sebastian Johnson and Kendrick Johnson Ray were hanging out with two other cousins outside at the complex when police arrived.

iii.    They saw officers swarm the complex, yelling profanities with guns unholstered.

iv.    The SCORPION Unit Officers ultimately beat Mr. Johnson after claiming he had a gun, but no one else on scene corroborated that version of events.

v.    Both cousins were left bloodied and bruised at the hands of the SCORPION Officers, and all criminal charges are in the process of being dismissed.

vi.    At least three of the five SCORPION Officers responsible for Tyre Nichols' death were present that day.

      vii.    Upon information and belief, no SCORPION officers were disciplined following this encounter.

e.  **Davitus Collier, age 32**: In May 2022, SCORPION Officers chased and pepper sprayed Mr. Collier in the face when he was on his way to buy beer for his father on Memorial Day weekend.

      i.    He was one of three Black men in the car and was stopped by the SCORPION Officers for a reported seatbelt violation.

      ii.    Mr. Collier maintained that all three men were indeed wearing seatbelts.

      iii.    Officer Martin was one of several SCORPION Officers present, and he demanded identification and then told Mr. Collier that there was a murder warrant connected with the car.

      iv.    The car belonged to Mr. Collier's 58-year-old father, and Mr. Collier knew that Officer Martin was lying about the basis to needlessly detain him and his passengers.

      v.    Martin began to pull Mr. Collier from his car, and out of fear Mr. Collier ran towards a convenience store where he knew there would be more witnesses.

      vi.    Mr. Collier slipped, and one of the SCORPION Officers tackled him and sprayed him with pepper spray, telling him not to resist.

      vii.    This part of the encounter is memorialized on video and Mr. Collier was *not* resisting, but rather was restrained when he was pepper sprayed.

      viii.    Upon information and belief, no SCORPION officers were disciplined following this encounter.

f. **Damecio Wilbourn, age 28, and brother Romello Hendrix:** In February 2022, the brothers were unloading recording equipment from their car trunk at a friend's apartment complex.

    i. Two SCORPION Officers jumped out of their unmarked car and demanded to know why the brothers were at the apartment complex, and one officer threw Mr. Wilbourn against a car.

    ii. Mr. Wilbourn was terrified because he had no idea who the officers were—they did not wear uniforms or identify themselves as law enforcement.

    iii. Officers claimed they smelled marijuana and found a legally obtained pistol.

    iv. All criminal charges were dropped.

    v. Upon information and belief, no SCORPION officers were disciplined following this encounter.

g. **Johnny Graham, age 50:** Mr. Graham has been stopped by SCORPION Officers more than once, always pulled over by an unmarked squad for no reason.

    i. On one occasion in East Memphis, he and his wife were humiliated when they were forced to stand on the side of a busy roadway while officers searched their car without basis and in view of many members of the public.

    ii. Upon information and belief, no SCORPION officers were disciplined following this encounter.

106.    Additional instances were brought to the attention of the Memphis City Council Public Safety Committee at a hearing on December 6, 2022—just one month before SCORPION Officers killed Tyre.

107.    At that meeting, local activists put the City of Memphis on further notice that violent, pretextual traffic stops by Memphis Police Officers (including SCORPION Unit Officers) were resulting in frequent injury and even several deaths and had been since 2013.[3]

108.    Police Chief Davis and at least five Memphis City Council members were in attendance at that meeting and made fully aware of these instances of violence.

109.    Despite these warnings, the City of Memphis and Chief Davis did nothing to address the SCORPION Unit's tactics and practices and turned a blind eye.

110.    Rather, Chief Davis and other Memphis city officials allowed the SCORPION Unit to continue to terrorize, victimize, and violate the Fourth Amendment rights of the citizens of Memphis until it culminated in the death of Tyre Nichols one month later.

**IV.    The City of Memphis' Staffing of the SCORPION Unit and the Broader Indifference to Hiring Standards and Training Within the Memphis Police Department**

111.    Although fully aware that a police unit like SCORPION demanded extensive training, experience, and judgment, the City of Memphis and Chief Davis failed to properly screen, hire, and assign officers qualified to serve on the SCORPION Unit, knowing that such failures would result in Fourth Amendment violations.

---

[3] Activists referenced Anjustine Hunter (killed in 2013 after a traffic stop), Darrius Stewart (killed in 2015 after a traffic stop), and D'Mario Perkins (killed in 2018 after a traffic stop). While these deaths pre-date the SCORPION unit, they are illustrative of the violent custom of MPD officers in conducting traffic stops, the Department's tolerance of the same, their refusal to make changes, and the need for further training.

112.     Chief Davis, as Director of Police Services, was specifically tasked with the hiring of police officers and was the final policymaker for the City of Memphis in this capacity.

113.     With a mission statement of "stopping crime at any cost," the City of Memphis had a constitutional duty to ensure that the officers it was hiring were qualified and capable of carrying out their duty without violating the Constitution.

114.     But rather than being elite, accomplished officers, SCORPION officers were often officers with past disciplinary issues or were vastly inexperienced.

115.     The City of Memphis has a longstanding policy of declining to conduct thorough background investigations on candidates such as reviewing past employment disciplinary files or interviewing former colleagues.

116.     For instance, five of the six named SCORPION Unit Officers who beat Tyre to death had a record of misconduct, including those instances listed in paragraph 97, above:

    a.  **Emmitt Martin III**

        i.   Before joining the Memphis Police Department in 2018, he was arrested on at least one occasion.

        ii.  In March 2019, Martin left a loaded handgun in his Memphis Police Department squad car where he had suspects in his backseat throughout the shift.

        iii. He claimed it was left accidently because he did not do a proper pre- or post-shift inspection.

        iv.  In September 2020 he violated Memphis Police Department protocol by mishandling a domestic abuse claim between sisters, and he threatened both women that they would both be arrested if he had to write a report.

   v. Nonetheless, he was selected to be a part of the SCORPION Unit.

b. **Demetrius Haley**

   i. In 2015, before joining the Memphis Police Department, he was accused of viciously beating an inmate while he was employed as a Shelby County Correctional Officer.

   ii. The inmate sued Haley for excessive force, and 34 other inmates wrote a letter expressing grave concern to the Correctional Director.

   iii. Nonetheless, Haley was hired by the Memphis Police Department in 2020.

   iv. In February 2021 he received a written reprimand for not filling out a "response to resistance form" when he forcefully grabbed a woman's arm while cuffing her.

   v. In August 2021 he crashed a squad vehicle into a stop sign.

   vi. Nonetheless, he was selected to be a part of the SCORPION Unit.

c. **Justin Smith**

   i. In January 2021, Smith caused a three-vehicle crash while he was speeding to a call, and occupants of all three cars went to the hospital.

   ii. Nonetheless, Smith was selected to be a part of the SCORPION Unit.

d. **Desmond Mills**

   i. In March 2019 he failed to file a "response to resistance" form after using physical force to take a woman to the ground to be handcuffed.

   ii. He said he did not realize that his actions necessitated that form.

   iii. Nonetheless, he was selected to be a part of the SCORPION Unit.

e. **Tadarrius Bean**

    i. Bean had been a police officer with the Memphis Police Department for less than three years.

    ii. Despite his lack of experience as a police officer, Bean was selected to be a part of the SCORPION Unit.

f. **Preston Hemphill**

    i. In June 2019, he violated Memphis Police Department policy against "rough or careless handling of equipment."

    ii. He also failed his physical fitness profile as an officer, and was moved to a role as a civilian employee in November 2019 before being re-transferred to a law enforcement role in March 2020.

    iii. In January 2022 he sustained damage to his squad car.

    iv. Nonetheless, he was selected for the SCORPION Unit.

117. The hiring of inexperienced officers and officers with disciplinary issues were not unique to the SCORPION Unit, as Chief Davis and the City of Memphis were hiring inexperienced and problem officers throughout the department between 2020 and 2022, after significantly decreasing hiring standards and an exodus of veteran leadership.

118. Still experiencing a lack of interest, the City attempted to entice more recruits in 2021 by offering a $15,000 signing bonus.

119. A year later in 2022, the City reduced the fitness test standards to secure more "qualified" officers.

120.    The City of Memphis also increasingly utilized arrest waivers for officers applying to the Memphis Police Department, which permitted more officers with a prior criminal arrest record to be selected as Memphis Police Department officers.

121.    The police academy, which ultimately fed these recruits to the Memphis Police Department, also relaxed standards by utilizing a more lenient grading structure and allowing recruits to retake exams several times.[4]

122.    Failures that would have resulted in dismissal were now tolerated at the academy, and cheating with previews of test materials was encouraged.

123.    If a student could not grasp the material or perform skills test–such as utilizing their service weapon—they were given multiple opportunities until they "passed" the already lower minimum standards.

124.    Even failures in shooting exams were now tolerated, as students unable to properly utilize their firearm graduated the academy and applied for positions with the Memphis Police Department.

125.    These changes in protocols were not communicated in writing, but rather through word of mouth.

126.    The graduating Police Academy classes were larger, because with lower standards, there were necessarily more graduates, albeit unqualified.

127.    Recent graduates often lacked communication skills and the ability to recognize when a situation should be deescalated.

---

[4] Several former and current Police Academy instructors went on record with the Washington Post concerning the Police Academy's subpar practices from 2018 to present. *See* https://www.washingtonpost.com/national-security/2023/03/12/memphis-police-academy-tyre-nichols/, published March 12, 2023.

128.    Not surprisingly, formal excessive-force complaints against Memphis Police Department officers reached an all-time high in 2020[5]–a nearly 60%  from the previous three years' average.

129.    All five police officers who unconstitutionally stopped, detained, and beat Tyre Nichols to death—Emmitt Martin III, Demetrius Haley, Justin Smith, Desmond Mills Jr., and Tadarrius Bean—graduated from the police academy during this problematic period of decreased oversight and requirements.

130.    Furthermore, the City of Memphis and Chief Davis were aware of the decreased standards and subpar graduates at the Police Academy, and instructors within the Police Department who objected were told to transfer out.

131.    The subpar academy practices continued through 2022 under the leadership of Police Chief Davis.

132.    Even without lowering the standards within the department and the academy, the City of Memphis and Chief Davis had chosen to turn a blind eye to potential problem recruits by not interviewing candidates because it was deemed too time-consuming to do so.

133.    The City of Memphis and Chief Davis could have rectified their unconstitutional hiring practices by properly training officers it placed in high-stress police suppression units like SCORPION, but failed to do so.

134.    Although fully aware that a police unit like SCORPION demanded rigorous training, the City of Memphis and Chief Davis failed to properly train SCORPION Unit Officers, knowing that such failures would result in Fourth Amendment violations.

---

[5]    Memphis    Police    Department    Inspectional    Services    2021    Annual    Report,    *see* https://reimagine.memphistn.gov/wp-content/uploads/sites/70/2022/03/2021-ISB-Annual-Report.pdf, last accessed April 12, 2023.

135.   The City of Memphis and Chief Davis failed to promulgate any specified policies or training to any member of the Memphis Police Department:

      a.   *Terry* stops;

      b.   Reasonable articulable suspicion;

      c.   Probable cause;

      d.   Traffic stops;

      e.   Foot pursuits;

      f.   The Fourth Amendment;

      g.   The use of force;

      h.   The use of batons;

      i.   The use of tasers;

      j.   The use of pepper spray; and

      k.   The use of deadly force.

136.   The City of Memphis and Chief Davis failed to offer any specialized training to its SCORPION Officers on a number of important categories, including but limited to the following:

      a.   *Terry* stops;

      b.   Reasonable articulable suspicion;

      c.   Probable cause;

      d.   Traffic stops;

      e.   Foot pursuits;

      f.   The Fourth Amendment;

      g.   The use of force;

      h.   The use of batons;

i.   The use of tasers;

j.   The use of pepper spray; and

k.   The use of deadly force.

137.   Turned loose on the streets of Memphis, SCORPION Unit Officers predictably acted in derogation of the Fourth and Fourteenth Amendments and violated the Constitution by using excessive force and engaging in unreasonable searches and seizures.

138.   Such constitutional violations were the highly predictable consequence of failing to hire qualified officers and train them on the bounds of the Constitution and proper policing, including reasonable search and seizure and use of force.

## V.   The City of Memphis' Indifference to the SCORPION Unit's Unsupervised Reign of Terror.

139.   Where hiring and training fall short of their Constitutional duty, the City of Memphis and Chief Davis could have supervised officers to ensure their respect for the Constitutional rights of Memphis citizens.

140.   Although fully aware that a police unit like SCORPION demanded close supervision, the City of Memphis and Chief Davis failed to properly supervise SCORPION Officers, knowing that such failures would result in Fourth and Fourteenth Amendment violations.

141.   The SCORPION Unit was housed in a satellite MPD office versus one of the main police stations.

142.   The SCORPION Unit was frequently deployed on the streets of Memphis without any supervisor on the team to ensure its officers—unqualified and untrained to begin with—adhered to Constitutional principles and avoided violating the constitutional rights of Memphis citizens.

143. Without proper supervision, SCORPION Unit Officers predictably acted in derogation of the Fourth and Fourteenth Amendments and violated the Constitution by engaging in unreasonable searches and seizures and using excessive force.

144. Such constitutional violations were the highly predictable consequence of failing to supervise the SCORPION Unit in situations that would inevitably arise such as searches, seizures, and the use of force.

## VI. The Baseless Stop: Consistent with Chief Davis' Directive, the SCORPION Unit Stops Tyre Nichols Without Legal Justification.

145. Tyre spent the evening of January 7, 2023 taking photos of the sunset and skateboarding at Shelby Farms Park in Memphis, Tennessee.

