**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| RowVaughn Wells, Individually and as Administratrix Ad Litem of the Estate of Tyre Deandre Nichols, deceased. | Case No. 2:23-CV-02224 |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| The City of Memphis, a municipality; Chief Cerelyn Davis, in her official capacity; Emmitt Martin III, in his individual capacity; Demetrius Haley, in his individual capacity; Justin Smith, in his individual capacity; Desmond Mills, Jr., in his individual capacity; Tadarrius Bean, in his individual capacity; Preston Hemphill, in his individual capacity; Robert Long, in his individual capacity; JaMichael Sandridge, in his individual capacity; Michelle Whitaker, in her individual capacity; DeWayne Smith, in his individual capacity and as an agent of the City of Memphis. | |
| Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

In the aftermath of the death of Tyre Nichols, much was made of the actions of the SCORPION Unit Officers on the scene. However, the liability here extends far beyond those officers, through the ranks, and up to the City of Memphis, itself. The Defendants' most persistent argument, woven throughout their Motion, is that Plaintiff is seeking to impose *respondeat superior* liability on the City simply because those officers were employed by the City. That is not the case. When accepting Plaintiff's well-pled allegations as true as the Court must at this stage, it is apparent that the City and its Chief of Police, Cerelyn Davis, are liable because they were the moving force behind those officers' unconstitutional stop, seizure, chase, use of force, failure to intervene, and, ultimately, killing of Tyre Nichols.

As the City of Memphis' final policymaker on all aspects of policing, Chief Davis' actions are those of the City. Shortly after beginning her tenure in early 2021, Chief Davis authorized and created the Street Crimes Operation to Restore Peace In Our Neighborhoods (SCORPION) Unit. Over the next 14 months, Chief Davis would maintain, tolerate, and deliberately ignore unconstitutional policies and customs that would lead directly to the violation of Tyre Nichols' rights. *First*, Chief Davis explicitly instructed SCORPION to violate the constitutional rights of Memphis citizens. *Second*, Chief Davis permitted and fostered a culture within SCORPION of tolerating constitutional violations with full knowledge of the predictable consequences, given her direct oversight of SCOPRION, her prior experiences in Atlanta working with the RED DOG Unit operating under a similar mandate, reports regarding police activities, internal investigations, public meetings, and common sense. *Third and fourth*, Chief Davis failed to provide *any* training or supervision to SCORPION to counteract these unconstitutional policies and customs knowing that constitutional violations were bound to follow in their wake, which they predictably did.

The events of January 7, 2023, demonstrated untrained, unsupervised officers predictably violating Tyre Nichols' constitutional rights in accordance with the custom and orders that Chief Davis tolerated and mandated. Far from being the "rogue" actions of a few officers, it was a concerted choreography taken directly from the SCORPION script Chief Davis authored. Consistent with the Supreme Court's guidance in *Monell*, Plaintiff pled each claim separately as potential avenues for municipal liability. Rather than threadbare, "conclusory allegations and labels," Plaintiff included the necessary and robust factual history of the orders, customs, failures, knowledge, indifference, and direct causal link to the underlying constitutional violations that Tyre Nichols suffered. Plaintiff's well-pled claims are not just conceivable or speculative. They are plausible; and—when read in the light most favorable to Plaintiff as is required—they assert all the elements that entitle her to relief under § 1983, *Monell*, and Tennessee law.

At the pleading stage, that is more than enough to exceed Rule 8's requirement for a "short, plain statement of facts" sufficient to put the Defendants on notice of the claims that Plaintiff is alleging. Fed. R. Civ. Pro. 8(a). As such, Defendants' Motion must be denied in its entirety.

## I.   Motions to Dismiss should not be granted where the Complaint provides plausible factual support and reasonable inferences upon which relief can be granted.

The question before the Court is "not whether [the plaintiff] will ultimately prevail, but whether [their] complaint [is] sufficient to cross the federal court's threshold." *Skinnerv, Switzer*, 562 U.S. 521, 529-530 (2011). "To survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face." *Cooper Butt ex rel. Q.T.R. v. Barr*, 954 F.3d 901, 904 (6th Cir. 2020) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

At the pleading stage, the Court must consider the Complaint in the light most favorable to the plaintiff. *Ryan v. Blackwell*, 979 F.3d 519, 525 (6th Cir. 2020) (quoting *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001)). The non-moving party enjoys the benefit of reasonable and plausible inferences with competing inferences falling in their favor. *Jackson v. City of Cleveland*, 622 F.Supp.3d 636, 642 (N.D. Ohio 2022). The Complaint must merely provide the Defendants with notice and "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 555. Demanding more would distort Rule 8's standard of a "short, plain statement of the claim" to require fact pleading, but *Monell* does not subject plaintiffs to a higher pleading standard. *Jackson*, 622 F.Supp.3d at 642. (*citing Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).

### A.  Plaintiff's *Monell* claims all set forth adequate facts that would entitle Plaintiff to relief if proven to be true.

Plaintiff included hundreds of factual allegations supporting her four distinct, yet interrelated, claims against the City. These claims arise from the Supreme Court's decision in *Monell* and its progeny, which hold that a municipality can be liable where a plaintiff shows: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).  A plaintiff must then allege that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019).

Plaintiff has alleged plausible claims under three of these four avenues: Official Policy— Count I,  Custom of Tolerance—Count II, and Failure to Train/Supervise—Counts III & IV.

### 1. Chief Davis' mandates to Memphis Police Department officers to violate the Fourth Amendment were official policies of the City of Memphis.

Under the first avenue under *Monell* (Official Policy), a Plaintiff must plausibly allege "'the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)). A single decision can constitute a policy if that decision is made by an official who "possesses final authority to establish municipal policy with respect to the action ordered," *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81 (1986), which means that their decisions are "final and unreviewable and are not constrained by the official policies of superior officials." *Miller v. Calhoun Cnty.,* 408 F.3d 803, 814 (6th Cir.2005) (internal quotation marks omitted). "[O]nce a municipal *policy* is established, 'it requires only one application…to satisfy fully *Monell*'s requirement[s]…'" *Pembaur,* 475 U.S. at 478 n. 6 (internal quotations omitted). The existence of a policy might be demonstrated by an action by a municipal employee if it is "at least implicitly authorized, approved, or knowingly acquiesced in" by a decisionmaker. *King v. City of Eastpointe*, 86 F. App'x 790, 801 (6th Cir. 2003) (internal citations omitted). Whether a municipal employee has final decision-making authority is a question of state law. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

Chief Davis was the final decisionmaker for the City on all aspects of policing, which is undisputed by Defendants. *See generally* Dkt. 81-1. The Tennessee Constitution authorizes a city's creation of a charter. Dkt. 1, ¶ 9.  According to the City of Memphis Charter, Chief Davis had control over the entire police force,  the appointment of those under her, and the promulgation and enforcement of rules and regulations for the conduct of the police division. *Id*. at ¶¶ 12, 17. As such, Chief Davis was the final policymaker for police policy, practice, hiring, implementation and oversight of training and supervision, as well as the assignment of officers to specialized units

within the Department. *Id*. at ¶¶ 13-16. Therefore, Chief Davis' described actions and decisions must be taken as those of the City's final decisionmaker, as well as the related allegations being taken as true. *See Pembaur*, 475 U.S. at 480-481; *Ryan*, 979 F.3d at 525.

