**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| RowVaughn Wells, Individually and as Administratrix Ad Litem of the Estate of Tyre Deandre Nichols, deceased, | |
| Plaintiff, | |
| v. | Case No. 2:23-CV-02224 |
| The City of Memphis, Tennessee; Chief Cerelyn Davis; Emmitt Martin III; Demetrius Haley; Justin Smith; Desmond Mills, Jr.; Tadarrius Bean; Preston Hemphill; Robert Long; JaMichael Sandridge; Michelle Whitaker; DeWayne Smith, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, RowVaughn Wells, Individually and as Administratrix Ad Litem for the Estate of Tyre Deandre Nichols, by and through her attorneys, and in complaining of the Defendants, pleads and alleges as follows:

## PRELIMINARY STATEMENT

On January 27, 2023, the world bore witness to videos of a gruesome, barbaric display of police brutality on the streets of a quiet neighborhood in Memphis, Tennessee from the night of January 7, 2023. Caught on film for all to see was the abhorrent and reprehensible conduct of the City of Memphis' police officers acting under the color of law and pursuant to officially sanctioned, unconstitutional policies and practices. The innocent victim was a 29-year-old father of one, who was on his way home to have dinner with his parents. His name was Tyre Deandre Nichols.

1

Tyre's death was driven and enabled by longstanding and widespread practices within the Memphis Police Department ("MPD"). Multiple MPD officers, including some who took part in beating Tyre, would later testify that the officers who savagely beat Tyre did so based on longstanding customs within the MPD in which officers would beat people who annoyed or angered them during the course of a police encounter, jokingly referring to such beatings as a "tax" and similar terms. Tyre had annoyed the police who killed him by daring to run from them after they first used brutal, terrifying force against him during an unjustified traffic stop. MPD officers would later testify that the police who beat Tyre felt free to do so because they were protected by a robust and pervasive code of silence within the MPD, in which officers would lie and manipulate evidence by various means to cover up their beatings of Memphis residents while supervisors knowingly looked the other way, and said nothing, reported nothing, and behaved as if nothing inappropriate had happened. Memphis police officers felt free to brutalize residents without fear of consequence because of an acceptance of, and deliberate indifference to, unconstitutional conduct that had been fostered for decades by the MPD. Tyre's tragic death was the foreseeable result of these unconstitutional policies, practices, customs, and deliberate indifference of the City of Memphis and Chief Cerelyn Davis, the City's chief policymaker for decisions related to the MPD.

While widespread across MPD, these practices of punitive police violence followed by coordinated coverups were particularly pronounced in the "SCORPION" tactical unit that killed Tyre. Consistent with directives from Chief Davis herself, SCORPION Officers routinely carried out Fourth Amendment violations against community members, including the repeated use of unjustified violence—with a particular focus on Black men, like Tyre. After a year of operating in this manner with impunity, the SCORPION Unit carried on into 2023 with its sanctioned mission

to inflict terror on the community in the name of "stopping crime." Just a week into the new year, on the night of January 7, the SCORPION Unit set its sights on 29-year-old Tyre Nichols.

The basis for SCORPION Unit officers stopping Tyre's car on January 7, 2023, has never been substantiated nor could there ever be a basis for the frenzy of force that was about to be unjustifiably unleashed. Two SCORPION Officers baselessly stopped Tyre's car, forcefully dragged him out onto the roadway, and violently apprehended him without ever articulating a reason for the stop. As the SCORPION Officers escalated the situation with harsh and disgusting profanity and hostility, Tyre attempted to deescalate with measured communication and calmness.

Upon recognizing these officers were operating with seething aggression and unjustified force, Tyre fled the scene toward his home where he lived with his parents. What transpired next can only be described as a pack of wolves attempting to hunt down their wounded prey. Just feet from his parents and the safety of his home, five SCORPION Officers tracked Tyre down and deployed their sting in the form of repeated punches, kicks, and pepper spray to a non-resistant, restrained young man shouting for his mother while they unleashed their physical hostility upon him. When Tyre fell to the ground, officers lifted him back up and held him so that other officers could continue to tee-off with more punches, strikes, kicks, and chemical sprays—all of this with full knowledge that their body-worn cameras were recording every second. Such a ruthless and brutal beating could only be carried out by officers that were devoid of any fear of discipline or intervention by a supervisor—or anyone else in the Department—and with a hardened, time-tested sense of impunity garnered from those running the Department.

There was never any attempt to intervene by any officer or MPD official at any point as Tyre remained defenseless throughout the onslaught. When it was finished, Tyre's body was propped up against the police car to be displayed like a battered trophy to be touted for the

countless Memphis officials that would arrive on the scene. Pictures would be taken, jokes would be made, and medical care would be withheld for over twenty minutes as Tyre's body lay devastated from the beating. Indeed, he was dying and those on scene knew it.

Tyre was eventually transported to the hospital where he battled for nearly three days until his body could not fight any longer. At the time of his death on January 10, 2023, Tyre's condition in the ICU was compared to that of Emmitt Till—a young Black man brutally beaten and killed in Mississippi in 1955. Like Till nearly 70 years prior, Tyre was left unrecognizable because of the beating he endured at hands of a modern-day lynch mob. Unlike Till, this lynching was carried out by those adorned in police department sweatshirts and vests and their actions were sanctioned—expressly and implicitly—by the City of Memphis.

This lawsuit is a civil indictment under the laws of the United States against the City of Memphis, its Police Department, its Chief of Police, the SCORPION Officers involved, and all those complicit in the deprivation of Tyre Nichol's constitutional rights, his pain and suffering in his last days on this Earth, and his wrongful death on January 10, 2023.



*The picture on the left shows Tyre Nichols in 2021.*

*The picture on the right shows Tyre Nichols swollen, bloody, and bruised in the ICU shortly before his death in January 2023.*

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343; 42 U.S.C. §§ 1983, 1988.  The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

2.       Venue is proper in this Court under 28 U.S.C. §1391(a) because all Defendants reside in the State of Tennessee and at least one of the Defendants resides in the Western District of Tennessee.

3.       Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred in Memphis, Tennessee, which is in the Western District of Tennessee.

## PARTIES

4.       At all relevant times and until the time of his death on January 10, 2023, Plaintiff's decedent, Tyre Deandre Nichols, was a citizen of the United States and resident of the City of Memphis, County of Shelby, State of Tennessee.

5.       Plaintiff RowVaughn Wells was appointed Administratrix Ad Litem of the Estate of Tyre Deandre Nichols on March 29, 2023, by the Probate Court of Shelby County, Tennessee.

6.       Plaintiff RowVaughn Wells is a citizen of the United States and a resident of the City of Memphis, County of Shelby, State of Tennessee.

7.       Tyre Nichols is survived by his next of kin, including his minor son.

8.       The City of Memphis is and was at relevant times a political subdivision of the State of Tennessee, organized and existing under and by virtue of the laws and the Constitution of the State of Tennessee.

9.     The City of Memphis fulfills its policing functions through the MPD, which is and was at all relevant times a law enforcement agency.

10.     The MPD is led by the Director of Police Services, also known as the "Chief of Police," who is bestowed with the following authority under the City of Memphis Charter's Section on Police Services:

a. The director of police services shall have general care of the peace of the city and shall see that all subordinates do their duty in preserving the same. Title 2, Chapter 2-30, Sec. 28-3.

b. He or she shall have control over the entire police force and see to the execution of every ordinance. Title 2, Chapter 2-30, Sec. 28-3.

c. He or she shall have general supervision over the subject of nuisances, and the abatement of same, and shall exercise and discharge all such powers and functions as pertain to his or her office and perform such other duties as may be required of him or her by this Code or other ordinance. Title 2, Chapter 2-30, Sec. 28-3.

d. The director of police services is authorized and empowered to appoint one deputy director, four deputy chiefs and as many chief inspectors, inspectors, captains, lieutenants, sergeants, detectives and patrol officers, together with such emergency police, secretaries, clerks, stenographers, operators, janitors, turnkeys, desk lieutenants, desk sergeants, mechanics, matrons, women police officers and such other help as may be needed to efficiently police the city and to efficiently conduct the police division of the city. Title 2, Chapter 2, Sec. 28-4.

e. The director of police may, from time to time, promulgate and shall enforce such rules and regulations for the conduct of the police division, not inconsistent with the Charter and ordinances of the city, as may be necessary for the efficient conduct of the division and policing of the city. Title 2, Chapter 2-30, Sec. 2-28-7.

11.     The Director of Police Services, also known as the Chief of Police of the MPD, is and was at all relevant times the final policymaker for the City of Memphis as it relates to the implementation of the policies and practices of the MPD.

12.     In April 2021, the City of Memphis appointed Defendant Cerelyn Davis ("Chief Davis") as the Director of Police Services, also known as the Chief of Police of the MPD.

13.     Upon information and belief, Chief Davis is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

14.     At all relevant times, Chief Davis was employed by the City of Memphis as the duly appointed Chief of Police and Director of Police Services, was acting under color of state law, and was acting within the scope of her employment with the City of Memphis. Defendant Davis is sued in her individual capacity.

15.     Upon information and belief, MPD Officer Emmitt Martin III is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

16.     At all relevant times, MPD Officer Emmitt Martin III (hereinafter "Martin" or "Martin III") was employed by the City of Memphis through the MPD as a duly appointed and sworn police officer, was acting was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

17.     Upon information and belief, MPD Officer Demetrius Haley is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

18.     At all relevant times, MPD Officer Demetrius Haley was employed by the City of Memphis through the MPD as a duly appointed and sworn police officer, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

19.     Upon information and belief, MPD Officer Justin Smith is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

20.     At all relevant times, MPD Officer Justin Smith was employed by the City of Memphis through the MPD as a duly appointed and sworn police officer, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

21.     Upon information and belief, MPD Officer Desmond Mills Jr. is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

22.     At all relevant times, MPD Officer Desmond Mills Jr. was employed by the City of Memphis through the MPD as a duly appointed and sworn police officer, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

23.     Upon information and belief, MPD Officer Tadarrius Bean is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

24.     At all relevant times, MPD Officer Tadarrius Bean was employed by the City of Memphis through the MPD as a duly appointed and sworn police officer, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

25.     Upon information and belief, MPD Officer Preston Hemphill is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

26.     At all relevant times, MPD Officer Preston Hemphill was employed by the City of Memphis through the MPD as a duly appointed and sworn police officer, was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

27.     Upon information and belief, Memphis Fire Department Emergency Medical Technician Robert Long is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

28.     At all relevant times, Memphis Fire Department Emergency Medical Technician Robert Long was employed by the City of Memphis through the Memphis Fire Department as a

duly appointed and sworn fire department officer and Emergency Medical Technician (EMT), was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

29.    Upon information and belief, Memphis Fire Department Emergency Medical Technician JaMichael Sandridge is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

30.    At all relevant times, Memphis Fire Department Emergency Medical Technician JaMichael Sandridge was employed by the City of Memphis through the Memphis Fire Department as a duly appointed and sworn fire department officer and Emergency Medical Technician (EMT), was acting under color of state law, and was acting within the scope of his employment with the City of Memphis.

31.    Upon information and belief, Memphis Fire Department Lieutenant Michelle Whitaker is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

32.    At all relevant times, Memphis Fire Department Lieutenant Michelle Whitaker was employed by the City of Memphis through the Memphis Fire Department as a duly appointed and sworn fire department officer, was acting under color of state law, and was acting within the scope of her employment with the City of Memphis.

33.    At all relevant times, MPD Lieutenant DeWayne Smith was employed by the City of Memphis through the MPD as a duly appointed and sworn police officer and was acting within the scope of his employment with the City of Memphis.

34.    Upon information and belief, MPD Lieutenant DeWayne Smith is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

## **FACTUAL ALLEGATIONS**

35.    At the time of his brutal death and the violation of his constitutional rights by the City of Memphis and its police officers, Tyre Nichols ("Tyre") was a son, a father, a brother, a friend.

36.    Tyre was the 29-year-old father of a five-year-old boy.

37.    Tyre was an employee at FedEx, where he worked second shift with his stepfather.

38.    Tyre loved skateboarding, photography, and was a Starbucks coffee enthusiast.

39.    On January 7, 2023, MPD Officers Martin III, Haley, Hemphill, Smith, Mills Jr., and Bean (collectively, "Defendant Officers") stopped Tyre Nichols without any reasonable, articulable suspicion. All the Defendant Officers were members of "Team 1" of MPD's SCORPION Unit, which was supervised by Defendant Lieutenant DeWayne Smith.

40.    On January 7, 2023, the Defendant Officers detained Tyre Nichols without any probable cause.

41.    On January 7, 2023, the Defendant Officers brutally beat Tyre, and assisted each other in beating him, within an inch of his life, without any legal justification.

42.    On January 7, 2023, at all relevant times, Tyre was unarmed, he was not resisting, he was defenseless, and he was restrained.

43.    On January 7, 2023, numerous other government employees from the MPD, the Memphis Fire Department, and the Shelby County Sheriff stood by apathetically as Tyre laid bloodied and battered on the street.

44.    On January 10, 2023, Tyre ultimately died from his injuries as a direct result of the policies and practices of the City of Memphis, which were the moving force behind Officers Martin

III, Haley, Hemphill, Smith, Mills Jr., and Bean's unconstitutional stop, assault, and use of force upon him.

I.    **The widespread practices within the Memphis Police Department.**

    A.    **The MPD has a longstanding custom of brutalizing civilians without justification.**

45.    Tyre's death was not an isolated event. Rather, it was the product of longstanding, unlawful customs that were allowed to flourish across the MPD.

46.    At the time of Tyre's killing, there was a well-established and widespread custom within the City of Memphis pursuant to which MPD officers routinely used force against civilians without justification, often because the persons have annoyed, angered, or embarrassed the police in one way or another.

47.    These beatings were often done by MPD officers as a way to punish the civilians.

48.    These beatings often occurred when the victims were not resisting.

49.    These beatings were often done while or after conducting a traffic stop.

50.    MPD officers, including the officers who beat Tyre, often refer to this practice as imposing a "tax" or a "run tax" on residents.

51.    This punishment generally meant beating a resident once they were already restrained or in police custody.

52.    These beatings were routinely administered on civilians as punishment for running from the police (hence the term "run tax") but could be administered as punishment for other actions that irritated officers as well.

53.    The "run tax" was not limited to specialized units, like the "SCORPION" tactical unit that the Defendant Officers worked in.

54.    To the contrary, the custom of using unjustified force against civilians who annoyed the police, to punish them for actions like running from officers, had been a longstanding and widespread custom within the MPD.

**B.    The MPD's custom of brutalizing civilians has been enabled by a code of silence.**

55.    The MPD's written policies prohibited the use of excessive force against civilians.

56.    Nevertheless, the MPD's custom of using excessive force (including imposing the "tax" or "run tax" against residents) was allowed to flourish within the MPD for years before Tyre's killing because of a firmly entrenched code of silence within the MPD in which officers lie for each other, manipulate evidence, and refuse to intervene or report wrongdoing, all to cover up violations of MPD policy, including unlawful use of force.

57.    When MPD officers used excessive force against a civilian, officers frequently would exaggerate or make up what the person did, fabricating violent or threatening behavior or ongoing noncompliance that falsely made the officers' excessive force appear proportional and necessary.

58.    Additionally, MPD officers frequently manipulated evidence that was captured by their body-worn cameras.

59.    Among other things, MPD officers sometimes did this by intentionally failing to turn on their cameras for encounters with civilians, or by activating their cameras but then intentionally leaving them inside their police cruisers or in other locations where the camera would be unable to record the officer's actual encounter.

60.    This fabrication and manipulation of evidence was enabled by an entrenched code of silence within the MPD.

61.     The code of silence meant that MPD officers would fail to report violations by other officers and would assist other officers in covering up violations.

62.     It was widely known within the MPD that an MPD officer who broke the code of silence could expect retaliation from other MPD officers.

63.     Because of this culture, MPD officers feared that if they broke the code of silence they would be labeled a "snitch," would face social isolation from fellow officers, and might not get help from other officers when they needed it in the field.

**C.    The MPD's code of silence was enabled by inadequate supervision, oversight, and accountability systems.**

64.     Central to MPD's code of silence was the inadequate supervision and oversight within the MPD.

65.     The code of silence extended to police supervisors, including Defendant Lt. DeWayne Smith, commander of the SCORPION Unit that encountered Tyre.  While MPD supervisors were supposed to oversee the use of force by their subordinates, in practice supervisors such as Defendant DeWayne Smith failed to carry out this function and enabled a culture of impunity to flourish.

66.     Supervisors discouraged line officers from reporting excessive uses of force, would fail to investigate improper uses of force that were reported to them, and would often turn on the *reporting officer*, cautioning them against making such reports lest the officer be labeled a "snitch."

67.     Supervisors also knowingly turned a blind eye to policy violations. Written MPD policy required supervisors to review body-worn camera videos associated with use of force reports, but supervisors routinely would approve even flagrantly excessive uses of force as being compliant with MPD policy.

68.    That occurred in Tyre Nichols' case, where Defendant Lt. DeWayne Smith, commander of the SCORPION Unit that encountered Tyre, reviewed the body-worn camera videos of Tyre's beating and yet declared his subordinates' flagrantly excessive and unjustified force to be in line with MPD policy.

69.    These problems of inadequate supervision and oversight were well known to the City.

70.    So obvious and pronounced were these inadequate oversight policies and practices that Chief Davis would later state that she had observed the problem in her first week on the job, in 2021, commenting that within days of starting, she could see that the MPD was "woefully unsupervised."

71.    In particular, Chief Davis indicated that within MPD there was "a culture that doesn't have supervision, that doesn't have adherence to the policies," which, she indicated, enabled abusive police practices such as the "run tax" that was visited on Tyre.

72.    These deficiencies were evident to other City leaders as well.  For example, officers' failure to use body-worn cameras was so well known that in 2021 high-ranking members of the MPD discussed the widespread issue of officers not using their body-worn cameras three times during their meetings entitled Tracking for Responsibility, Accountability, and Credibility or "TRAC" meetings.