146. At about 8:00 p.m. that night, Tyre set out to return home from Shelby Farms Park to 6743 Castlegate Lane, where he lived with his mother and his step-father.

147. While Tyre was at Shelby Farms, Memphis Police Department Officers Emmitt Martin III, Demetrius Haley, and Preston Hemphill—officers in the SCORPION Unit—were on patrol in unmarked squad cars.

148. As members of the SCORPION Unit, Officer Martin, Officer Haley, and Officer Hemphill were responsible for carrying out the directive of Chief Davis to make stops, even without a Constitutional basis for doing so.

149. At approximately 8:20 p.m. Officer Martin, Officer Haley, and Officer Hemphill saw a young black man driving a car: it was Tyre Nichols.

150. In accordance with Chief Davis' directives and the suspects (young, black males) she instructed SCORPION officers to stop, even without a constitutional basis, Officer Martin, Officer Haley, and Officer Hemphill set out to stop Tyre.

151.    Officer Martin called into MPD Dispatch to run Tyre's license plate for warrants and traffic infractions to which Dispatch responded "negative."

152.    Officer Martin had no lawful basis to stop Tyre's vehicle, but Officer Martin pursued Tyre waiting for an opportunity to stop him with Officer Haley and Officer Hemphill following suit.

153.    Officer Haley passed Officer Hemphill to be second in line, also waiting for the opportunity to stop Tyre.

154.    None of the officers had reasonable articulable suspicion to stop Tyre's vehicle, but proceeded to attempt to do so anyway.

155.    When Tyre pulled up to a red light at Ross Road and Raines Road and activated his left turn signal, Officer Martin and Officer Haley saw their opportunity to attempt to seize him.

156.    Officer Martin and Officer Haley pulled their squad cars up next to Tyre, boxed him in, and descended on his car while he waited at the traffic light to take a lawful left turn.

157.    Moments later, Officer Hemphill pulled up behind Tyre's car in the left turn lane as all three squad cars worked in tandem with unmarked police vehicles to encircle and block Tyre's car at the intersection and seize Tyre.

158.    There was no reasonable justification for this type of aggressive police tactic to be used against Tyre, as there was no reasonable justification for stopping Tyre in the first place.

159.    Officer Martin and Officer Haley quickly exited their unmarked vehicles and  ran up to Tyre's car.

160.    Officer Martin and Officer Haley both wore black sweatshirt hoodies over their heads, and never identified themselves as police.

161.    Officer Martin and Officer Haley were both wearing body worn cameras ("BWCs") and knew Officer Hemphill was present and likely had his BWC on recording their conduct.

162.    Officer Martin and Officer Haley knew that Chief Davis' directive was to make stops and suppress crime even without a Constitutional basis, so they deactivated their cameras knowing they could forge a reasonable basis after the fact and not face any repercussions.

163.    Officer Martin and Officer Haley carried out their actions without any regard for whether their conduct would ultimately be seen and reviewed by Memphis Police Department officials.

164.    Officer Martin and Officer Haley had a mindset of impunity as prior, similar conduct had occurred without any repercussions.

165.    Officer Martin and Officer Haley immediately opened the drivers' side door and forcefully pulled Tyre out without explanation, prompting Tyre to ask, shocked and terrified, "What did I do?!"

166.    Officer Martin and Officer Haley pushed Tyre down, and pulled at his arms yelling, "Get on the ground, mother fucker!"

167.    Officer Martin and Officer Haley unreasonably escalated the situation by physically assaulting and shouting at a cooperative, non-resistant individual.

168.    At no point prior to this encounter was Tyre suspected of committing a crime.

169.    At no point prior to this encounter was Tyre a threat of bodily injury or harm to members of the public or to the SCORPION Officers.

170.    Officer Preston Hemphill predictably reacted like the unqualified, untrained, and unsupervised officer that he was as a result of the City of Memphis' unconstitutional failures.

171.    Officer Preston Hemphill sprinted out of his unmarked squad with his gun drawn, held sideways, and pointed squarely at Tyre—ready to deploy deadly force on a non-resistant individual for an unknown and unidentified offense.



*Officer Hemphill immediately pulls out and points his gun at Tyre as he approaches his fellow SCORPION Officers on scene.*

172.    Officer Hemphill unreasonably escalated the situation by threatening deadly force with a cooperative, non-violent, non-resistant individual.



*Tyre looking up at Officers terrified and confused as to why he was pulled from the car.*

173.    At this point, Tyre was restrained by both Officer Martin and Officer Haley with a gun pointed at him, as he pled for answers as to why he was dragged from his car.

174.    Tyre, fearful and panicked, again shouted "What did I do?!"  He never received an answer to that question from any MPD Officer.

175.    Officer Martin and Officer Haley commanded that Tyre lay down and that he place his hands behind his back.

176.    While attempting to comply, Tyre tried to be the calm voice of reason, asking what was going on as they pulled his arms behind his back.

177.    Tyre said to Officer Martin and Officer Haley, in a scared yet measured tone, "you're doing a lot here."

178.    In response to Officer Martin and Officer Haley barking that he must get down on the ground he responded "Ok, I'm laying down!"

179.    Tyre's pleas fell on deaf ears despite his multiple attempts to de-escalate the situation to no avail.

180.    All three SCORPION Officers (Officer Martin, Officer Haley, and Officer Hemphill) simultaneously restrained, pulled, and struck Tyre trying to force him further into the ground and yanked his arms behind his back.

181.    Tyre did not resist and attempted to comply with the SCORPION Officers' orders.

182.    Any resistance perceived by the SCORPION Officers were Tyre's reasonable attempts to comply with their unlawful orders.

183.    Despite Tyre's efforts to comply with those unlawful orders, Officer Haley proceeded to deploy pepper spray directly into Tyre's eyes at close range.

184.    Officer Haley had no reasonable basis to deploy pepper spray into Tyre's face at close range.

185.    With Tyre's eyes and face burning after attempting to deescalate the situation multiple times and with a gun pointed at him, the SCORPION Officers' tempers raged as they continued to shout threats and profanity at Tyre.

186.    Terrified and in fear for his life, Tyre was somehow able to loosen himself from the officers' grip after about a minute.

187.    Tyre then did the only thing he could to attempt to save his life and defend himself—he ran.

188.    Tyre was not suspected of committing any kind of crime at any time.

189.    Tyre was never suspected of committing any kind of crime at any relevant time.

190.    At no point prior to this was Tyre a threat to members of the public or to the SCORPION Officers.

191.    Without any reasonable justification, Officer Hemphill deployed his taser at Tyre, which was ineffective.

192.    With his parents' home just a half mile away, Tyre ran for the safety of their home.

193.    Officer Martin and Officer Haley both took off running after Tyre, furious that he escaped the grip of the SCORPION Unit and their unconstitutional stop.

194.    Both Officers gave up the foot chase and eventually got in their unmarked squads to attempt to run Tyre down.

195.    Officer Hemphill stayed back at the intersection of Ross and Raines, calling dispatch for more SCORPION Units to support Officer Martin and Officer Haley as they hunted for Tyre.

196.    As Officer Hemphill called for more SCORPION Units to assist Officer Martin and Officer Haley, he called out "I hope they stomp his ass!"

## VII.    The Capture and the Retaliation: The Gang of SCORPION Unit Officers Beat Tyre Within an Inch of His Life.

197.    After tracking him for roughly four minutes, Officer Martin and Officer Haley found Tyre at approximately 8:30 p.m.

198.    Tyre reached the intersection of Bear Creek Cove and Castlegate Road—just 100 yards from his parents' home—before he was captured by the SCORPION Officers.

199.    The intersection where he was stopped was also directly underneath a SkyCop camera—a fixed pole-mounted and police-monitored camera designed to enhance safety and monitor crime in the neighborhood.

200.    Rather than capturing the crimes of civilians, the SkyCop camera recorded evidence of the SCORPION Unit's Department-sanctioned brutality against Tyre.

201.    Officer Martin and Officer Haley immediately grabbed Tyre when they found him and shoved him to the ground, pulling his hands behind his back.

202.    At this moment:

    a.   Tyre was restrained;

    b.   Tyre was unarmed;

    c.   Tyre was not resisting;

    d.   Tyre was compliant;

    e.   Tyre had not committed any violent crimes;

    f.   Tyre had not committed any crimes whatsoever;

    g.   Tyre was not a threat to any member of the public;

    h.   Tyre was not a threat to any law enforcement officer; and

i.   Tyre was not a threat to any individual.

203.   Three more SCORPION Officers arrived moments later—Officers Justin Smith, Desmond Mills, Jr., and Tadarrius Bean.

204.   Without hesitation or justifiable reason, Officer Martin, Officer Haley, Officer Smith, Officer Mills, Jr., and Officer Bean all proceeded to brutally beat Tyre Nichols, as set forth in the individual counts below.

205.   The five SCORPION Unit Officers each took turns punching and kicking Tyre in his face and midsection.

206.   During this time, Tyre was restrained by at least one, but often two, SCORPION Officers and held up for the other three or four SCORPION Officers to savagely beat him.

207.   While still able to speak, Tyre screamed out for his mother—shouting "Mom! Mom!" into the neighborhood in hopes that she or someone nearby would come to his aid as he was being brutalized and pummeled to death.

208.   For approximately seven minutes straight, the five SCORPION Officers punched, kicked, pepper sprayed, and struck Tyre with a baton.

209.   In accordance with their mission as members of the SCORPION Unit, the five SCORPION Officers were unrelenting and merciless.

210.   In accordance with their mission as members of the SCORPION Unit and consistent with the directive of their Police Chief, they violated the Fourth Amendment.



*The five SCORPION Officers (Emmitt Martin, Demetrius Haley, Justin Smith, Desmond Mills, and Tadarrius Bean) ruthlessly beating Tyre Nichols to death.*

211.     As Tyre struggled to comply with a flurry of conflicting commands shouted at him from all directions and begged for the onslaught to cease, three SCORPION Officers restrained and repeatedly struck and punched Tyre in the face and body.

212.     The remaining two officers then joined in restraining, punching, and kicking Tyre.

213.     Officer Smith and Officer Mills sprayed Tyre in the face with pepper spray while Officer Bean held Tyre's arm back.

214.     Either Officer Smith or Officer Mills menacingly yelled at and taunted Tyre, "You wanna get sprayed again? Huh?" before spraying him in the face again while other SCORPION Officers held Tyre's hands behind his back.

215.     Even with Tyre's pleas and cries for help and with his attempts to cover his eyes from the chemical assault being rained upon him, the SCORPION Officers continued to hold him down and hold him up as the assault continued.



*Officer Mills sprays Tyre directly in his face with pepper spray, despite already being on the ground, while another SCORPION officer restrains Tyre.*

216.     While lying on the ground restrained and doused with chemical agents, Officer Mills and Officer Smith took turns and struck Tyre repeatedly with a telescoping police baton.

217.     After that, two SCORPION Officers propped Tyre up to make him an upright target for other SCORPION Officers to continue to hit him and use Tyre's body and face as a punching bag.

218.     Tyre fell to the ground and the SCORPION Officers held him on his stomach so that he could be cuffed, which could have been accomplished minutes prior at the stoplight immediately after the unconstitutional stop and before their unconstitutional assault began.

219.     At least three SCORPION Officers held Tyre down, several sat on top of him during this time.

220.     At this point, another one of the five SCORPION Unit Officers took the opportunity to kick Tyre while he was down on the ground, restrained, and handcuffed.

221.     Ultimately the five SCORPION Officers beat Tyre within an inch of his life over the course of seven unrelenting minutes without any justifiable reason and without any government interest in doing so.

222.     At all relevant times:

41

a.  Tyre was unarmed;

b.  Tyre was not resisting;

c.  Tyre was compliant;

d.  Tyre had not committed any violent crimes;

e.  Tyre had not committed any crimes;

f.  Tyre was not a threat to any member of the public;

g.  Tyre was not a threat any law enforcement officer;

h.  Tyre not a threat to any individual; and

i.  Tyre was restrained.

## VIII.  The Aftermath: The Indifference of SCORPION Unit Officers, MPD Officers, MFD Agents, and Others Contribute to Tyre's Death.

223.    More MPD Officers arrived on scene as the original five SCORPION Officers (Martin, Haley, Smith, Mills Jr., and Bean) finished with Tyre and left him on the street.

*224*.    None of the original or newly arrived officers checked Tyre's condition or expressed any concern for the bloodied, dazed, handcuffed man left alone and barely moving in the street.[6]

225.    Instead, as more MPD officers arrived, they smiled, laughed, and talked with their fellow officers.

226.    As they did so in complete and utter indifference, Tyre lay dying in the street just feet away from his home.

---

[6] At least one officer, Justin Smith, is a certified EMT and thereby trained in administering basic medical care.

42

227.    MPD officers, including the original five SCORPION Unit Officers (Martin, Haley, Smith, Mills, and Bean), joked about the chase with Tyre and suggested that he might be on drugs or perhaps reached for a service weapon despite there being no evidence to suggest either was true.

228.    The original five SCORPION Unit Officers (Martin, Haley, Smith, Mills, and Bean) bragged about their involvement with stopping and beating him.

229.    At approximately 8:38 p.m. two officers dragged Tyre from his position laying on the ground, and another officer helped them prop him up in a supine position to lean him against an unmarked squad care.



*Tyre laying unrecognizable propped up against an unmarked Memphis Police Department vehicle*

230.    Tyre passed in and out of consciousness, attempting to roll on several occasions, while officers milled around and chatted nearby.