Chief Davis and the Memphis Police Department created the SCORPION Unit in November 2021 just seven months into her tenure. Dkt. 1 ¶ 70, 76, 298. Under immense pressure as a newcomer to the City and as the first female to lead the MPD, Chief Davis needed a quick solution to the rising violent crime rate in the city. *Id*. at ¶¶ 71-72. That solution was the creation of a suppression unit called SCORPION. *Id*. at ¶¶ 75-76. SCORPION was comprised of four roving teams of approximately ten police officers, which operated by patrolling higher crime neighborhoods attempting to address street and vehicular crime. *Id*. at ¶ 77-78. In doing so, SCORPION used unmarked vehicles, plain-clothes and tactical gear, employing an aggressive "street-style of policing." *Id*. at ¶ 79. Given their mandate to restore peace through monitoring street crime, officers necessarily would encounter citizens on the street requiring them to have knowledge and training in the areas most likely to arise on a daily basis: *Terry* stops, reasonable articulable suspicion, vehicle stops, probable cause, and use of force. *Id*. at ¶¶ 80-90, 336, 340.

Given the pressure and situation, Chief Davis acted officially and decisively in directing SCORPION. Yet in doing so, she repeatedly overstepped her Constitutional limits by giving unconstitutional directives to her officers, which were therefore official policies given her role as final policymaker. These policies included the following:

- Instructing SCORPION to focus on an *all-out* strategy of seizing Memphis Citizens and their property through traffic stops in derogation of the Fourth Amendment. *Id*. at ¶¶ 81, 83-85, 299.

- Instructing SCORPION to take property from Memphis citizens without a valid Constitutional basis "even if [the case] gets dropped in court." *Id*. at ¶ 82.

- Instructing SCORPION to deprive citizens of their property without due process, without legal basis, and in disregard of their constitutional rights. *Id*. at ¶ 83-85.

- Instructing SCORPION to disregard and violate the constitutional rights of Memphis citizens through unlawful and baseless searches and seizures and the use of excessive force. *Id*. at ¶¶ 88, 300-301.

- Instructing SCORPION to employ ambushing, aggressive harassing, and searching Memphis citizens in public. *Id*. at ¶ 87.

- Instructing SCORPION to omit written reports if they engaged in searches without finding drugs or weapons to maintain a stronger "hit rate" on stops. *Id*. at ¶ 89.

- Instructing SCORPION Officers to engage in unconstitutional traffic stops and employ aggressive police tactics to achieve quotas. *Id*. at ¶ 90.

Defendants can claim the above policies "def[y] logic," but illogical and unconstitutional are not mutually exclusive, in fact the opposite is often true. *See* Dkt. 81-1 pg. 12. Nevertheless, "logical" is not a legal standard and does nothing to disturb the well-pled facts alleging the policies' existence. To the extent Defendants claim such policies "do not exist," they can move for summary judgment. *See id*. For now, it must be taken as true that Chief Davis' orders to SCORPION were to violate the Fourth Amendment by aggressively stopping Memphis citizens on the streets and in their vehicles without reasonable articulable suspicion, unreasonably seizing them and their property, and employing excessive force in hopes that an unconstitutional blitzkrieg would instill enough fear and lead to enough arrests to reduce the crime rate. Dkt. 1 ¶¶ 81-89. These were the City's official policies through Chief Davis's deliberately indifferent, direct mandates. Dkt. 1 at ¶¶ 81-82, 302-3. The consequences of such blatantly unconstitutional policies were easy to predict: the Court need look no further than what happened to Tyre Nichols, although there are numerous others in SCORPION's short, yet sordid history. *See id*. at ¶¶ 105-106; *see* Section II(A)(2) *infra*. With Tyre Nichols, though, it is impossible to ignore the connection between these policies and his death at the hands of SCORPION.

For Tyre, *first* came the ordered, yet baseless seizure through an unjustified traffic stop. *Id*. at ¶¶ 81, 83-85, 90. On January 7, 2023, Tyre was driving home from a park at approximately 8:00 p.m. *Id*. at ¶ 146. Three SCORPION Officers (Martin, Haley, and Hemphill) were on patrol and carrying out Chief Davis' directives to make baseless stops. *Id*. at ¶¶ 147-148. Upon seeing Tyre, the three SCORPION Officers set out to stop him *in accordance with those directives*. *Id*. at ¶ 150. The lack of such basis was confirmed by the "negative" license plate call for warrants and traffic infractions and the fact that none of the officers had any reasonable articulable suspicion to stop Tyre's vehicle. *Id*. at ¶ 151, 154, 174 (SCORPION Officers never provided an answer to Tyre's questioning). Tyre was never suspected of committing a crime nor was he a threat to anyone, including the SCORPION Officers. *Id*. at ¶¶ 168-169, 188-190. The basis for the SCORPION Unit Officers' initial stopping of Tyre has still never been substantiated. *Id*. at pg. 2.

*Second* came the mandated, unjustified aggression. *Id*. at ¶¶ 88, 300-301. Despite lacking a constitutional basis, the three SCORPION Officers worked in tandem to pull their cars up to Tyre, box him in, and then descend on his vehicle. *Id*. at ¶¶ 155-158. They did so in black sweatshirt hoodies and with their body-worn cameras turned off to cover up their actions knowing there was no basis for the stop. *Id*. at ¶¶ 159-160, 162. Martin and Haley ran up to Tyre's car, opened the drivers' side door, and forcefully pulled Tyre out without any explanation before beginning to verbally barrage him with profanities. *Id*. at ¶¶ 159, 165-166. Martin and Haley then proceeded to push Tyre down, pull at his arms, physically assault him, and shout at him thus escalating the situation far beyond what was necessary and constitutionally permissible. *Id*. at ¶¶ 166-167.

Officer Hemphill then approached with his gun brandished, held sideways, and pointed at Tyre without any lawful basis. *Id*. at ¶¶ 88, 171-172, 300-301. Officers Martin and Haley proceeded to strike Tyre, yank his arms behind his back, and deploy pepper spray into his face

despite his efforts and attempts to comply and avoid resistance. *Id*. at ¶¶ 180-183.   Officer Hemphill then deployed his taser at Tyre without any justification and to no effect. *Id*. at ¶ 191.

Officers Martin and Haley then chased Tyre down, eventually grabbed him, and threw him to the ground. *Id*. at ¶ 201 The aggression would escalate as more SCORPION Officers arrived (Mills, Smith, Bean). *Id*. at ¶ 203. Those five SCORPION Officers took turns for over seven minutes holding Tyre up and brutally punching, kicking, baton-striking, and pepper spraying him. *Id*. at ¶¶ 203-208, 211-213, 216-217, 220-221. All of this was done in accordance with Chief Davis' directive for members of the SCORPION Unit. *Id*. at ¶¶ 81-90, 202, 209-210, 222.

Clearly the City's express policies were the moving force behind the unconstitutional stop of Tyre, the unconstitutional force used against him, the failure to intervene by each of the five beating SCORPION Officers to prevent it, the harms inflicted, the injuries he suffered, the violation of his constitutional rights, and all the damages he and his estate have suffered, including his ultimate death. *Id* at ¶ 283-292, 304-310. Following in lockstep with the bulletpoints (*see* pgs. 5-6 *supra*) above, everything that happened to Tyre was incurred as a direct, foreseeable, and proximate result of Chief Davis' authorization and instructions. *Id*. at ¶¶ 291-292, 305-309; *see Garner*, 8 F.3d at 364.

Defendants' cited cases offer no support as none discuss what constitutes an official policy, a policymaker's directive, or the pleading of such a claim. Yet, they do cite this Court discussing "custom" liability, which explained the ease with which Defendants' Motion can be dispatched: "This standard does not ask much of Plaintiff, it merely requires *some* factual basis for the Court" to reach its conclusion. *Sanders v. City of Memphis, Tennessee*, 2022 WL 4665867 at *4, n. 5 (W.D. Tenn. Sept. 30, 2022) (*citing Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020) (summary judgment decision)); *see also Doe v. Claiborne Cnty., Tenn. By & Through Claiborne.*

*Cnty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996) (deciding summary judgment on a "custom of inaction" and "tacit authorization," rather than an official policy). Plaintiff has provided more than enough facts at this stage with eight different, detailed descriptions of the alleged policies. *See  e.g.*, Dkt. 1 ¶¶ 81-90; *see also Sanders*, 2022 WL 4665867 at *4, n. 6.