73.    Yet despite knowing of these problems, the City did little to remedy them, both before and after Chief Davis took charge.  For example, penalties for misuse of body-worn cameras or failure to record civilian interactions were minimal to nonexistent.  And there were no written policies requiring audits or other oversight of supervisors' reviews of use of force, nor was there

any written requirement to randomly audit body-worn camera videos or use of force reports to ensure compliance with use of force policies—instead, such audits were optional.

74.    MPD's failure to institute mandatory audits and oversight over use-of-force reporting, use-of-force reviews, and body-worn camera usage was crucial to MPD's code of silence because it enabled officers and supervisors to routinely cover up unlawful uses of force.

75.    In addition, MPD maintained inadequate and improper training on use of force, use-of-force reporting, use-of-force reviews, and body-worn camera usage. The deficient training on these topics compounded the code of silence by ensuring that body-worn cameras, force reporting, and supervisory review of use of force would not be reliable or effective tools for accountability and oversight.

76.    MPD's longstanding deficiencies in policies, supervision, and training—and the culture of impunity these failures fostered—were allowed to persist through 2023, when, emboldened by this culture, MPD officers beat Tyre Nichols to death.

### D.    MPD's custom of excessive force and inadequate supervision was compounded in its "tactical" units such as SCORPION.

77.    The culture of brutality and impunity within the MPD was compounded in its "tactical" units, such as the SCORPION Unit that killed Tyre.

78.    For decades the MPD had deployed "proactive" policing units in the city under various names within the MPD's Organized Crime Unit ("OCU"), including CAT, SCORPION, and BLUE CRUSH.

79.    These units were treated as "elite" units, and they operated by giving officers far more leeway and much less oversight than regular MPD patrol officers.

80.    By the time the City hired Chief Davis in 2021, tactical units like SCORPION had been discredited across the country and had fallen out of favor.

81.    Indeed, while she was with the Atlanta police department, Chief Davis worked in a unit similar to SCORPION, called RED DOG, which was disbanded in 2011 after multiple high-profile incidents in which its officers used excessive force against civilians.

82.    Despite Chief Davis's experience with RED DOG in Atlanta, the MPD, under her command, pursued similar tactics with the SCORPION Unit in Memphis.

83.    The stated purpose of these units was to enter purportedly "high crime" areas and interdict hardened criminals there.  Chief Davis, for example, claimed that the SCORPION Unit was "laser-focused on repeat offenders, those individuals we know are committing violent crime in the community."

84.    In practice, however, these specialized "proactive" MPD units have been documented to patrol largely Black neighborhoods and use "pretextual stops" for minor infractions, such as driving with tinted windows or expired tags, to harass and intimidate residents and manufacture higher numbers of stops, arrests, and vehicle seizures, all contributing to an appearance that City policymakers were winning their war on crime.

85.    These units and their pretextual stops often resulted in unjustified violent encounters with community members, including high-speed chases and physical force that violated both MPD's policies and the constitutional rights of Memphis civilians.

86.    The custom of excessive force was exacerbated by top-down pressure within MPD, and specialized units in particular, that focused on increasing the quantity—rather than the lawfulness—of stops, arrests, and seizures. For example, SCORPION Unit commanders were required to set clear operational goals and "measurable performance objectives." Commanders and supervisors often measured the performance of SCORPION officers by the number of arrests they made and the number of vehicles they seized.

87.     Asset forfeiture, particularly the seizure of vehicles, was a lucrative source of revenue for the MPD.

88.     Chief Davis made the vehicle seizure policy a department wide initiative and notified the public of it. "When we identify individuals that are reckless driving to a point where they put other lives in danger we want to take your car too." She declared that the department would no longer merely be issuing citations for alleged reckless driving. "Take the car. Even if the case gets dropped in court. We witnessed it. You did it."

89.     SCORPION Unit Officers also notoriously utilized extreme intimidation, humiliation, and violence in their "investigations."

90.     To meet the Unit's objective performance measures, SCORPION and OCU Officers were given informal permission to engage in car chase scenarios which were unauthorized by formal MPD Policy.

91.     Unauthorized car chases often played out in dangerous ways. On several occasions Officers engaged in high-speed chases to pull over vehicles alleged to have committed only minor traffic violations.

92.     These tactics were all designed to enable Officers to increase the number of arrests they made as a means of meeting the objective performance measures set and enforced by their supervisors.

93.     After pulling an individual over for a minor traffic infraction, officers in specialized units, including SCORPION, often engaged in physically aggressive tactics against the people they pulled over. These officers often wore plainclothes (such as black hoodies) and often failed to identify themselves as police officers, which predictably would invoke a reaction of resistance from civilians out of fear of being injured.

94.    The physical encounters that often resulted allowed MPD Officers to allege—often based on fabricated or exaggerated facts—a violation by the civilian, such as aggravated assault against a police officer, and make an arrest on the civilian which could be classified as a felony.

95.    SCORPION Unit Officers frequently traveled in a pack of unmarked Dodge Chargers.

96.    Their uniforms were equally disguised, as they regularly wore black hoodies and ski-masks rather than traditional police garb.

97.    SCORPION Unit Officers routinely utilized a course of conduct endorsed and recommended by Chief Davis: they would start their hostile and harassing encounters with a traffic stop, often for a minor violation like a seatbelt or tinted window infraction, or sometimes (as with Tyre) for nothing at all.

98.    Next, the officers would jump out of their unmarked squad vehicles while barking orders, often shouting overlapping and conflicting commands that are impossible to comply with. Those in the stopped vehicle were left confused and frightened.

99.    This pattern and practice of violent, aggressive, and unconstitutional policing is demonstrated through the many examples of other community members who experienced similar encounters with the MPD. Victims reported being "subdued" by pepper spray, batons, tasers, or with a hands-on beating by officers unnecessarily and often while restrained or in handcuffs.

**II.    The City's widespread practices have resulted in numerous instances of police brutality.**

100.    The foregoing policies and practices of the City of Memphis have led to numerous uses of excessive force against civilians over the years.  What follows are several examples:

a.    **Deangelo Lauderdale, age 32**: The day before the Defendant SCORPION Officers beat Tyre Nichols to death, on January 6, 2023, Mr. Lauderdale was

18

outside of a gas station when Defendant Officers Mills, Bean, and Justin Smith swooped into the parking lot.

    i.    The officers allegedly suspected Mr. Lauderdale of a drug transaction.

    ii.    Out of fear Mr. Lauderdale attempted to flee the scene.

    iii.    A police affidavit of the incident claimed that to complete the arrest of Mr. Lauderdale a chemical agent was deployed.

    iv.    However, the federal criminal trial regarding the death of Tyre Nichols revealed the usage of a much higher level of force on Mr. Lauderdale.

    v.    At the trial, Defendant Officer Mills testified that Officer Haley had arrived on the scene and kicked Mr. Lauderdale in the face while the officers regained control of Mr. Lauderdale.

    vi.    Mills testified that neither he, or any of the SCORPION Unit 1 Officers, reported Defendant Haley's instance of excessive force because "the kick was bad" and they wanted to hide the incident.

**b. Monterrious Harris, age 22**: On January 4, 2023, SCORPION Officers clad in hoodies and ski-masks descended on his car in an apartment complex parking lot where he was waiting to visit his cousin.

    i.    Mr. Harris maneuvered into a parking spot in the complex, and officers claimed he was driving rapidly at them before backing away.

    ii.    SCORPION Officers yelled at him to get out of his car and threatened to shoot him.

    iii.    They punched him, threw him to the ground, and dragged him across the concrete.

iv.    He suffered cuts and a black eye.

v.    The officers only stopped when people from nearby apartments came to check on the noise from Mr. Harris' screams for help.

vi.    Mr. Harris filed a 42 U.S.C. § 1983 lawsuit against the City of Memphis and individual officers based on this interaction, which includes Defendants Martin, Haley, Smith, Mills, and Bean.

vii.    Upon information and belief, no SCORPION officers were disciplined following this encounter.

c.  **Cornell Walker:** Just one day earlier, on January 3, 2023, Mr. Walker was sitting in a parked car with his friend when Officer Emmitt Martin III and another SCORPION officer approached the car from an unmarked squad, screaming "I need to see your motherfucking hands or I'll blow your motherfucking heads off!"

i.    Walker was at first terrified that he was the victim of a carjacking or robbery, until he saw Officer Martin's badge and "SCORPION" on his shirt.

ii.    Martin pulled Walker out of his car, with his gun drawn and pointed at Walker, and dragged him to the unmarked squad where Walker was met with two more SCORPION Officers with guns drawn—Officer Smith and Officer Haley.

iii.    Walker never learned why he was pulled from his car, and he was never cited or arrested.

iv.   He called the MPD Internal Affairs Unit to complain about the traumatizing incident and was ignored by a sergeant who defended the conduct.

v.    Upon information and belief, no SCORPION officers were disciplined following this encounter.

d. **Jeremy Henderson:** On December 23, 2022, MPD Officers responded to a domestic dispute where Mr. Henderson and his brother were being asked to leave their grandfather's house. When Officers arrived and asked them to leave the property the incident escalated. An altercation between Mr. Henderson and one of the MPD Officers occurred and Mr. Henderson was slammed to the ground and punched in the face.

i.    Upon MPD officers arriving on the scene the brothers were asked to leave the premises of their grandfather's property. While trying to pack their belongings, officers began to hassle Mr. Henderson's younger 19-year-old brother to hurry up in collecting his belongings.

ii.   Mr. Henderson asked the Officers not to rush his brother and was pushed by an Officer. Mr. Henderson admits to "swinging" on the Officer after he was pushed.

iii.  In response the Officer applied a "tax" and slammed Mr. Henderson to the ground and punched him in the face.

iv.   Mr. Henderson was arrested for resisting arrest.

v.    Four different Officers, who were also on the scene, turned off their body worn cameras at various times during the incident.

vi.  The Officer was given a five-day suspension for his excessive force.

e.  **Jaylin McKenzie, age 20:** On December 16, 2022, two MPD Officers ensued in a car chase of Jaylin McKenzie for running a red light. Eventually Jaylin pulled over and a foot chase began which ended when one of the officers shot and killed Jaylin.

   i.  The MPD Officers involved in the pursuit said they were patrolling to prevent burglaries and stated they engaged in an extended chase of the vehicle because the driver would not pull over.

   ii.  When the vehicle hit a curb and came to a stop a foot chase pursued where one of the officers tripped and fell and the other continued to pursue Jaylin instead of the other three individuals who exited the vehicle.

   iii.  The Officer who continued the pursuit had turned off his body worn camera and no footage showing him firing the bullets that killed Jaylin was recorded.

   iv.  It took roughly 9 months for the MPD to release the footage from the body-worn camera of the Officer who tripped, which reveals the sounds of the deadly shots being fired at Jaylin.

   v.  The Memphis Police initially had reported that Jaylin had fired at the officers, but no evidence suggested this report to be true.

   vi.  Jaylin's mother Ashley McKenzie asked for a police report or footage of the scene but received no information until the TBI investigation was complete in September of 2023.

vii.    MPD provided no information to Ms. McKenzie until the completion of the TBI investigation. A month after her son's death Ms. McKenzie stated, "I literally buried my son, and I still don't know what's wrong or what happened that night."

f.   **Labryant Burnside:** On December 1, 2022, three SCORPION Officers pursued a vehicle with three minors who they suspected of a carjacking. Eventually the vehicle pulled over and the three minors bailed from the vehicle and attempted to flee from the Officers. Labryant was one of these minors who ran and when he was handcuffed by officers he was smacked in the face by two of the arresting officers.

i.    Immediately after Labryant was put in handcuffs and placed on the ground one Officer placed the muzzle of his MPD issued AR15 to the back of Labryant's head and stated, "if you move, I will blow your [expletive] head off." This was done in the presence of the Labryant's mother.

ii.    After Labryant was placed in the back of the squad car the Officers transporting him stopped at a nearby parking lot. One got out of the vehicle to apply the "tax" and smacked Labryant while he was handcuffed and restrained in the backseat.

iii.    When Labryant was inside the investigation office the Officers tried to take a photo of him and as a means of getting Labryant to put his face in an upward position an Officer slapped him in the face and told him to hold his head up.

    iv.    Not one of the three Officers who initially engaged in the pursuit of the minors had turned on their body worn cameras to record the incident and no Response to Resistance form was filled out, which MPD Officers were required to do per department policy.

    v.    The only individual who was punished for the excessive force used on Labryant was the Officer who slapped him while they attempted to take a photo because other police personnel witnessed the use of force.

**g.  Marcus Bills:** On November 26, 2022, Mr. Bills was involved in an arrest following an MPD traffic stop where he slipped out of his handcuffs and escaped from the arresting officers.

    i.    During an initial traffic stop, Mr. Bills escaped SCORPION Officers Kyle Coudriet and Defendant Officer Haley. Officer Haley chased Mr. Bills down and tackled him.

    ii.    Officer Coudriet punched Mr. Bills in the back during his attempt to re-handcuff Mr. Bills.

    iii.    Defendant Officer Haley applied a "tax" to Mr. Bills for escaping by punching him in the face.

    iv.    Officer Coudriet turned himself and another officer around while Officer Haley was applying the "tax" to keep them from seeing "something [they] didn't want to see."

**h.  Maurice Chalmers-Stokes, age 19**: On October 1, 2022, Mr. Chalmers-Stokes was leaving a barbershop on foot when he noticed a car following him aggressively, and the people inside the car were wearing ski-masks.

    i.    He was scared, and he started to run.

    ii.    He was struck by the SCORPION Unit's unmarked car, and when he got up and continued to run he was tackled by Officer Haley, causing Mr. Chalmers-Stokes to hit his head on a brick.

    iii.    Officers later claimed that they approached him because he was walking in the middle of the street, and upon searching his backpack they found a legally obtained pistol that they believed to be stolen.

    iv.    Officer Mills, Officer Bean, and Officer Hemphill were all part of this stop with Officer Haley.

    v.    Upon information and belief, no SCORPION officers were disciplined following this encounter.

**i.** **Sebastian Johnson, age 19 and Kendrick Johnson Ray, age 20**: In August 2022, SCORPION Officers were responding to a call at an apartment complex in Memphis.

    i.    A crowd grew at the complex and the officers called in backup.

    ii.    Cousins Sebastian Johnson and Kendrick Johnson Ray were hanging out with two other cousins outside at the complex when police arrived.

    iii.    They saw officers swarm the complex, yelling profanities with guns unholstered.

    iv.    The SCORPION Officers beat Mr. Johnson after claiming he had a gun, but no one else on scene corroborated that version of events.

    v.    Both cousins were left bloodied and bruised at the hands of the SCORPION Officers, and all criminal charges are in the process of being dismissed.

   vi.    At least three of the six SCORPION Officers responsible for Tyre Nichols' death were present that day.

  vii.    Upon information and belief, no SCORPION Officers were disciplined following this encounter.

**j.** **Carla Hamilton:** On July 23, 2022, Ms. Hamilton was handcuffed and arrested following a traffic stop conducted by MPD Officers. At a redlight one of the Officers exited the vehicle and kicked Ms. Hamilton while she was handcuffed in the backseat.

    i.    Ms. Hamilton was pulled over by MPD Officers for a fraudulent temporary tag. Ms. Hamilton was placed in handcuffs without resistance and when Marijuana was found in her vehicle she was arrested.

    ii.    It was alleged that Ms. Hamilton was agitated in the backseat and threatened to spit on the arresting Officers.

   iii.    While stopped at a red light one of the Officers got out of the vehicle and kicked Ms. Hamilton in the stomach four times.

   iv.    The officer kicking stated, "[expletive] that's for spitting on me."

    v.    The Officer who kicked Ms. Hamilton received a two-day suspension for her excessive force.

k. **Jesus Valles**: In July 2022, SCORPION Officers, including Defendant Officer Haley and Martin the "Smash Brothers," made the arrest of Mr. Valles while he was in his apartment.

   i. Mr. Valles allegedly posted a photo on social media where he was seen pointing a gun at an MPD Officer.

   ii. Even though Mr. Valles was not fighting during his arrest, Defendant Officers Haley and Martin applied a "tax" for the photo taken by Mr. Valles and struck Mr. Valles with closed fists.

   iii. These closed fist blows continued even after Mr. Valles was in handcuffs.

   iv. A SCORPION Officer who witnessed the beating, Officer Coudriet, covered his body-worn camera when his colleagues delivered the punches out of fear.

   v. After the beating, the response to resistance forms officers are required to fill out after an altercation of excessive force contained false information that Mr. Valles attempted to spit on Officer Haley.

   vi. Mr. Valles never attempted to spit on any officer.

   vii. The encounter was so charged that Defendant Officer Haley accidentally punched his colleague Officer Coudriet in the eye as he was abusing Mr. Valles.

   viii. Upon information and belief Defendant Officers Martin and Haley never faced punishment for this instance of excessive force.

l.  **Davitus Collier, age 32**: In May 2022, SCORPION Officers chased and pepper sprayed Mr. Collier in the face when he was on his way to buy beer for his father on Memorial Day weekend.

  i.  He was one of three Black men in the car and was stopped by the SCORPION Officers for a reported seatbelt violation.

  ii.  Mr. Collier maintained that all three men were indeed wearing seatbelts.

  iii.  Officer Martin was one of several SCORPION Officers present, and he demanded identification and then told Mr. Collier that there was a murder warrant connected with the car.

  iv.  The car belonged to Mr. Collier's 58-year-old father, and Mr. Collier knew that Officer Martin was lying about the basis to needlessly detain him and his passengers.

  v.  Martin began to pull Mr. Collier from his car, and out of fear Mr. Collier ran towards a convenience store where he knew there would be more witnesses.

  vi.  Mr. Collier slipped, and one of the SCORPION Officers tackled him and sprayed him with pepper spray, telling him not to resist.

  vii.  This part of the encounter is memorialized on video and Mr. Collier was *not* resisting, but rather was restrained when he was pepper sprayed.

  viii.  Upon information and belief, no SCORPION officers were disciplined following this encounter.