*Many officers on scene moving around, but not checking on Tyre.*

231.    Rather than attend to or acknowledge Tyre's obvious need for medical care, officers crowded together in groups and actively ignored Tyre.

232.    As a testament to their apathy and heartlessness, Officer Haley took out his cell phone and took a photo of Tyre, who was beaten, bloodied, dazed and nearly unconscious.



*Officer Haley is circled in red, taking a closeup photo of Tyre with the flash of his cell phone camera activated.*

44

233.    Officer Haley sent that photo to at least five other people, including at least one civilian, to brag about the beating he had just levied on a defenseless young man.

234.    About four minutes after being propped up against the squad car, Tyre fell onto the ground on his side.

235.    MPD officers then propped Tyre back up into a sitting position against the squad car as he continued to fight for life.

236.    At 8:41 p.m. three Emergency Medical Technicians ("EMTs") arrived and proceeded to disregard Tyre's condition and failed to provide any of the clearly necessary medical aid to him.

237.    Two of those EMTs—Memphis Fire Department ("MFD") EMTs Robert Long and JaMichael Sandridge—joined the other officers milling around Tyre.

238.    The third was Lieutenant Michelle Whitaker—a 25-year veteran with the MFD—who had arrived in a fire engine nearby, could see Tyre and was informed of the incident, but never left the engine to assist on the scene.

239.    EMTs Long and Sandridge knelt near Tyre briefly while carrying medical bags containing triage kits and first aid supplies.

240.    At one point, EMT Sandridge pulled a blood pressure cuff from his bag.

241.    MFD EMT Sandridge took out the blood pressure cuff, but failed to use it or anything else in his medical bag.

242.    Rather than using the cuff to evaluate Tyre's blood pressure, EMT Sandridge set it back down after Tyre slumped over onto the ground at which time EMT Sandridge left him there.



*EMT Sandridge declines to use his blood pressure cuff to evaluate Tyre.*

243.    For the next 19 minutes, all three EMTs failed to provide aid for Tyre:

    a.  They did not assess Tyre's airway, breathing, and circulation;

    b.  They did not obtain vital signs;

    c.  They did not conduct a head-to-toe examination;

    d.  They did not uncuff Tyre or adjust him against the squad car;

    e.  They did not attend to his obvious wounds;

    f.  They did not provide high-flow oxygen;

    g.  They did not provide an intravenous line;

    h.  They did not place Tyre on a cardiac monitor to assist in his future care at the hospital; and

    i.  They did not transport him to a hospital or emergency medical center.

244.    MFD EMT Robert Long was aware of Tyre's medical condition and plainly obvious injuries, but deliberately refused to provide necessary medical care.

245.     MFD EMT JaMichael Sandridge was aware of Tyre's medical condition and plainly obvious injuries, but deliberately refused to provide necessary medical care.

246.     MFD Lieutenant Michelle Whitaker was aware of Tyre's medical condition and plainly obvious injuries, but deliberately refused to provide necessary medical care.

247.     Tyre attempted to roll into another position or move his legs, as he was clearly writhing in pain.

248.     Officers and EMTs did not address his physical state, and one of the original five SCORPION Officers (Martin, Haley, Smith, Mills, and Bean) squatted down next to him, taunting and mocking Tyre, saying "You can't go nowhere! You can't go nowhere, man. You ain't goin' nowhere. Be still."

249.     At one point, there were at least 12 City of Memphis employees within feet of Tyre's body and within range of being able to offer necessary medical aid.

250.     None of them showed concern or attempted to help Tyre, even though he was battered, bleeding, and barely alive.

251.     Officers nonchalantly circulated near Tyre for approximately 19 minutes total after the beating, slowly walking around the area and speaking with each other.

252.     Finally, at 8:55 p.m., 25 minutes after he was chased down and beaten by the original five SCORPION Officers (Martin, Haley, Smith, Mills, and Bean), two new EMTs began assessing Tyre and offered the medical attention he desperately and obviously needed.

253.     The two new EMTs placed him on a stretcher and loaded him into an ambulance about seven minutes later.

254.     Tyre was finally transported to St. Francis hospital: a 15 minutes' drive from where he was beaten.

IX.     **The Late Arrival of Lieutenant DeWayne Smith and the Misrepresentations and Lies to RowVaughn Wells.**

255.    Memphis Police Department Lieutenant DeWayne Smith was a supervisor within the SCORPION Unit and arrived on the scene at the very end of the beating by his five fellow Memphis Police Department SCORPION Officers (Martin, Haley, Smith, Mills, and Bean).

256.    Following the beating of Tyre by the five Memphis Police Department SCORPION Officers (Martin, Haley, Smith, Mills, and Bean), other government employees from the Memphis Police Department, the Memphis Fire Department, and the Shelby County Sheriff began arriving to the scene.

257.    The other government employees stood by apathetically as Tyre laid bloodied and battered on the street propped up against the car.

258.    Memphis Police Department Lieutenant DeWayne Smith was one of the employees standing by as Tyre was battered, beaten, and propped up against the police car.

259.    Memphis Police Department Lieutenant DeWayne Smith saw Tyre Nichols in the condition shown in the above photographs.

260.    Memphis Police Department Lieutenant DeWayne Smith knew Tyre Nichols was in critical medical condition.

261.    Memphis Police Department Lieutenant DeWayne Smith knew Tyre Nichols had suffered life-threatening injuries.

262.    Memphis Police Department Lieutenant DeWayne Smith knew Tyre Nichols was unlikely to survive a trip to the hospital.

263.    After seeing the condition Tyre was in, at approximately 9:50 p.m. on January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith walked the 100 or so yards to Tyre's listed address at 6743 Castlegate Lane where he lived with his mother, RowVaughn Wells.

264.   Memphis Police Department Lieutenant DeWayne Smith arrived at the home of RowVaughn Wells and proceeded to tell her that Tyre was under arrest for DUI.

265.   Memphis Police Department Lieutenant DeWayne Smith also told RowVaughn Wells that Tyre was intoxicated.

266.   Memphis Police Department Lieutenant DeWayne Smith had no evidence that Tyre had been driving under the influence.

267.   Memphis Police Department Lieutenant DeWayne Smith had no evidence that Tyre was intoxicated or under the influence of any illicit drug or other substance.

268.   Memphis Police Department Lieutenant DeWayne Smith did have evidence that Tyre had been brutally beaten by a gang of Memphis Police Officers.

269.   Memphis Police Department Lieutenant DeWayne Smith misled and lied to RowVaughn Wells about her son being under the influence and being intoxicated.

270.   RowVaughn Wells asked Memphis Police Department Lieutenant DeWayne Smith more than once where Tyre was, as she wanted to see her son and check on his well-being.

271.   Memphis Police Department Lieutenant DeWayne Smith told RowVaughn Wells that paramedics were treating Tyre "in the neighborhood."

272.   Memphis Police Department Lieutenant DeWayne Smith told RowVaughn Wells that Tyre was going to jail after he received  medical treatment.

273.   Memphis Police Department Lieutenant DeWayne Smith had not seen any paramedics render any medical treatment or assistance to Tyre prior to the conversation.

274.   Memphis Police Department Lieutenant DeWayne Smith had not ordered any medical treatment or assistance to Tyre prior to the conversation.

275.    Memphis Police Department Lieutenant DeWayne Smith took no steps to alert RowVaughn Wells to her son's immediate and critical healthcare needs after misleading and lying to her.

276.    Memphis Police Department Lieutenant DeWayne Smith withheld Tyre's whereabouts 100 yard away, as well as his critical health condition, from RowVaughn Wells.

277.    Memphis Police Department Lieutenant DeWayne Smith misled and lied to RowVaughn Wells that her son was being treated in the neighborhood.

278.    Memphis Police Department Lieutenant DeWayne Smith withheld that Tyre had been brutally beaten by a gang of Memphis Police Officers.

279.    Memphis Police Department Lieutenant DeWayne Smith withheld that Tyre was in critical medical condition.

280.    Memphis Police Department Lieutenant DeWayne Smith withheld that Tyre was unlikely to survive the trip to the hospital.

281.    When Memphis Police Department Lieutenant DeWayne Smith left RowVaughn Wells' home, he was concerned that if the Memphis Police transferred Tyre to the hospital he would die in a department vehicle.

282.    Memphis Police Department Lieutenant DeWayne Smith knew that regardless of any medical treatment, Tyre was not going to survive the beating on the night of January 7, 2023.

## X.    The Original Five SCORPION Unit Officers' Use of Excessive Force and Failure to Intervene in the Use of Excessive Force Contributes to Tyre's Death.

283.    When he arrived at the St. Francis Hospital Emergency Department at approximately 9:35 p.m., Tyre had no pulse and was being treated with a manual resuscitator to attempt to provide positive pressure ventilation.

284.    As a result of the extensive beating he received, Tyre had suffered cardiac arrest.

285.     For the next three days, Tyre fought for his life in the Intensive Care Unit ("ICU"). He was intubated and underwent dialysis as his kidneys were critically damaged due to the beating.

286.     Tyre's head and face were swollen to the point of being unrecognizable and he had broken teeth due to the repeated blows to his head.

287.     Tyre's brain was so swollen from the repeated blows to his head that it was no longer able to function properly.

288.     Tyre's autonomic nervous system began to fail, as did his internal organs.

289.     Despite the efforts of his medical team, Tyre died in the ICU three days after the police ran him down and beat him to death in the street.

290.     Tyre died swollen, bloody, and hooked up to devices that ultimately could not save his life.

291.     Tyre died as a direct and proximate result of the unconstitutional policies and practices of the City of Memphis, which were the moving force behind the constitutional violations of Defendants Martin, Haley, Smith, Mills, Bean, and Hemphill.

292.     Tyre died as a direct and proximate result of the brutal and excessive beating at the hands of the five SCORPION Officers: Martin, Haley, Smith, Mills, and Bean.

293.     Tyre died as a direct and proximate result of the deliberate indifference of Defendants Long, Sandridge, and Whittaker to his plainly obvious, critical medical needs.

## CAUSES OF ACTION

### COUNT I—42 U.S.C. § 1983—*Monell* Claim—Official Policy
*Plaintiff v.  Chief Cerelyn Davis, in her official capacity (City of Memphis)*

294.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

295.    The Director of Police Services, also known as the Police Chief of the Memphis Police Department (hereinafter "Chief"), is the official with policymaking authority for the City of Memphis regarding policing and police policies and practices.

296.    Cerelyn Davis ("Chief Davis") was installed as the Police Chief of the Memphis Police Department in April 2021.

297.    In her official capacity, Chief Davis' actions and inactions are those of the City of Memphis.

298.    Shortly after her appointment, in November 2021, Chief Davis created and established the Street Crimes Operation to Restore Peace In Our Neighborhoods, referred to as the "SCORPION Unit" amongst Memphis Police Department Officers.

299.    Chief Davis instructed SCORPION Officers to focus on an all-out strategy of searching and seizing individuals and their property through traffic stops in complete disregard of the United States Constitution and the Fourth Amendment.

300.    Chief Davis knowingly encouraged and authorized members of the Memphis Police Department, especially SCORPION Officers, to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens to attempt to "stop crime" at any cost, including condoning the use of unlawful searches and seizures.

301.    Chief Davis knowingly encouraged and authorized members of the Memphis Police Department, especially SCORPION Officers, to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens to attempt to "stop crime" at any cost, including condoning the use of excessive force.

302.    Chief Davis' authorization to SCORPION Officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens constituted an official policy of the City of Memphis.

303.    Chief Davis' authorization to SCORPION Officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens was maintained with deliberate indifference to and at the expense of the constitutional rights of Memphis citizens.

304.    Chief Davis' authorization to SCORPION Officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens was the moving force behind:

a.  The unlawful and unconstitutional stop made by Defendant Officers against Tyre Nichols;

b.  The excessive, unconstitutional, and deadly force used by Defendant Officers against Tyre Nichols;

c.  The failure of Defendant Officers to intervene in the excessive, unconstitutional, and deadly force used by Defendant Officers against Tyre Nichols;

d.  The harms inflicted against and injuries suffered by Tyre Nichols;

e.  The death of Tyre Nichols; and/or

f.  The constitutional violations complained of in Counts V through XIX and elsewhere in this Complaint.

305.    Tyre Nichols' injuries and death were a direct, foreseeable, and proximate result of Chief Davis' authorization to SCORPION Officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens.

306.     The violation of Tyre Nichols' constitutional right to be free from unreasonable searches and seizures as well as excessive force were a direct, foreseeable, and proximate result of Chief Davis' authorization to SCORPION Officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens.

307.     As a direct and proximate result of Chief Davis' authorization to SCORPION Officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

308.     As a direct and proximate result of Chief Davis' authorization to SCORPION Officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens, Tyre Nichols suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

309.     As a direct and proximate result of the acts described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

310.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT II—42 U.S.C. § 1983—*Monell* Claim—Custom of Tolerance
*Plaintiff v.  Chief Cerelyn Davis, in her official capacity (City of Memphis)*

311.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

312.     The Director of Police Services, also known as the Police Chief of the Memphis Police Department (hereinafter "Chief"), is the official with policymaking authority for the City of Memphis regarding policing and police policies and practices.

313.     In her official capacity, Chief Davis' actions and inactions are those of the City of Memphis.

314.     The City of Memphis, through the Memphis Police Department, maintained a custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment prior to the violation of Tyre Nichols' constitutional rights and death.

315.     The City of Memphis' custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment was so permanent, well-settled, widespread, and commonly accepted within the Memphis Police Department as to constitute and carry with it the force of law.