In one last attempt to disarm Plaintiff's first Count, Defendants refer to a lawsuit filed by Plaintiff's Counsel arising from the death of George Floyd, which was never the subject of any Motion or ruling by the Court. Dkt. 81-1 pg. 12. In doing so, Defendants seem to suggest that the only way to succeed on a "policy" *Monell* theory is with an express, written policy. But that claim is belied by the  Defendants' own Motion where they correctly state that Plaintiff must assert "formal rules or understandings—often *but not always committed to writing*—that are intended to, and do, establish fixed plans of actions to be followed under similar circumstances consistently and over time." Dkt. 81-1 pg. 11 (emphasis added) (*citing Sanders*, 2022 WL 4665867 at *4). Plaintiff must then demonstrate that the municipality was the "moving force" behind the injury alleged. *Id*.  Indeed, that is exactly what Plaintiff has done with Chief Davis: "identify[ing] the polic[ies], connect[ing] the policies] to the city itself and show[ing] that the particular injury was incurred because of the execution of [those policies]." *Id*.

Such decisions by an authorized policymaker like Chief Davis necessarily establish municipal culpability, especially at the pleading stage. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997). In fact, the Court in *Wright v. Fentress Cty. Tennessee* went through a variety of similar situations denying a motion to dismiss:

> …Hamilton County, Ohio could be liable where deputies, **acting pursuant to instructions** from the county prosecutor, forcibly entered premises to serve *capiases*, *Pembaur*, 475 U.S. at 485; Key West, Florida could be liable where its Chief of Police enforced a statute that prohibited leaks to the press regarding internal police investigations, *Cooper v. Dillon*, 403 F.3d 1208, 1223 (11th Cir. 2005); the City of Highland Park, Michigan could be liable where plaintiff alleged

that the Chief of Police personally participated in the allegedly unlawful raid of his home, *Greer v. City of Highland Park*, 2016 WL 4206008, at *2 (E.D. Mich. Aug. 10, 2016); the City of Battle Creek, Michigan could be found liable where its Chief of Police allegedly approved video surveillance in the women's locker room, *Gillespie v. City of Battle Creek*, 100 F.Supp.3d 623, 630 (W.D. Mich. 2015); Benton County, Tennessee could be liable for the Sheriff's actions in allegedly striking plaintiff and ordering the arrest of 100 people at an underage drinking party, *Holloran v. Duncan*, 92 F.Supp.3d 774, 786 (W.D. Tenn. 2015); and Webb County, Texas could be liable for the Sheriff's decision to terminate plaintiff allegedly in retaliation for supporting his opponent, *Arredondo v. Flores*, 2006 WL 2459460, at *3 (S.D. Tex. Aug. 22, 2006). Likewise, Fentress County can be liable to the extent that Sheriff Cravens committed a constitutional tort in his role as a policymaker for the jail.

313 F.Supp.3d 886, 890-891 (M.D. Tenn. 2018) (emphasis added). Indeed, other courts within the Sixth Circuit have upheld pleadings at this stage and beyond with far less to substantiate an official policy. *See e.g., Boykins v. Trinity, Inc.*, 2021 WL 2156196 at *3-4 (E.D. Mich., May 27, 2021) (denying a motion to dismiss official policy claims based on just two paragraphs of allegations in a complaint); *Hernden v. Chippewa Valley Schools*, 2023 WL 4140819 at *3-4 (E.D. Mich., June 22, 2023); *Jackson*, 925 F.3d at 834 (denying motion for summary judgment).

With the plethora of facts alleged at this stage as to the policies and without any other case law in support, Defendants' arguments as to Count I fail, and the Motion must be denied.

2. **The City of Memphis tolerated the unlawful and unconstitutional conduct of the SCORPION Unit with deliberate indifference to their known misconduct.** [1]

---

[1] Dismissal of Count II at this stage would be especially premature given the U.S. Department of Justice's July 27, 2023 announcement launching a "Pattern or Practice Investigation of the City of Memphis and the Memphis Police Department" geared *specifically* toward the Memphis Police Department's "use of force and its stops, searches and arrests, as well as whether it engages in discriminatory policing." https://www.justice.gov/opa/pr/justice-department-announces-pattern-or-practice-investigation-city-memphis-and-memphis. According to Attorney General Merrick B. Garland, the investigation is being launched "to examine *serious* allegations that the City of Memphis and the Memphis Police Department engage in a pattern or practice of unconstitutional conduct and discriminatory policing based on race, *including a dangerously aggressive approach to traffic enforcement*." *Id*. (emphasis added). As Defendants note, *see* Dkt. 81-1 pg. 6, the Court may take judicial notice of such facts at this stage of proceeding given their public nature and the authority of the U.S. DOJ. *See* Fed. R. Ev. 201(f).

Along with rising to the level of an "official policy," Chief Davis' directives are also evidence supporting Plaintiff's allegations that the City of Memphis maintained a widespread custom of tolerance for SCORPION's Fourth Amendment violations, which led to the stop, seizure, beating, and death of Tyre Nichols.[2] All of Defendants' arguments relating to notice of this custom are belied by the simple fact that Chief Davis first **designed, ordered, and endorsed the policies for SCORPION Officers**. Far from just having some notice of and acquiescing to its consequences, the custom was *known* by Chief Davis, giving it the force and effect of law, even if never written down as formal policy. Dkt. 1 ¶ 315. The custom of tolerance throughout the MPD necessarily followed and permeated officer conduct who operated with an emboldened sense of impunity that was on full display the night of the assault on Tyre. *Id*. at pgs. 2-4, ¶ 105, 163-164.

"A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005) (internal citations omitted). As Defendants state, in order to state a claim under a "custom of tolerance" theory, Plaintiff must establish: (1) a clear and persistent pattern of unconstitutional conduct by municipal employees; (2) the municipality's notice or constructive notice of the unconstitutional conduct; (3) the municipality's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official

---

[2] To be clear, Plaintiff's allegations in this case are not *just* that the City of Memphis had a custom of tolerance for the use of excessive force; it is far broader. *See* Dkt. 1 ¶ 318. The custom of tolerance for constitutional violations encompassed the entirety of the Fourth Amendment, which was the moving force behind all of the constitutional violations alleged: unreasonable stop, excessive force, and the failure to intervene to prevent excessive force. Dkt. 1 ¶ 318(f); *see also e.g.,* Counts V-VII (claims against Defendant Martin).

policy of inaction; and (4) that the City's custom was the "moving force" or direct causal link in Tyre's constitutional deprivation. Dkt. 81-1 pg. 14 (citing *Sanders*, 2022 WL 4665867).

Beyond mere "conclusory allegations" of a widespread custom and notice, Plaintiff pled specific facts relating to other incidents that clearly and consistently demonstrate the exact pattern alleged as being longstanding, widespread, tolerated, and known by Chief Davis and the City. *Cf.* Dkt. 1 at ¶¶ 81-99; Dkt. 1 at ¶¶ 104-110. The Complaint is replete with the necessary factual allegations and lead to the reasonable inference to establish these elements at this stage:

- Chief Davis instructing SCORPION to conduct traffic stops, seize individuals and their property and otherwise disregard the Fourth Amendment without any justification in direct contravention of written policy on such stops. Dkt. 1 ¶¶ 81-90.

- The maintaining of a custom of tolerance for SCORPION Officers' unreasonable search and seizure of individuals, use of excessive force, [3] and—more generally—the violation of the Fourth Amendment. Dkt. 1 ¶ 314.

- The custom of tolerance being permanent, well-settled, widespread, and commonly accepted within the Memphis Police Department before Chief Davis' hiring and the creation of the SCORPION Unit as to constitute and carry the force of law. *Id*. at ¶ 315.

- The conscious awareness and notice that their custom of tolerance was unconstitutional and would lead to the violation of the Fourth Amendment. *Id*. at ¶ 316.