28

m. **Damecio Wilbourn, age 28, and brother Romello Hendrix:** In February 2022, the brothers were unloading recording equipment from their car trunk at a friend's apartment complex.

    i. Two SCORPION Officers jumped out of their unmarked car and demanded to know why the brothers were at the apartment complex, and one officer threw Mr. Wilbourn against a car.

    ii. Mr. Wilbourn was terrified because he had no idea who the officers were—they did not wear uniforms or identify themselves as law enforcement.

    iii. Officers claimed they smelled marijuana and found a legally obtained pistol.

    iv. All criminal charges were dropped.

    v. Upon information and belief, no SCORPION officers were disciplined following this encounter.

n. **Kieron Lee:** On June 1, 2021, Mr. Lee was found by MPD Officers to be asleep at the wheel and under the influence of alcohol. After being transported to the hospital by the responding Officers he was handcuffed and placed in a chair. Mr. Lee became agitated and spit on an Officer who then punched Mr. Lee three times while he was handcuffed.

    i. During the preparation of the trial for Mr. Lee's alleged criminal offense the body worn camera was reviewed by the prosecutor, which unearthed the excessive force used on Mr. Lee.

    ii.    When Mr. Lee and the arresting Officers arrived at the hospital Mr. Lee was uncooperative and placed in a wheelchair.

    iii.    While handcuffed and in the wheelchair Mr. Lee's agitation continued, and he spit on one of the Officers.

    iv.    The responding Officer applied a "tax" by punching Mr. Lee three times.

    v.    The Officer received a 6-day suspension for his excessive force.

**o.  Marco Lockett:** On January 16, 2021, Mr. Lockett was pursued by MPD Officers for driving an alleged stolen vehicle. After a foot pursuit ensued, the arresting MPD Officer hit Mr. Lockett in the face with his pistol and continued to beat Mr. Lockett while he was in handcuffs.

    i.    MPD Officers pursued a chase of an alleged stolen vehicle that contained Mr. Lockett.

    ii.    When the two suspects bailed out on foot one Officer was able to locate Mr. Lockett in a nearby shed.

    iii.    When the Officer located Mr. Lockett and struck him in the head with his MPD issued pistol.

    iv.    Mr. Lockett was then handcuffed, and a "tax" was applied to him by the Officer as he was punched in the face three times while restrained.

    v.    The Officer that inflicted the "tax" and excessive force had a history of problematic behavior, including one where he kicked a man in the face during an arrest.

p. **Drew Thomas:** In January of 2019, Mr. Thomas, who experienced mental illness and MPD officers knew had been in and out of psychiatric care, was excessively sprayed with chemical agent in the eyes by a MPD Officer while he was restrained in the back seat of an MPD vehicle.

   i.   While being stopped for allegedly vandalizing a convenience store, Mr. Thomas submitted to arrest and was handcuffed without any resistance.

   ii.   When Mr. Thomas was put in the back of the squad car, he became agitated and started to kick the inside of the car.

   iii.   The arresting Officer responded to Mr. Thomas by stating "I will spray the [expletive] out of you! You worthless piece of incestuous shit!"

   iv.   The Officer radioed over dispatch that he was going to deploy his pepper foam chemical agent. The radioed message stirred laughter from officers and one responded stating "I got to see this."

   v.   After initially failing to make contact with his chemical agent the Officer went deep into the back seat and sprayed it directly into the eyes of Mr. Thomas. Another Officer on the scene encouraged the behavior stating, "make that [expletive] burn!"

   vi.   A Supervisor got to the scene and asked the subordinate officer if he sprayed Mr. Thomas. The Officer stated, "I foamed him!" The supervisor responded "Good."

   vii.   The Officer who foamed Mr. Thomas then stated, "I foamed the [expletive] out of him!" He next pulled his body-worn camera off his

31

chest and yelled directly into the lens "I'll tell the camera I foamed the [expletive] out of him!"

    viii.    No Officers on the scene responded to Mr. Thomas' cries for air, water, and help in the backseat.

    ix.    Another subordinate Officer fist bumped the supervisor on the scene after a conversation about deciding to charge Mr. Thomas with a felony.

    x.    The Officer who engaged in foaming Mr. Thomas remained on the force for another year and resigned just before supervisors could complete their disciplinary action.

    xi.    Another Officer on the scene and the supervisor on the scene received a three-day suspension. The case was not referred to the district attorney's office for review.

q. **Johnny Graham, age 50:** Mr. Graham has been stopped by SCORPION Officers more than once, always pulled over by an unmarked squad for no reason.

    i.    On one occasion in East Memphis, he and his wife were humiliated when they were forced to stand on the side of a busy roadway while officers searched their car without basis and in view of many members of the public.

    ii.    Upon information and belief, no SCORPION officers were disciplined following this encounter.

**r. Jeremiah Hall and Anthony Whitt**: October 29, 2016, Mr. Hall was beat while he was no longer resisting and in a defenseless position. Additionally, Mr. Whitt was slammed to the ground despite complying with the orders given.

  i.   Officers were called to handle a domestic dispute and tased Mr. Hall shortly after arriving.

  ii.  After tasing Mr. Hall, the Officers claimed that Hall continued to resist, and they began to hit him with their ASP batons.

  iii. The Officers continued to administer blows with their batons even after Mr. Hall was curled up on the ground in a fetal and defenseless position.

  iv.  Mr. Whitt was engaging in a normal conversation with his friend Mr. Hall and posed no immediate threat to the officers. Despite this, one officer slammed Mr. Whitt to the ground, causing visible facial injuries.

  v.   One of the responding Officers was given a 25-day suspension and the other resigned about 13 months after the incident before the disciplinary proceedings were complete.

**s. Antonio Strawder:** On March 13, 2016, Mr. Strawder was tased by an MPD Officer multiple times while in handcuffs by an officer who had given him a citation for driving with a suspended license a month earlier.

  i.   The MPD Officer who gave Mr. Strawder a traffic citation a month prior arrived at Mr. Strawder's house asking him if he had ever got a new license.

  ii.  Mr. Strawder replied he did not and went into his home.

iii. When Mr. Stawder walked out of his house the officer was standing to the side of the door and a struggle ensued which was not recorded because the officer was not wearing his body-worn camera.

iv. Mr. Strawder was handcuffed with his hands behind his back when the officer fired his taser which caused Mr. Strawder to fall to the ground.

v. At this point Mr. Strawder's girlfriend began to record the incident on her cell phone and recorded the officer deploying his taser two more times to Mr. Strawder while he was handcuffed on the ground.

vi. The Officer was suspended for 10 days, and the case was not sent to the district attorney for review.

t. **Darrius Stewart, age 19:** On July 17, 2015, Darrius Stewart was shot and killed by MPD Officers after a traffic stop that originated out of a headlight violation.

i. When the MPD Officer pulled over Darrius, who was in the car with friends, he learned there were two outstanding warrants for the teen.

ii. The MPD Officer attempted to arrest Darrius, and a struggle ensued where Darrius attempted to run.

iii. The teenager was shot three times by the MPD Officer, including once while his back was turned to the Officer.

u. **Daniel Jefferson Jr, age 29:** On April 2, 2015, Mr. Jefferson was beat by MPD Officers after being taken into custody for shooting a Memphis Organized Crime Unit Officer who had been following Mr. Jefferson in an unmarked car for several blocks.

34

i.    Mr. Jefferson was unaware he was being followed by law enforcement, as the MPD Organized Crime Unit Officer who was following him was in an unmarked car.

ii.    Mr. Jefferson recalled that he acted in self-defense believing his life was at risk.

iii.    Mr. Jefferson was arrested without issue after the incident and taken to the Raines Precinct by the responding Officers.

iv.    As soon as Mr. Jefferson got into the door of the Raines Precinct officers started hitting him in his ribs and backs.

v.    One supervisor was quoted saying, "Go take him to the bathroom, don't do it out here."

vi.    Mr. Jefferson was taken to a recreation room where additional officers joined in on the beating.

vii.    One Officer entered the room and sated "Is this the guy that shot the officer?" and proceeded to punch Mr. Jefferson in the stomach region.

viii.    As a "tax" for shooting one of their own, the officers kicked, punched, body-slammed, and humiliated Jefferson as he was restrained in handcuffs at the Raines precinct.

ix.    Supervisors handed out suspensions ranging from 15 to 20 days for the incident and the case was not sent to the district attorney's office for review.

III.    **The baseless stop: consistent with MPD's widespread practices, the SCPRPION Unit stops Tyre Nichols without justification.**

101.    Tyre Nichols spent the evening of January 7, 2023, taking photos of the sunset and skateboarding at Shelby Farms Park in Memphis, Tennessee.

102.    At about 8:00 p.m. that night, Tyre set out to return home from Shelby Farms Park to 6743 Castlegate Lane, where he lived with his mother and his stepfather.

103.    While Tyre was at Shelby Farms, Memphis Police Department Officers Emmitt Martin III, Demetrius Haley, and Preston Hemphill—officers in SCORPION Unit Team 1—were on patrol in unmarked squad cars.

104.    As members of the SCORPION Unit, Officer Martin, Officer Haley, and Officer Hemphill were responsible for carrying out the directive of Chief Davis to make stops, even without a Constitutional basis for doing so.

105.    On the night of Tyre Nichols' beating, Defendant DeWayne Smith—the supervising Lieutenant over SCORPION Unit Team 1—instructed one of his officers, Defendant Justin Smith, to go out and "get them started" because SCORPION Unit Team 1 was not making any arrests that night, and the number of arrests his team made on a given night was a metric by which MPD measured his and his officers' performance.

106.    At approximately 8:20 p.m. Officer Martin, Officer Haley, and Officer Hemphill saw a young black man driving a car: it was Tyre Nichols.

107.    In accordance with Chief Davis's directives to stop and seize cars even without a constitutional basis, Officer Martin, Officer Haley, and Officer Hemphill set out to stop Tyre.

108.    Officer Martin called into MPD Dispatch to run Tyre's license plate for warrants and traffic infractions to which Dispatch responded "negative."

109.     Officer Martin had no lawful basis to stop Tyre's vehicle, but Officer Martin pursued Tyre waiting for an opportunity to stop him with Officer Haley and Officer Hemphill following suit.

110.     Officer Haley passed Officer Hemphill to be second in line, also waiting for the opportunity to stop Tyre.

111.     None of the officers had probable cause or reasonable articulable suspicion to stop Tyre's vehicle but proceeded to attempt to do so anyway.

112.     When Tyre pulled up to a red light at Ross Road and Raines Road and activated his left turn signal, Officer Martin and Officer Haley saw their opportunity to attempt to seize him.

113.     Officer Martin and Officer Haley pulled their squad cars up next to Tyre, boxed him in, and descended on his car while he waited at the traffic light to take a lawful left turn.

114.     Moments later, Officer Hemphill pulled up behind Tyre's car in the left turn lane as all three squad cars worked in tandem with unmarked police vehicles to encircle and block Tyre's car at the intersection and seize Tyre.

115.     There was no justification for this type of aggressive and frightening police tactic to be used against Tyre, as there was no reasonable justification for stopping Tyre in the first place.

116.     Officer Martin and Officer Haley quickly got out of their unmarked police cars and ran up to Tyre's car.

117.     Officer Martin and Officer Haley both wore black sweatshirt hoodies over their heads, and never identified themselves as police.

118.     Officer Martin and Officer Haley were both wearing body-worn cameras and knew Officer Hemphill was present and likely had his body-worn camera on recording their conduct.

119.    Officer Martin and Officer Haley knew that Chief Davis's directive was to make stops and suppress crime even without a Constitutional basis—and further knew that MPD failed to review or audit officers' body-worn camera usage—so neither Officer Martin nor Officer Haley activated their cameras when they stopped Tyre, knowing they could fabricate a reasonable basis for their actions after the fact and not face any repercussions.

120.    Officer Martin and Officer Haley had a mindset of impunity as prior, similar conduct had occurred without any repercussions.

121.    Officer Martin and Officer Haley immediately opened the driver's side door and forcefully pulled Tyre out without explanation, prompting Tyre to ask, shocked and terrified, "What did I do?!"

122.    Officer Martin and Officer Haley pushed Tyre down, and pulled at his arms yelling, "Get on the ground, mother fucker!"

123.    Officer Martin and Officer Haley unreasonably escalated the situation by physically assaulting and shouting at a cooperative, non-resistant individual.

124.    Their conduct was condoned and enabled by MPD's custom of brutalizing civilians without justification and MPD's code of silence that protected officers who carried out that custom.

125.    At no point prior to this encounter was Tyre suspected of committing a crime.

126.    At no point prior to this encounter was Tyre a threat of bodily injury or harm to members of the public or to the SCORPION Officers.

127.    Next, Officer Preston Hemphill sprinted out of his unmarked squad car with his gun drawn, held sideways, and pointed squarely at Tyre—ready to deploy deadly force on a non-resistant individual without any justification.

38



*Officer Hemphill immediately pulls out and points his gun at Tyre as he
approaches his fellow SCORPION Officers on scene.*

128.    Officer Hemphill unreasonably escalated the situation by threatening deadly force
against a cooperative, non-violent, non-resistant individual. Officer Hemphill's actions were
consistent with, and enabled by, MPD's custom of brutalizing civilians without justification and
MPD's code of silence that protected officers who carried out that custom.



*Tyre looking up at Officers terrified and confused as to why he was pulled from the car.*

129.    At this point, Tyre was restrained by both Officer Martin and Officer Haley, with Officer Hemphill's gun pointed at him, as he pled for answers as to why he was dragged from his car.

130.    Tyre, fearful and panicked, again shouted "What did I do?!"  He never received an answer to that question from any MPD Officer.

131.    Officer Martin and Officer Haley commanded that Tyre lay down and that he place his hands behind his back.

132.    While attempting to comply, Tyre tried to be the calm voice of reason, asking what was going on as they pulled his arms behind his back.

133.    Tyre said to Officer Martin and Officer Haley, in a scared yet measured tone, "you're doing a lot here."

134.    In response to Officer Martin and Officer Haley barking that he must get down on the ground he responded "Ok, I'm laying down!"

135.    Tyre's pleas fell on deaf ears despite his multiple attempts to de-escalate the situation to no avail.

136.    All three SCORPION Officers (Officer Martin, Officer Haley, and Officer Hemphill) simultaneously restrained, pulled, and struck Tyre trying to force him further into the ground, and yanked his arms behind his back, all in keeping with MPD's custom of brutalizing civilians without justification.

137.    Tyre did not resist and attempted to comply with the SCORPION Officers' orders.

138.    Any resistance perceived by the SCORPION Officers were Tyre's reasonable attempts to comply with their unlawful orders.

139.    Despite Tyre's efforts to comply with those unlawful orders, Officer Haley proceeded to deploy pepper spray directly into Tyre's eyes at close range.

140.    Officer Haley had no reasonable basis to deploy pepper spray into Tyre's face at close range.

141.    Officer Haley acted pursuant to, and was enabled by, MPD's custom of brutalizing civilians without justification and MPD's code of silence that protected officers who carried out that custom.

142.    With Tyre's eyes and face burning after attempting to deescalate the situation multiple times and with a gun pointed at him, the SCORPION Officers' tempers raged as they continued to shout threats and profanity at Tyre.

143.    Terrified and in fear for his life, Tyre was somehow able to loosen himself from the officers' grip after about a minute.

144.    Tyre then did the only thing he could to attempt to save his life and defend himself—he ran.

145.    Tyre was not suspected of committing any kind of crime at any time.

146.    Tyre was never suspected of committing any kind of crime at any relevant time.

147.    At no point prior to or during this encounter was Tyre a threat to members of the public or to the SCORPION Officers.

148.    Without any reasonable justification, Officer Hemphill deployed his taser at Tyre, which was ineffective.

149.    With his parents' home just a half mile away, Tyre ran for the safety of their home.

150.    Officer Martin and Officer Haley both took off running after Tyre, furious that he escaped the grip of the SCORPION Unit and their unconstitutional stop.

151. Both Officers gave up the foot chase and eventually got in their unmarked squad cars to attempt to chase Tyre down.

152. Officer Hemphill stayed back at the intersection of Ross and Raines, calling dispatch for more SCORPION Units to support Officer Martin and Officer Haley as they hunted for Tyre.

153. As Officer Hemphill called for more SCORPION Units to assist Officer Martin and Officer Haley, he called out "I hope they stomp his ass!" invoking MPD's "run tax," which the SCORPRION Officers were about to levy on Tyre.

## IV.    The Capture and the Retaliation: The Gang of SCORPION Unit Officers Beat Tyre Within an Inch of His Life.

154. Tyre reached the intersection of Bear Creek Cove and Castlegate Road—just 100 yards from his parents' home—when he was captured by SCORPION Officers Justin Smith and Tadarrius Bean at approximately 8:30 p.m., who were joined by Officer Desmond Mills seconds later.

155. SCORPION Officers Mills and Bean learned that Tyre had run from fellow SCORPION Officers Haley, Martin, and Hemphill over the radio while they were in the process of conducting a separate traffic stop, which they abandoned to enforce the "run tax" against Tyre.

156. At the same time that Officers Mills and Bean heard about Tyre running from Officers Haley, Martin, and Hemphill, Officer Justin Smith also heard over the radio that Tyre was running towards Bear Creek Cove and Castlegate Road.

157. The intersection where Officers Smith, Bean, and Mills stopped Tyre was directly underneath a SkyCop camera—a fixed pole-mounted and police-monitored camera designed to enhance safety and monitor crime in the neighborhood.

158.    Rather than capturing the crimes of civilians, the SkyCop camera recorded the SCORPION Officers' Department-sanctioned brutality against Tyre.

159.    Officer Smith and Officer Bean immediately grabbed Tyre when they found him and shoved him to the ground, pulling his hands behind his back.

160.    At this moment:

    a.   Tyre was restrained;

    b.   Tyre was unarmed;

    c.   Tyre was not resisting;

    d.   Tyre was compliant;

    e.   Tyre had not committed any violent crimes;

    f.   Tyre had not committed any crimes whatsoever;

    g.   Tyre was not a threat to any member of the public;

    h.   Tyre was not a threat to any law enforcement officer; and

    i.   Tyre was not a threat to any individual.

161.    When Officer Mills arrived moments later, Officers Smith and Bean were standing over Tyre and were punching Tyre, who was on the ground.

162.    Officer Mills immediately deployed pepper spray in Tyre's face.

163.    Officer Mills had no justification for doing so.

164.    Either Officer Smith or Officer Mills menacingly yelled at and taunted Tyre, "You wanna get sprayed again? Huh?" before spraying him in the face again with pepper spray while the other SCORPION Officers held Tyre's hands behind his back.