316.     The City of Memphis was consciously aware and on notice that their custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment was unconstitutional and would lead to the violation of the Fourth Amendment by SCORPION Officers.

317.     Despite this awareness and knowledge, the City of Memphis maintained this custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment with deliberate indifference to and at the expense of the constitutional rights of Memphis citizens.

318.    The City of Memphis' custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment was the moving force behind:

a.  The unlawful and unconstitutional stop made by Defendant Officers against Tyre Nichols;

b.  The excessive, unconstitutional, and deadly force used by Defendant Officers against Tyre Nichols;

c.  The failure of Defendant Officers to intervene in the excessive, unconstitutional, and deadly force used by Defendant Officers against Tyre Nichols;

d.  The harms inflicted against and injuries suffered by Tyre Nichols;

e.  The death of Tyre Nichols; and/or

f.  The constitutional violations complained of in Counts V through XIX and elsewhere in this Complaint.

319.    Tyre Nichols' injuries and death were a direct, foreseeable, and proximate result of the City of Memphis' custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment.

320.    The violation of Tyre Nichols' constitutional rights was a direct, foreseeable, and proximate result of the City of Memphis' custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment.

321.    As a direct and proximate result of the City of Memphis' custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, and

the violation of the Fourth Amendment, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

322.    As a direct and proximate result of City of Memphis' custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment, Tyre Nichols suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

323.    As a direct and proximate result of the acts described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

324.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT III—42 U.S.C. § 1983—*Monell* Claim—Failure to Train
*Plaintiff v.  Chief Cerelyn Davis, in her official capacity (City of Memphis)*

325.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

326.    The Director of Police Services, also known as the Police Chief of the Memphis Police Department (hereinafter "Chief"), is the official with policymaking authority for the City of Memphis regarding policing and police policies and practices relating to training.

327.    In her official capacity, Chief Davis' actions and inactions are those of the City of Memphis.

328.    The City of Memphis, through the Memphis Police Department and its Chief, had a duty to train its police officers on the constitutional bounds of their police duties.

329.     Specifically, the City of Memphis had a duty to train members of specialized police units meant to handle stops, seizures, violent crime, and vehicular crimes— like SCORPION Unit officers—on the constitutional bounds of their job.

330.     The City of Memphis had a duty to train members of specialized police units meant to handle stops, seizures, violent crime, and vehicular crimes—like SCORPION Unit officers—on the predictable and foreseeable situations they would encounter that would implicate the Constitutional rights of citizens of Memphis.

331.     The City of Memphis had a duty to train members of specialized police units meant to handle stops, seizures, violent crime, and vehicular crimes—like SCORPION Unit officers—beyond the ordinary academy training given the specialized nature of the SCORPION Unit.

332.     The City of Memphis was aware that it had placed inexperienced officers on the SCORPION Unit with the retirement and departure of older members of the force.

333.     The City of Memphis was aware that it did not have enough senior staff members training the new officers.

334.     The City of Memphis was aware that rookie and otherwise inexperienced officers were placed on specialized units, like SCORPION, where they had no business serving and were bound to violate the constitutional rights of Memphis citizens without proper training and guidance.

335.     The City of Memphis had a widespread practice or custom of failing to train its officers in specialized units, like SCORPION, in the common, routine, and foreseeable tasks that officers had to perform and, specifically, the constitutional limits of permissible stops and seizures, and engagement with individuals suspected of violent crime and property theft, among other things.

336.    The City of Memphis had a widespread practice of failing to train its officers in specialized units, like SCORPION, on the following:

    a.   The constitutional parameters on the use of force;

    b.   The constitutional parameters on the use of deadly force;

    c.   The constitutional parameters on the intervention to prevent the use of unreasonable force;

    d.   The constitutional parameters on the intervention to prevent the use of unreasonable deadly force;

    e.   The constitutional parameters on conducting traffic stops;

    f.   The constitutional parameters on conducting *Terry* stops;

    g.   The constitutional parameters on search and seizure;

    h.   The Fourth Amendment to the United States Constitution; and

    i.   De-escalation with citizens.

337.    The City of Memphis' failure to train in the aforementioned areas was so permanent, well-settled, widespread, and commonly accepted that it constituted an official custom or policy.

338.    The City of Memphis was consciously aware and on notice of this pattern of failures, but continued to allow SCORPION to operate.

339.    The City of Memphis was deliberately indifferent to the consequences of their failures to train and to civil rights violations that were obvious, predictable, and readily foreseeable as a result.

340.     Alternatively, even without a widespread practice, the City of Memphis failed to equip its officers in specialized units, like SCORPION, with the training to handle situations that were bound to occur during the course of their specific job responsibilities.

341.     The need for training SCORPION Officers on the constitutional bounds of their jobs was so obvious that the City of Memphis knew that if training was not provided, then it was highly predictable and likely to result in the violation of citizens' constitutional rights.

342.     Had the City of Memphis trained SCORPION officers in the areas alleged in Paragraph 336, it would have prevented the violation of Tyre Nichols' constitutional rights.

343.     The City of Memphis' failure to train its officers in specialized units, like SCORPION officers, in the areas alleged in Paragraph 336, was the moving force behind:

    a.   The unlawful and unconstitutional stop made by Defendant Officers against Tyre Nichols;

    b.   The excessive, unconstitutional, and deadly force used by Defendant Officers against Tyre Nichols;

    c.   The failure of Defendant Officers to intervene in the excessive, unconstitutional, and deadly force used by Defendant Officers against Tyre Nichols;

    d.   The harms inflicted against and injuries suffered by Tyre Nichols;

    e.   The death of Tyre Nichols; and/or

    f.   The constitutional violations complained of in Counts V through XIX and elsewhere in this Complaint.

344.     Tyre Nichols' injuries and death were a highly predictable consequence of the City of Memphis' failure to train its officers in specialized units, like SCORPION, in the areas alleged in Paragraph 336.

345.     Tyre Nichols injuries and death were a direct, foreseeable, and proximate result of the City of Memphis' failure to train its officers in specialized units, like SCORPION, in the areas alleged in Paragraph 336.

346.     As a direct and proximate result of The City of Memphis' failure to train its officers in specialized units, like SCORPION, in the aforementioned areas, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

347.     As a direct and proximate result of The City of Memphis' failure to train its officers in specialized units, like SCORPION, in the aforementioned areas, Tyre Nichols suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

348.     As a direct and proximate result of the acts described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

349.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT IV—42 U.S.C. § 1983—*Monell* Claim—Failure to Supervise
*Plaintiff v.  Chief Cerelyn Davis, in her official capacity (City of Memphis)*

350.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

351.     The Director of Police Services, also known as the Police Chief of the Memphis Police Department (hereinafter "Chief"), is the official with policymaking authority for the City of Memphis regarding policing and police policies and practices relating to supervision.

352.     In her official capacity, Chief Davis' actions and inactions are those of the City of Memphis.

353.     The City of Memphis, through the Memphis Police Department and its Chief, had a duty to supervise its police officers on the constitutional bounds of their jobs.

354.     Specifically, the City of Memphis had a duty to supervise members of specialized police units meant to handle search and seizures, violent crime, and vehicular crimes—such as those officers in the SCORPION Unit—to ensure the constitutionality of their conduct in situations where they would predictably and foreseeably implicate the Constitutional rights of citizens of Memphis.

355.     The City of Memphis had a duty to supervise members of specialized police units meant to handle search and seizures, violent crime, and vehicular crimes —such as those officers in the SCORPION Unit—beyond the ordinary standards of supervision given the specialized nature of the SCORPION Unit.

356.     The City of Memphis was aware that it did not have enough senior staff members supervising new officers.

357.     The City of Memphis was aware that rookie and inexperienced officers were being placed on specialized units—such as those officers in the SCORPION Unit—without adequate supervision and despite their lack of qualifications, training, and experience.

358.     The City of Memphis had a widespread practice or custom of failing to supervise officers in specialized units—such as those officers in the SCORPION Unit—concerning the tasks

that officers had to perform, including but not limited to engaging in searches, seizures, and interacting with individuals suspected of violent crime and property theft.

359.    The City of Memphis maintained a widespread practice or custom of failing to supervise its police officers in specialized police units—such as those officers in the SCORPION Unit—in situations where they would predictably and foreseeably implicate or infringe upon the Constitutional rights of citizens of Memphis.

360.    The City of Memphis' failure to supervise its officers in specialized units—such as those officers in the SCORPION Unit—was so well-settled, widespread, and commonly accepted that it, in effect, constituted an official custom or policy.

361.    The City of Memphis was consciously aware and on notice of this pattern of failures but continued to allow SCORPION to operate.

362.    The City of Memphis was deliberately indifferent to the consequences of their failures to supervise and the civil rights violations that were obvious, predictable, and readily foreseeable as a result.

363.    Alternatively, even without a widespread practice, the City of Memphis failed to supervise its officers in specialized units like SCORPION to such a degree and in such areas that would obviously, predictably, and foreseeably implicate the Constitutional rights of Memphis citizens on a daily basis.

364.    The need for supervision of those officers was so obvious that the City of Memphis knew that, if not provided, it was highly predictable and likely to result in the violation of constitutional rights.

365.    The City of Memphis' proper supervision of specialized police units meant to handle search and seizures, violent crime, and vehicular crimes, like those officers in SCORPION, would have prevented the violation of Tyre Nichols' constitutional rights.

366.    The City of Memphis was consciously aware and on notice of these failures but continued to allow SCORPION to operate.

367.    The City of Memphis was deliberately indifferent to the consequences of their failures to supervise and the civil rights violations that were predictable and readily foreseeable as a result.

368.    The City of Memphis' failure to supervise officers in specialized units—such as those officers in the SCORPION Unit—was constitutionally inadequate and deliberately indifferent.

369.    Despite this knowledge and awareness, the City of Memphis failed to supervise its officers in specialized units—such as those officers in the SCORPION Unit—at the expense of the constitutional rights of Memphis citizens.

370.    The City of Memphis' failure to supervise its officers in specialized units—such as those officers in the SCORPION Unit—was the moving force behind:

    a.    The unlawful and unconstitutional stop made by Defendant Officers against Tyre Nichols;

    b.    The excessive, unconstitutional, and deadly force used by Defendant Officers against Tyre Nichols;

    c.    The failure of Defendant Officers to intervene in the excessive, unconstitutional, and deadly force used by Defendant Officers against Tyre Nichols;

    d.   The harms inflicted against and injuries suffered by Tyre Nichols;

    e.   The death of Tyre Nichols; and/or

    f.   The constitutional violations complained of in Counts V through XIX and elsewhere in this Complaint.

371.    Tyre Nichols' injuries and death were a highly predictable consequence of the City of Memphis' failure to supervise its officers in specialized units, like SCORPION.

372.    Tyre Nichols' injuries and death were a direct, foreseeable, and proximate result of the City of Memphis' failure to supervise its officers in specialized units, like SCORPION.

373.    As a direct and proximate result of The City of Memphis' failure to supervise its officers in specialized units, like SCORPION, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

374.    As a direct and proximate result of The City of Memphis' failure to train its officers in specialized units, like SCORPION, in the aforementioned areas, Tyre Nichols suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

375.    As a direct and proximate result of the acts described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

376.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT V—42 U.S.C. § 1983—Fourth Amendment Violation: Unreasonable Stop
*Plaintiff v. Emmitt Martin III, in his individual capacity*

377.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

378.     On January 7, 2023, Memphis Police Officer Emmitt Martin III was patrolling the Memphis area as a member of the SCORPION Unit.

379.     On January 7, 2023, Memphis Police Officer Emmitt Martin III witnessed Tyre Nichols driving a Nissan Sentra Turbo on the streets of Memphis, Tennessee.

380.     On January 7, 2023, Memphis Police Officer Emmitt Martin III attempted to find information sufficient to pull Tyre Nichols over by searching for driver's license holds or active warrants on the vehicle.

381.     On January 7, 2023, Memphis Police Officer Emmitt Martin III found no information relating to any warrants, history of traffic infractions, history of criminal activity, or any other information that would justify a traffic stop of Tyre Nichols.

382.     On January 7, 2023, Memphis Police Officer Emmitt Martin III had no reasonable, articulable suspicion that Tyre Nichols was engaged in criminal activity.

383.     On January 7, 2023, Memphis Police Officer Emmitt Martin III had no reasonable, articulable suspicion that Tyre Nichols was about to be engaged in criminal activity.

384.     On January 7, 2023, Memphis Police Officer Emmitt Martin III had no particularized and objective basis that Tyre Nichols was suspected of legal wrongdoing.

385.     On January 7, 2023, Memphis Police Officer Emmitt Martin III, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his own safety.

386.     On January 7, 2023, Memphis Police Officer Emmitt Martin III, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his fellow officers' safety.

387.     On January 7, 2023, prior to and while being stopped, Tyre Nichols was not:

    a.    Engaged in criminal activity nor was he on the verge of criminal activity;

    b.    Engaged in legal wrongdoing nor was he on the verge of legal wrongdoing; or

        c.   A threat to any of the officers.

388.    On January 7, 2023, Memphis Police Officer Emmitt Martin III lacked reasonable, articulable suspicion for stopping Tyre Nichols in his vehicle at Ross Road and Raines Road.

389.    On January 7, 2023, Memphis Police Officer Emmitt Martin III proceeded to stop Tyre Nichols, despite not having reasonable, articulable suspicion.

390.    On January 7, 2023, Memphis Police Officer Emmitt Martin III effected an unreasonable seizure of Tyre Nichols when Tyre yielded to Officer Martin's show of authority.