- That despite this awareness and knowledge, they still maintained the custom of tolerance for SCORPION Officers. *Id*. at ¶ 317.

- The custom of tolerance was the moving force behind the SCOPRION Officers' unconstitutional stop of Tyre, the unconstitutional force, the failure to intervene by each of the five beating SCORPION Officers to prevent it, the harms inflicted, the injuries he suffered, the violation of his constitutional rights, his ultimate death, and all of the damages he and his estate have suffered. *Id*. at ¶¶ 283-292, 318-323.

---

[3] There is no written policy on the use of force alleged anywhere in the Complaint for the City of Memphis. Despite the City of Memphis maintaining a voluminous 15-Chapter Policy and Procedures Manual available for public access, there is not a single chapter that addresses and details the proper and Constitutional use of force or the use of deadly force for SCORPION Officers or any Memphis Police Officer. *See generally* https://memphispolice.org/wp-content/uploads/2023/06/2023_MPD_POLICY_AND_PROCEDURES_FULL_6-27-2023.pdf, last accessed August 10, 2023.

- The violation of Tyre's constitutional rights, his injuries, and his death were a direct, foreseeable, and proximate result of the custom of tolerance for the SCORPION Unit's enforcement procedures that violate the Fourth Amendment. *Id*. at ¶¶ 319-323.

The choreographed custom is clear and consistently carried out, but first requires Plaintiff correcting Defendants' misleading timeline. *See* Dkt, 81-1 pgs. 13-15. Chief Davis was installed in April 2021 and SCORPION was created just a few months later in November 2021 at her direction. Dkt. 1 ¶¶ 17, 76. In the ensuing 14 months, the SCORPION Unit focused on young Black men, instilled terror in minority communities, carried out oppression-style policing, and functioned as a notoriously violent policing unit. *Id*. at ¶¶ 91-93, 95, 98-99. All of this was *tolerated* and *ratified* by Davis as Chief of Police, who recommended starting hostile and harassing encounters for a minor infraction or for nothing at all. *Id*. at ¶¶ 90, 95, 102. This toleration was then memorialized in the directives described in Section (II)(A)(1) where Chief Davis instructed SCORPION Officers to conduct baseless traffic stops, seize individuals and property without a lawful basis, and employ excessive force to effectuate their goals. *Id*. at ¶¶ 81-102. Following such unconstitutional conduct, Chief Davis refused to discipline officers and ignored consistent complaints and public comments concerning the havoc SCORPION officers were wreaking. *Id*. at ¶¶ 109, 316-319. It was all tolerated as an unconstitutional means to an unrealized end.

Defendants only argument to dispel the pattern of misconduct Plaintiff details in the Complaint is by claiming that just one such encounter was reported to internal affairs and occurred a mere three days before the SCORPION Unit's encounter with Tyre. Dkt. 81-1 pg. 14. But surely Defendants *were* aware of *all* these incidents. *See* Dkt. 1, ¶ 314-323. At the very least, Plaintiff's Complaint alleges as much and therefore it must be taken as true that they were. *Id*.

It's further puzzling how the Defendants can argue so definitively that "'additional instances' **pre-dated** the formation of the SCORPION Unit," "pre-date[d] Chief Davis' tenure as

Chief of Police," and that "the only alleged SCORPION Unit encounter that was allegedly reported to internal affairs occurred a mere three days before the encounter with Mr. Nichols." Dkt. 81-1 pgs. 14-15. This may be in reference to *some* of the specific incidents discussed at the December 2022 meeting, but—if so—it wholly ignores the numerous incidents that took place with SCORPION Officers for which Plaintiff alleged the Defendants had notice. *See* Dkt. 1 ¶¶ 104-110, 315-317. Moreover, Plaintiff's allegations of the incidents that pre-date Chief Davis—as well as the all-time high in excessive force complaints in the year prior to her start—do not negate that the SCORPION Unit exacerbated previous customs and patterns of unconstitutional conduct. *Id.* at ¶¶ 104-110, 138. Given Chief Davis' knowledge of those pre-existing problems, they support it.

Lest there be any doubt as to the reasonableness of the Court's inference as to the existence of a custom, Plaintiff provided specific examples of the pattern in practice. Without the benefit of any discovery and *just* relying on the publicly available information at the time of filing, Plaintiff identified ten other individuals by name and circumstance who fell victim to SCORPION's tolerated tactics in just 14 months of the unit's existence. *Id.* at ¶ 105(a)-(g):

- **Multiple Times**: Johnny Graham was stopped multiple times in his vehicle by SCORPION Officers without any lawful basis. *Id.* at ¶ 105(g).

- **February 2022**: Damecio Wilbourn and Romello Hendrix were ambushed, arrested, and thrown against their vehicles by plain-clothed SCORPION Officers before having their criminal charges dropped. *Id.* at ¶ 105(f).

- **May 2022**: Davitus Collier was assaulted, pulled from his car, tackled, and pepper sprayed by SCORPION Officers without any lawful basis. *Id.* at ¶ 105(e).

- **August 2022**: Sebastian Johnson and Kendrick Johnson Ray were confronted by SCORPION Officers who had their guns drawn, yelled profanities, and later assaulted them before having all criminal charges dropped. The officer's accounts of the incident remaining unsubstantiated. *Id.* at ¶ 105(d).

- **October 2022**: Maurice Chalmers-Stokes was confronted by SCORPION Officers in a vehicle wearing ski masks who then tackled him striking his head against a brick for "walking in the middle of the street." *Id.* at ¶ 105(c)

- **December 6, 2022**: Chief Davis attended a Public Safety Committee Hearing where activists described the ***longstanding, continuing*** violent traffic stops by Memphis Police Officers (including SCORPION Unit Officers) resulting in frequent injury and even several deaths going back to 2013. *Id*. at ¶¶ 106-110.

- **No action or remedial measures were taken to curtail the problem that began before Chief Davis' tenure, rather the violence within the Memphis Police Department persisted and increased. *Id*.**

- **January 3, 2023**: Cornell Walker and his friend were in their vehicle, were approached by SCORPION Officers, and were told officers "need[ed] to see [their] motherfucking hands" or they'd have their "motherfucking heads" blown off before they were pulled from the vehicle without ever being cited or arrested. *Id*. at ¶ 105(b).

- **January 4, 2023**: Monterrious Harris was in his vehicle and approached by SCORPION Officers clad in hooded sweatshirts and ski-masks and then dragged from the vehicle where they punched him, threw him to the ground, dragged him across the concrete, and had their guns pointed at him. *Id*. at ¶ 105(a).

The escalation of these incidents in frequency and aggression are hard to ignore, yet they were until culminating on January 7, 2023. The consistent pattern stemming from Chief Davis' tolerance is apparent and dispels Defendants consistent drumbeat that this incident was solely the result of "five rogue police officers" who "acted outside their duties as sworn police officers." Dkt. 81-1 pg. 2, 12. In other words: "the City could not have been behind such a heinous beating." *See* Dkt. 81-1 pg. On the contrary, the above pattern and the "ruthless and brutal beating [of Tyre] could only be carried out by officers that were devoid of any fear of discipline or intervention by a supervisor and with a hardened, defined sense of impunity garnered from those running their Department" enabling and condoning these actions. *See* Dkt. 1, *Id*. at pgs. 2-4, ¶ 105, 163-164.

The very phrase "five rogue officers" is a contradiction in and of itself—if the Court counts Hemphill, six officers equate to 15% of the entire SCORPION Unit. *See id*. at ¶ 78. One or even two officers acting out may lend credence to the "rogue" officer theory, but a collaboration of five (technically six with Hemphill), along with the previous, nearly identical incidents officers points

to something far more insidious and systemic. *Id*. at ¶105. The repeated blows over a period of several minutes, the taunting, the taking of pictures, and the lack of any remorse as over a dozen more of Defendants' employees arrived at the scene demonstrated the lengths to which this feeling of impunity extend. *Id*. at ¶¶ 227 (joking), 228 (bragging), 232 (taking pictures on cell phone), 248-251. These Officers knew their conduct would be tolerated because it had been tolerated numerous times before without any discipline or sanction. *Id*. at ¶ 105, 163-164.