165.    Then, Officer Emmitt Martin arrived on scene and joined the other officers in beating Tyre.

166.    As Tyre begged for the onslaught to cease, the SCORPION Officers restrained and repeatedly struck and punched Tyre in the face and body.

167.    Even with Tyre's pleas and cries for help and with his attempts to cover his eyes from the chemical assault being rained upon him, the SCORPION Officers continued to hold him down and hold him up as their assault continued.



*Officer Mills sprays Tyre directly in his face with pepper spray, despite already being on the ground, while another SCORPION officer restrains Tyre.*

168.    While Tyre lay on the ground restrained and doused with chemical agents, Officer Mills struck Tyre repeatedly with a telescoping police baton.

169.    While Officer Mills beat Tyre with the baton, Officer Smith held Tyre's arms back to heighten the impact of the blows.

170.    While Tyre was restrained by Officers Bean and Smith, Officer Martin punched Tyre many times in succession.

171.    Officer Demetrius Haley was the last of the five SCORPION officers to arrive at the scene. Officer Haley ran up to join the savage beating, kicking Tyre who remained restrained by the other officers.

172.    Without any legal justification, Officer Martin, Officer Haley, Officer Smith, Officer Mills, Jr., and Officer Bean all brutally beat and assisted each other in beating Tyre, taking turns punching and kicking him in his face and midsection.

173.    While still able to speak, Tyre screamed out for his mother—shouting "Mom! Mom!" into the neighborhood—in hopes that she or someone nearby would come to his aid as he was being brutalized and pummeled to death.

174.    Two SCORPION Officers propped Tyre up to make him an upright target for other SCORPION Officers to continue to hit him and use Tyre's body and face as a punching bag.

175.    Tyre fell to the ground and the SCORPION Officers held him on his stomach so that he could be cuffed, which could have been accomplished minutes prior at the stoplight immediately after the unconstitutional stop and before their unconstitutional assault began.

176.    At least three SCORPION Officers held Tyre down, while the others beat him and several sat on top of him.

177.    One of the five SCORPION Officers took the opportunity to kick Tyre while he was down on the ground, restrained, and handcuffed.

178.    Ultimately the five SCORPION Officers (Martin, Haley, Smith, Mills, Jr., and Bean) beat Tyre within an inch of his life over the course of seven unrelenting minutes without any justifiable reason and without any government interest in doing so.



*The five SCORPION Officers (Emmitt Martin, Demetrius Haley, Justin Smith, Desmond Mills,*
*and Tadarrius Bean) ruthlessly beating Tyre Nichols to death.*

179.   At all relevant times:

a.   Tyre was unarmed;

b.   Tyre was not resisting;

c.   Tyre was compliant;

d.   Tyre had not committed any violent crimes;

e.   Tyre had not committed any crimes;

f.   Tyre was not a threat to any member of the public;

g.   Tyre was not a threat any law enforcement officer;

h.   Tyre not a threat to any individual; and

i.   Tyre was restrained.

180.    In beating Tyre, these five SCORPION Officers were following the longstanding custom within the MPD of imposing a "tax" on civilians who annoyed, irritated, or shamed police officers.

181.    In this instance, Tyre had annoyed the officers by running away from the initial stop.

182.    In accordance with MPD's custom of brutalizing civilians without justification—and the "run tax" custom in particular—the five SCORPION Officers were unrelenting and merciless in beating Tyre, in violation of his Fourth Amendment rights.

183.    Even though beating Tyre in this manner was flagrantly unlawful, the five SCORPION Officers proceeded because none expected to be caught or disciplined.

184.    None of the five SCORPION Officers expected to be caught or disciplined because all of them anticipated that, in keeping with MPD's widespread practice, they could fabricate evidence that Tyre was threatening them, lies that they expected would be accepted by their supervisors without serious question.

185.    The five SCORPION Officers also believed that their lies would be upheld because the officers would observe the code of silence within the MPD and, pursuant to that unwritten code, none of them would reveal what actually happened.

186.    In sum, the five SCORPION officers (Martin, Haley, Smith, Mills, Jr., and Bean) were carrying out MPD's custom of brutalizing civilians without justification (particularly civilians who run from or otherwise annoy officers) and were enabled by MPD's code of silence that protected officers who carried out this unlawful custom.

**V.    The Aftermath: The Indifference of SCORPION Unit Officers, MPD Officers, MFD Agents, and Others Contribute to Tyre's Death.**

187.    More MPD Officers arrived on scene as the original five SCORPION Officers (Martin, Haley, Smith, Mills Jr., and Bean) finished with Tyre and left him on the street.

188.    The original five SCORPION Officers (Martin, Haley, Smith, Mills Jr., and Bean) had handcuffed Tyre by 20:37:05, and Tyre remained laying on the street, rolling around to try and rest on his back, obviously in distress.

189.    None of the original or newly arrived officers checked Tyre's condition or expressed any concern for the bloodied, dazed, handcuffed man left alone and barely moving in the street.

190.    Instead, the MPD Officers, including all of the original five SCORPION Officers (Martin, Haley, Smith, Mills Jr., and Bean), walked away from Tyre, high-fiving and discussing their own actions in Tyre's beating.

191.    As more MPD officers arrived, the five SCORPION Officers smiled, laughed, and talked with their fellow officers.

192.    They did so in complete and utter indifference to Tyre, who lay dying in the street just feet away from his home.

193.    MPD officers have a duty to provide appropriate medical aid as quickly as reasonably possible following any law enforcement action in which injuries have been sustained, especially when those injuries are obvious and severe, medical distress is apparent, or the individual is unconscious.

194.    No officer on scene, including the original five SCORPION Unit Officers (Martin, Haley, Smith, Mills Jr., and Bean), assessed Tyre for injuries, despite his obvious bleeding, distress, and incoherence.

195.    MPD officers, including the original five SCORPION Unit Officers (Martin, Haley, Smith, Mills, and Bean), joked about the chase with Tyre and suggested that he might be on drugs or perhaps reached for a service weapon despite there being no evidence to suggest either was true.

196.    The original five SCORPION Unit Officers (Martin, Haley, Smith, Mills, and Bean) bragged about their involvement with stopping and beating him.

197.    At approximately 8:38 p.m. two officers dragged Tyre from his position laying on the ground, and another officer helped them prop him up in a supine position to lean him against an unmarked squad car.



*Tyre laying unrecognizable propped up against an unmarked Memphis Police Department vehicle*

198.    Tyre passed in and out of consciousness, attempting to roll on several occasions, while officers milled around and chatted nearby.



*Many officers on scene moving around, but not checking on Tyre.*

199.    Rather than attend to or acknowledge Tyre's obvious need for medical care, officers crowded together in groups and actively ignored Tyre.

200.    As a testament to MPD's culture of brutality and impunity, Officer Haley took out his cell phone and took a photo of Tyre, who was beaten, bloodied, dazed and nearly unconscious.



*Officer Haley is circled in red, taking a closeup photo of Tyre with the flash of his cell phone camera activated.*

201.    Officer Haley sent that photo to at least five other people, including at least one civilian, to brag about the beating he had just levied on a defenseless young man.

202.    About four minutes after being propped up against the squad car, Tyre fell onto the ground on his side.

203.    MPD officers then propped Tyre back up into a sitting position against the squad car as he continued to fight for life.

204.    At 8:41 p.m. three Emergency Medical Technicians ("EMTs") arrived and proceeded to disregard Tyre's condition and failed to provide any of the clearly necessary medical aid to him.

205.    Two of those EMTs—Memphis Fire Department ("MFD") EMTs Robert Long and JaMichael Sandridge—joined the other officers milling around Tyre.

206.    The third was Lieutenant Michelle Whitaker—a 25-year veteran with the MFD— who had arrived in a fire engine nearby, could see Tyre, and was informed of the incident, but never left the engine to assist on the scene.

207.    EMTs Long and Sandridge knelt near Tyre briefly while carrying medical bags containing triage kits and first aid supplies.

208.    At one point, EMT Sandridge pulled a blood pressure cuff from his bag.

209.    MFD EMT Sandridge took out the blood pressure cuff but failed to use it or anything else in his medical bag.

210.    Rather than using the cuff to evaluate Tyre's blood pressure, EMT Sandridge set it back down after Tyre slumped over onto the ground at which time EMT Sandridge left him there.



*EMT Sandridge declines to use his blood pressure cuff to evaluate Tyre.*

211. Tyre told the EMTs multiple times that he could not breathe, and collapsed over to his right side on top of the EMT supply bag.

212. Instead of assisting Tyre, EMT Sandridge moved the EMT supply bag out from under Tyre.

213. None of the original five SCORPION Unit Officers (Martin, Haley, Smith, Mills Jr., and Bean) informed the EMTs that Tyre had been sprayed with chemical irritants, had been Tased, or had been hit with fists, the telescoping police baton, or kicked.

214. EMT Sandridge determined, based on the original five SCORPION Unit Officers' (Martin, Haley, Smith, Mills Jr., and Bean) assertions, and not a medical evaluation, that Tyre was high on drugs.

215. For the next 19 minutes, all three EMTs and every MPD Officer on scene failed to provide aid for Tyre:

    a. They did not assess Tyre's airway, breathing, and circulation;

b. They did not obtain vital signs;

c. They did not conduct a head-to-toe examination;

d. They did not uncuff Tyre or adjust him against the squad car;

e. They did not attend to his obvious wounds;

f. They did not provide high-flow oxygen;

g. They did not provide an intravenous line;

h. They did not place Tyre on a cardiac monitor to assist in his future care at the hospital; and

i. They did not transport him to a hospital or emergency medical center.

216.    MFD EMT Robert Long was aware of Tyre's medical condition and plainly obvious injuries, but deliberately refused to provide necessary medical care.

217.    MFD EMT JaMichael Sandridge was aware of Tyre's medical condition and plainly obvious injuries, but deliberately refused to provide necessary medical care.

218.    MFD Lieutenant Michelle Whitaker was aware of Tyre's medical condition and plainly obvious injuries, but deliberately refused to provide necessary medical care.

219.    Tyre attempted to roll into another position or move his legs, as he was clearly writhing in pain.

220.    Officers and EMTs did not address his physical state, and one of the original five SCORPION Officers (Martin, Haley, Smith, Mills, and Bean) squatted down next to him, taunting and mocking Tyre, saying "You can't go nowhere! You can't go nowhere, man. You ain't goin' nowhere. Be still."

221.    At one point, there were at least 12 City of Memphis employees within feet of Tyre's body and within range of being able to offer necessary medical aid.

222.    None of them showed concern or attempted to help Tyre, even though he was battered, bleeding, and barely alive.

223.    Officers nonchalantly circulated near Tyre for approximately 19 minutes total after the beating, slowly walking around the area and speaking with each other.

224.    Finally, at 8:55 p.m., 25 minutes after he was chased down and beaten by the original five SCORPION Officers (Martin, Haley, Smith, Mills, and Bean), two new EMTs began assessing Tyre and offered the medical attention he desperately and obviously needed.

225.    The two new EMTs placed him on a stretcher and loaded him into an ambulance about seven minutes later.

226.    Tyre was finally transported to St. Francis hospital: a 15 minutes' drive from where he was beaten.

## VI.    The Late Arrival of Lieutenant DeWayne Smith and the Misrepresentations and Lies to RowVaughn Wells.

227.    Defendant DeWayne Smith, an MPD Lieutenant, was the supervisor over SCORPION Unit Team 1, of which all the Defendant Officers were members. Defendant DeWayne Smith arrived on the scene at the very end of the beating by his five subordinate SCORPION Officers (Martin, Haley, Smith, Mills, and Bean).

228.    Defendant DeWayne Smith was one of the many City of Memphis employees standing by and offering no aid to Tyre as Tyre lay battered, beaten, and propped up against the police car.

229.    MPD's code of silence, including inadequate supervision and oversight, were exemplified by Defendant DeWayne Smith's actions.

230.    Defendant DeWayne Smith was the only MPD supervisor who arrived on scene.

231.    Defendant DeWayne Smith was not wearing a body-worn camera when he arrived on scene, despite MPD policy requiring him to do so.

232.    Defendant DeWayne Smith saw Tyre Nichols in the condition shown in the above photographs. He could see Tyre's obvious injuries and distress.

233.    Yet despite seeing Tyre's condition, Defendant DeWayne Smith did not ask any of his SCORPION Officers how Tyre came to be in this condition or what justified the Officers' use of force. Nor did he ask whether any of his SCORPION Officers had properly documented their use of force or recorded it on their body-worn cameras.

234.    Instead, Defendant DeWayne Smith only asked his SCORPION Officers if they were alright.

235.    Defendant DeWayne Smith then knelt down next to Tyre and asked "what did you take man?" and when Tyre said he didn't take anything, Defendant DeWayne Smith said "you done took something man." Tyre then said "alcohol."

236.    Tyre asked if he could stand up, and Defendant DeWayne Smith said he had to stay down.

237.    Defendant DeWayne Smith then walked away despite Tyre's obvious injuries and distress.

238.    Defendant DeWayne Smith knew Tyre Nichols was in critical medical condition.

239.    Defendant DeWayne Smith knew Tyre Nichols had suffered life-threatening injuries.

240.    Defendant DeWayne Smith knew Tyre Nichols was unlikely to survive a trip to the hospital.

241.    After seeing the condition Tyre was in, at approximately 9:50 p.m. on January 7, 2023, Defendant DeWayne Smith walked the 100 or so yards to Tyre's listed address at 6743 Castlegate Lane where he lived with his mother, RowVaughn Wells.

242.    Defendant DeWayne Smith arrived at the home of RowVaughn Wells and proceeded to tell her that Tyre was under arrest for DUI.

243.    Defendant DeWayne Smith also told RowVaughn Wells that Tyre was intoxicated.

244.    Defendant DeWayne Smith had no evidence that Tyre had been driving under the influence or had been arrested for DUI.

245.    Defendant DeWayne Smith had no evidence that Tyre was intoxicated or under the influence of any illicit drug or other substance.

246.    Defendant DeWayne Smith did have evidence that Tyre had been brutally beaten by the SCORPION Officers who are under his command.

247.    Defendant DeWayne Smith misled and lied to RowVaughn Wells about her son being under the influence and being intoxicated.

248.    RowVaughn Wells asked Defendant DeWayne Smith more than once where Tyre was, as she wanted to see her son and check on his well-being.

249.    Defendant DeWayne Smith told RowVaughn Wells that paramedics were treating Tyre "in the neighborhood."

250.    Defendant DeWayne Smith told RowVaughn Wells that Tyre was going to jail after he received medical treatment.

251.    Defendant DeWayne Smith had not seen any paramedics render any medical treatment or assistance to Tyre prior to the conversation.

252.    Defendant DeWayne Smith had not ordered any medical treatment or assistance to Tyre prior to the conversation.

253.    Defendant DeWayne Smith took no steps to alert RowVaughn Wells to her son's immediate and critical healthcare needs after misleading and lying to her.

254.    Defendant DeWayne Smith withheld Tyre's whereabouts 100 yard away, as well as his critical health condition, from RowVaughn Wells.

255.    Defendant DeWayne Smith misled and lied to RowVaughn Wells that her son was being treated in the neighborhood.

256.    Defendant DeWayne Smith misled and lied to RowVaughn Wells by falsely telling her that Tyre was under arrest for DUI.

257.    Defendant DeWayne Smith withheld that Tyre had been brutally beaten by the SCORPION Officers.

258.    Defendant DeWayne Smith withheld that Tyre was in critical medical condition.

259.    Defendant DeWayne Smith withheld that Tyre was unlikely to survive the trip to the hospital.

260.    When Defendant DeWayne Smith left RowVaughn Wells' home, he was concerned that if the Memphis Police transferred Tyre to the hospital, he would die in an MPD vehicle.

## VII.    MPD's coverup of Tyre's beating begins.

261.    After Tyre's beating, the SCORPION Officers and their commander, Lieutenant DeWayne Smith, began to cover up their crimes.

262.    As described below, they fabricated false allegations against Tyre in order to falsely justify the SCORPION Officers' unlawful use of force. They undertook this coverup pursuant to

the widespread practice within the MPD of fabricating aggressive conduct on the part of a civilian in order to falsely justify MPD officers' mistreatment of the civilian.

263.    Defendant Hemphill, after the incident, falsely claimed that Tyre "started fighting us." Hemphill went on to pronounce, "you can get him on evading arrests, fleeing on foot, which is a misdemeanor, speeding and improper lane change." His MPD colleague stated, "That's enough. You don't need a felony once he starts fighting." Defendant Hemphill went on to falsely claim that Tyre was "grabbing for somebody's gun. That could be aggravated assault right there."

264.    In addition, the SCORPION Officers initiated false criminal charges against Tyre in order to conceal their unlawful use of force by making it seem as though their force was justified.

265.    The Affidavit of Complaint that was filed against Tyre in the Criminal Court of Shelby County alleged that Tyre committed an Assault Against a First Responder because Tyre allegedly attempted to grab Defendant Martin's gun. This never occurred.

266.    In the bond recommendation filed by the MPD in the same criminal case, Defendant Martin is falsely listed as the victim of the incident on the night of January 7, 2023, because of an alleged aggravated assault committed by Tyre.

267.    Additionally, Defendant DeWayne Smith used his supervisory role to conceal his subordinates' constitutional violations. As part of his supervisory duties, Defendant DeWayne Smith reviewed the body-worn camera footage from his subordinate SCORPION Officers Mills, Bean, and Hemphill.

268.    Defendant DeWayne Smith found in his official reports of the incident that there were no policy violations shown in these officers' body-worn camera videos.

269.    Defendant DeWayne Smith made this conclusion even though the body-worn camera footage showed flagrant uses of excessive force against Tyre.

58

270.    The lies and fabrications of the SCORPION Officers and their supervisor DeWayne

Smith were all undertaken pursuant to MPD's code of silence, which conceals officers' excessive

use of force, thereby allowing excessive force to perpetuate in the MPD.

**VIII.    The SCORPION Unit Officers' Use of Excessive Force and Failure to Intervene in the Use of Excessive Force Contributes to Tyre's Death.**

271.    When he arrived at the St. Francis Hospital Emergency Department at

approximately 9:35 p.m., Tyre had no pulse and was being treated with a manual resuscitator to

attempt to provide positive pressure ventilation.