391.    On January 7, 2023, Memphis Police Officer Emmitt Martin III violated the Fourth Amendment and clearly established law when he stopped Tyre Nichols in his vehicle at Ross Road and Raines Road.

392.    Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

393.    Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

394.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

395.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

396.    As a direct and proximate result of the acts and omissions of Memphis Police Officer Emmitt Martin III described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

397.    Punitive damages are available against Memphis Police Officer Emmitt Martin III as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Emmitt Martin III's conduct.

398.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

399.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT VI—42 U.S.C. § 1983—Fourth Amendment Violation: Excessive Force
*Plaintiff v. Emmitt Martin III, in his individual capacity*

400.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

401.    The conduct by Memphis Police Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

402.    The conduct by Memphis Police Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

403.    At all relevant times, Memphis Police Officer Emmitt Martin III was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

404.    At all relevant times, Memphis Police Officer Emmitt Martin III had no reasonable, articulable suspicion to stop Tyre Nichols.

405.    At all relevant times, Memphis Police Officer Emmitt Martin III had no probable cause to arrest Tyre Nichols.

406.    At all relevant times, Tyre Nichols was compliant with Memphis Police Officer Emmitt Martin III's orders.

407.    At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

408.    At all relevant times, Tyre Nichols was not resisting arrest.

409.    At all relevant times, Memphis Police Officer Emmitt Martin III could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

410.    At all relevant times, Memphis Police Officer Emmitt Martin III had no reasonable belief that Tyre Nichols was armed or a danger to others.

411.    At all relevant times, Memphis Police Officer Emmitt Martin III did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Martin or any other person.

412.    At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Emmitt Martin III and other Defendants.

413.    Despite the aforementioned facts, Memphis Police Officer Emmitt Martin III proceeded to:

    a.   Stop Tyre Nichols a second time;

    b.   Seize Tyre Nichols a second time;

    c.   Detain Tyre Nichols a second time;

    d.   Punch Tyre Nichols;

    e.   Kick Tyre Nichols;

    f.   Strike Tyre Nichols with a baton;

    g.   Spray chemical agents into Tyre Nichols' face;

    h.   Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and

    i.   Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

414.    Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

415.    Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

416.    Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

417.    Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

418.    Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

419.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

420.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional.

421.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

422.    As a direct and proximate result of the acts and omissions of Memphis Police Officer Emmitt Martin III described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

423.    Punitive damages are available against Memphis Police Officer Emmitt Martin III as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Emmitt Martin III's conduct.

424.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

425.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

**COUNT VII—42 U.S.C. § 1983—Fourth Amendment Violation: Failure to Intervene to Prevent Excessive Force**
*Plaintiff v. Emmitt Martin III, in his individual capacity*

426.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

427.    The conduct by Memphis Police Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

428.    The conduct by Memphis Police Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

429.    At all relevant times, Memphis Police Officer Emmitt Martin III was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

430.    At all relevant times, Memphis Police Officer Emmitt Martin III could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

431.    At all relevant times, Memphis Police Officer Emmitt Martin III had no reasonable belief that Tyre Nichols was armed or dangerous to others.

432.    At all relevant times, Memphis Police Officer Emmitt Martin III did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Martin or any other person.

433.    At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Emmitt Martin III and other Defendants.

434.    Despite the aforementioned facts, Memphis Police Officer Emmitt Martin III stood by and watched, failing to intervene, while:

      a.   Other Defendants punched Tyre Nichols;

      b.   Other Defendants kicked Tyre Nichols;

      c.   Other Defendants struck Tyre Nichols with a baton; and

      d.   Other Defendants sprayed chemical agents into Tyre Nichols' face.

435.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

436.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

437.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

438.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

439.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

440.    Memphis Police Officer Emmitt Martin III's restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

441.    Memphis Police Officer Emmitt Martin III observed that the force being used by other Defendants was unjustified, excessive, and illegal.

442.    Memphis Police Officer Emmitt Martin III was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

443.    Memphis Police Officer Emmitt Martin III's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

444.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

445.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

446.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic, conscious pain, suffering, and emotional distress.

447.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

448.    As a direct and proximate result of the acts and omissions of Memphis Police Officer Emmitt Martin III, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

449.    Punitive damages are available against Memphis Police Officer Emmitt Martin III as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Emmitt Martin III's conduct.

450.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

451.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT VIII—42 U.S.C. § 1983—Fourth Amendment Violation: Unreasonable Stop
*Plaintiff v. Demetrius Haley, in his individual capacity*

452.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

453.    On January 7, 2023, Memphis Police Officer Demetrius Haley was patrolling the Memphis area as a member of the SCORPION Unit.

454.    On January 7, 2023, Memphis Police Officer Demetrius Haley witnessed Tyre Nichols driving a Nissan Sentra Turbo on the streets of Memphis, Tennessee.

455.    On January 7, 2023, Memphis Police Officer Demetrius Haley attempted to find information sufficient to pull Tyre Nichols over by searching for driver's license holds or active warrants on the vehicle.

456.    On January 7, 2023, Memphis Police Officer Demetrius Haley found no information relating to any warrants, history of traffic infractions, history of criminal activity, or any other information that would justify a traffic stop of Tyre Nichols.

457.    On January 7, 2023, Memphis Police Officer Demetrius Haley had no reasonable, articulable suspicion that Tyre Nichols was engaged in criminal activity.

458.    On January 7, 2023, Memphis Police Officer Demetrius Haley had no reasonable, articulable suspicion that Tyre Nichols was about to be engaged in criminal activity.

459.    On January 7, 2023, Memphis Police Officer Demetrius Haley had no particularized and objective basis that Tyre Nichols was suspected of legal wrongdoing.

460.    On January 7, 2023, Memphis Police Officer Demetrius Haley, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his own safety.

461.    On January 7, 2023, Memphis Police Officer Demetrius Haley, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his fellow officers' safety.

462.    On January 7, 2023, prior to and while being stopped, Tyre Nichols was not:

    a.   Engaged in criminal activity nor was he on the verge of criminal activity;

    b.   Engaged in legal wrongdoing nor was he on the verge of legal wrongdoing; or

    c.   A threat to any of the officers.

463.    On January 7, 2023, Memphis Police Officer Demetrius Haley lacked reasonable, articulable suspicion for stopping Tyre Nichols in his vehicle at Ross Road and Raines Road.

464.     On January 7, 2023, Memphis Police Officer Demetrius Haley proceeded to stop Tyre Nichols, despite not having reasonable, articulable suspicion.

465.     On January 7, 2023, Memphis Police Officer Demetrius Haley effected an unreasonable seizure of Tyre Nichols when Tyre yielded to Officer Haley's show of authority.

466.     On January 7, 2023, Memphis Police Officer Demetrius Haley violated the Fourth Amendment and clearly established law when he stopped Tyre Nichols in his vehicle at Ross Road and Raines Road.

467.     Every reasonable officer would have known that stopping an individual without reasonable, articulable suspicion would be a violation of the Fourth Amendment.

468.     Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

469.     As a direct and proximate result of Memphis Police Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

470.     As a direct and proximate result of Memphis Police Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

471.     As a direct and proximate result of the acts and omissions of Memphis Police Officer Demetrius Haley described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

472.     Punitive damages are available against Memphis Police Officer Demetrius Haley as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Demetrius Haley's conduct.

473.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

474.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT IX—42 U.S.C. § 1983—Fourth Amendment Violation: Excessive Force
*Plaintiff v. Demetrius Haley, in his individual capacity*

475.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

476.     The conduct by Memphis Police Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

477.     The conduct by Memphis Police Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

478.     At all relevant times, Memphis Police Officer Demetrius Haley was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

479.    At all relevant times, Memphis Police Officer Demetrius Haley had no reasonable, articulable suspicion to stop Tyre Nichols.

480.    At all relevant times, Memphis Police Officer Demetrius Haley had no probable cause to arrest Tyre Nichols.

481.    At all relevant times, Tyre Nichols was compliant with Memphis Police Officer Demetrius Haley's orders.

482.    At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

483.    At all relevant times, Tyre Nichols was not resisting arrest.

484.    At all relevant times, Memphis Police Officer Demetrius Haley could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

485.    At all relevant times, Memphis Police Officer Demetrius Haley had no reasonable belief that Tyre Nichols was armed or a danger to others.

486.    At all relevant times, Memphis Police Officer Demetrius Haley did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Haley or any other person.

487.    At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Demetrius Haley and other Defendants.

488.    Despite the aforementioned facts, Memphis Police Officer Demetrius Haley proceeded to:

      a.   Stop Tyre Nichols a second time;

      b.   Seize Tyre Nichols a second time;

      c.   Detain Tyre Nichols a second time;

    d.   Punch Tyre Nichols;

    e.   Kick Tyre Nichols;

    f.   Strike Tyre Nichols with a baton;

    g.   Spray chemical agents into Tyre Nichols' face;

    h.   Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and

    i.   Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

489.   Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

490.   Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

491.   Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

492.   Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

493.   Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

494.   As a direct and proximate result of Memphis Police Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

495.   As a direct and proximate result of Memphis Police Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

496.     As a direct and proximate result of Memphis Police Officer Demetrius Haley's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

497.     As a direct and proximate result of the acts and omissions of Memphis Police Officer Demetrius Haley described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

498.     Punitive damages are available against Memphis Police Officer Demetrius Haley as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Demetrius Haley's conduct.

499.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

500.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT X—42 U.S.C. § 1983—Fourth Amendment Violation: Failure to Intervene to Prevent Excessive Force
*Plaintiff v. Demetrius Haley, in his individual capacity*

501.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

502.     The conduct by Memphis Police Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

503.    The conduct by Memphis Police Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

504.    At all relevant times, Memphis Police Officer Demetrius Haley was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

505.    At all relevant times, Memphis Police Officer Demetrius Haley could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

506.    At all relevant times, Memphis Police Officer Demetrius Haley had no reasonable belief that Tyre Nichols was armed or dangerous to others.

507.    At all relevant times, Memphis Police Officer Demetrius Haley did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Haley or any other person.

508.    At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Demetrius Haley and other Defendants.

509.    Despite the aforementioned facts, Memphis Police Officer Demetrius Haley stood by and watched, failing to intervene, while:

        a.   Other Defendants punched Tyre Nichols;

        b.   Other Defendants kicked Tyre Nichols;

        c.   Other Defendants struck Tyre Nichols with a baton; and

        d.   Other Defendants sprayed chemical agents into Tyre Nichols' face.

510.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

511.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

512.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

513.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

514.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

515.    Memphis Police Officer Demetrius Haley's restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

516.     Memphis Police Officer Demetrius Haley observed that the force being used by other Defendants was unjustified, excessive, and illegal.

517.     Memphis Police Officer Demetrius Haley was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

518.     Memphis Police Officer Demetrius Haley's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

519.     As a direct and proximate result of Memphis Police Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

520.     As a direct and proximate result of Memphis Police Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

521.     As a direct and proximate result of Memphis Police Officer Demetrius Haley's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic, conscious pain, suffering, and emotional distress.

522.     As a direct and proximate result of Memphis Police Officer Demetrius Haley's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

523.     As a direct and proximate result of the acts and omissions of Memphis Police Officer Demetrius Haley, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

524.     Punitive damages are available against Memphis Police Officer Demetrius Haley as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Demetrius Haley's conduct.

525.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

526.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XI—42 U.S.C. § 1983—Fourth Amendment Violation: Excessive Force
*Plaintiff v. Justin Smith, in his individual capacity*

527.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

528.     The conduct by Memphis Police Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

529.     The conduct by Memphis Police Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

530.     At all relevant times, Memphis Police Officer Justin Smith was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

531.     At all relevant times, Memphis Police Officer Justin Smith had no reasonable, articulable suspicion to stop Tyre Nichols.

532.     At all relevant times, Memphis Police Officer Justin Smith had no probable cause to arrest Tyre Nichols.

533.    At all relevant times, Tyre Nichols was compliant with Memphis Police Officer Justin Smith's orders.

534.    At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

535.    At all relevant times, Tyre Nichols was not resisting arrest.

536.    At all relevant times, Memphis Police Officer Justin Smith could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

537.    At all relevant times, Memphis Police Officer Justin Smith had no reasonable belief that Tyre Nichols was armed or a danger to others.

538.    At all relevant times, Memphis Police Officer Justin Smith did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Smith or any other person.

539.    At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Justin Smith and other Defendants.

540.    Despite the aforementioned facts, Memphis Police Officer Justin Smith proceeded to:

      a.   Stop Tyre Nichols;

      b.   Seize Tyre Nichols;

      c.   Detain Tyre Nichols;

      d.   Punch Tyre Nichols;

      e.   Kick Tyre Nichols;

      f.   Strike Tyre Nichols with a baton;

      g.   Spray chemical agents into Tyre Nichols' face;

      h.   Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and

      i.   Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

541.    Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

542.    Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

543.    Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

544.    Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

545.    Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

546.    Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

547.    Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

548.    As a direct and proximate result of Memphis Police Justin Smith's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

549.     As a direct and proximate result of Memphis Police Officer Justin Smith's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

550.     As a direct and proximate result of Memphis Police Officer Justin Smith's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

551.     As a direct and proximate result of the acts and omissions of Memphis Police Officer Justin Smith described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

552.     Punitive damages are available against Memphis Police Officer Justin Smith as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Justin Smith's conduct.

553.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

554.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XII—42 U.S.C. § 1983—Fourth Amendment Violation: Failure to Intervene to Prevent Excessive Force
*Plaintiff v. Justin Smith, in his individual capacity*

555.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

556.     The conduct by Memphis Police Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent

excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

557.    The conduct by Memphis Police Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

558.    At all relevant times, Memphis Police Officer Justin Smith was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

559.    At all relevant times, Memphis Police Officer Justin Smith could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

560.    At all relevant times, Memphis Police Officer Justin Smith had no reasonable belief that Tyre Nichols was armed or dangerous to others.