Notice is also pled with sufficient and significant detail, though Plaintiff need not plead with particularity the *exact* notice the City had, it can be inferred at this stage. *Waksul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020) (Courts must "draw all reasonable inferences in [the plaintiff's] favor."). Nevertheless, Plaintiff alleged that over the 14 months of SCORPION's existence (1) Chief Davis and the City of Memphis were aware and authorized this type of conduct or, alternatively (2) that Chief Davis and the City of Memphis were on notice of it, yet nothing was done. Dkt. 1, ¶¶ 81-89, 105-110, 314-323. At the very least, Plaintiff has created the reasonable inference that the City of Memphis was aware of unconstitutional and violent incidents involving SCORPION occurring on a near-monthly and then near-daily basis in 2023. *See Alkire v. Irving*, 330 F.3d 802, 818 (6th Cir. 2003) (concluding that nine other cases of similar *alleged* constitutional violations was sufficient to find a "custom" of those violations); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1243, 1247 (6th Cir. 1989) (finding evidence of a municipal custom or policy from "numerous similar incidents…"); *cf. Jackson*, 622 F.Supp.3d at 643-644 (denying Motion to Dismiss even where "no specific instances of unconstitutional conduct from any time frame relevant" were alleged).[4]

---

[4] Courts around the country have cautioned against a mechanical, numerical approach to custom claims and allowing parties to proceed to discovery to develop the plausibility of their factual allegations. *See Fields v. King*, 576 F.Supp.3d 392, 410 (S.D. WV 2021) (custom claim plausible

Defendants' toleration and decisions to do *nothing* to curtail the SCORPION Unit's behavior is further evinced by the complete lack of discipline for officers. Dkt. 1 ¶¶ 105(a)(vii); 105(b)(vii); 105(c)(v); 105(d)(vii); 105(e)(vii); 105(f)(v); 105(g)(ii), 163-164. Defendants had access to information on all of the aforementioned incidents and were on notice of these incidents prior to Tyre's death, going so far as to authorize the conduct. *Id*. at ¶¶ 81-89, 108, 316.

Put simply: Chief Davis and the City were aware and did nothing to address the SCORPION Unit's tactics and practices and turned a blind eye. *See id*. at ¶ 109-110, 317. They were deliberately indifferent. *Id*. at ¶ 303, 317. As a result, just one month after the hearing, days after multiple other incidents, and having done nothing to curtail the SCORPION Unit's sting, they beat Tyre Nichols to death. *See id*. at ¶ 110, 318-323. The causal link is abundantly clear as the exact same pattern alleged (*id*. at ¶ 105) carried through to the night of January 7, 2023 and was

where Plaintiff maintained a culture of use of excessive force and utter disregard where Sheriff had knowledge of incidents and potentially others, yet did nothing, which led to Plaintiff's decedent's death); *Tirado v. City of Minneapolis*, 521 F.Supp.3d 833, 841-843 (D. Minn. 2021) (declining to dismiss a Complaint based on ten or so incidents being identified and distinguishing between summary judgment where more may be required); *Armstrong v. City of Minneapolis*, 525 F.Supp.3d 954, 963-964 (D. Minn. 2021) ("relatively small" number of incidents alleged were sufficient at pleading stage to permit the reasonable inference); *Estate of Osuna v. City of Stanislaus*, 392 F.Supp.3d 1162, 1173 (E.D. Cal. 2019) ("Whether these previous cases are all manifestations of the same policy or custom, and whether that policy or custom was the moving force behind the injury to decedent in this case, are factual issues to be determined following the discovery phase of this litigation."); *Mateos-Sandoval v. Cty. of Sonoma*, 942 F.Supp.2d 890, 900 (N.D. Cal. 2013) (noting difficulty plaintiffs may have defining exact contours of the custom and notice more easily available to Defendants); *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp.3d 3383, 403 (S.D.N.Y. 2021) (five complaints sufficiently alleged municipal liability at pleading stage); *Cruz v. Dart*, 2017 WL 1021992, at *5 (N.D. Ill. Mar. 16, 2017) (aggregating Seventh Circuit authority, including *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006), to explain that "[t]he court does not mechanically count the number of incidents, [ ] but instead looks for competent evidence tending to show a general pattern of repeated behavior."); *Barnes v. City of El Paso*, 2023 WL 4097075 at *8 (W.D. TX, June 12, 2023) (*collecting cases* explaining Fifth Circuit's cautionary instruction dismissing such claims at the pleading stage prior to discovery where information is alleged to be limited) *accord* Dkt 1. ¶ 105 ("Other SCORPION victims include, ***but are certainly not limited to***…") (emphasis added).

on display, this time with Tyre as the victim: (1) A plain-clothed, street gang style police unit; (2) approached an African-American male in or near a vehicle; (3) aggressively confronted him; (4) menaced him with loud, profanity-laced language; (5) never articulated to him the reason for the stop; (6) dragged him out of or away from the car; (7) forced him to the ground; (8) verbally and physically assaulted him; (8) deployed excessive, unnecessary, and unjustified force; and (9) failed to ever articulate a reason for the stop, seizure, or force. Dkt. 1 ¶¶ 145-222. The basis for the stop, like so many of the other incidents, has still never been substantiated. *Id*. at pg. 2; *Id*. at ¶ 105.

At this point, the allegations relating to these individuals and the surrounding allegations provide more than enough for the Court to find it *plausible* that the alleged custom existed, the City was aware of it, and that it was the moving force behind the violation of Tyre's constitutional rights. *Jackson v. City of Cleveland*, 622 F.Supp.3d at 642 (*citing Leatherman*, 507 U.S. at 168 (holding Rule 8 merely requires a "short, plain statement of the claim" and requiring fact pleading would impermissibly impose a higher pleading standard on Plaintiff's *Monell* claims)).

Plaintiff has gone above and beyond in providing examples to reach plausibility, especially at this stage where "[t]he recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." *Owens v. Baltimore Cty. State's Atty Ofc.*, 767 F.3d 379, 403 (4th Cir. 2013); *Jackson*, 622 F.Supp.3d at 642 ("At this stage of the proceedings, Plaintiff receives the benefit of [ ] competing inferences."). The Motion as to Count II must be denied.

### 3. The City of Memphis' failure and disregard in training its SCORPION Officers in the most basic policing functions and in their lack of supervision were unconstitutional.

To compound the unconstitutional policies that Chief Davis ordered and the custom of constitutional violations she tolerated, the City of Memphis failed to train and supervise its SCORPION Officers in a widespread, deliberately indifferent neglect of the most routine aspects of the situations those Officers were bound to encounter daily. Both claims (training and

supervision) fall under the auspices of the Supreme Court's guidance on claims involving a municipality's failures resulting in constitutional violations. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). As the Sixth Circuit has recently reiterated, there are two ways to support a claim that failure to train or supervise is the result of a municipality's deliberate indifference:

> Plaintiff may prove (1) a "**pattern** of similar constitutional violations by untrained employees" or (2) "a **single violation** of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation."

*Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 323 (6th Cir. 2023) (internal quotations and citations omitted).

Here, Plaintiff relies on both theories to support her two claims. Under the first "pattern" theory, a plaintiff must establish that: 1) the City's training or supervisory program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 583 (6th Cir. 2020) (citing *Jackson*, 925 F.3d at 834). In essence, the "pattern" theory closely aligns with the "custom" on the requisite pervasiveness, the municipality's notice, and causal link. *See Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006) (holding that a "custom of failing to train…is sufficient to establish the requisite fault on the part of the [municipality]" for a deliberate-indifference claim.); *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 289 (6th Cir. 2020); *see also Flores v. City of South Bend*, 997 F.3d 725, 732-733 (7th Cir. 2021) (*collecting cases* denying motion to dismiss failure to train claims with plausible allegations of deliberate indifference).