272.    As a result of the extensive beating he received, Tyre had suffered cardiac arrest.

273.    For the next three days, Tyre fought for his life in the Intensive Care Unit ("ICU").

He was intubated and underwent dialysis as his kidneys were critically damaged due to the beating.

274.    Tyre's head and face were swollen to the point of being unrecognizable and he had

broken teeth due to the repeated blows to his head.

275.    Tyre's brain was so swollen from the repeated blows to his head that it was no

longer able to function properly.

276.    Tyre's autonomic nervous system began to fail, as did his internal organs.

277.    Despite the efforts of his medical team, Tyre died in the ICU three days after the

police ran him down and beat him to death in the street.

278.    Tyre died swollen, bloody, and hooked up to devices that ultimately could not save

his life.

## CAUSES OF ACTION

### COUNT I—Fourth Amendment
*Plaintiff v. City of Memphis*

279.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

280.     As described in the preceding paragraphs, the conduct of multiple MPD officers toward Tyre Nichols on the night of January 7, 2023, constituted both an unreasonable seizure and excessive force in violation of the Fourth Amendment to the United States Constitution.

281.     The misconduct described in this Complaint was undertaken pursuant to the policies and practices of the City of Memphis, such that Defendant City of Memphis is liable, in that:

a.   As a matter of both policy and practice, the City of Memphis encouraged, and was thereby the moving force behind, the very type of misconduct at issue here by failing adequately to train, supervise, control, and discipline its officers such that its failures manifest deliberate indifference;

b.   As a matter of both policy and practice, the City of Memphis facilitated the very type of misconduct at issue here by failing adequately to investigate, punish, and discipline prior instances of similar misconduct, thereby leading Memphis police officers to believe their actions are unlikely ever to be meaningfully scrutinized and, in that way, directly encouraging future uses of excessive deadly force such as those Plaintiff complains of;

c.   As a matter of widespread practice so prevalent and well-established as to comprise municipal policy, officers of the Memphis Police Department abused civilians, including through the Department's encouragement of unsupervised excessive uses of force by "proactive" policing units like SCORPION, and then officers and supervisors covered it up in a manner similar to that alleged by Plaintiff.

282.    As a result of the City of Memphis's policies and practices and the unjustified conduct of the individual defendants in this case, Tyre Nichols was unlawfully stopped and savagely beaten by MPD officers on January 7, 2023.

283.    As a direct and proximate result of the City's policies and practices as described in this Complaint, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

284.    As a direct and proximate result of the acts and omissions of Chief Davis described in this Complaint, Tyre Nichols suffered compensatory and special damages in an amount to be determined by a jury.

285.    Punitive damages are available against Chief Davis and are hereby sought by Plaintiff given the reprehensibility of Chief Davis's conduct.

286.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

287.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT II—Fourth Amendment
*Plaintiff v. Chief Cerelyn Davis, in her individual capacity*

288.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

289.    The Director of Police Services, also known as the Police Chief of the MPD (hereinafter "Chief"), has supervisory authority for the City of Memphis regarding policing and police policies and practices.

290.    As described in the preceding paragraphs, the conduct of multiple MPD officers toward Tyre Nichols on the night of January 7, 2023, constituted both an unreasonable seizure and excessive force in violation of the Fourth Amendment to the United States Constitution.

291.    The misconduct described in this Complaint was undertaken pursuant to the policies and practices of the City of Memphis in that:

    a.   As a matter of both policy and practice, the City of Memphis encouraged the very type of misconduct at issue here by failing adequately to train, supervise, control, and discipline its officers such that its failures manifest deliberate indifference;

    b.   As a matter of both policy and practice, the City of Memphis facilitated the very type of misconduct at issue here by failing adequately to investigate, punish, and discipline prior instances of similar misconduct, thereby leading Memphis police officers to believe their actions are unlikely ever to be meaningfully scrutinized and, in that way, directly encouraging future uses of excessive deadly force such as those Plaintiff complains of;

    c.   As a matter of widespread practice, officers of the Memphis Police Department abused civilians, including through the Department's encouragement of unsupervised excessive uses of force by "proactive" policing units like SCORPION, and then officers and supervisors covered it up in a manner similar to that alleged by Plaintiff.

292.    Chief Davis knew about these failures of MPD policy and practice but was indifferent to them, thereby encouraging them and allowing them to flourish.

293.    As a direct and proximate result of Chief Davis's failure to supervise as described in this Complaint, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

294.    As a direct and proximate result of the acts and omissions of Chief Davis described in this Complaint, Tyre Nichols suffered compensatory and special damages in an amount to be determined by a jury.

295.    Punitive damages are available against Chief Davis and are hereby sought by Plaintiff given the reprehensibility of Chief Davis's conduct.

296.    As a direct and proximate result of the acts and omissions of Chief Davis described in this Complaint, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

297.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT III—Fourth Amendment: Unreasonable Stop
*Plaintiff v. Emmitt Martin III, in his individual capacity*

298.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

299.    On January 7, 2023, Memphis Police Officer Emmitt Martin III was patrolling the Memphis area as a member of the SCORPION Unit.

300.    On January 7, 2023, Memphis Police Officer Emmitt Martin III witnessed Tyre Nichols driving a Nissan Sentra Turbo on the streets of Memphis, Tennessee.

301.    On January 7, 2023, Memphis Police Officer Emmitt Martin III attempted to find information sufficient to pull Tyre Nichols over by searching for driver's license holds or active warrants on the vehicle.

302.    On January 7, 2023, Memphis Police Officer Emmitt Martin III found no information relating to any warrants, history of traffic infractions, history of criminal activity, or any other information that would justify a traffic stop of Tyre Nichols.

303.    On January 7, 2023, Memphis Police Officer Emmitt Martin III had no reasonable, articulable suspicion that Tyre Nichols was engaged in criminal activity.

304.    On January 7, 2023, Memphis Police Officer Emmitt Martin III had no reasonable, articulable suspicion that Tyre Nichols was about to be engaged in criminal activity.

305.    On January 7, 2023, Memphis Police Officer Emmitt Martin III had no particularized and objective basis that Tyre Nichols was suspected of legal wrongdoing.

306.    On January 7, 2023, Memphis Police Officer Emmitt Martin III, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his own safety.

307.    On January 7, 2023, Memphis Police Officer Emmitt Martin III, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his fellow officers' safety.

308.    On January 7, 2023, prior to and while being stopped, Tyre Nichols was not:

   a.    Engaged in criminal activity nor was he on the verge of criminal activity;

   b.    Engaged in legal wrongdoing nor was he on the verge of legal wrongdoing; or

   c.    A threat to any of the officers.

309.    On January 7, 2023, Memphis Police Officer Emmitt Martin III lacked reasonable, articulable suspicion for stopping Tyre Nichols in his vehicle at Ross Road and Raines Road.

310.    On January 7, 2023, Memphis Police Officer Emmitt Martin III proceeded to stop Tyre Nichols, despite not having reasonable, articulable suspicion.

311.    On January 7, 2023, Memphis Police Officer Emmitt Martin III effected an unreasonable seizure of Tyre Nichols when Tyre yielded to Officer Martin's show of authority.

312.    On January 7, 2023, Memphis Police Officer Emmitt Martin III violated the Fourth Amendment and clearly established law when he stopped Tyre Nichols in his vehicle at Ross Road and Raines Road.

313.    Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

314.    Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

315.    As a direct and proximate result of Memphis Police Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

316.    As a direct and proximate result of these acts and omissions Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

317.    As a direct and proximate result of these acts and omissions Tyre Nichols suffered compensatory and special damages in an amount to be determined by a jury.

318.    Punitive damages are available and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Emmitt Martin III's conduct.

319.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

320.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

**COUNT IV—Fourth Amendment: Excessive Force and Conspiracy to use Excessive Force**
*Plaintiff v. Emmitt Martin III, in his individual capacity*

321.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

322.    The conduct by MPD Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

323.    The conduct by MPD Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

324.    At all relevant times, MPD Officer Emmitt Martin III was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

325.    At all relevant times, MPD Officer Emmitt Martin III had no reasonable, articulable suspicion to stop Tyre Nichols.

326.    At all relevant times, MPD Officer Emmitt Martin III had no probable cause to arrest Tyre Nichols.

327.    At all relevant times, Tyre Nichols was compliant with MPD Officer Emmitt Martin III's orders.

328.    At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

329.    At all relevant times, Tyre Nichols was not resisting arrest.

66

330.    At all relevant times, MPD Officer Emmitt Martin III could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

331.    At all relevant times, MPD Officer Emmitt Martin III had no reasonable belief that Tyre Nichols was armed or a danger to others.

332.    At all relevant times, MPD Officer Emmitt Martin III did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Martin or any other person.

333.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Emmitt Martin III and other Defendants.

334.    Despite the aforementioned facts, MPD Officer Emmitt Martin III proceeded to:

    a.   Stop Tyre Nichols a second time;

    b.   Seize Tyre Nichols a second time;

    c.   Detain Tyre Nichols a second time;

    d.   Punch Tyre Nichols;

    e.   Kick Tyre Nichols;

    f.   Strike Tyre Nichols with a baton;

    g.   Spray chemical agents into Tyre Nichols' face;

    h.   Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and

    i.   Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

335.    Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

336.    Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

337.    Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

338.    Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

339.    Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

340.    As a direct and proximate result of MPD Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

341.    As a direct and proximate result of MPD Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional.

342.    As a direct and proximate result of MPD Officer Emmitt Martin III's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

343.    As a direct and proximate result of the acts and omissions of MPD Officer Emmitt Martin III described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

344.    Punitive damages are available against MPD Officer Emmitt Martin III as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Emmitt Martin III's conduct.

345.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses;

loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

346.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT V—Fourth Amendment: Failure to Intervene to Prevent Excessive Force
*Plaintiff v. Emmitt Martin III, in his individual capacity*

347.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

348.    The conduct by MPD Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

349.    The conduct by MPD Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

350.    At all relevant times, MPD Officer Emmitt Martin III was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

351.    At all relevant times, MPD Officer Emmitt Martin III could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

352.    At all relevant times, MPD Officer Emmitt Martin III had no reasonable belief that Tyre Nichols was armed or dangerous to others.

353.    At all relevant times, MPD Officer Emmitt Martin III did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Martin or any other person.

354.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Emmitt Martin III and other Defendants.

355.    Despite the aforementioned facts, MPD Officer Emmitt Martin III stood by and watched, failing to intervene, while:

      a.   Other Defendants punched Tyre Nichols;

      b.   Other Defendants kicked Tyre Nichols;

      c.   Other Defendants struck Tyre Nichols with a baton; and

      d.   Other Defendants sprayed chemical agents into Tyre Nichols' face.

356.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

357.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

358.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

359.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

360.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

361.    MPD Officer Emmitt Martin III's restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

362.    MPD Officer Emmitt Martin III observed that the force being used by other Defendants was unjustified, excessive, and illegal.

363.    MPD Officer Emmitt Martin III was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

364.    MPD Officer Emmitt Martin III's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

365.    As a direct and proximate result of MPD Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

366.    As a direct and proximate result of MPD Officer Emmitt Martin III's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

367.    As a direct and proximate result of MPD Officer Emmitt Martin III's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic, conscious pain, suffering, and emotional distress.

368.    As a direct and proximate result of MPD Officer Emmitt Martin III's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

369.    As a direct and proximate result of the acts and omissions of MPD Officer Emmitt Martin III, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

370.    Punitive damages are available against MPD Officer Emmitt Martin III as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Emmitt Martin III's conduct.

371.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

372.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

## COUNT VI—Fourteenth Amendment: Deliberate Indifference to Serious Medical Needs
*Plaintiff v. Emmitt Martin III, in his individual capacity*

373.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

374.    The conduct by MPD Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

375.    The conduct by MPD Officer Emmitt Martin III identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

376.    At all relevant times, MPD Officer Emmitt Martin III was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified Police Officer with the City of Memphis.

377.    At all relevant times in which MPD Officer Emmitt Martin III interacted with Tyre Nichols after Tyre was handcuffed, Tyre was suffering from injuries so obvious and severe that even a layperson would have easily recognized the necessity for medical attention.

378.    Every reasonable Police Officer would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

    a.    He was sprayed with chemical irritants; had a Taser deployed against him; and was struck with fists, telescoping Police baton, and kicked in the head area;

    b.    He was unable to communicate or speak;

    c.    He was unable to hold himself up in a seated position;

    d.    He was bleeding from his face and his body, and his wounds were unattended;

    e.    He was unable to keep his eyes open;

    f.    He passed in and out of consciousness.

379.    Even a layperson, let alone a trained MPD Officer, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

380.    Every reasonable MPD Officer would have known that he or she had a duty to provide appropriate medical aid as quickly as reasonably possible to a person who was injured during a law enforcement action, especially if those injuries were obvious and severe, medical distress is apparent, or the individual was unconscious.

381.    Every reasonable MPD Officer would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

382.    MPD Officer Emmitt Martin III was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

383.    MPD Officer Emmitt Martin III observed Tyre Nichols' grave condition for several minutes before Memphis Fire Department EMTs arrived on scene.

384.    MPD Officer Emmitt Martin III continued to ignore Tyre Nichols' condition; instead standing near and walking around Tyre Nichols as his physical condition only worsened.

385.    MPD Officer Emmitt Martin III's failure to render appropriate medical aid to Tyre Nichols in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

386.    As a direct and proximate result of MPD Officer Emmitt Martin III's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

387.    As a direct and proximate result of MPD Officer Emmitt Martin III's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

388.    As a direct and proximate result of MPD Officer Emmitt Martin III's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

389.    As a direct and proximate result of MPD Officer Emmitt Martin III's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

390.    Punitive damages are available against MPD Officer Emmitt Martin III as a matter of federal common law and are hereby sought by Plaintiff.

391.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

392.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

<u>**COUNT VII—Fourth Amendment: Unreasonable Stop**</u>
*Plaintiff v. Demetrius Haley, in his individual capacity*

393.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

394.    On January 7, 2023, MPD Officer Demetrius Haley was patrolling the Memphis area as a member of the SCORPION Unit.

395.    On January 7, 2023, MPD Officer Demetrius Haley witnessed Tyre Nichols driving a Nissan Sentra Turbo on the streets of Memphis, Tennessee.

396.    On January 7, 2023, MPD Officer Demetrius Haley attempted to find information sufficient to pull Tyre Nichols over by searching for driver's license holds or active warrants on the vehicle.

397.    On January 7, 2023, MPD Officer Demetrius Haley found no information relating to any warrants, history of traffic infractions, history of criminal activity, or any other information that would justify a traffic stop of Tyre Nichols.

398.    On January 7, 2023, MPD Officer Demetrius Haley had no reasonable, articulable suspicion that Tyre Nichols was engaged in criminal activity.

399.    On January 7, 2023, MPD Officer Demetrius Haley had no reasonable, articulable suspicion that Tyre Nichols was about to be engaged in criminal activity.

400.    On January 7, 2023, MPD Officer Demetrius Haley had no particularized and objective basis that Tyre Nichols was suspected of legal wrongdoing.

401.    On January 7, 2023, MPD Officer Demetrius Haley, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his own safety.

402.    On January 7, 2023, MPD Officer Demetrius Haley, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his fellow officers' safety.

403.    On January 7, 2023, prior to and while being stopped, Tyre Nichols was not:

a.    Engaged in criminal activity nor was he on the verge of criminal activity;

b.    Engaged in legal wrongdoing nor was he on the verge of legal wrongdoing; or

c.    A threat to any of the officers.

404.    On January 7, 2023, MPD Officer Demetrius Haley lacked reasonable, articulable suspicion for stopping Tyre Nichols in his vehicle at Ross Road and Raines Road.

405.    On January 7, 2023, MPD Officer Demetrius Haley proceeded to stop Tyre Nichols, despite not having reasonable, articulable suspicion.

406.    On January 7, 2023, MPD Officer Demetrius Haley effected an unreasonable seizure of Tyre Nichols when Tyre yielded to Officer Haley's show of authority.

407.    On January 7, 2023, MPD Officer Demetrius Haley violated the Fourth Amendment and clearly established law when he stopped Tyre Nichols in his vehicle at Ross Road and Raines Road.

408.    Every reasonable officer would have known that stopping an individual without reasonable, articulable suspicion would be a violation of the Fourth Amendment.

409.    Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

76

410.     As a direct and proximate result of MPD Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

411.     As a direct and proximate result of MPD Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

412.     As a direct and proximate result of the acts and omissions of MPD Officer Demetrius Haley described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

413.     Punitive damages are available against MPD Officer Demetrius Haley as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Demetrius Haley's conduct.

414.     As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

415.     Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT VIII—Fourth Amendment: Excessive Force
*Plaintiff v. Demetrius Haley, in his individual capacity*

416.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

417.     The conduct by MPD Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

418.    The conduct by MPD Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

419.    At all relevant times, MPD Officer Demetrius Haley was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

420.    At all relevant times, MPD Officer Demetrius Haley had no reasonable, articulable suspicion to stop Tyre Nichols.

421.    At all relevant times, MPD Officer Demetrius Haley had no probable cause to arrest Tyre Nichols.

422.    At all relevant times, Tyre Nichols was compliant with MPD Officer Demetrius Haley's orders.

423.    At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

424.    At all relevant times, Tyre Nichols was not resisting arrest.

425.    At all relevant times, MPD Officer Demetrius Haley could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

426.    At all relevant times, MPD Officer Demetrius Haley had no reasonable belief that Tyre Nichols was armed or a danger to others.

427.    At all relevant times, MPD Officer Demetrius Haley did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Haley or any other person.

428.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Demetrius Haley and other Defendants.

429.  Despite the aforementioned facts, MPD Officer Demetrius Haley proceeded to:

    a.  Stop Tyre Nichols a second time;

    b.  Seize Tyre Nichols a second time;

    c.  Detain Tyre Nichols a second time;

    d.  Punch Tyre Nichols;

    e.  Kick Tyre Nichols;

    f.  Strike Tyre Nichols with a baton;

    g.  Spray chemical agents into Tyre Nichols' face;

    h.  Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and

    i.  Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

430.  Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

431.  Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

432.  Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

433.  Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

434.  Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

435.    As a direct and proximate result of Memphis Police Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

436.    As a direct and proximate result of MPD Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

437.    As a direct and proximate result of MPD Officer Demetrius Haley's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

438.    As a direct and proximate result of the acts and omissions of MPD Officer Demetrius Haley described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

439.    Punitive damages are available against MPD Officer Demetrius Haley as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Demetrius Haley's conduct.