561.    At all relevant times, Memphis Police Officer Justin Smith did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Smith or any other person.

562.    At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Justin Smith and other Defendants.

563.    Despite the aforementioned facts, Memphis Police Officer Justin Smith stood by and watched, failing to intervene, while:

        a.   Other Defendants punched Tyre Nichols;

        b.   Other Defendants kicked Tyre Nichols;

        c.   Other Defendants struck Tyre Nichols with a baton; and

        d.   Other Defendants sprayed chemical agents into Tyre Nichols' face.

564.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

565.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

566.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

567.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

568.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

569.    Memphis Police Officer Justin Smith's restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

570.    Memphis Police Officer Justin Smith observed that the force being used by other Defendants was unjustified, excessive, and illegal.

571.     Memphis Police Officer Justin Smith was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

572.     Memphis Police Officer Justin Smith's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

573.     As a direct and proximate result of Memphis Police Officer Justin Smith's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

574.     As a direct and proximate result of Memphis Police Officer Justin Smith's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

575.     As a direct and proximate result of Memphis Police Officer Justin Smith's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

576.     As a direct and proximate result of Memphis Police Officer Justin Smith's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

577.     As a direct and proximate result of the acts and omissions of Memphis Police Officer Justin Smith, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

578.     Punitive damages are available against Memphis Police Officer Justin Smith as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Justin Smith's conduct.

579.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

580.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XIII—42 U.S.C. § 1983—Fourth Amendment Violation: Excessive Force
*Plaintiff v. Desmond Mills, Jr., in his individual capacity*

581.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein

582.     The conduct by Memphis Police Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

583.     The conduct by Memphis Police Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

584.     At all relevant times, Memphis Police Officer Desmond Mills, Jr. was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

585.     At all relevant times, Memphis Police Officer Desmond Mills, Jr. had no reasonable, articulable suspicion to stop Tyre Nichols.

586.     At all relevant times, Memphis Police Officer Desmond Mills had no probable cause to arrest Tyre Nichols.

587.     At all relevant times, Tyre Nichols was compliant with Memphis Police Officer Desmond Mills, Jr.'s orders.

588.     At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

589.     At all relevant times, Tyre Nichols was not resisting arrest.

590.     At all relevant times, Memphis Police Officer Desmond Mills, Jr. could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

591.     At all relevant times, Memphis Police Officer Desmond Mills, Jr. had no reasonable belief that Tyre Nichols was armed or a danger to others.

592.     At all relevant times, Memphis Police Officer Desmond Mills, Jr. did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Desmond Mills, Jr. or any other person.

593.     At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Desmond Mills, Jr. and other Defendants.

594.     Despite the aforementioned facts, Memphis Police Officer Desmond Mills proceeded to:

      a.   Stop Tyre Nichols;

      b.   Seize Tyre Nichols;

      c.   Detain Tyre Nichols;

      d.   Punch Tyre Nichols;

      e.   Kick Tyre Nichols;

      f.   Strike Tyre Nichols with a baton;

      g.   Spray chemical agents into Tyre Nichols' face;

> h.   Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and
>
> i.   Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

595.   Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

596.   Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

597.   Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

598.   Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

599.   Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

600.   Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

601.   Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

602.   As a direct and proximate result of Memphis Police Officer Desmond Mills, Jr.'s violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

603.   As a direct and proximate result of Memphis Police Officer Desmond Mills, Jr.'s violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and death.

604.   As a direct and proximate result of Memphis Police Officer Desmond Mills Jr.'s unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

605.   As a direct and proximate result of the acts and omissions of Memphis Police Officer Desmond Mills, Jr. described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

606.   Punitive damages are available against Memphis Police Desmond Mills, Jr. as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Desmond Mills, Jr.'s conduct.

607.   As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

608.   Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XIV—42 U.S.C. § 1983—Fourth Amendment Violation: Failure to Intervene to Prevent Excessive Force
*Plaintiff v. Desmond Mills, Jr., in his individual capacity*

609.   Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein

610.    The conduct by Memphis Police Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

611.    The conduct by Memphis Police Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

612.    At all relevant times, Memphis Police Officer Desmond Mills, Jr. was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

613.    At all relevant times, Memphis Police Officer Desmond Mills, Jr. could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

614.    At all relevant times, Memphis Police Officer Desmond Mills, Jr. had no reasonable belief that Tyre Nichols was armed or dangerous to others.

615.    At all relevant times, Memphis Police Officer Desmond Mills, Jr. did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Desmond Mills, Jr. or any other person.

616.    At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Desmond Mills, Jr. and other Defendants.

617.    Despite the aforementioned facts, Memphis Police Officer Desmond Mills, Jr. stood by and watched, failing to intervene, while:

    a.   Other Defendants punched Tyre Nichols;

    b.   Other Defendants kicked Tyre Nichols;

    c.   Other Defendants struck Tyre Nichols with a baton; and

    d.   Other Defendants sprayed chemical agents into Tyre Nichols' face.

618.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

619.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

620.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

621.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

622.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

623.    Memphis Police Officer Desmond Mills, Jr.'s restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

624.    Memphis Police Officer Desmond Mills, Jr. observed that the force being used by other Defendants was unjustified, excessive, and illegal.

625.     Memphis Police Officer Desmond Mills, Jr. was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

626.     Memphis Police Officer Desmond Mills, Jr.'s failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

627.     As a direct and proximate result of Memphis Police Officer Desmond Mills, Jr.'s violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

628.     As a direct and proximate result of Memphis Police Officer Desmond Mills, Jr.'s violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

629.     As a direct and proximate result of Memphis Police Officer Desmond Mills, Jr.'s failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic, conscious pain, suffering, and emotional distress.

630.     As a direct and proximate result of Memphis Police Officer Desmond Mills, Jr.'s failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

631.     As a direct and proximate result of the acts and omissions of Memphis Police Officer Desmond Mills, Jr., Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

632.     Punitive damages are available against Memphis Police Officer Desmond Mills as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Desmond Mills, Jr.'s  conduct.

633.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

634.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XV—42 U.S.C. § 1983—Fourth Amendment Violation: Excessive Force
*Plaintiff v. Tadarrius Bean, in his individual capacity*

635.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

636.     The conduct by Memphis Police Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

637.     The conduct by Memphis Police Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

638.     At all relevant times, Memphis Police Officer Tadarrius Bean was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

639.     At all relevant times, Memphis Police Officer Tadarrius Bean had no reasonable, articulable suspicion to stop Tyre Nichols.

640.     At all relevant times, Memphis Police Officer Tadarrius Bean had no probable cause to arrest Tyre Nichols.

641.     At all relevant times, Tyre Nichols was compliant with Memphis Police Officer Tadarrius Bean's orders.

642.     At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

643.     At all relevant times, Tyre Nichols was not resisting arrest.

644.     At all relevant times, Memphis Police Officer Tadarrius Bean could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

645.     At all relevant times, Memphis Police Officer Tadarrius Bean had no reasonable belief that Tyre Nichols was armed or a danger to others.

646.     At all relevant times, Memphis Police Officer Tadarrius Bean did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Bean or any other person.

647.     At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Tadarrius Bean and other Defendants.

648.     Despite the aforementioned facts, Memphis Police Officer Tadarrius Bean proceeded to:

　　　　a.   Stop Tyre Nichols;

　　　　b.   Seize Tyre Nichols;

　　　　c.   Detain Tyre Nichols;

　　　　d.   Punch Tyre Nichols;

    e.   Kick Tyre Nichols;

    f.   Strike Tyre Nichols with a baton;

    g.   Spray chemical agents into Tyre Nichols' face;

    h.   Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and

    i.   Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

649.    Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

650.    Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

651.    Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

652.    Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

653.    Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

654.    Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

655.    Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

656.    As a direct and proximate result of Memphis Police Officer Tadarrius Bean's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

657.    As a direct and proximate result of Memphis Police Officer Tadarrius Bean's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

658.    As a direct and proximate result of Memphis Police Officer Tadarrius Bean's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

659.    As a direct and proximate result of the acts and omissions of Memphis Police Officer Tadarrius Bean described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

660.    Punitive damages are available against Memphis Police Officer Tadarrius Bean as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Tadarrius Bean's conduct.

661.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

662.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

**COUNT XVI—42 U.S.C. § 1983—Fourth Amendment Violation: Failure to Intervene to Prevent Excessive Force**
*Plaintiff v. Tadarrius Bean, in his individual capacity*

663.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

664.    The conduct by Memphis Police Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

665.    The conduct by Memphis Police Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

666.    At all relevant times, Memphis Police Officer Tadarrius Bean was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

667.    At all relevant times, Memphis Police Officer Tadarrius Bean could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

668.    At all relevant times, Memphis Police Officer Tadarrius Bean had no reasonable belief that Tyre Nichols was armed or dangerous to others.

669.    At all relevant times, Memphis Police Officer Tadarrius Bean did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Bean or any other person.

670.    At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Tadarrius Bean and other Defendants.

671. Despite the aforementioned facts, Memphis Police Officer Tadarrius Bean stood by and watched, failing to intervene, while:

  a. Other Defendants punched Tyre Nichols;

  b. Other Defendants kicked Tyre Nichols;

  c. Other Defendants struck Tyre Nichols with a baton; and

  d. Other Defendants sprayed chemical agents into Tyre Nichols' face.

672. Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

673. Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

674. Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

675. No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

676. No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

677.     Memphis Police Officer Tadarrius Bean' restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

678.     Memphis Police Officer Tadarrius Bean observed that the force being used by other Defendants was unjustified, excessive, and illegal.

679.     Memphis Police Officer Tadarrius Bean was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

680.     Memphis Police Officer Tadarrius Bean's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

681.     As a direct and proximate result of Memphis Police Officer Tadarrius Bean's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

682.     As a direct and proximate result of Memphis Police Officer Tadarrius Bean's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

683.     As a direct and proximate result of Memphis Police Officer Tadarrius Bean's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic, conscious pain, suffering, and emotional distress.

684.     As a direct and proximate result of Memphis Police Officer Tadarrius Bean's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

685.     As a direct and proximate result of the acts and omissions of Memphis Police Officer Tadarrius Bean, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

686.     Punitive damages are available against Memphis Police Officer Tadarrius Bean as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Tadarrius Bean's conduct.

687.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

688.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XVII—42 U.S.C. § 1983—Fourth Amendment Violation: Unreasonable Stop
*Plaintiff v. Preston Hemphill, in his individual capacity*

689.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

690.     On January 7, 2023, Memphis Police Officer Preston Hemphill was patrolling the Memphis area as a member of the SCORPION Unit.

691.     On January 7, 2023, Memphis Police Officer Preston Hemphill witnessed Tyre Nichols driving a Nissan Sentra Turbo on the streets of Memphis, Tennessee.

692.     On January 7, 2023, Memphis Police Officer Preston Hemphill attempted to find information sufficient to pull Tyre Nichols over by searching for driver's license holds or active warrants on the vehicle.

693.     On January 7, 2023, Memphis Police Officer Preston Hemphill found no information relating to any warrants, history of traffic infractions, history of criminal activity, or any other information that would justify a traffic stop of Tyre Nichols.

694.     On January 7, 2023, Memphis Police Officer Preston Hemphill had no reasonable, articulable suspicion that Tyre Nichols was engaged in criminal activity.

695.     On January 7, 2023, Memphis Police Officer Preston Hemphill had no reasonable, articulable suspicion that Tyre Nichols was about to be engaged in criminal activity.

696.     On January 7, 2023, Memphis Police Officer Preston Hemphill had no particularized and objective basis that Tyre Nichols was suspected of legal wrongdoing.

697.     On January 7, 2023, Memphis Police Officer Preston Hemphill, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his own safety.

698.     On January 7, 2023, Memphis Police Officer Preston Hemphill, upon pulling over Tyre Nichols, was taking reasonable steps to protect his fellow officers' safety.

699.     On January 7, 2023, prior to and while being stopped, Tyre Nichols was not:

    a.   Engaged in criminal activity nor was he on the verge of criminal activity;

    b.   Engaged in legal wrongdoing nor was he on the verge of legal wrongdoing; or

    c.   A threat to any of the officers.

700.     On January 7, 2023, Memphis Police Officer Preston Hemphill lacked reasonable, articulable suspicion for stopping Tyre Nichols in his vehicle at Ross Road and Raines Road.

701.    On January 7, 2023, Memphis Police Officer Preston Hemphill proceeded to stop Tyre Nichols, despite not having reasonable, articulable suspicion.

702.    On January 7, 2023, Memphis Police Officer Preston Hemphill effected an unreasonable seizure of Tyre Nichols when Tyre yielded to Preston Hemphill's show of authority.

703.    On January 7, 2023, Memphis Police Officer Preston Hemphill violated the Fourth Amendment and clearly established law when he stopped Tyre Nichols in his vehicle at Ross Road and Raines Road.

704.    Every reasonable officer would have known that stopping an individual without reasonable, articulable suspicion would be a violation of the Fourth Amendment.

705.    Every reasonable officer would have known that detaining an individual without probable cause would be a violation of the Fourth Amendment.

706.    As a direct and proximate result of Memphis Police Officer Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

707.    As a direct and proximate result of Memphis Police Officer Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

708.    As a direct and proximate result of the acts and omissions of Memphis Police Officer Preston Hemphill described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

709.    Punitive damages are available against Memphis Police Officer Preston Hemphill as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Preston Hemphill's conduct.