In addition to the "pattern" theory, Plaintiff also alleged a "single violation" theory of liability for both training and supervision. A Plaintiff can satisfy this theory by demonstrating deliberate indifference through the "likelihood that the situation…will recur and the predictability

that an officer lacking specific tools to handle that situation will violate citizens' rights." *Jackson*, 925 F.3d at 836 (handling exculpatory evidence).  The violation of constitutional rights thus becomes the "highly predictable consequence" of the failures. *Id*. (*citing Bd. of Cty. Comm'rs*, 520 U.S. at 409–10 (same)); *see also Gregory*, 443 at 753-754 (same; denying summary judgment).

At the pleading stage and beyond Courts have found that requiring training in numerous other areas, such as probable cause and use of force, is "plainly obvious" giving rise to "single violation" liability. *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 289 (6th Cir. 2020) (denying summary judgment finding failure to provide training on probable cause or use of force was constitutionally inadequate); *City of Canton*, 489 U.S. at 390 n.10 (use of deadly force);  *Abdi v. Karnes*, 556 F. Supp. 2d 804, 817 (S.D. Ohio 2008) (denying summary judgment where dispute as to adequacy of crisis training for officers executing arrests of mentally ill individuals); *Chamberlain v. City of White Plains*, 986 F.Supp.2d 363, 393 (S.D.N.Y. 2013) (same on motion to dismiss);  *Ocasio v. City of Canandaigua*, 513 F. Supp. 3d 310, 326–27 (W.D.N.Y. 2021) (denying motion to dismiss finding officers are frequently required to make entries onto private property to conduct searches); *Waller v. City of Middletown*, 89 F.Supp.3d 279, 284–86 (D. Conn. 2015) (same); *Gerskovich v. Iocco*, 2017 WL 3236445, at *10 (S.D.N.Y. July 17, 2017) (denying summary judgment on single-violation claim due to failure to train police officers on rights of protestors); *Edrei v. City of New York*, 254 F.Supp.3d at 581 (denying motion to dismiss plaintiff's single-violation claim where plaintiff alleged failure to train on use of crowd control devices).

### a.  Training Allegations

Unlike the Sixth Circuit's findings in *Boddy v. City of Memphis*, Plaintiff's Complaint is full of facts alleging a failure to train—both as a "pattern" and under a "single violation" theory. *See* Dkt. 81-1pg. 16-17 (*citing* 2022 WL 12258977 at *3 (6th Cir. 2022) (unreported)). In *Boddy*, the Complaint was deemed as being "bereft…of **any** factual allegations that could plausibly

suggest [plaintiff's] sweeping assertions…not alleg[ing] *a single fact* related to the training the City provides its police officers, *any* prior incidents involving comparable use of force [by the defendant officers], or *anything else* that would plausibly suggest" the City's liability in causing the constitutional violation in question. 2022 WL 12258977 at *3 (emphasis added).

The situation in *Boddy* is a far cry from this Complaint. First, SCORPION was a select unit designed specifically to deal with street crime, violent crime, and auto thefts by patrolling "hot spot" crime areas and conducting traffic stops. Dkt. 1 ¶¶ 76-80. Defendants were necessarily aware that such a unit demanded extensive experience, training, and oversight. *Id.* at ¶ 111. Said another way: if you are going to create such a unit, hire officers with requisite experience; if you cannot, train the officers; and if you cannot do that, supervise them. Defendants took none of these actions. *Id.* at ¶ 111, 133-134, 139-140.

The first step to ensuring the requisite level of qualification for a special police unit is to hire capable officers. *Id.* at ¶113-114. The Defendants turned a blind eye to doing so as it would have been too time-consuming and they were in desperate need of recruits following an exodus of veteran leadership. *Id.* at ¶¶ 117, 132. Ultimately, the Defendants knew the officers it was hiring for the SCORPION Unit, and police force at large,[5] were officers with histories of misconduct or vastly inexperienced. *Id.* at ¶¶ 114-115. In either event, extensive training in the basics of the Fourth Amendment and the situations these new SCORPION Officers were bound to encounter daily were necessary to avoid constitutional violations. *Id.* at ¶ 134.

---

[5] For more evidence of this issue, Plaintiff detailed the extent to which the entire Memphis Police Department—beyond just the SCORPION Unit—had a widespread, deficient hiring program that vastly reduced the quality of the officers it was hiring and only further necessitated the need for extensive training on the Constitution and supervision. Dkt. 1 ¶¶ 111-127.

Despite being fully aware that a police unit like SCORPION demanded such rigorous training, regardless of the quality of its officers, the City of Memphis and Chief Davis failed to properly train them. *Id*. at ¶ 134. Plaintiff identified eleven specific areas (ten if the Fourth Amendment is treated as an overarching umbrella) that the Defendants failed to train SCORPION Officers in:

- *Terry* Stops
- Reasonable Articulable Suspicion
- Probable Cause
- Traffic Stops
- Foot Pursuits

- Use of Force
- Use of Batons
- Use of Tasers
- Use of Peper Spray
- Use of Deadly Force

*Id*. at ¶ 136. To further illustrate the lack of training, the Defendants did not even have written policies on these subjects for its officers to read and study. *Id*. at ¶135.

Of course, the officers in question here slipped through the City of Memphis' lax hiring standards and were in desperate need of the training they never received. *Id*. at ¶¶ 116. Each had some prior incident—regardless of severity—or a deficiency in experience (sometimes both) that warranted further training of some kind in policing basics *before* they started with SCORPION. *See generally id*. at ¶ 116. This is especially so if they were to become a part of that unit dealing with the most volatile, high-pressure situations and designed specifically to deal with "street crime operations." *Id*. at ¶ 78, 113, 134-138, 140, 143-144.

Yet, no such training was ever provided—whether at the Police Academy or at the Memphis Police Department. *Id*. ¶¶ 135-136, 129 (describing decreased standards, subpar practices, and deficient training at the Police Academy), *see generally id*. at ¶¶ 114-138. Then, once a part of the SCORPION Unit, the lack of training became more evident. Almost a dozen

other individuals had similar accusations against the same officers and other members of SCORPION in a year of its approximately 40 members carrying out their duties. *Id*. at ¶ 105. All those incidents that Plaintiff highlighted dealt with the exact same type of situation: officers baselessly approaching people on the street in or near their vehicles and violating their Fourth Amendment rights. *Id*.

This alone distinguishes *Sweat v. Butler*. Dkt. 81-1 pg.16-7 (*citing* 90 F.Supp. 773, 781-782 (W.D.TN 2015). There, the Complaint did not include ***any*** facts of prior incidents relating to use of force for the offending officer that demonstrated a lack of training. *Id*. at 781. *Sweat* also did not have a specialized police unit that the Chief of Police was personally overseeing and sanctioning, the level of notice with a public hearing a month prior, or any allegations that "the city was made aware of or deliberately ignored these incidents." *Sweat*, 90 F.Supp. at 782-783 (holding plaintiff's allegations failed because none concerned training practices or lack thereof).