440.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

441.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT IX—Fourth Amendment: Failure to Intervene to Prevent Excessive Force
*Plaintiff v. Demetrius Haley, in his individual capacity*

442.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

443.    The conduct by MPD Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive

and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

444.    The conduct by MPD Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

445.    At all relevant times, MPD Officer Demetrius Haley was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

446.    At all relevant times, MPD Officer Demetrius Haley could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

447.    At all relevant times, MPD Officer Demetrius Haley had no reasonable belief that Tyre Nichols was armed or dangerous to others.

448.    At all relevant times, MPD Officer Demetrius Haley did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Haley or any other person.

449.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Demetrius Haley and other Defendants.

450.    Despite the aforementioned facts, MPD Officer Demetrius Haley stood by and watched, failing to intervene, while:

    a.    Other Defendants punched Tyre Nichols;

    b.    Other Defendants kicked Tyre Nichols;

    c.    Other Defendants struck Tyre Nichols with a baton; and

    d.    Other Defendants sprayed chemical agents into Tyre Nichols' face.

451.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

452.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

453.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

454.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

455.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

456.    MPD Officer Demetrius Haley's restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

457.    MPD Officer Demetrius Haley observed that the force being used by other Defendants was unjustified, excessive, and illegal.

458.    MPD Officer Demetrius Haley was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

459.    MPD Officer Demetrius Haley's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

460.    As a direct and proximate result of MPD Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

461.    As a direct and proximate result of MPD Officer Demetrius Haley's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

462.    As a direct and proximate result of MPD Officer Demetrius Haley's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic, conscious pain, suffering, and emotional distress.

463.    As a direct and proximate result of MPD Officer Demetrius Haley's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

464.    As a direct and proximate result of the acts and omissions of MPD Officer Demetrius Haley, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

465.    Punitive damages are available against MPD Officer Demetrius Haley as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Demetrius Haley's conduct.

466.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses;

loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

467. Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

## COUNT X—Fourteenth Amendment: Deliberate Indifference to Serious Medical Needs
*Plaintiff v. Demetrius Haley, in his individual capacity*

468. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

469. The conduct by MPD Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

470. The conduct by MPD Officer Demetrius Haley identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

471. At all relevant times, MPD Officer Demetrius Haley was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified Police Officer with the City of Memphis.

472. At all relevant times in which MPD Officer Demetrius Haley interacted with Tyre Nichols after Tyre was handcuffed, Tyre was suffering from injuries so obvious and severe that even a layperson would have easily recognized the necessity for medical attention.

473. Every reasonable Police Officer would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

    a. He was sprayed with chemical irritants; had a Taser deployed against him; and was struck with fists, telescoping Police baton, and kicked in the head area;

    b. He was unable to communicate or speak;

    c.   He was unable to hold himself up in a seated position;

    d.   He was bleeding from his face and his body, and his wounds were unattended;

    e.   He was unable to keep his eyes open;

    f.   He passed in and out of consciousness.

474.    Even a layperson, let alone a trained MPD Officer, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

475.    Every reasonable MPD Officer would have known that he or she had a duty to provide appropriate medical aid as quickly as reasonably possible to a person who was injured during a law enforcement action, especially if those injuries were obvious and severe, medical distress is apparent, or the individual was unconscious.

476.    Every reasonable MPD Officer would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

477.    MPD Officer Demetrius Haley was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

478.    MPD Officer Demetrius Haley observed Tyre Nichols' grave condition for several minutes before Memphis Fire Department EMTs arrived on scene.

479.    MPD Officer Demetrius Haley continued to ignore Tyre Nichols' condition; instead standing near and walking around Tyre Nichols as his physical condition only worsened.

480.    MPD Officer Demetrius Haley's failure to render appropriate medical aid to Tyre Nichols in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

481.    As a direct and proximate result of MPD Officer Demetrius Haley's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

482.    As a direct and proximate result of MPD Officer Demetrius Haley's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

483.    As a direct and proximate result of Memphis Police Demetrius Haley's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

484.    As a direct and proximate result of MPD Officer Demetrius Haley's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

485.    Punitive damages are available against MPD Officer Demetrius Haley as a matter of federal common law and are hereby sought by Plaintiff.

486.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

487.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

### COUNT XI—Fourth Amendment: Excessive Force
*Plaintiff v. Justin Smith, in his individual capacity*

488.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

489.    The conduct by MPD Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the

Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

490.    The conduct by MPD Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

491.    At all relevant times, MPD Officer Justin Smith was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

492.    At all relevant times, MPD Officer Justin Smith had no reasonable, articulable suspicion to stop Tyre Nichols.

493.    At all relevant times, MPD Officer Justin Smith had no probable cause to arrest Tyre Nichols.

494.    At all relevant times, Tyre Nichols was compliant with MPD Officer Justin Smith's orders.

495.    At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

496.    At all relevant times, Tyre Nichols was not resisting arrest.

497.    At all relevant times, MPD Officer Justin Smith could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

498.    At all relevant times, MPD Officer Justin Smith had no reasonable belief that Tyre Nichols was armed or a danger to others.

499.    At all relevant times, MPD Officer Justin Smith did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Smith or any other person.

500.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Justin Smith and other Defendants.

501.    Despite the aforementioned facts, MPD Officer Justin Smith proceeded to:

    a.   Stop Tyre Nichols;

    b.   Seize Tyre Nichols;

    c.   Detain Tyre Nichols;

    d.   Punch Tyre Nichols;

    e.   Kick Tyre Nichols;

    f.   Strike Tyre Nichols with a baton;

    g.   Spray chemical agents into Tyre Nichols' face;

    h.   Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and

    i.   Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

502.    Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

503.    Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

504.    Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

505.    Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

506.    Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

507.    Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

508.    Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

509.    As a direct and proximate result of Memphis Police Justin Smith's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

510.    As a direct and proximate result of MPD Officer Justin Smith's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

511.    As a direct and proximate result of MPD Officer Justin Smith's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

512.    As a direct and proximate result of the acts and omissions of MPD Officer Justin Smith described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

513.    Punitive damages are available against MPD Officer Justin Smith as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Justin Smith's conduct.

514.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses;

loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

515.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

## COUNT XII—Fourth Amendment: Failure to Intervene to Prevent Excessive Force
### *Plaintiff v. Justin Smith, in his individual capacity*

516.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

517.    The conduct by MPD Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

518.    The conduct by MPD Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

519.    At all relevant times, MPD Officer Justin Smith was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

520.    At all relevant times, MPD Officer Justin Smith could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

521.    At all relevant times, MPD Officer Justin Smith had no reasonable belief that Tyre Nichols was armed or dangerous to others.

522.    At all relevant times, MPD Officer Justin Smith did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Smith or any other person.

523.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Justin Smith and other Defendants.

524.    Despite the aforementioned facts, MPD Officer Justin Smith stood by and watched, failing to intervene, while:

      a.  Other Defendants punched Tyre Nichols;

      b.  Other Defendants kicked Tyre Nichols;

      c.  Other Defendants struck Tyre Nichols with a baton; and

      d.  Other Defendants sprayed chemical agents into Tyre Nichols' face.

525.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

526.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

527.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

528.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

529.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

530.    MPD Officer Justin Smith's restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

531.    MPD Officer Justin Smith observed that the force being used by other Defendants was unjustified, excessive, and illegal.

532.    MPD Officer Justin Smith was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

533.    MPD Officer Justin Smith's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

534.    As a direct and proximate result of MPD Officer Justin Smith's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

535.    As a direct and proximate result of MPD Officer Justin Smith's  violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

536.    As a direct and proximate result of MPD Officer Justin Smith's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

537.    As a direct and proximate result of MPD Officer Justin Smith's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

538.    As a direct and proximate result of the acts and omissions of MPD Officer Justin Smith, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

539.    Punitive damages are available against MPD Officer Justin Smith as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Justin Smith's conduct.

540.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

541.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

## COUNT XIII—Fourteenth Amendment: Deliberate Indifference to Serious Medical Needs
### *Plaintiff v. Justin Smith, in his individual capacity*

542.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

543.    The conduct by MPD Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

544.    The conduct by MPD Officer Justin Smith identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

545.    At all relevant times, MPD Officer Justin Smith was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified Police Officer with the City of Memphis.

546.    MPD Officer Justin Smith is also a certified EMT and thereby trained in administering basic medical care.

547.    At all relevant times in which MPD Officer Justin Smith interacted with Tyre Nichols after Tyre was handcuffed, Tyre was suffering from injuries so obvious and severe that even a layperson would have easily recognized the necessity for medical attention.

548.    Every reasonable Police Officer and EMT would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

    a.    He was sprayed with chemical irritants; had a Taser deployed against him; and was struck with fists, telescoping Police baton, and kicked in the head area;

    b.    He was unable to communicate or speak;

    c.    He was unable to hold himself up in a seated position;

    d.    He was bleeding from his face and his body, and his wounds were unattended;

    e.    He was unable to keep his eyes open;

    f.    He passed in and out of consciousness.

549.    Even a layperson, let alone a trained MPD Officer and EMT, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

550.    Every reasonable MPD Officer would have known that he or she had a duty to provide appropriate medical aid as quickly as reasonably possible to a person who was injured during a law enforcement action, especially if those injuries were obvious and severe, medical distress is apparent, or the individual was unconscious.

551.    Every reasonable MPD Officer and EMT would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

552.    MPD Officer Justin Smith was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

553.    MPD Officer Justin Smith observed Tyre Nichols' grave condition for several minutes before Memphis Fire Department EMTs arrived on scene.

554.    MPD Officer Justin Smith continued to ignore Tyre Nichols' condition; instead standing near and walking around Tyre Nichols as his physical condition only worsened.

555.    MPD Officer Justin Smith's failure to render appropriate medical aid to Tyre Nichols in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

556.    As a direct and proximate result of MPD Officer Justin Smith's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

557.    As a direct and proximate result of MPD Officer Justin Smith's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

558.    As a direct and proximate result of MPD Officer Justin Smith's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

559.    As a direct and proximate result of MPD Officer Justin Smith's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

560.    Punitive damages are available against MPD Officer Justin Smith as a matter of federal common law and are hereby sought by Plaintiff.

561.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

562.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

### COUNT XIV—Fourth Amendment: Excessive Force
*Plaintiff v. Desmond Mills, Jr., in his individual capacity*

563.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

564.    The conduct by MPD Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

565.    The conduct by MPD Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

566.    At all relevant times, MPD Officer Desmond Mills, Jr., was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

567.    At all relevant times, MPD Officer Desmond Mills, Jr. had no reasonable, articulable suspicion to stop Tyre Nichols.

568.    At all relevant times, MPD Officer Desmond Mills had no probable cause to arrest Tyre Nichols.

569.    At all relevant times, Tyre Nichols was compliant with MPD Officer Desmond Mills, Jr.'s orders.

570.    At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

571.    At all relevant times, Tyre Nichols was not resisting arrest.

572.    At all relevant times, MPD Officer Desmond Mills, Jr. could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

573.    At all relevant times, MPD Officer Desmond Mills, Jr. had no reasonable belief that Tyre Nichols was armed or a danger to others.

574.    At all relevant times, MPD Officer Desmond Mills, Jr. did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Desmond Mills, Jr. or any other person.

575.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Desmond Mills, Jr. and other Defendants.

576.    Despite the aforementioned facts, MPD Officer Desmond Mills proceeded to:

    a.   Stop Tyre Nichols;

    b.   Seize Tyre Nichols;

    c.   Detain Tyre Nichols;

    d.   Punch Tyre Nichols;

    e.   Kick Tyre Nichols;

    f.   Strike Tyre Nichols with a baton;

    g.   Spray chemical agents into Tyre Nichols' face;

    h.   Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and

    i.   Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

577.    Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

578.    Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

579.    Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

580.    Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

581.    Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

582.    Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

583.    Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

584.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

585.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and death.

586.    As a direct and proximate result of MPD Officer Desmond Mills Jr.'s unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

587.    As a direct and proximate result of the acts and omissions of MPD Officer Desmond Mills, Jr. described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

588.    Punitive damages are available against Memphis Police Desmond Mills, Jr. as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Desmond Mills, Jr.'s conduct.

589.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

590.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XV—Fourth Amendment: Failure to Intervene to Prevent Excessive Force
*Plaintiff v. Desmond Mills, Jr., in his individual capacity*

591.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

592.    The conduct by MPD Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

593.    The conduct by MPD Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

594.    At all relevant times, MPD Officer Desmond Mills, Jr., was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

595.    At all relevant times, MPD Officer Desmond Mills, Jr. could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

596.    At all relevant times, MPD Officer Desmond Mills, Jr. had no reasonable belief that Tyre Nichols was armed or dangerous to others.

597.    At all relevant times, MPD Officer Desmond Mills, Jr. did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Desmond Mills, Jr. or any other person.

598.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Desmond Mills, Jr. and other Defendants.

599.    Despite the aforementioned facts, MPD Officer Desmond Mills, Jr. stood by and watched, failing to intervene, while:

     a.    Other Defendants punched Tyre Nichols;

     b.    Other Defendants kicked Tyre Nichols;

     c.    Other Defendants struck Tyre Nichols with a baton; and

     d.    Other Defendants sprayed chemical agents into Tyre Nichols' face.

600.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

601.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

602.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

603.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

604.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

605.    MPD Officer Desmond Mills, Jr.'s restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

606.    MPD Officer Desmond Mills, Jr. observed that the force being used by other Defendants was unjustified, excessive, and illegal.

607.    MPD Officer Desmond Mills, Jr. was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

608.    MPD Officer Desmond Mills, Jr.'s failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

609.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

610.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

611.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic, conscious pain, suffering, and emotional distress.

612.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

613.    As a direct and proximate result of the acts and omissions of MPD Officer Desmond Mills, Jr., Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

614.    Punitive damages are available against MPD Officer Desmond Mills as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Desmond Mills, Jr.'s conduct.

615.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses;

loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

616.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

## COUNT XVI—Fourteenth Amendment: Deliberate Indifference to Serious Medical Needs
*Plaintiff v. Desmond Mills, Jr., in his individual capacity*

617.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

618.    The conduct by MPD Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

619.    The conduct by MPD Officer Desmond Mills, Jr. identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

620.    At all relevant times, MPD Officer Desmond Mills, Jr. was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified Police Officer with the City of Memphis.

621.    At all relevant times in which MPD Officer Desmond Mills, Jr. interacted with Tyre Nichols after Tyre was handcuffed, Tyre was suffering from injuries so obvious and severe that even a layperson would have easily recognized the necessity for medical attention.

622.    Every reasonable Police Officer would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

    a.    He was sprayed with chemical irritants; had a Taser deployed against him; and was struck with fists, telescoping Police baton, and kicked in the head area;

    b.    He was unable to communicate or speak;

    c.   He was unable to hold himself up in a seated position;

    d.   He was bleeding from his face and his body, and his wounds were unattended;

    e.   He was unable to keep his eyes open;

    f.   He passed in and out of consciousness.

623.    Even a layperson, let alone a trained MPD Officer, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

624.    Every reasonable MPD Officer would have known that he or she had a duty to provide appropriate medical aid as quickly as reasonably possible to a person who was injured during a law enforcement action, especially if those injuries were obvious and severe, medical distress is apparent, or the individual was unconscious.

625.    Every reasonable MPD Officer would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

626.    MPD Officer Desmond Mills, Jr. was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

627.    MPD Officer Desmond Mills, Jr. observed Tyre Nichols' grave condition for several minutes before Memphis Fire Department EMTs arrived on scene.

628.    MPD Officer Desmond Mills, Jr. continued to ignore Tyre Nichols' condition; instead standing near and walking around Tyre Nichols as his physical condition only worsened.

629.    MPD Officer Desmond Mills, Jr.'s failure to render appropriate medical aid to Tyre Nichols in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

630.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

631.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

632.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

633.    As a direct and proximate result of MPD Officer Desmond Mills, Jr.'s deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

634.    Punitive damages are available against MPD Officer Desmond Mills, Jr. as a matter of federal common law and are hereby sought by Plaintiff.

635.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

636.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

## COUNT XVII—Fourth Amendment: Excessive Force
*Plaintiff v. Tadarrius Bean, in his individual capacity*

637.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

638.    The conduct by MPD Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the

Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

639.    The conduct by MPD Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

640.    At all relevant times, MPD Officer Tadarrius Bean was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

641.    At all relevant times, MPD Officer Tadarrius Bean had no reasonable, articulable suspicion to stop Tyre Nichols.

642.    At all relevant times, MPD Officer Tadarrius Bean had no probable cause to arrest Tyre Nichols.

643.    At all relevant times, Tyre Nichols was compliant with MPD Officer Tadarrius Bean's orders.

644.    At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

645.    At all relevant times, Tyre Nichols was not resisting arrest.

646.    At all relevant times, MPD Officer Tadarrius Bean could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

647.    At all relevant times, MPD Officer Tadarrius Bean had no reasonable belief that Tyre Nichols was armed or a danger to others.

648.    At all relevant times, MPD Officer Tadarrius Bean did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Bean or any other person.

649.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Tadarrius Bean and other Defendants.

650.    Despite the aforementioned facts, MPD Officer Tadarrius Bean proceeded to:

   a.   Stop Tyre Nichols;

   b.   Seize Tyre Nichols;

   c.   Detain Tyre Nichols;

   d.   Punch Tyre Nichols;

   e.   Kick Tyre Nichols;

   f.   Strike Tyre Nichols with a baton;

   g.   Spray chemical agents into Tyre Nichols' face;

   h.   Restrain Tyre Nichols while other Defendants punched Tyre Nichols; and

   i.   Restrain Tyre Nichols while other Defendants kicked Tyre Nichols.