710.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

711.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XVIII—42 U.S.C. § 1983—Fourth Amendment Violation: Excessive Force
*Plaintiff v. Preston Hemphill, in his individual capacity*

712.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

713.     The conduct by Memphis Police Officer Preston Hemphill identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

714.     The conduct by Memphis Police Officer Preston Hemphill identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

715.     At all relevant times, Memphis Police Officer Preston Hemphill was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

716.     At all relevant times, Memphis Police Officer Preston Hemphill no reasonable, articulable suspicion to stop Tyre Nichols.

717.     At all relevant times, Memphis Police Officer Preston Hemphill had no probable cause to arrest Tyre Nichols.

718.   At all relevant times, Tyre Nichols was compliant with Memphis Police Officer Preston Hemphill's orders.

719.   At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

720.   At all relevant times, Tyre Nichols was not resisting arrest.

721.   At all relevant times, Memphis Police Officer Preston Hemphill could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

722.   At all relevant times, Memphis Police Officer Preston Hemphill had no reasonable belief that Tyre Nichols was armed or a danger to others.

723.   At all relevant times, Memphis Police Officer Preston Hemphill did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Hemphill or any other person.

724.   At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Preston Hemphill and other Defendants.

725.   Despite the aforementioned facts, Memphis Police Officer Preston Hemphill proceeded to:

   a.   Punch Tyre Nichols;

   b.   Kick Tyre Nichols;

   c.   Strike Tyre Nichols with a baton;

   d.   Spray chemical agents into Tyre Nichols' face; and

   e.   Deploy a Taser at Tyre Nichols.

726.    Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

727.    Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

728.    Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

729.    Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

730.    Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

731.    Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

732.    Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

733.    As a direct and proximate result of Memphis Police Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

734.    As a direct and proximate result of Memphis Police Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

735.     As a direct and proximate result of Memphis Police Officer Preston Hemphill's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

736.     As a direct and proximate result of the acts and omissions of Memphis Police Officer Preston Hemphill described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

737.     Punitive damages are available against Memphis Police Officer Preston Hemphill as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Preston Hemphill's conduct.

738.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

739.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XIX—42 U.S.C. § 1983—Failure to Intervene to Prevent Excessive Force
*Plaintiff v. Preston Hemphill, in his individual capacity*

740.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

741.     The conduct by Memphis Police Officer Preston Hemphill identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

742.    The conduct by Memphis Police Officer Preston Hemphill identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

743.    At all relevant times, Memphis Police Officer Preston Hemphill was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

744.    At all relevant times, Memphis Police Officer Preston Hemphill could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

745.    At all relevant times, Memphis Police Officer Preston Hemphill had no reasonable belief that Tyre Nichols was armed or dangerous to others.

746.    At all relevant times, Memphis Police Officer Preston Hemphill did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Hemphill or any other person.

747.    At all relevant times, Tyre Nichols was fully restrained and subdued by Memphis Police Officer Preston Hemphill and other Defendants.

748.    Despite the aforementioned facts, Memphis Police Officer Preston Hemphill stood by and watched, failing to intervene, while:

   a.   Other Defendants punched Tyre Nichols;

   b.   Other Defendants kicked Tyre Nichols;

   c.   Other Defendants struck Tyre Nichols with a baton; and

   d.   Other Defendants sprayed chemical agents into Tyre Nichols' face.

749.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

750.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

751.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

752.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

753.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

754.    Memphis Police Officer Preston Hemphill's restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

755.    Memphis Police Officer Preston Hemphill observed that the force being used by other Defendants was unjustified, excessive, and illegal.

756.     Memphis Police Officer Preston Hemphill was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

757.     Memphis Police Officer Preston Hemphill's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

758.     As a direct and proximate result of Memphis Police Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

759.     As a direct and proximate result of Memphis Police Officer Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

760.     As a direct and proximate result of Memphis Police Officer Preston Hemphill's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

761.     As a direct and proximate result of Memphis Police Officer Preston Hemphill's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

762.     As a direct and proximate result of the acts and omissions of Memphis Police Officer Preston Hemphill, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

763.     Punitive damages are available against Memphis Police Officer Preston Hemphill as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of Memphis Police Officer Preston Hemphill's conduct.

764.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses;

loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

765.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XX—42 U.S.C. § 1983—Fourteenth Amendment Violation of Deliberate Indifference to Serious Medical Needs
*Plaintiff v. Robert Long, in his individual capacity*

766.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

767.    The conduct by Memphis Fire Department Emergency Medical Technician ("EMT") Robert Long identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

768.    The conduct by Memphis Fire Department EMT Robert Long identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

769.    At all relevant times, Memphis Fire Department EMT Robert Long was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified EMT with the City of Memphis.

770.    At all relevant times, Memphis Fire Department EMT Robert Long was licensed by the Tennessee Emergency Medical Services Division as an advanced emergency medical technician in the State of Tennessee, licensed since 2020.

771.   At all relevant times in which Memphis Fire Department EMT Robert Long interacted with him, Tyre Nichols was suffering from injuries so obvious that even a layperson would have easily recognized the necessity for medical attention.

772.   Every reasonable EMT would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

      a.   He was unable to communicate or speak;

      b.   He was unable to hold himself up in a seated position;

      c.   He was bleeding from his face and his body, and his wounds were unattended;

      d.   He was unable to keep his eyes open;

      e.   He passed in and out of consciousness.

773.   Even a layperson, let alone a trained EMT, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

774.   Memphis Fire Department EMT Robert Long failed to transport Tyre Nichols to receive medical care by a doctor for approximately nineteen minutes.

775.   Every reasonable EMT would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

776.   Memphis Fire Department EMT Robert Long was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

777.   As a trained EMT, Robert Long was required to transport patients with medical needs to the emergency department to be treated by physicians.

778. Memphis Fire Department EMT Robert Long observed Tyre Nichols' grave condition for nearly twenty minutes, and only assisted in placing him on a stretcher when other medical personnel arrived on scene to provide care for Tyre Nichols.

779. Memphis Fire Department EMT Robert Long showed deliberate indifference to a substantial risk of serious harm to Tyre Nichols when he ignored Tyre Nichols' condition, and instead stood and walked around Tyre Nichols as his physical condition only worsened.

780. Memphis Fire Department EMT Robert Long failure to render medical attention to Tyre Nichols or transport him to a hospital in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

781. As a direct and proximate result of Memphis Fire Department EMT Robert Long's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

782. As a direct and proximate result of Memphis Fire Department EMT Robert Long's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

783. As a direct and proximate result of Memphis Fire Department EMT Robert Long's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

784. As a direct and proximate result of Memphis Fire Department EMT Robert Long's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

785. Punitive damages are available against Memphis Fire Department EMT Robert Long as a matter of federal common law and are hereby sought by Plaintiff.

786.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

787.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XXI—42 U.S.C. § 1983—Fourteenth Amendment Violation of Deliberate Indifference to Serious Medical Needs
*Plaintiff v. JaMichael Sandridge, in his individual capacity*

788.     Plaintiff hereby incorporates and realleges Paragraphs 1 through 293 as though fully pleaded herein.

789.     The conduct by Memphis Fire Department Advanced Emergency Medical Technician ("Advanced EMT") JaMichael Sandridge identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

790.     The conduct by Memphis Fire Department Advanced EMT JaMichael Sandridge identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

791.     At all relevant times, Memphis Fire Department Advanced EMT JaMichael Sandridge was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified Advanced EMT with the City of Memphis.

792.   At all relevant times, Memphis Fire Department Advanced EMT JaMichael Sandridge was licensed by the Tennessee Emergency Medical Services Division as an advanced emergency medical technician in the State of Tennessee, licensed since 2015.

793.   At all relevant times in which Memphis Fire Department Advanced EMT JaMichael Sandridge interacted with him, Tyre Nichols was suffering from injuries so obvious that even a layperson would have easily recognized the necessity for medical attention.

794.   Every reasonable EMT would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

    a.   He was unable to communicate or speak;

    b.   He was unable to hold himself up in a seated position;

    c.   He was bleeding from his face and his body, and his wounds were unattended;

    d.   He was unable to keep his eyes open;

    e.   He passed in and out of consciousness.

795.   Even a layperson, let alone a trained EMT, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

796.   Memphis Fire Department Advanced EMT JaMichael Sandridge failed to transport Tyre Nichols to receive medical care by a doctor for approximately twenty minutes.

797.   Every reasonable EMT would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

798.   Memphis Fire Department Advanced EMT JaMichael Sandridge was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

799.    As a trained Advanced EMT, JaMichael Sandridge was required to transport patients with medical needs to the emergency department to be treated by physicians.

800.    Memphis Fire Department Advanced EMT JaMichael Sandridge observed Tyre Nichols' grave condition for nearly twenty minutes, and only assisted in placing him on a stretcher when other medical personnel arrived on scene to provide care for Tyre Nichols.  Memphis Fire Department Advanced EMT JaMichael Sandridge showed deliberate indifference to a substantial risk of serious harm to Tyre Nichols when he observed Tyre Nichols' condition, pulled out a blood pressure cuff from his triage bag, and then failed to actually use it on Tyre Nichols.

801.    Memphis Fire Department Advanced EMT JaMichael Sandridge continued to ignore Tyre Nichols' condition; instead standing near and walking around Tyre Nichols as his physical condition only worsened.

802.    Memphis Fire Department Advanced EMT JaMichael Sandridge's failure to render medical attention to Tyre Nichols or transport him to a hospital in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

803.    As a direct and proximate result of Memphis Fire Department Advanced EMT JaMichael Sandridge's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

804.    As a direct and proximate result of Memphis Fire Department Advanced EMT JaMichael Sandridge's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

805.     As a direct and proximate result of Memphis Fire Department advanced EMT JaMichael Sandridge's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

806.     As a direct and proximate result of Memphis Fire Department Advanced EMT JaMichael Sandridge's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

807.     Punitive damages are available against Memphis Fire Department Advanced EMT JaMichael Sandridge as a matter of federal common law and are hereby sought by Plaintiff.

808.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

809.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

### COUNT XXII—42 U.S.C. § 1983—Fourteenth Amendment Violation of Deliberate Indifference to Serious Medical Needs
*Plaintiff v. Michelle Whitaker, in her individual capacity*

810.     Plaintiff hereby incorporates and realleges Paragraphs 1 through  293  as though fully pleaded herein.

811.     The conduct by Memphis Fire Department Lieutenant Michelle Whitaker identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

812. The conduct by Memphis Fire Department Lt. Michelle Whitaker identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

813. At all relevant times, Memphis Fire Department Lt. Michelle Whitaker was acting under color of state law, as an agent of the City of Memphis, and within the scope of her employment and authority as a duly sworn and certified Fire Department Lieutenant with the City of Memphis.

814. At all relevant times in which Memphis Fire Department Lt. Michelle Whitaker observed him, Tyre Nichols was suffering from injuries so obvious that even a layperson would have easily recognized the necessity for a doctor's attention.

815. At all relevant times in which Memphis Fire Department Lt. Michelle Whitaker learned of Tyre Nichols' medical condition through conversations with the EMTs and police officers on scene, she would have easily recognized the obvious need for medical attention to his injuries.

816. Every reasonable Fire Department Lieutenant would have known that Tyre Nichols objectively required medical attention after observing or learning of the following physical conditions:

    a. He was unable to communicate or speak;

    b. He was unable to hold himself up in a seated position;

    c. He was bleeding from his face and his body, and his wounds were unattended;

    d. He was unable to keep his eyes open;

    e. He passed in and out of consciousness.

817.    Even a lay person would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

818.    Memphis Fire Department Lt. Michelle Whitaker stayed in the fire engine upon arriving at the scene of Tyre Nichols' beating at Bear Creek Cove and Castlegate.

819.    Memphis Fire Department Lt. Michelle Whitaker did not transport Tyre Nichols to receive medical care by a doctor for approximately twenty minutes after arriving at Bear Creek Cove and Castlegate.

820.    Every reasonable Fire Department Lieutenant would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

821.    Memphis Fire Department Lt. Michelle Whitaker was deliberately indifferent in denying Tyre Nichols appropriate medical care.

822.    As a Lieutenant with the Memphis Fire Department, responding to a law enforcement call for medical care, Lt. Michelle Whitaker was required to transport patients with medical needs to the emergency department to be treated by physicians.

823.    Memphis Fire Department Lt. Michelle Whitaker observed or was made aware of Tyre Nichols' grave condition for nearly twenty minutes before she assisted in transporting him to the hospital emergency department.

824.    Memphis Fire Department Lt. Michelle Whitaker ignored Tyre Nichols' condition, staying in the fire engine while Tyre Nichols' physical condition only worsened.

825.    Memphis Fire Department Lt. Michelle Whitaker was deliberately indifferent in denying Tyre Nichols medical care that was obviously necessary.

826.    Memphis Fire Department Lt. Michelle Whitaker's failure to render medical attention to Tyre Nichols or transport him to a hospital in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

827.    As a direct and proximate result of Memphis Fire Department Lt. Michelle Whitaker's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

828.    As a direct and proximate result of Memphis Fire Department Lt. Michelle Whitaker's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

829.    As a direct and proximate result of Memphis Fire Department advanced Lt. Michelle Whitaker's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

830.    As a direct and proximate result of Memphis Fire Department Lt. Michelle Whitaker's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

831.    Punitive damages are available against Memphis Fire Department Lt. Michelle Whitaker as a matter of federal common law and are hereby sought by Plaintiff.

832.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

833.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XXIII— Intentional Infliction of Emotional Distress
*Plaintiff v. DeWayne Smith, Individually and as Agent of the City of Memphis*

834.    Plaintiff incorporates by reference Paragraphs 1 through  293 as though fully plead and alleged herein.

835.    Memphis Police Department Lieutenant DeWayne Smith carried out the actions and inactions on January 7, 2023 set forth in Paragraphs 255 through 282 with the intent to deceive, lie to, and manipulate RowVaughn Wells.