Ultimately, Plaintiff has sufficiently pled allegations giving rise to liability under a "pattern" theory. Here, the City of Memphis was aware that it had placed inexperienced officers on the SCORPION Unit with a mass departure of veteran officers. *Id*. at ¶¶ 111-127, 332. It lacked the senior staff members to train those inexperienced officers thus compounding the problem. *Id*. at ¶¶ 117-127, 333. As a result, the City of Memphis had a widespread, constitutionally deficient practice of failing to train its officers for specialized units like SCORPION "in the common, routine, and foreseeable tasks" that such officers would have to perform. *Id*. at ¶ 335. This practice was so well-settled and widespread throughout the Department for SCORPION that it constituted a custom as to that unit—something they were consciously aware of. *Id*. at ¶¶ 337-338. Despite this knowledge and the obvious, predictable, and readily foreseeable consequences, the City of

Memphis allowed the SCORPION Unit to operate, thus constituting deliberate indifference. *Id*. at ¶ 339. Thus, Plaintiff has plausibly alleged a "pattern" theory for failure to train.

Even with the pattern, given the failures in training in areas so intrinsic and instrumental to policing, especially for a saturation, mobile street unit like SCORPION, the City's liability arises even before reaching a "pattern." Single violation liability is also warranted here. *Ouza*, 969 F.3d at 289 n.10 ("the direct causal link in a single-incident claim comes from the constitutional violation's "high degree of predictability.").  The SCORPION Unit was specifically meant to deal with street crime, violent crime, and vehicular stops—Chief Davis made that abundantly clear in her proclamations and directives. *See* Section (II)(A)(1) *supra*. The ten topics referenced above are the most common situations such officers would deal with in such a unit and surely the ones rife with the greatest risk of constitutional violations. *See Ouza*, 969 F.3d at 389 (holding a jury could find it obvious that officers would need additional training on subjects like handcuffing and probable cause). The need for training the SCORPION Unit on constitutional bounds in these areas "was so obvious that the City knew that if training was not provided, then it was highly predictable and likely to result in the violations of citizens' constitutional rights." *Id*. at 287 (internal citations omitted); *accord* Dkt. 1 ¶ 341. These were the technical areas for which up-to-date training could have provided guidance about what was lawful and what was not. *See Ouza*, 969 F.3d at 289.

The highly plausible causal link between these failures and the underlying incident is clear as all were at play with Tyre Nichols and the six SCORPION Officers. *See Ouza*, 969 F.3d at 289 n.10. There was an attempted vehicular *Terry* stop where the officers failed to articulate any reasonable suspicion for the stop or probable cause for the arrest. *Id*. at ¶¶ 336(e)-(h), 343(a). There was a threat of deadly force and deployment of less lethal means of force against a non-resisting individual. ¶¶ 336(a)-(c); 343(b). Next came a foot pursuit of an individual who presented no threat

of harm to himself, officers, or members of the public. *Id*. at ¶¶ 336(e)-(i). There was a subsequent seizure and arrest—again, without reasonable suspicion or probable cause. *Id*. And finally, a display of force that erupted in a cacophony of punches, kicks, baton strikes, and pepper sprays without any justification or resistance—passive or active. ¶¶ 336(a)-(c); 343(b). Had the City of Memphis trained SCORPION officers in the areas alleged, it would have prevented the violation of Tyre's constitutional rights. *Id*. at ¶ 342. That failure to train was the moving force behind all of the constitutional violations alleged, which were highly predictable, foreseeable, and obvious. *Id*. at ¶ 343. The Motion to Dismiss Count III must be denied.

### b.  Supervision

The requirements to properly allege a claim for failure to supervise largely mirror those of the failure to train. *Ouza*, 969 F.3d at 286-287 (*citing City of Canton*, 489 U.S. at 388). In *Ouza*, the Sixth Circuit denied summary judgment where officers testified they never received a performance evaluation and where Defendants did not put on any evidence that it evaluated, reviewed, or monitored officer conduct. *Ouza*, 969 F.3d at 289. Taking that evidence in conjunction with evidence on the failure to train, the Court found a factual dispute as to the municipality's deliberate indifference. *Id*. At the pleading stage, the Court here should do the same.

Much like the requirements mirroring each other, so to do the underlying facts in support warranting denial of the Motion concerning Count IV. The Defendants were fully aware SCORPION officers were unqualified and untrained. *Id*. at ¶ 111, 133-134, 139-140. As such, they required some level of supervision to avoid the violation of citizens' Fourth Amendment rights. Dkt. 1 ¶ 140. Despite this, the Defendants housed the SCORPION Unit in a separate building from the rest of the Department and were frequently deployed without any supervisors on the team. *Id*. at  ¶¶ 141-142. The Defendants were aware that they did not have enough senior staff members supervising new officers and that inexperienced officers were being placed on specialized units,

like SCORPION, without adequate supervision. *Id*. at ¶¶ 111-127, 356-357. They were also aware of prior, similar incidents and refused to discipline the officers for their misconduct. *Id*. at ¶¶ 105-110. Given its widespread, patterned nature, this practice of failing to supervise SCORPION Officers rose to the level of a custom. ¶¶ 358-360. The City's awareness of this systemic failure and decision to continue to allow SCORPION to operate rose to the level of deliberate indifference and is sufficient to state a plausible claim for relief. *Id*. at ¶¶ 361-362; *see Ouza*, 969 F.3d at 268.

Along with the pattern, the failure to supervise untrained SCORPION Officers in their activities—knowing they would encounter citizens and their constitutional rights would be implicated—gives rise to single violation liability. Turning loose a platoon of inexperienced, untrained officers on city streets with the instruction and mandate to seize citizens and deprive them of their property without any supervision is bound to lead to constitutional violations. *Id*. at ¶¶ 139-144, 364-368. Predictably, the unqualified and untrained SCORPION Officers violated the Fourth Amendment in the situations that the Defendants assigned them to: patrolling the streets, stopping citizens, stopping vehicles, and engaging in crime reduction. *Id*. at ¶¶ 137-138, 143-144; 361-362. This, of course, happened on the night of January 7, 2023, as the squad of six SCORPION Officers operated for nearly the entire time without any supervisor or instruction on how to properly handle the situation involving Tyre Nichols. *Id*. at ¶¶ 370-375. It was close to an hour after the initial stop until a supervisor arrived at the scene. *Id*. at ¶ 146, 197, 236, 243, 255.

It is more than plausible that the presence of a trained supervisor or proper supervision of their activities would have prevented Tyre's death. In fact, Plaintiff alleges exactly that: "The City of Memphis' proper supervision of specialized police units meant to handle search and seizures, violent crime, and vehicular crimes…would have prevented the violations of Tyre Nichols' constitutional rights. *Id*. at ¶¶ 365. Plaintiff has pled the existence of a widespread failure, the

Defendants' deliberate indifference, the predictable and obvious consequences of such failures warranting single-violation liability, and the strong causal link between these failures and the underlying constitutional violation. The Motion to Dismiss Count IV must be denied.

### 4. Plaintiff's state law negligence claims against the City of Memphis are properly pled and should not be dismissed.

Separate from the civil rights claims, Plaintiff's Complaint also alleges state law claims against MPD Lieutenant Smith ("Lt. Smith"), as an Agent of the City of Memphis.[6] Dkt. 1 ¶¶ 834-870. Lt. Smith did not participate in the beating of Tyre, but following the incident walked the 100 yards to Tyre's home. Dkt 1, ¶ 263. Fully aware of Tyre's condition nearby, Lt. Smith told Plaintiff that that her son was intoxicated and was being arrested for a DUI. *Id.* at ¶¶ 261-265. When Plaintiff asked Lt. Smith for information on her son, Smith lied to her by stating that Tyre would be going to jail after receiving medical care and he could be picked up there. *Id.* at ¶ 272. Lt. Smith knew that Tyre Nichols would not be transported to jail because he was nearly dead. *Id.* at ¶ 281.

Defendants incorrectly claim that Plaintiff's claim for negligent infliction of emotional distress ("NIED") against Lt. Smith as an agent of the City is barred by the Tennessee Governmental Tort Liability Act ("the GTLA"). Defendants argue that Plaintiff's NIED claim must be dismissed "because it is essentially a claim for fraudulent misrepresentation disguised as a claim for [NIED]." Dkt. 81-1 at p. 20. Defendants' characterization is incorrect, as fraudulent misrepresentation is a completely different claim, requiring a completely different mental state.[7]

---

[6] This response only addresses Lt. Smith as an agent of the city, and not in his individual capacity, as the City of Memphis did not move to dismiss the individual claims against him.