651.    Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

652.    Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

653.    Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

654.    Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

655.    Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

656.    Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

657.    Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

658.    As a direct and proximate result of MPD Officer Tadarrius Bean's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

659.    As a direct and proximate result of MPD Officer Tadarrius Bean's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

660.    As a direct and proximate result of MPD Officer Tadarrius Bean's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

661.    As a direct and proximate result of the acts and omissions of MPD Officer Tadarrius Bean described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

662.    Punitive damages are available against MPD Officer Tadarrius Bean as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Tadarrius Bean's conduct.

663.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses;

loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

664.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XVIII—Fourth Amendment: Failure to Intervene to Prevent Excessive Force
*Plaintiff v. Tadarrius Bean, in his individual capacity*

665.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

666.    The conduct by MPD Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

667.    The conduct by MPD Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

668.    At all relevant times, MPD Officer Tadarrius Bean was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

669.    At all relevant times, MPD Officer Tadarrius Bean could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

670.    At all relevant times, MPD Officer Tadarrius Bean had no reasonable belief that Tyre Nichols was armed or dangerous to others.

671.    At all relevant times, MPD Officer Tadarrius Bean did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Bean or any other person.

672.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Tadarrius Bean and other Defendants.

673.    Despite the aforementioned facts, MPD Officer Tadarrius Bean stood by and watched, failing to intervene, while:

    a.   Other Defendants punched Tyre Nichols;

    b.   Other Defendants kicked Tyre Nichols;

    c.   Other Defendants struck Tyre Nichols with a baton; and

    d.   Other Defendants sprayed chemical agents into Tyre Nichols' face.

674.    Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

675.    Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

676.    Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

677.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

678.    No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

679.    MPD Officer Tadarrius Bean' restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

680.    MPD Officer Tadarrius Bean observed that the force being used by other Defendants was unjustified, excessive, and illegal.

681.    MPD Officer Tadarrius Bean was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

682.    MPD Officer Tadarrius Bean's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

683.    As a direct and proximate result of MPD Officer Tadarrius Bean's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

684.    As a direct and proximate result of MPD Officer Tadarrius Bean's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

685.    As a direct and proximate result of MPD Officer Tadarrius Bean's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic, conscious pain, suffering, and emotional distress.

686.    As a direct and proximate result of MPD Officer Tadarrius Bean's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

687.    As a direct and proximate result of the acts and omissions of MPD Officer Tadarrius Bean, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

688.    Punitive damages are available against MPD Officer Tadarrius Bean as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Tadarrius Bean's conduct.

689.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

690.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

## COUNT XIX—Fourteenth Amendment: Deliberate Indifference to Serious Medical Needs
*Plaintiff v. Tadarrius Bean, in his individual capacity*

691.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

692.    The conduct by MPD Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

693.    The conduct by MPD Officer Tadarrius Bean identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

694.    At all relevant times, MPD Officer Tadarrius Bean was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified Police Officer with the City of Memphis.

695.    At all relevant times in which MPD Officer Tadarrius Bean interacted with Tyre Nichols after Tyre was handcuffed, Tyre was suffering from injuries so obvious and severe that even a layperson would have easily recognized the necessity for medical attention.

696.    Every reasonable Police Officer would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

    a.   He was sprayed with chemical irritants; had a Taser deployed against him; and was struck with fists, telescoping Police baton, and kicked in the head area;

    b.   He was unable to communicate or speak;

    c.   He was unable to hold himself up in a seated position;

    d.   He was bleeding from his face and his body, and his wounds were unattended;

    e.   He was unable to keep his eyes open;

    f.   He passed in and out of consciousness.

697.    Even a layperson, let alone a trained MPD Officer, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

698.    Every reasonable MPD Officer would have known that he or she had a duty to provide appropriate medical aid as quickly as reasonably possible to a person who was injured during a law enforcement action, especially if those injuries were obvious and severe, medical distress is apparent, or the individual was unconscious.

699.    Every reasonable MPD Officer would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

700.    MPD Officer Tadarrius Bean was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

701.    MPD Officer Tadarrius Bean observed Tyre Nichols' grave condition for several minutes before Memphis Fire Department EMTs arrived on scene.

702.    MPD Officer Tadarrius Bean continued to ignore Tyre Nichols' condition; instead standing near and walking around Tyre Nichols as his physical condition only worsened.

703.    MPD Officer Tadarrius Bean's failure to render appropriate medical aid to Tyre Nichols in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

704.    As a direct and proximate result of MPD Officer Tadarrius Bean's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

705.    As a direct and proximate result of MPD Officer Tadarrius Bean's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

706.    As a direct and proximate result of MPD Officer Tadarrius Bean's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

707.    As a direct and proximate result of MPD Officer Tadarrius Bean's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

708.    Punitive damages are available against MPD Officer Tadarrius Bean as a matter of federal common law and are hereby sought by Plaintiff.

709.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

710.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

### COUNT XX—Fourth Amendment: Unreasonable Stop
*Plaintiff v. Preston Hemphill, in his individual capacity*

711.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

712.    On January 7, 2023, MPD Officer Preston Hemphill was patrolling the Memphis area as a member of the SCORPION Unit.

713.    On January 7, 2023, MPD Officer Preston Hemphill witnessed Tyre Nichols driving a Nissan Sentra Turbo on the streets of Memphis, Tennessee.

714.    On January 7, 2023, MPD Officer Preston Hemphill attempted to find information sufficient to pull Tyre Nichols over by searching for driver's license holds or active warrants on the vehicle.

715.    On January 7, 2023, MPD Officer Preston Hemphill found no information relating to any warrants, history of traffic infractions, history of criminal activity, or any other information that would justify a traffic stop of Tyre Nichols.

716.    On January 7, 2023, MPD Officer Preston Hemphill had no reasonable, articulable suspicion that Tyre Nichols was engaged in criminal activity.

717.    On January 7, 2023, MPD Officer Preston Hemphill had no reasonable, articulable suspicion that Tyre Nichols was about to be engaged in criminal activity.

718.    On January 7, 2023, MPD Officer Preston Hemphill had no particularized and objective basis that Tyre Nichols was suspected of legal wrongdoing.

719.    On January 7, 2023, MPD Officer Preston Hemphill, upon pulling over Tyre Nichols, was not taking reasonable steps to protect his own safety.

720.    On January 7, 2023, MPD Officer Preston Hemphill, upon pulling over Tyre Nichols, was taking reasonable steps to protect his fellow officers' safety.

721.    On January 7, 2023, prior to and while being stopped, Tyre Nichols was not:

   a.    Engaged in criminal activity nor was he on the verge of criminal activity;

   b.    Engaged in legal wrongdoing nor was he on the verge of legal wrongdoing; or

   c.    A threat to any of the officers.

722.    On January 7, 2023, MPD Officer Preston Hemphill lacked reasonable, articulable suspicion for stopping Tyre Nichols in his vehicle at Ross Road and Raines Road.

723.    On January 7, 2023, MPD Officer Preston Hemphill proceeded to stop Tyre Nichols, despite not having reasonable, articulable suspicion.

724.    On January 7, 2023, MPD Officer Preston Hemphill effected an unreasonable seizure of Tyre Nichols when Tyre yielded to Preston Hemphill's show of authority.

725.    On January 7, 2023, MPD Officer Preston Hemphill violated the Fourth Amendment and clearly established law when he stopped Tyre Nichols in his vehicle at Ross Road and Raines Road.

726.    Every reasonable officer would have known that stopping an individual without reasonable, articulable suspicion would be a violation of the Fourth Amendment.

727.    Every reasonable officer would have known that detaining an individual without probable cause would be a violation of the Fourth Amendment.

728.    As a direct and proximate result of MPD Officer Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

729.    As a direct and proximate result of MPD Officer Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

730.    As a direct and proximate result of the acts and omissions of MPD Officer Preston Hemphill described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

731.    Punitive damages are available against MPD Officer Preston Hemphill as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Preston Hemphill's conduct.

732.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

733.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XXI—Fourth Amendment: Excessive Force
*Plaintiff v. Preston Hemphill, in his individual capacity*

734.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

735.    The conduct by MPD Officer Preston Hemphill identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

736.    The conduct by MPD Officer Preston Hemphill identified and described in this count and in the preceding factual paragraphs constituted excessive and deadly force in violation of clearly established law.

737.    At all relevant times, MPD Officer Preston Hemphill was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

738.    At all relevant times, MPD Officer Preston Hemphill no reasonable, articulable suspicion to stop Tyre Nichols.

739.    At all relevant times, MPD Officer Preston Hemphill had no probable cause to arrest Tyre Nichols.

740.    At all relevant times, Tyre Nichols was compliant with MPD Officer Preston Hemphill's orders.

741.    At all relevant times, Tyre Nichols was not violating any laws of the City of Memphis, Shelby County, the State of Tennessee, or the United States.

742.    At all relevant times, Tyre Nichols was not resisting arrest.

743.    At all relevant times, MPD Officer Preston Hemphill could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

744.    At all relevant times, MPD Officer Preston Hemphill had no reasonable belief that Tyre Nichols was armed or a danger to others.

745.    At all relevant times, MPD Officer Preston Hemphill did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Hemphill or any other person.

746.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Preston Hemphill and other Defendants.

747. Despite the aforementioned facts, MPD Officer Preston Hemphill proceeded to:

    a. Punch Tyre Nichols;

    b. Kick Tyre Nichols;

    c. Strike Tyre Nichols with a baton;

    d. Spray chemical agents into Tyre Nichols' face; and

    e. Deploy a Taser at Tyre Nichols.

748. Every reasonable officer would have known that stopping someone without reasonable, articulable suspicion constituted an unreasonable search and seizure in violation of the Fourth Amendment.

749. Every reasonable officer would have known that detaining someone without probable cause constituted an unreasonable search and seizure in violation of the Fourth Amendment.

750. Every reasonable officer would have known that using force against a non-resistant individual constituted excessive force in violation of the Fourth Amendment.

751. Every reasonable officer would have known that using force against a restrained individual constituted excessive force in violation of the Fourth Amendment.

752. Every reasonable officer would have known that using force against a passively resisting individual constituted excessive force in violation of the Fourth Amendment.

753. Every reasonable officer would have known that restraining a non-resistant individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

754.    Every reasonable officer would have known that restraining a passively resisting individual while other police officers use force against him would be excessive force and a violation of the Fourth Amendment.

755.    As a direct and proximate result of Memphis Police Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

756.    As a direct and proximate result of Memphis Police Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

757.    As a direct and proximate result of MPD Officer Preston Hemphill's unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

758.    As a direct and proximate result of the acts and omissions of MPD Officer Preston Hemphill described in this Count, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

759.    Punitive damages are available against MPD Officer Preston Hemphill as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Preston Hemphill's conduct.

760.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

761.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

**COUNT XXII—Fourth Amendment: Failure to Intervene to Prevent Excessive Force**
*Plaintiff v. Preston Hemphill, in his individual capacity*

762.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

763.    The conduct by MPD Officer Preston Hemphill identified and described in this count and in the preceding factual paragraphs constituted a failure to intervene to prevent excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution.

764.    The conduct by MPD Officer Preston Hemphill identified and described in this count and in the preceding factual paragraphs constituted failure to intervene to prevent excessive and deadly force in violation of clearly established law.

765.    At all relevant times, MPD Officer Preston Hemphill was acting under color of state law, as agent of the City of Memphis, and within the scope of his employment and authority as a duly-certified law enforcement officer of the City of Memphis.

766.    At all relevant times, MPD Officer Preston Hemphill could not have reasonably perceived Tyre Nichols as resisting arrest or refusing to comply.

767.    At all relevant times, MPD Officer Preston Hemphill had no reasonable belief that Tyre Nichols was armed or dangerous to others.

768.    At all relevant times, MPD Officer Preston Hemphill did not have a reasonable fear of Tyre Nichols causing imminent bodily harm to Officer Hemphill or any other person.

769.    At all relevant times, Tyre Nichols was fully restrained and subdued by MPD Officer Preston Hemphill and other Defendants.

770.    Despite the aforementioned facts, MPD Officer Preston Hemphill stood by and watched, failing to intervene, while:

      a.   Other Defendants punched Tyre Nichols;

b.   Other Defendants kicked Tyre Nichols;

c.   Other Defendants struck Tyre Nichols with a baton; and

d.   Other Defendants sprayed chemical agents into Tyre Nichols' face.

771.   Every reasonable officer would have known that failing to intervene while police officers used force against a non-resistant individual would be excessive force and a violation of the Fourth Amendment.

772.   Every reasonable officer would have known that failing to intervene while police officers used force against a restrained individual would be excessive force and a violation of the Fourth Amendment.

773.   Every reasonable officer would have known that failing to intervene while police officers used force against a passively resisting individual would be excessive force and a violation of the Fourth Amendment.

774.   No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and not resisting arrest.

775.   No reasonable officer could have thought there was a justification for the use of force against Tyre Nichols after he had been neutralized, subdued, restrained in handcuffs, arrested, and passively resisting.

776.   MPD Officer Preston Hemphill's restraining of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

777.   MPD Officer Preston Hemphill observed that the force being used by other Defendants was unjustified, excessive, and illegal.

778. MPD Officer Preston Hemphill was in a position to intervene and stop other Defendants' use of unjustified, excessive, illegal, and deadly use of force against Tyre Nichols.

779. MPD Officer Preston Hemphill's failure to intervene on behalf of Tyre Nichols while other Defendants used force against Tyre Nichols was objectively unreasonable and violated clearly established law.

780. As a direct and proximate result of Memphis Police Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic personal injuries and death.

781. As a direct and proximate result of MPD Officer Preston Hemphill's violations of the Fourth Amendment, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

782. As a direct and proximate result of MPD Officer Preston Hemphill's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

783. As a direct and proximate result of MPD Officer Preston Hemphill's failing to intervene on behalf of Tyre Nichols while other Defendants used unjustified, excessive, illegal, and deadly use of force, Tyre Nichols eventually died of his injuries.

784. As a direct and proximate result of the acts and omissions of MPD Officer Preston Hemphill, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

785. Punitive damages are available against MPD Officer Preston Hemphill as a matter of federal common law and are hereby sought by Plaintiff given the reprehensibility of MPD Officer Preston Hemphill's conduct.

786.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

787.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XXIII—Fourteenth Amendment: Deliberate Indifference to Serious Medical Needs
*Plaintiff v. DeWayne Smith, in his individual capacity*

788.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

789.    The conduct by Memphis Police Lieutenant DeWayne Smith identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

790.    The conduct by Memphis Police Lieutenant DeWayne Smith identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

791.    At all relevant times, Memphis Police Lieutenant DeWayne Smith was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified Police Officer with the City of Memphis.

792.    At all relevant times in which Memphis Police Lieutenant DeWayne Smith interacted with Tyre Nichols after Tyre was handcuffed, Tyre was suffering from injuries so obvious and severe that even a layperson would have easily recognized the necessity for medical attention.

793.    Every reasonable Police Lieutenant would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

    a.   He was unable to communicate or speak;

    b.   He was unable to hold himself up in a seated position;

    c.   He was bleeding from his face and his body, and his wounds were unattended;

    d.   He was unable to keep his eyes open;

    e.   He passed in and out of consciousness.

794.    Even a layperson, let alone a trained Memphis Police Lieutenant, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

795.    Every reasonable MPD Lieutenant would have known that he or she had a duty to provide appropriate medical aid as quickly as reasonably possible to a person who was injured during a law enforcement action, especially if those injuries were obvious and severe, medical distress is apparent, or the individual was unconscious.

796.    Every reasonable MPD Lieutenant would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

797.    Memphis Police Lieutenant DeWayne Smith was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

798.    Memphis Police Lieutenant DeWayne Smith continued to ignore Tyre Nichols' condition; instead standing near and walking around Tyre Nichols as his physical condition only worsened.

799.    Memphis Police Lieutenant DeWayne Smith's failure to render appropriate medical aid to Tyre Nichols in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

800.    As a direct and proximate result of Memphis Police Lieutenant DeWayne Smith's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

801.    As a direct and proximate result of Memphis Police Lieutenant DeWayne Smith's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

802.    As a direct and proximate result of Memphis Police Lieutenant DeWayne Smith's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

803.    As a direct and proximate result of Memphis Police Lieutenant DeWayne Smith's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

804.    Punitive damages are available against Memphis Police Lieutenant DeWayne Smith as a matter of federal common law and are hereby sought by Plaintiff.

805.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

806.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

**COUNT XXIV—42 U.S.C. § 1983—Fourteenth Amendment Violation of Deliberate Indifference to Serious Medical Needs**
*Plaintiff v. Robert Long, in his individual capacity*

807.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

808.    The conduct by Memphis Fire Department Emergency Medical Technician ("EMT") Robert Long identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

809.    The conduct by Memphis Fire Department EMT Robert Long identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

810.    At all relevant times, Memphis Fire Department EMT Robert Long was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified EMT with the City of Memphis.

811.    At all relevant times, Memphis Fire Department EMT Robert Long was licensed by the Tennessee Emergency Medical Services Division as an advanced emergency medical technician in the State of Tennessee, licensed since 2020.

812.    At all relevant times in which Memphis Fire Department EMT Robert Long interacted with him, Tyre Nichols was suffering from injuries so obvious that even a layperson would have easily recognized the necessity for medical attention.

813.    Every reasonable EMT would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

a.  He was unable to communicate or speak;

b.  He was unable to hold himself up in a seated position;

    c.   He was bleeding from his face and his body, and his wounds were unattended;

    d.   He was unable to keep his eyes open;

    e.   He passed in and out of consciousness.

814.    Even a layperson, let alone a trained EMT, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

815.    Memphis Fire Department EMT Robert Long failed to transport Tyre Nichols to receive medical care by a doctor for approximately nineteen minutes.

816.    Every reasonable EMT would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

817.    Memphis Fire Department EMT Robert Long was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

818.    As a trained EMT, Robert Long was required to transport patients with medical needs to the emergency department to be treated by physicians.

819.    Memphis Fire Department EMT Robert Long observed Tyre Nichols' grave condition for nearly twenty minutes, and only assisted in placing him on a stretcher when other medical personnel arrived on scene to provide care for Tyre Nichols.

820.    Memphis Fire Department EMT Robert Long showed deliberate indifference to a substantial risk of serious harm to Tyre Nichols when he ignored Tyre Nichols' condition, and instead stood and walked around Tyre Nichols as his physical condition only worsened.