836.     The actions and inactions of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023 described in Paragraphs 255 through 282 toward RowVaughn Wells were so outrageous in character and so extreme in degree that they went beyond all bounds of decency.

837.    Memphis Police Department Lieutenant DeWayne Smith intentionally lied to and withheld information from RowVaughn Wells on January 7, 2023 as described in Paragraphs 255 through 282  that was certain to foreseeably cause severe emotional distress to RowVaughn Wells.

838.    The actions and inactions of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023 described in Paragraphs 255 through 282 toward RowVaughn Wells were so outrageous in character and so extreme in degree that they are utterly intolerable in a civilized community.

839.    On January 7, 2023, notwithstanding said duties, Memphis Police Department Lieutenant DeWayne Smith committed one or more of the following acts or omissions described in Paragraphs 255 through 282, including—but not limited to—intentionally and/or recklessly:

a.  Telling RowVaughn Wells that Tyre was driving under the influence with no evidence or support;

b.  Telling RowVaughn Wells that Tyre was intoxicated with no evidence or support;

c.  Lying to RowVaughn Wells about the reasons why Tyre was being arrested;

d.  Withholding the reasons why Tyre was being arrested from RowVaughn Wells;

e.  Lying to RowVaughn Wells about Tyre's medical condition;

f.  Failing to tell RowVaughn Wells that Tyre was around the corner from her home and on the verge of dying; and/or

g.  Withholding Tyre's medical condition from RowVaughn Wells.

840.   But for the aforementioned intentional acts by Memphis Police Department Lieutenant DeWayne Smith, RowVaughn Wells would not have incurred the severe emotional distress she faced and continues to face.

841.   As a direct and proximate result of the intentional actions and inaction of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe emotional distress.

842.   As a direct and proximate result of the intentional actions and inaction of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe loss of her normal and ordinary life.

843.   As a direct and proximate result of the intentional actions and inaction of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells suffered compensatory and special damages as defined under state common law and in an amount to be determined by a jury.

844.     As a direct and proximate result of the intentional acts and omissions described in this Count on January 7, 2023, RowVaughn Wells has suffered and will suffer pecuniary loss, including medical expenses; lost wages and earnings; as well as emotional damages in the form of severe emotional distress, loss of normal life, suffering, anguish, and disability in an amount to be determined by a jury.

### COUNT XXIV— Negligent Infliction of Emotional Distress
*Plaintiff v. DeWayne Smith, Individually and as Agent of the City of Memphis*

845.     Plaintiff incorporates by reference Paragraphs 1 through 293 as though fully plead and alleged herein.

846.     On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith owed RowVaughn Wells a duty to exercise ordinary care.

847.     On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith owed RowVaughn Wells a duty to act reasonably.

848.     On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith owed RowVaughn Wells a duty to refrain from causing emotional distress.

849.     On January 7, 2023, notwithstanding said duties, Memphis Police Department Lieutenant DeWayne Smith committed one or more of the following acts or omissions described in Paragraphs 255 through 282, including—but not limited to—negligently:

    a.   Telling RowVaughn Wells that Tyre was driving under the influence with no evidence or support;

    b.   Telling RowVaughn Wells that Tyre was intoxicated with no evidence or support;

    c.   Lying to RowVaughn Wells about the reasons why Tyre was being arrested;

    d.   Withholding the reasons why Tyre was being arrested from RowVaughn Wells;

e.   Lying to RowVaughn Wells about Tyre's medical condition;

f.   Failing to tell RowVaughn Wells that Tyre was around the corner from her home and on the verge of dying; and/or

g.   Withholding Tyre's medical condition from RowVaughn Wells;

850.   It was foreseeable that the aforementioned negligent acts by Memphis Police Department Lieutenant DeWayne Smith would lead to the severe emotional distress that RowVaughn Wells has suffered and continues to suffer from.

851.   As a direct and proximate result of the aforementioned negligent acts by Memphis Police Department Lieutenant DeWayne Smith, RowVaughn Wells was caused to incur severe emotional distress.

852.   But for the aforementioned negligent acts by Memphis Police Department Lieutenant DeWayne Smith, RowVaughn Wells would not have incurred the severe emotional distress she faced and continues to face.

853.   As a direct and proximate result of the negligent actions and inaction of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe emotional distress.

854.   RowVaughn Wells' emotional distress is the type that an ordinary person would be unable to adequately cope with the mental stress caused by the aforementioned circumstances.

855.   As a direct and proximate result of the negligent actions and inaction of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe loss of her normal and ordinary life.

856.   As a direct and proximate result of the negligent actions and inaction of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells suffered

compensatory and special damages as defined under state common law and in an amount to be determined by a jury.

857.    As a direct and proximate result of the negligent acts and omissions described in this Count on January 7, 2023, RowVaughn Wells has suffered and will suffer pecuniary loss, including medical expenses; lost wages and earnings; as well as emotional damages in the form of severe emotional distress, loss of normal life, suffering, anguish, and disability in an amount to be determined by a jury.

### COUNT XXV— Fraudulent Misrepresentation
*Plaintiff v. DeWayne Smith, Individually and as Agent of the City of Memphis*

858.    Plaintiff incorporates by reference Paragraphs 1 through 293 as though fully plead and alleged herein.

859.    On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith made the following representations of fact to RowVaughn Wells:

    a.    That her son, Tyre, was driving under the influence;

    b.    That her son, Tyre, was intoxicated;

    c.    That her son, Tyre, was not in physical pain;

    d.    That her son, Tyre, was not at risk of physical harm;

    e.    That her son, Tyre, was not in mental pain and anguish;

    f.    That her son, Tyre, was not at risk of mental harm and anguish;

    g.    That her son, Tyre, was being treated by paramedics;

    h.    That her son, Tyre, was receiving medical attention;

    i.    That her son, Tyre, was likely to survive his injuries; and

    j.    That her son, Tyre, was not injured.

860.    On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith's representations to RowVaughn Wells were false when made.

861.    On January 7, 2023, each of Memphis Police Department Lieutenant DeWayne Smith's false representations to RowVaughn Wells were in regard to material facts, namely as to the health, well-being, and life of her son, Tyre Nichols.

862.    On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith's false representations to RowVaughn Wells were made knowingly.

863.    On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith's false representations to RowVaughn Wells were made without belief in their truth.

864.    On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith's false representations to RowVaughn Wells were made recklessly.

865.    On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith's false representations caused RowVaughn Wells to rely on these representations in delaying the time she would go to check on the medical condition and health of her son, Tyre.

866.    On January 7, 2023, Memphis Police Department Lieutenant DeWayne Smith's false representations caused RowVaughn Wells to rely on these representations in delaying the time she would have sought medical attention for her son, Tyre.

867.    As a direct and proximate result of the misrepresentations of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe emotional distress.

868.    As a direct and proximate result of the misrepresentations of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe loss of her normal and ordinary life.

869. As a direct and proximate result of the misrepresentations of Memphis Police Department Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells suffered compensatory and special damages as defined under state common law and in an amount to be determined by a jury.

870. As a direct and proximate result of the misrepresentations described in this Count on January 7, 2023, RowVaughn Wells has suffered and will suffer pecuniary loss, including medical expenses; lost wages and earnings; as well as emotional damages in the form of severe emotional distress, loss of normal life, suffering, anguish, and disability in an amount to be determined by a jury.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff RowVaughn Wells, Individually and as Administratrix Ad Litem of the Estate of Tyre Deandre Nichols, prays for judgment against Defendants as follows:

871. As to Count I, as Administratrix, a money judgment against Chief Cerelyn Davis and the City of Memphis for all damages under the law, including—but not limited to—compensatory damages and special damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

872. As to Count II, as Administratrix, a money judgment against Chief Cerelyn Davis and the City of Memphis for all damages under the law, including—but not limited to—compensatory damages and special damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

873. As to Count III, as Administratrix, a money judgment against Chief Cerelyn Davis and the City of Memphis for all damages under the law, including—but not limited to—

compensatory damages and special damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

874.    As to Count IV, as Administratrix, a money judgment Chief Cerelyn Davis and the City of Memphis for all damages under the law, including—but not limited to—compensatory damages and special damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

875.    As to Count V, as Administratrix, a money judgment against Emmitt Martin III for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

876.    As to Count VI, as Administratrix, a money judgment against Emmitt Martin III for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

877.    As to Count VII, as Administratrix, a money judgment against Emmitt Martin III for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

878.    As to Count VIII, as Administratrix, a money judgment against Demetrius Haley for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

879.     As to Count IX, as Administratrix, a money judgment against Demetrius Haley for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

880.     As to Count X, as Administratrix, a money judgment against Demetrius Haley for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

881.     As to Count XI, as Administratrix, a money judgment against Justin Smith for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

882.     As to Count XII, as Administratrix, a money judgment against Justin Smith for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

883.     As to Count XIII, as Administratrix, a money judgment against Desmond Mills, Jr. for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

884.     As to Count XIV, as Administratrix, a money judgment against Desmond Mills, Jr. for all damages under the law, including—but not limited to—compensatory damages, special

134

damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

885.   As to Count XV, as Administratrix, a money judgment against Tadarrius Bean for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

886.   As to Count XVI, as Administratrix, a money judgment against Tadarrius Bean for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

887.   As to Count XVII, as Administratrix, a money judgment against Preston Hemphill for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

888.   As to Count XVIII, as Administratrix, a money judgment against Preston Hemphill for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

889.   As to Count XIX, as Administratrix, a money judgment against Preston Hemphill for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

890.     As to Count XX, as Administratrix, a money judgment against Robert Long for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

891.     As to Count XXI, as Administratrix, a money judgment against JaMichael Sandridge for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

892.     As to Count XXII, as Administratrix, a money judgment against Michele Whittaker for all damages under the law, including—but not limited to—compensatory damages, special damages, punitive damages; costs, disbursements, and reasonable attorneys' fees under 42 U.S.C. § 1988; and pre-judgment and post-judgment interest as allowed by law.

893.     As to Count XXIII, individually, a money judgment against DeWayne Smith, individually and as agent of the City of Memphis for all damages under the law, including—but not limited to—compensatory damages and special damages; costs, disbursements, and reasonable attorneys' fees; punitive damages; and pre-judgment and post-judgment interest as allowed by law.

894.     As to Count XXIV, individually, a money judgment against DeWayne Smith, individually and as agent of the City of Memphis for all damages under the law, including—but not limited to— compensatory damages and special damages; costs, disbursements, and reasonable attorneys' fees; punitive damages; and pre-judgment and post-judgment interest as allowed by law.

895.     As to Count XXV, individually, a money judgment against DeWayne Smith, individually and as agent of the City of Memphis, for all damages under the law, including—but

not limited to— compensatory damages and special damages; costs, disbursements, and reasonable attorneys' fees; punitive damages; and pre-judgment and post-judgment interest as allowed by law.

896.    For any other such relief that this Court deems just and equitable under the laws of the United States and the State of Tennessee.

## JURY DEMAND

897.    Plaintiff hereby demands a trial by jury as set forth in the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38.


**Dated:  April 19, 2023**                              **/s/ David Mendelson**
                                                        **MENDELSON LAW FIRM**
                                                        David Mendelson
                                                        (Tennessee Bar No. 016812)
                                                        Benjamin Wachtel
                                                        (Tennessee Bar No. 037986)
                                                        799 Estate Place
                                                        Memphis, Tennessee 38187
                                                        Tel: (901) 763-2500 ext. 103
                                                        Fax: (901) 763-2525
                                                        Email: dm@mendelsonfirm.com
                                                        Email: bwachtel@mendelsonfirm.com

                                                        **BEN CRUMP LAW**
                                                        Ben Crump (*pro hac vice pending*)
                                                        (Washington, D.C. Bar No. 1552623)
                                                        (Tennessee Bar No. 038054)
                                                        Chris O'Neal (*pro hac vice pending*)
                                                        (Florida Bar No. 910201)
                                                        Brooke Cluse
                                                        (Texas Bar No. 24123034)
                                                        717 D Street N.W., Suite 310
                                                        Washington, D.C. 20004
                                                        Email: ben@bencrump.com
                                                        Email: chris@bencrump.com
                                                        Email: brooke@bencrump.com

**ROMANUCCI & BLANDIN, LLC**
Antonio Romanucci (*pro hac vice pending*)
(Illinois ARDC No. 6190290)
Bhavani Raveendran (*pro hac vice pending*)
(Illinois ARDC No. 6309968)
Bryce Hensley (*pro hac pending*)
(Illinois ARDC No. 6327025)
Sarah Raisch (*pro hac vice pending*)
(Illinois ARDC No. 6305374)
321 North Clark St., Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: aromanucci@rblaw.net
Email: b.raveendran@rblaw.net
E-mail: bhensley@rblaw.net
Email: sraisch@rblaw.net

**COUNCIL & ASSOCIATES, LLC**
Lashonda Council Rogers
(Georgia Bar No. 190276)
50 Hunt Plaza, SE Suite 740
Atlanta, Georgia 30303
Tel: (404) 526-8857
Fax: (404) 478-8423
Email: lrogers@thecouncilfirm.com

**EARNESTINE HUNT DORSE**
Earnestine Hunt Dorse
(Tennessee Bar No. 012126)
3268 N Waynoka Circle
Memphis, Tennessee 38111-3616
Tel: (901) 604-8866
Email: ehdorse@icloud.com