[7] In making a claim for fraudulent misrepresentation, the Plaintiff must show that the defendant made false material representation, that "the defendant either *knew it was false or made it recklessly* without knowledge of its truth," that "the representation was made *with the intent that the plaintiff would act upon it*" and finally that "the plaintiff did act, which caused the plaintiff to suffer damages." *Dugan v. Vlcko*, 307 F. Supp. 3d 684, 696–97 (E.D. Mich. 2018)

A claim for NIED requires Plaintiff to prove "the basic elements of negligence: duty, breach, causation, and damages" and "that the defendant's negligence caused a serious or severe emotional injury." *Brown v. Regions Bank*, 2019 WL 13297196, at *4 (W.D. Tenn. Nov. 14, 2019) (internal quotations omitted). Plaintiff has so pled. Dkt. ¶¶ 264-269, 840-841. There is no "knowing" or "intentional" mental state requirement for NIED—only negligence by the Defendant.

The GTLA specifically removes immunity for government entities when injury is "proximately caused by a negligent act or omission" of its employees. *See Greenwood v. City of Memphis*, 2017 WL 5151378, at *4 (Tenn. Ct. App. Nov. 6, 2017) (holding the GTLA "does generally *remove* the City's immunity for negligence and negligent infliction of emotional distress."). Yet, the GTLA explicitly enumerates specific torts for which government entities are immune and NIED is *absent* from that list as it was not contemplated as a tort which government employees should be immune. Tenn. Code Ann. § 29-20-205(2), *see also Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 84 (Tenn. 2001) ("section 29–20–205 of the GTLA *removes* immunity for injuries proximately caused by the negligent act or omission of a governmental employee except when the injury arises out of *only those specified torts enumerated in subsection (2).*").

Furthermore, the Tennessee Supreme Court has expressly stated that NIED is not considered as "infliction of mental anguish" within the bounds of § 29-20-205. *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 853 (E.D. Tenn. 2011). Nor is Plaintiff's NIED claim a civil rights allegation, which would be barred by the GTLA, as they do not arise from the same facts. *Cf. Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 852–53 (E.D. Tenn. 2011) ("Because the claims arise out of the same facts—and are based upon the same arguments—Plaintiffs' negligence claims… are barred under the "civil rights" exception of the TGTLA, T.C.A. § 29–20–205(2).), *see also Shelton v. Rutherford Cnty.*, 2009 WL 2929394, at *12 (M.D.Tenn. Sep. 8, 2009) (where

28

"negligence claims are asserted in the context of a civil rights case and are based upon the same actions that gave rise to the civil rights claims ... the cause of action falls within ... [the] immunity granted under Tenn.Code. Ann. § 39–20–205"); *Butler v. City of Englewood,* 2008 WL 4006786, at *13 (E.D.Tenn. Aug. 25, 2008) (holding the municipality was entitled to immunity under the TGTLA where the plaintiff's claims "clearly arise out of and directly flow from the allegations that the police officer deprived [plaintiff] of [her] civil rights…").

Accordingly, the City of Memphis' motion to dismiss Plaintiff's NIED claim against Lt. Smith as an Agent of the City should be denied, as that claim is not barred by the GTLA.

### 5. Chief Davis was properly named in the lawsuit in her official capacity and amendment should be allowed to permit individual capacity claims.

The claims against Chief Davis in her official capacity serve to make clear that she is the final policymaker on behalf of the City. Dkt. 1 ¶¶ 12-17; *see also* Section (II)(A)(1) *supra.* Plaintiff has adequately pled that Chief Davis actively directed and encouraged the exact conduct behind the SCORPION Unit's violation of Tyre's constitutional rights such that her actions were the moving force. Dkt. 1 ¶¶ 81-89, 90, 95, 102. Such directives subject her to personal, supervisory liability. *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (liability where supervisor implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate); *Gregory*, 444 F.3d at 751 ("Plaintiff must show that the supervisors somehow encouraged or condoned the actions of their inferiors."); *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (encouragement satisfies this requirement).

Plaintiff requests that the Motion to Dismiss Chief Davis as a defendant be denied and that Plaintiff be granted leave to amend to add claims against her in her individual capacity. *Williams v. Barton Malow Co.*, 581 F.Supp.3d 923, 926 (N.D. Ohio 2022) (*citing Forman v. Davis*, 371 U.S. 178, 182 (1962)) (holding Rule 15 is construed liberally with a presumption in favor of the

moving party and should be freely given). "In the absence of any apparent or declared reason—
such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure
deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue
of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules
require, be 'freely given.' " *Parchman v. SLM Corp.*, 896 F.3d 728, 736 (6th Cir. 2018). "To deny
a motion to amend, a court must find 'at least some significant showing of prejudice to the
opponent.'" *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (quoting *Moore v.
City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986)).

## II.    CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests the Court deny Defendants'
Motion to Dismiss in its entirety; permit the parties to proceed to discovery to investigate the well-
pled, plausible factual allegations; and grant Plaintiff leave to amend to add a claim for Supervisory
Liability against Defendant Chief Davis in her individual capacity.

In the alternative, should the Court dismiss any of the above claims, Plaintiff respectfully
requests that such dismissal be granted without prejudice and with leave to amend.

**Respectfully submitted,**

Dated:  August 11, 2023

**/s/ Bryce T. Hensley**
**ROMANUCCI & BLANDIN, LLC**
Antonio Romanucci (*pro hac vice*)
(Illinois ARDC No. 6190290)
Bhavani Raveendran (*pro hac vice*)
(Illinois ARDC No. 6309968)
Bryce Hensley
(Illinois ARDC/WDTN No. 6327025)
Sarah Raisch (*pro hac vice*)
(Illinois ARDC No. 6305374)
321 North Clark St., Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: aromanucci@rblaw.net

Email: b.raveendran@rblaw.net
Email: bhensley@rblaw.net
Email: sraisch@rblaw.net

**MENDELSON LAW FIRM**
David Mendelson
(Tennessee Bar No. 016812)
Benjamin Wachtel
(Tennessee Bar No. 037986)
799 Estate Place
Memphis, Tennessee 38187
Tel: (901) 763-2500 ext. 103
Fax: (901) 763-2525
Email: dm@mendelsonfirm.com
Email: bwachtel@mendelsonfirm.com

**BEN CRUMP LAW**
Ben Crump (*pro hac vice pending*)
(Washington, D.C. Bar No. 1552623)
(Tennessee Bar No. 038054)
Chris O'Neal (*pro hac vice pending*)
(Florida Bar No. 910201)
Brooke Cluse
(Texas Bar No. 24123034)
717 D Street N.W., Suite 310
Washington, D.C. 20004
Email: ben@bencrump.com
Email: chris@bencrump.com
Email: brooke@bencrump.com

**COUNCIL & ASSOCIATES, LLC**
Lashonda Council Rogers
(Georgia Bar No. 190276)
50 Hunt Plaza, SE Suite 740
Atlanta, Georgia 30303
Tel: (404) 526-8857
Fax: (404) 478-8423
Email: lrogers@thecouncilfirm.com

**EARNESTINE HUNT DORSE**
Earnestine Hunt Dorse
(Tennessee Bar No. 012126)
3268 N Waynoka Circle
Memphis, Tennessee 38111-3616
Tel: (901) 604-8866
Email: ehdorse@gmail.com

31

## <u>CERTIFICATE OF SERVICE</u>

I, Bryce Thomas Hensley, hereby certify that on August 11, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, and that upon filing, such system will serve a copy of the foregoing upon all counsel of record in this action.

*s/ Bryce T. Hensley*
Bryce T. Hensley