821.    Memphis Fire Department EMT Robert Long failure to render medical attention to Tyre Nichols or transport him to a hospital in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

822.    As a direct and proximate result of Memphis Fire Department EMT Robert Long's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

823.    As a direct and proximate result of Memphis Fire Department EMT Robert Long's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

824.    As a direct and proximate result of Memphis Fire Department EMT Robert Long's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

825.    As a direct and proximate result of Memphis Fire Department EMT Robert Long's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

826.    Punitive damages are available against Memphis Fire Department EMT Robert Long as a matter of federal common law and are hereby sought by Plaintiff.

827.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

828.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XXV—42 U.S.C. § 1983—Fourteenth Amendment Violation of Deliberate Indifference to Serious Medical Needs
*Plaintiff v. JaMichael Sandridge, in his individual capacity*

829.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

830.    The conduct by Memphis Fire Department Advanced Emergency Medical Technician ("Advanced EMT") JaMichael Sandridge identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

831.    The conduct by Memphis Fire Department Advanced EMT JaMichael Sandridge identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

832.    At all relevant times, Memphis Fire Department Advanced EMT JaMichael Sandridge was acting under color of state law, as an agent of the City of Memphis, and within the scope of his employment and authority as a duly certified Advanced EMT with the City of Memphis.

833.    At all relevant times, Memphis Fire Department Advanced EMT JaMichael Sandridge was licensed by the Tennessee Emergency Medical Services Division as an advanced emergency medical technician in the State of Tennessee, licensed since 2015.

834.    At all relevant times in which Memphis Fire Department Advanced EMT JaMichael Sandridge interacted with him, Tyre Nichols was suffering from injuries so obvious that even a layperson would have easily recognized the necessity for medical attention.

835.    Every reasonable EMT would have known that Tyre Nichols objectively required medical attention after observing the following physical conditions:

    a.   He was unable to communicate or speak;

    b.   He was unable to hold himself up in a seated position;

    c.   He was bleeding from his face and his body, and his wounds were unattended;

    d.   He was unable to keep his eyes open;

e.    He passed in and out of consciousness.

836.    Even a layperson, let alone a trained EMT, would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

837.    Memphis Fire Department Advanced EMT JaMichael Sandridge failed to transport Tyre Nichols to receive medical care by a doctor for approximately twenty minutes.

838.    Every reasonable EMT would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

839.    Memphis Fire Department Advanced EMT JaMichael Sandridge was deliberately indifferent in denying Tyre Nichols appropriate medical care that was obviously necessary.

840.    As a trained Advanced EMT, JaMichael Sandridge was required to transport patients with medical needs to the emergency department to be treated by physicians.

841.    Memphis Fire Department Advanced EMT JaMichael Sandridge observed Tyre Nichols' grave condition for nearly twenty minutes, and only assisted in placing him on a stretcher when other medical personnel arrived on scene to provide care for Tyre Nichols.  Memphis Fire Department Advanced EMT JaMichael Sandridge showed deliberate indifference to a substantial risk of serious harm to Tyre Nichols when he observed Tyre Nichols' condition, pulled out a blood pressure cuff from his triage bag, and then failed to actually use it on Tyre Nichols.

842.    Memphis Fire Department Advanced EMT JaMichael Sandridge continued to ignore Tyre Nichols' condition; instead standing near and walking around Tyre Nichols as his physical condition only worsened.

843.    Memphis Fire Department Advanced EMT JaMichael Sandridge's failure to render medical attention to Tyre Nichols or transport him to a hospital in a timely manner after he

was in a critical medical condition was deliberately indifferent and violated clearly established law.

844.    As a direct and proximate result of Memphis Fire Department Advanced EMT JaMichael Sandridge's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

845.    As a direct and proximate result of Memphis Fire Department Advanced EMT JaMichael Sandridge's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

846.    As a direct and proximate result of Memphis Fire Department advanced EMT JaMichael Sandridge's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

847.    As a direct and proximate result of Memphis Fire Department Advanced EMT JaMichael Sandridge's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

848.    Punitive damages are available against Memphis Fire Department Advanced EMT JaMichael Sandridge as a matter of federal common law and are hereby sought by Plaintiff.

849.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

850.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

**COUNT XXVI—42 U.S.C. § 1983—Fourteenth Amendment Violation of Deliberate Indifference to Serious Medical Needs**
*Plaintiff v. Michelle Whitaker, in her individual capacity*

851.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

852.    The conduct by Memphis Fire Department Lieutenant Michelle Whitaker identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

853.    The conduct by Memphis Fire Department Lt. Michelle Whitaker identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

854.    At all relevant times, Memphis Fire Department Lt. Michelle Whitaker was acting under color of state law, as an agent of the City of Memphis, and within the scope of her employment and authority as a duly sworn and certified Fire Department Lieutenant with the City of Memphis.

855.    At all relevant times in which Memphis Fire Department Lt. Michelle Whitaker observed him, Tyre Nichols was suffering from injuries so obvious that even a layperson would have easily recognized the necessity for a doctor's attention.

856.    At all relevant times in which Memphis Fire Department Lt. Michelle Whitaker learned of Tyre Nichols' medical condition through conversations with the EMTs and police officers on scene, she would have easily recognized the obvious need for medical attention to his injuries.

857.    Every reasonable Fire Department Lieutenant would have known that Tyre Nichols objectively required medical attention after observing or learning of the following physical conditions:

    a.   He was unable to communicate or speak;

    b.   He was unable to hold himself up in a seated position;

    c.   He was bleeding from his face and his body, and his wounds were unattended;

    d.   He was unable to keep his eyes open;

    e.   He passed in and out of consciousness.

858.    Even a lay person would have known that Tyre Nichols was suffering from several serious medical needs and necessitated medical treatment.

859.    Memphis Fire Department Lt. Michelle Whitaker stayed in the fire engine upon arriving at the scene of Tyre Nichols' beating at Bear Creek Cove and Castlegate.

860.    Memphis Fire Department Lt. Michelle Whitaker did not transport Tyre Nichols to receive medical care by a doctor for approximately twenty minutes after arriving at Bear Creek Cove and Castlegate.

861.    Every reasonable Fire Department Lieutenant would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

862.    Memphis Fire Department Lt. Michelle Whitaker was deliberately indifferent in denying Tyre Nichols appropriate medical care.

863.    As a Lieutenant with the Memphis Fire Department, responding to a law enforcement call for medical care, Lt. Michelle Whitaker was required to transport patients with medical needs to the emergency department to be treated by physicians.

864.    Memphis Fire Department Lt. Michelle Whitaker observed or was made aware of Tyre Nichols' grave condition for nearly twenty minutes before she assisted in transporting him to the hospital emergency department.

865.    Memphis Fire Department Lt. Michelle Whitaker ignored Tyre Nichols' condition, staying in the fire engine while Tyre Nichols' physical condition only worsened.

866.    Memphis Fire Department Lt. Michelle Whitaker was deliberately indifferent in denying Tyre Nichols medical care that was obviously necessary.

867.    Memphis Fire Department Lt. Michelle Whitaker's failure to render medical attention to Tyre Nichols or transport him to a hospital in a timely manner after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

868.    As a direct and proximate result of Memphis Fire Department Lt. Michelle Whitaker's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic personal injuries and death.

869.    As a direct and proximate result of Memphis Fire Department Lt. Michelle Whitaker's deliberate indifference to serious medical needs, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress.

870.    As a direct and proximate result of Memphis Fire Department advanced Lt. Michelle Whitaker's deliberate indifference to serious medical needs, Tyre Nichols eventually died of his injuries.

871.    As a direct and proximate result of Memphis Fire Department Lt. Michelle Whitaker's deliberate indifference to serious medical needs, Tyre Nichols suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

872.    Punitive damages are available against Memphis Fire Department Lt. Michelle Whitaker as a matter of federal common law and are hereby sought by Plaintiff.

873.    As a direct and proximate result of the acts and omissions described in this Count, Tyre Nichols' next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

874.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT XXVII— Intentional Infliction of Emotional Distress
*Plaintiff v. DeWayne Smith, Individually and as Agent of the City of Memphis*

875.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

876.    MPD Lieutenant DeWayne Smith carried out the actions and inactions on January 7, 2023, set forth in Paragraphs 232 through 260 with the intent to deceive, lie to, and manipulate RowVaughn Wells.

877.    The actions and inactions of MPD Lieutenant DeWayne Smith on January 7, 2023, described in Paragraphs 232 through 260 toward RowVaughn Wells were so outrageous in character and so extreme in degree that they went beyond all bounds of decency.

878.    MPD Lieutenant DeWayne Smith intentionally lied to and withheld information from RowVaughn Wells on January 7, 2023, as described in Paragraphs 232 through 260 that was certain to foreseeably cause severe emotional distress to RowVaughn Wells.

879.    The actions and inactions of MPD Lieutenant DeWayne Smith on January 7, 2023, described in Paragraphs 232 through 260 toward RowVaughn Wells were so outrageous in character and so extreme in degree that they are utterly intolerable in a civilized community.

136

880.    On January 7, 2023, notwithstanding said duties, MPD Lieutenant DeWayne Smith committed one or more of the following acts or omissions described in Paragraphs 232 through 260, including—but not limited to—intentionally and/or recklessly:

    a.  Telling RowVaughn Wells that Tyre was driving under the influence with no evidence or support;

    b.  Telling RowVaughn Wells that Tyre was intoxicated with no evidence or support;

    c.  Lying to RowVaughn Wells about the reasons why Tyre was being arrested;

    d.  Withholding the reasons why Tyre was being arrested from RowVaughn Wells;

    e.  Lying to RowVaughn Wells about Tyre's medical condition;

    f.  Failing to tell RowVaughn Wells that Tyre was around the corner from her home and on the verge of dying; and/or

    g.  Withholding Tyre's medical condition from RowVaughn Wells.

881.    But for the aforementioned intentional acts by MPD Lieutenant DeWayne Smith, RowVaughn Wells would not have incurred the severe emotional distress she faced and continues to face.

882.    As a direct and proximate result of the intentional actions and inaction of MPD Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe emotional distress.

883.    As a direct and proximate result of the intentional actions and inaction of MPD Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe loss of her normal and ordinary life.

884.    As a direct and proximate result of the intentional actions and inaction of MPD Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells suffered compensatory and special damages as defined under state common law and in an amount to be determined by a jury.

885.    As a direct and proximate result of the intentional acts and omissions described in this Count on January 7, 2023, RowVaughn Wells has suffered and will suffer pecuniary loss, including medical expenses; lost wages and earnings; as well as emotional damages in the form of severe emotional distress, loss of normal life, suffering, anguish, and disability in an amount to be determined by a jury.

### COUNT XXVIII— Negligent Infliction of Emotional Distress
*Plaintiff v. DeWayne Smith, Individually and as Agent of the City of Memphis*

886.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

887.    On January 7, 2023, MPD Lieutenant DeWayne Smith owed RowVaughn Wells a duty to exercise ordinary care.

888.    On January 7, 2023, MPD Lieutenant DeWayne Smith owed RowVaughn Wells a duty to act reasonably.

889.    On January 7, 2023, MPD Lieutenant DeWayne Smith owed RowVaughn Wells a duty to refrain from causing emotional distress.

890.    On January 7, 2023, notwithstanding said duties, MPD Lieutenant DeWayne Smith committed one or more of the following acts or omissions described in Paragraphs 232 through 260, including—but not limited to—negligently:

    a.  Telling RowVaughn Wells that Tyre was driving under the influence with no evidence or support;

    b.  Telling RowVaughn Wells that Tyre was intoxicated with no evidence or support;

c.  Lying to RowVaughn Wells about the reasons why Tyre was being arrested;

d.  Withholding the reasons why Tyre was being arrested from RowVaughn Wells;

e.  Lying to RowVaughn Wells about Tyre's medical condition;

f.  Failing to tell RowVaughn Wells that Tyre was around the corner from her home and on the verge of dying; and/or

g.  Withholding Tyre's medical condition from RowVaughn Wells;

891.  It was foreseeable that the aforementioned negligent acts by MPD Lieutenant DeWayne Smith would lead to the severe emotional distress that RowVaughn Wells has suffered and continues to suffer from.

892.  As a direct and proximate result of the aforementioned negligent acts by MPD Lieutenant DeWayne Smith, RowVaughn Wells was caused to incur severe emotional distress.

893.  But for the aforementioned negligent acts by MPD Lieutenant DeWayne Smith, RowVaughn Wells would not have incurred the severe emotional distress she faced and continues to face.

894.  As a direct and proximate result of the negligent actions and inaction of MPD Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe emotional distress.

895.  RowVaughn Wells' emotional distress is the type that an ordinary person would be unable to adequately cope with the mental stress caused by the aforementioned circumstances.

896.  As a direct and proximate result of the negligent actions and inaction of MPD Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe loss of her normal and ordinary life.

897.    As a direct and proximate result of the negligent actions and inaction of MPD Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells suffered compensatory and special damages as defined under state common law and in an amount to be determined by a jury.

898.    As a direct and proximate result of the negligent acts and omissions described in this Count on January 7, 2023, RowVaughn Wells has suffered and will suffer pecuniary loss, including medical expenses; lost wages and earnings; as well as emotional damages in the form of severe emotional distress, loss of normal life, suffering, anguish, and disability in an amount to be determined by a jury.

### COUNT XXIX— Fraudulent Misrepresentation
*Plaintiff v. DeWayne Smith, Individually and as Agent of the City of Memphis*

899.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

900.    On January 7, 2023, MPD Lieutenant DeWayne Smith made the following representations of fact to RowVaughn Wells:

    a.   That her son, Tyre, was driving under the influence;

    b.   That her son, Tyre, was intoxicated;

    c.   That her son, Tyre, was not in physical pain;

    d.   That her son, Tyre, was not at risk of physical harm;

    e.   That her son, Tyre, was not in mental pain and anguish;

    f.   That her son, Tyre, was not at risk of mental harm and anguish;

    g.   That her son, Tyre, was being treated by paramedics;

    h.   That her son, Tyre, was receiving medical attention;

    i.   That her son, Tyre, was likely to survive his injuries; and

    j.   That her son, Tyre, was not injured.

901.    On January 7, 2023, MPD Lieutenant DeWayne Smith's representations to RowVaughn Wells were false when made.

902.    On January 7, 2023, each of MPD Lieutenant DeWayne Smith's false representations to RowVaughn Wells were in regard to material facts, namely as to the health, well-being, and life of her son, Tyre Nichols.

903.    On January 7, 2023, MPD Lieutenant DeWayne Smith's false representations to RowVaughn Wells were made knowingly.

904.    On January 7, 2023, MPD Lieutenant DeWayne Smith's false representations to RowVaughn Wells were made without belief in their truth.

905.    On January 7, 2023, MPD Lieutenant DeWayne Smith's false representations to RowVaughn Wells were made recklessly.

906.    On January 7, 2023, MPD Lieutenant DeWayne Smith's false representations caused RowVaughn Wells to rely on these representations in delaying the time she would go to check on the medical condition and health of her son, Tyre.

907.    On January 7, 2023, MPD Lieutenant DeWayne Smith's false representations caused RowVaughn Wells to rely on these representations in delaying the time she would have sought medical attention for her son, Tyre.

908.    As a direct and proximate result of the misrepresentations of MPD Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe emotional distress.

909.    As a direct and proximate result of the misrepresentations of MPD Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells experienced severe loss of her normal and ordinary life.

910.    As a direct and proximate result of the misrepresentations of MPD Lieutenant DeWayne Smith on January 7, 2023, RowVaughn Wells suffered compensatory and special damages as defined under state common law and in an amount to be determined by a jury.

911.    As a direct and proximate result of the misrepresentations described in this Count on January 7, 2023, RowVaughn Wells has suffered and will suffer pecuniary loss, including medical expenses; lost wages and earnings; as well as emotional damages in the form of severe emotional distress, loss of normal life, suffering, anguish, and disability in an amount to be determined by a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff RowVaughn Wells, Individually and as Administratrix Ad Litem of the Estate of Tyre Deandre Nichols, prays for judgment against each and every one of the Defendants as follows: compensatory damages; punitive damages (except against Defendant City of Memphis); interest; statutory attorney fees; costs; and any other relief that this Court deems just and equitable under the laws of the United States and the State of Tennessee.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as set forth in the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38.

Dated:  January 3, 2025                    Respectfully submitted,

                                            /s/ Antonio M. Romanucci

                                            Antonio M. Romanucci (Ill. Bar No. 6190290) (*pro hac vice*)
                                            Bhavani K. Raveendran (Ill. Bar No. 6309968) (*pro hac vice*)
                                            Sarah Raisch (Ill. Bar No. 6305374) (*pro hac vice*)
                                            Joshua M. Levin (Ill. Bar No. 6320993) (*pro hac vice*)
                                            Stephen H. Weil (Ill. Bar No. 6291026) (*pro hac vice*)
                                            Sam Harton (Ill. Bar No. 6342112) (*pro hac vice*)
                                            **ROMANUCCI & BLANDIN, LLC**
                                            321 N. Clark St., Ste. 900
                                            Chicago, IL 60654
                                            +1 (312) 458-1000, Main
                                            +1 (312) 458-1004, Facsimile
                                            aromanucci@rblaw.net
                                            b.raveendran@rblaw.net
                                            sraisch@rblaw.net
                                            jlevin@rblaw.net
                                            sweil@rblaw.net
                                            sharton@rblaw.net

                                            David L. Mendelson (Tenn. Bar No. 016812)
                                            **MENDELSON LAW FIRM**
                                            799 Estate Place
                                            Memphis, TN 38187
                                            +1 (901) 763-2500 (ext. 103), Telephone
                                            +1 (901) 763-2525, Facsimile
                                            dm@mendelsonfirm.com

                                            Brooke Cluse (Tex. Bar No. 24123034) (*pro hac vice
                                            pending*)
                                            **BEN CRUMP LAW, PLLC**
                                            717 D Street N.W., Suite 310
                                            Washington, D.C. 20004
                                            +1 (337) 501-8356 (Cluse), Telephone
                                            brooke@bencrump.com

                                            *Attorneys for Plaintiff, RowVaughn Wells, individually and as
                                            Administratrix Ad Litem of the Estate of Tyre Deandre
                                            Nichols, deceased*