**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| RowVaughn Wells, Individually and as Administratrix of the Estate of Tyre Deandre Nichols, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CASE NO. 2:23-CV-02224 JURY DEMAND |
| The City of Memphis, Tennessee; Chief Cerelyn Davis; Emmitt Martin III; Demetrius Haley; Justin Smith; Desmond Mills, Jr.; Tadarrius Bean; Preston Hemphill; Robert Long; JaMichael Sandridge; Michelle Whitaker; DeWayne Smith, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE CITY DEFENDANTS' MOTION TO
DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

4924-8102-7597

Defendants the City of Memphis ("the City"), Chief Cerelyn Davis in her individual capacity, and Dewayne Smith as Agent of the City of Memphis ("Lt. Smith") (collectively, "the City Defendants"), submit this Memorandum in Support of their Motion to Dismiss Plaintiff RowVaughn Wells's ("Plaintiff") First Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. (ECF No. 277.)

## I.     INTRODUCTION

This case arises from a tragic encounter between Tyre Nichols ("Nichols"), and five rogue police officers that resulted in Nichols's death. Nichols's life was cut short by the actions of these officers, and the City in no way condones, ratifies, or approves of those actions.

The primary question that this suit presents, however, is whether the City should be civilly liable for Mr. Nichols's death under 42 U.S.C. § 1983. The short answer is no. It is well settled that § 1983 does not impose liability on the City under a *respondeat superior* theory for its employees' misconduct. Instead, Plaintiff must show that any constitutional harms are directly attributable to the City itself based on its customs, practices, and policies. This is an incredibly high bar to meet, and Plaintiff, as Administratrix of the Estate of Nichols, failed to sufficiently plead facts to establish liability under *Monell v. Department of Social Services of the City of New York* (436 U.S. 658 (1978).

Plaintiff further failed to sufficiently state her own claims, which are barred by the Tennessee Governmental Tort Liability Act. The Court, therefore, should dismiss the claims against the City Defendants.

## II.    FACTUAL BACKGROUND

### A.     Plaintiff's Allegations Regarding the Memphis Police Department.

Plaintiff alleges that the Memphis Police Department ("MPD") had a longstanding

1

custom of brutalizing citizens without justification. (First Amended Complaint ("Complaint"), ECF No. 277, PageID 3137.) Plaintiff alleges that the MPD had a widespread custom in which officers used force against citizens because the person annoyed, angered, or embarrassed the MPD officer in some way. (Compl., ¶ 46.) Plaintiff alleges that this practice is often referred to as a "tax" or a "run tax" on citizens. (*Id.*, ¶ 50.) Plaintiff claims that the run tax generally meant beating a resident once they were already restrained or in police custody. Plaintiff alleges that this "run tax" was not limited to the SCORPION unit that Defendant Officers worked in. (*Id.*, ¶ 53.)

Plaintiff alleges that this custom of officers was enabled by a "code of silence within the MPD in which officers lie for each other, manipulate evidence, and refuse to intervene or report wrongdoing, all to cover up violations of MPD policy, including unlawful use of force." (*Id.*, ¶ 56.) Plaintiff claims that "[w]hen MPD officers used excessive force against a civilian, officers frequently would *exaggerate or make up* what the person did, *fabricating* violent or threatening behavior or ongoing noncompliance *that falsely made the officers' excessive force appear proportional and necessary*." (*Id.*, ¶ 57) (emphasis added). Plaintiff alleges that "[t]he code of silence meant that MPD officers would fail to report violations by other officers and would assist other officers in covering up violations." (*Id.*, ¶ 61.) Plaintiff also alleges that the code of silence was enabled by inadequate supervision and oversight. (*Id.*, ¶ 64.) Plaintiff claims the code of silence extended to police supervisors, including Defendant Lt. Smith. (*Id.*, ¶ 65.) Plaintiff also claims that supervisors discouraged line officers from reporting excessive uses of force or would fail to investigate improper uses of force or would turn a blind eye to policy violations. (*Id.*, ¶ 66.)

### B.    Plaintiff's Allegations Regarding the Scorpion Unit.

Plaintiff alleges that Chief Davis pursued a special unit called the Street Crimes

Operation to Restore Peace in Our Neighborhoods ("Scorpion") Unit similar to a unit called RED DOG that Chief Davis was a part of when she was with the Atlanta police department. (Compl., ¶ 81.) Plaintiff claims that the "stated purpose of these units was to enter purportedly 'high crime' areas and interdict hardened criminals there." (*Id.*, ¶ 83.) And that "Chief Davis, for example, claimed that the SCORPION Unit was 'laser-focused on repeat offenders, those individuals we know are committing violent crime in the community.'" (*Id.*) Plaintiff claims that these kinds of units and their pretextual stops resulted in "unjustified violent encounters with community members, including high-speed chases and physical force that violated both MPD's policies and the constitutional rights of Memphis civilians." (*Id.*, ¶ 85.) Plaintiff claims that excessive force was exacerbated by top-down pressure within the MPD and specialized unit commanders, such as Scorpion Unit commanders, were required to set clear operational goals and measurable performance objectives. (*Id.*, ¶ 86.) Plaintiff asserts that to meet the Scorpion Unit's objectives, officers were given informal permission to engage in car chases that were unauthorized by formal MPD policy and that these unauthorized car chases "played out in dangerous ways." (*Id.*, ¶ 91.)

Plaintiff alleges that "Chief Davis made the vehicle seizure policy a department wide initiative and notified the public of it." (*Id.*, ¶ 88.) And that her official quote was: "When we identify individuals that are reckless driving to a point where they put other lives in danger we want to take your car too." (*Id.*) She allegedly "declared that the department would no longer merely be issuing citations for alleged reckless driving. 'Take the car. Even if the case gets dropped in court. We witnessed it. You did it.'" (*Id.*) Plaintiff also alleges that "SCORPION Unit Officers routinely utilized a course of conduct endorsed and recommended by Chief Davis: they would start their hostile and harassing encounters with a traffic stop, often for a minor violation like a seatbelt or tinted window infraction, or sometimes (as with Tyre) for nothing at all." (*Id.*, ¶

97.)

### C.    The Incident Giving Rise to the Lawsuit.

Plaintiff states that on the evening of January 7, 2023, Nichols left Shelby Farms Park to

return to his home. (Compl., ¶ 102.) At the same time, Plaintiff alleges that Defendant Officers

Martin, Haley, and Hemphill, were on patrol in unmarked cars. (*Id.*, ¶103.) According to

Plaintiff, around 8:20 p.m. the Officers spotted Nichols driving and called into MPD Dispatch to

run his license plate number. (*Id.*, ¶¶ 106,108.) Dispatch reported that there were no outstanding

warrants. (*Id.*) Even so, Officers Martin, Haley, and Hemphill allegedly boxed in Nichols with

their patrol cars as he was attempting to make a left turn. (*Id.*, ¶¶ 112–14.)

Plaintiff alleges that, without any type of reasonable suspicion or probable cause, Officers

Martin and Haley then opened Mr. Nichols's car door and forcefully pulled him out of the car

while pushing him down, assaulting him, and shouting at him. (*Id.*, ¶¶ 115, 121-22.)  Plaintiff

charges that Officer Hemphill then sprinted out of his car with his gun drawn, escalating the

situation further. (*Id.*, ¶ 127.)  Plaintiff asserts that "[a]ll three SCORPION Officers (Officer

Martin, Officer Haley, and Officer Hemphill) simultaneously restrained, pulled, and struck Tyre

trying to force him further into the ground, and yanked his arms behind his back, all in keeping

with MPD's custom of brutalizing civilians without justification." (*Id.*, ¶ 136.) Plaintiff alleges

that Officer Haley then sprayed pepper spray in Nichols's face at close range. (*Id.*, ¶ 139.)

Nichols was able to momentarily free himself at which time he began to run away from the

officers. (*Id.*, ¶ 144.)

Plaintiff claims Officer Hemphill deployed his taser as Nichols ran from the officers, and

the other officers began a foot chase. (*Id.*, ¶¶ 148, 150.) Plaintiff claims that  "[Nichols] reached

the intersection of Bear Creek Cove and Castlegate Road . . . when he was captured by

SCORPION Officers Justin Smith and Tadarrius Bean at approximately 8:30 p.m., who were

joined by Officer Desmond Mills seconds later." (*Id.*, ¶ 154.) "SCORPION Officers Mills and

Bean learned that Tyre had run from fellow SCORPION Officers Haley, Martin, and Hemphill

over the radio while they were in the process of conducting a separate traffic stop, which they

abandoned to enforce the 'run tax' against Tyre." (*Id.*, ¶ 155.)

Plaintiff claims that the Officer Defendants "beat Tyre within an inch of his life over the

course of seven unrelenting minutes without any justifiable reason and without any government

interest in doing so." (*Id.*, ¶ 178.)

Plaintiff claims that more officers arrived on the scene but expressed no concern for "the

bloodied, dazed, handcuffed man left alone and barely moving in the street." (*Id.*, ¶ 189.)

Plaintiff contends that the officers on the scene joked around and acted with indifference to

Nichols's condition; and Officer Haley went so far as to take a photo of Mr. Nichols after he was

beaten and then circulated the photo. (*Id.*, ¶¶ 190-200.)

Plaintiff alleges that Lt. Smith, who was a supervisor of the Scorpion Unit, arrived late to

the scene. (*Id.*, PageID 3180.) Once there, Plaintiff alleges that Lt. Smith saw Nichols' condition

but did not question the officers. (*Id.*, ¶ 233.) Plaintiff claims that Lt. Smith walked to Nichols's

home address where Nichols lived with Plaintiff. (*Id.*, ¶ 241.) Lt. Smith allegedly told Plaintiff

that Nichols was under arrest for driving while intoxicated. (*Id.*, ¶¶ 242-243.) Plaintiff alleges

that though Lt. Smith had no evidence that Nichols was intoxicated but did know that Nichols

had been beaten by Scorpion Officers. (*Id.*, ¶¶ 245, 246.) Plaintiff claims that Lt. Smith misled

and lied to Plaintiff. (*Id.*, ¶ 247.)

Plaintiff states that around 8:40 p.m., three Memphis Fire Department EMTs Robert

Long, JaMichael Sandridge, and Michelle Whitaker, arrived on the scene but failed to render

necessary aid to Mr. Nichols. (*See id.*, ¶¶ 204-207.) Plaintiff notes that "[n]one of the original

five SCORPION Unit Officers (Martin, Haley, Smith, Mills Jr., and Bean) informed the EMTs

that Tyre had been sprayed with chemical irritants, had been Tased, or had been hit with fists, the telescoping police baton, or kicked." (*Id.*, ¶ 213.) At around 8:55 p.m., Nichols was transported to St. Francis Hospital, where he died three days later. (*Id.*, ¶¶ 224-226.) Plaintiff alleges that Scorpion Officers and Lt. Smith tried to cover up their crimes after the incident. (*Id.*, ¶¶ 262-270.)

### D.    Plaintiff's Allegations Against the City.

Based on these events, Plaintiff brings claims against Defendants including the City and Lt. Smith as an agent of the City. Specifically, Plaintiff brings a § 1983 Fourth Amendment claim against the City and claims that "[t]he misconduct described in this Complaint was undertaken pursuant to the policies and practices of the City of Memphis, such that Defendant City of Memphis is liable." (Compl., ¶ 281.) Plaintiff also sues Lt. Smith individually[1] and as an agent of the City for allegedly intentionally and negligently inflicting emotional distress on her after he allegedly falsely communicated with her regarding the encounter with the Defendant Officers and Mr. Nichols's physical condition, as well as fraudulent misrepresentation.

### E.    Plaintiff's Claims against Chief Davis Individually.

Plaintiff also brings a Fourth Amendment claim against Chief Davis in her individual capacity. Plaintiff alleges that Chief Davis has supervisory authority over the City regarding "policing and police policies and practices." (Compl., ¶ 289.) Plaintiff also alleges that "Chief Davis "knew about these failures of MPD policy and practice but was indifferent to them, thereby encouraging them and allowing them to flourish." (*Id.*, ¶ 292.) Further, Plaintiff alleges that "[a]s a direct and proximate result of Chief Davis's failure to supervise as described in this Complaint, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional

---

[1] The City of Memphis does not represent Lt. Smith in his individual capacity, and this Motion does not address claims against Lt. Smith in his individual capacity.

distress." (*Id.*, ¶ 293.) Plaintiff also requests punitive damages be awarded against Chief Davis.

(*Id.*, ¶ 295.)

## III.    LAW AND ARGUMENT

### A.    Legal Standard for Motions to Dismiss.

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must take all

well-pleaded allegations in the complaint as true and construe those allegations in a light most

favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted). "To

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While legal

conclusions can provide the framework of a complaint, they must be supported by factual

allegations. When there are well-pleaded factual allegations, a court should assume their veracity

and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed me

accusation." *Iqbal*, 556 U.S. at 678. While a complaint need not present detailed factual

allegations, to be cognizable it must provide more than "labels and conclusions, and a formulaic

recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545. The factual

allegations in the complaint "must be enough to raise a right to relief above the speculative

level." *Twombly*, 550 U.S. at 555 (citing authorities). In other words, "claims set forth in a

complaint must be plausible, rather than conceivable." *Id.* at 570.

A complaint must have a factual foundation, and the mere possibility "that a plaintiff

might later establish some set of undisclosed facts to support recovery" is insufficient to survive

a 12(b)(6) challenge. *Twombly*, 550 U.S. at 561 (internal quotation marks omitted). If the

plaintiff does not "nudge his claims across the line from conceivable to plausible, his complaint

must be dismissed." *Id.*

The *Twombly* plausibility standard consists of a "two-pronged approach." *Iqbal*, 556 U.S. at 679. Under the first prong, the Court identifies allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* The second prong requires that "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

"In the context of [§] 1983 municipal liability, district courts in the Sixth Circuit Court of Appeals have interpreted *Iqbal*'s standards strictly." *See, e.g.*, *Epperson v. City of Humboldt, Tenn.*, 140 F. Supp. 3d 676, 685 (W. D. Tenn. 2015) (quoting *Hutchison v. Metro. Gov't of Nashville & Davidson Cty.*, 685 F. Supp. 2d 747, 751 (M.D. Tenn. 2010)).

**B.    Plaintiff's Claim Against Chief Davis in Her Individual Capacity Should Be Dismissed Based on the Doctrine of Qualified Immunity.**

Chief Davis, in her individual capacity, is protected by the doctrine of qualified immunity. Complaints are subject to dismissal under 12(b)(6) if the prongs of the qualified immunity analysis are not adequately pleaded. *See, e.g.*, *Crawford v. Tilley,* 15 F.4th 752, 760 (6th Cir. 2021) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.")

To overcome qualified immunity, the burden on the Plaintiff is to show that (1) the official violated a federal statutory or constitutional right, **and** (2) the unlawfulness of the official's conduct was clearly established at the time. *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). Courts can address these requirements in either order, but in order to overcome the immunity defense, **both** requirements must be met. *Pearson v. Callahan*, 555 U.S. at 223, 236 (2009). If a plaintiff fails to adequately plead either prong, the official is protected by qualified immunity, and the claim fails on its face. *Crawford*, 15 F.4th at 760; *see Crouse v.*

8

*Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017) ("[T]he first two prongs of the test

are questions of law, an [official] is entitled to qualified immunity if either prong cannot be

resolved under clearly established law.").

Here, Plaintiff fails to plead either prong, and the claims against Chief Davis individually

must be dismissed.

      1.    <u>Plaintiff did not allege that Chief Davis violated any statutory or
constitutional right.</u>

The Complaint ***does not include any allegations*** that Chief Davis herself took any action

that violated a constitutional right. For example, Paragraph 290 of the Complaint states "the

conduct *of multiple MPD officers* toward Tyre Nichols on the night of January 7, 2023

constituted both an unreasonable seizure and excessive force in violation of the Fourth

Amendment to the United States Constitution." (Compl., PageID 3188 (emphasis added)).

Paragraph 290 does <u>not</u>, however, allege any unconstitutional action taken by Chief Davis

toward Mr. Nichols on January 7, 2023, nor could Plaintiff allege any such action because Chief

Davis did not interact with Mr. Nichols or any other citizen on the night of the incident.

Likewise, the Complaint alleges a "longstanding custom" of unconstitutional policing

within MPD—a custom, Plaintiff alleges, that existed far before Chief Davis was appointed as

Chief of Police in April 2021. (*See* ECF No. 277, PageID 3137.) Instead, Plaintiff alleges that

Chief Davis "observed the problem the first week on the job . . . that the MPD was 'woefully

unsupervised.'" (ECF No. 277, PageID 3140, ¶ 70.)  The Complaint alleges that "Chief Davis

knew about these failures of MPD policy and practice but was indifferent to them, thereby

encouraging them and allowing them to flourish." (*Id.* at ¶ 292.)

Plaintiff did not—and cannot—plausibly allege that Chief Davis, as Chief policymaker

for MPD violated any federal statutory or constitutional right through her alleged knowledge of

and indifference to "these failures of MPD policy and practice." (*Id.*)

9

In short, Plaintiff failed to plead that Chief Davis violated a federal statutory or

constitutional right, and she is entitled to qualified immunity on that basis alone.

> 2.    There was no clearly established law under which Chief Davis should
> have known her actions were unlawful.

Moreover, Plaintiff failed to allege that Chief Davis's actions violated clearly established

law. Reading the Complaint in the light most favorable to Plaintiff, one can find only a few

instances of allegations even tangentially directed at Chief Davis. To take one example,

paragraphs 80–83 fail to allege any actions by Chief Davis that were unlawful based on clearly

established law. (*See* Compl. ¶¶ 80–83.) These paragraphs allege:

> 80. By the time the City hired Chief Davis in 2021, tactical units like
> SCORPION had been discredited across the country and had fallen out of
> favor.
>
> 81. Indeed, while she was with the Atlanta police department, Chief
> Davis worked in a unit similar to SCORPION, called RED DOG, which
> was disbanded in 2011 after multiple high profile incidents in which its
> officers used excessive force against civilians.
>
> 82. Despite Chief Davis's experience with RED DOG in Atlanta,
> the MPD, under her command, pursued similar tactics with the SCORPION
> Unit in Memphis.
>
> 83. The stated purpose of these units was to enter purportedly "high
> crime" areas and interdict hardened criminals there. Chief Davis, for
> example, claimed that the SCORPION Unit was "laser-focused on repeat
> offenders, those individuals we know are committing violent crime in the
> community."

*Id.* Plaintiff does not—and cannot—allege that tactical units focusing on repeat-offenders and

violent crime have been clearly established as unconstitutional. Thus, Plaintiff also cannot allege

that Chief Davis's implementation of the SCORPION Unit was an action she should have known

violated clearly established law.

In sum, Plaintiff's Complaint utterly fails to address either prong required to defeat Chief

Davis's qualified immunity. As such, Plaintiff's claim against Chief Davis in her individual

capacity must be dismissed.

**C.      Plaintiff's Official Capacity Claim Against Lt. Smith as an Agent of the City
Should Be Dismissed Because All Claims Are Redundant with the Claims
Against the City.**

The Court should dismiss Plaintiff's claim against Lt. Smith "as an agent of the City"

because such claims are nothing more than the claims made against the City itself. Because the

City is also named as a defendant in this lawsuit, the claims against Defendant Smith "as an

agent of the City" are redundant and should be dismissed.

A suit against a government official in his or her official capacity is "'only another way

of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*,

473 U.S. 159, 165–66 (1985) (quoting *Monell*, 436 U.S. at 690, n. 55). "As long as the

government entity receives notice and an opportunity to respond, an official-capacity suit is, in

all respects other than name, to be treated as a suit against the entity." *Id*. at 166 (citing *Brandon

v. Holt*, 469 U.S. 464, 471–72 (1985)). When, as here, the entity is a named defendant, official

capacity claims against police officers acting as agents of the entity are "redundant" and

"superfluous." *Foster v. Michigan*, 573 Fed. Appx. 377, 390 (6th Cir. 2014).

Here, Plaintiff sued Lt. Smith individually and as an agent of the City. (*See* ECF No. 22,

PageIDs 3262, 3264, 3266.) Plaintiff also sued the City. Accordingly, Plaintiff's claims against

Lt. Smith as an agent of the City should be construed as claims against the City and, thus,

dismissed with prejudice.

**D.      Plaintiff Fails to Plead Sufficient Facts Under *Monell* to Sustain the § 1983
Claim Against the City.**

Plaintiff's *Monell* claim, Count I, against the City should be dismissed because Plaintiff

fails to plead sufficient facts to sustain this claim. In Count I, Plaintiff brings a Fourth

Amendment claim against the City. In *Monell v, Department of Social Security Services of City

of New York*, the Supreme Court found that "[l]ocal governing bodies, therefore, can be sued

11

directly under § 1983 for monetary, declaratory, or injunctive relief where. . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that *body's officers*." 436 U.S. 658, 690, (1978) (emphasis added). Essentially, a municipality cannot be held liabile solely because it employs tortfeasors and Congress "did not intend for § 1983 liability to attach where such causation [is] absent." *Id.* To prevail on a claim against a municipality under §1983, a plaintiff must establish both: (1) the deprivation of a constitutional right; and (2) the municipality's responsibility for that violation. *Doe v. Claiborne Cnty., Tenn. By and Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 505–506 (6th Cir. 1996).

It is well-settled that "a municipality cannot be held liable under § 1983 on a respondeat superior basis." *Mhoon v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, No. 3:16-cv-01751, 2016 WL 6250379, at *6 (M.D. Tenn. Oct. 26, 2016) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 432–33 (6th Cir. 2005)). Rather, municipal liability under § 1983 arises "when execution of a government's policy or custom ... inflicts the injury of a constitutional violation." *David v. City of Bellevue, Ohio*, 706 F. App'x 847, 850 (6th Cir. 2017) (quoting *Monell,* 436 U.S. at 694). "[T]he touchstone of 'official policy' is designed '*to distinguish acts of the municipality from acts of employees of the municipality*, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479–480 (1986)) (emphasis in original).

The Sixth Circuit recognizes four avenues by which a plaintiff can prove the existence of a municipality's illegal policy or custom: "1) the municipality's legislative enactments or official agency policies; 2) actions taken by officials with final decision-making authority; 3) a policy of inadequate training or supervision; or 4) a custom of tolerance or acquiescence of federal rights

violations." *Thomas*, 398 F.3d at 429 (citations omitted).

Here, Plaintiff does not specify in which avenue of *Monell* she is proceeding, but based on the conclusory allegations contained in the Amended Complaint, it appears they could fall under: official policy, failure to train, failure to supervise, and custom of tolerance. Specifically, Plaintiff alleges that: (1) the City failed "adequately to train, supervise, control, and discipline its officers such that its failures manifest deliberate indifference;" (2) the City failed "adequately to investigate, punish, and discipline prior instances of similar misconduct, thereby leading Memphis police officers to believe their actions are unlikely ever to be meaningfully scrutinized and, in that way, directly encouraging future uses of excessive deadly force…"; and (3) the City had an unofficial policy of allowing MPD officers to abuse "civilians, including through the Department's encouragement of unsupervised excessive uses of force by 'proactive' policing units like SCORPION, and then officers and supervisors covered it up …."(Compl, ¶ 281.)

Additionally, Plaintiff alleges that the Officer Defendants' actions were taken in line with a "code of silence" amongst the officers, but she does not allege that the City or MPD's leadership knew or acquiesced to this alleged "code of silence." (*See* Compl., ¶¶ 55-63.)

Plaintiff's Fourth Amendment *Monell* claim fails as a matter of law.

      1.     <u>Plaintiff fails to state a claim that the City had an unlawful official policy condoning the Defendant Officers' conduct.</u>

Plaintiff fails to point to an official policy authorizing the conduct alleged in the Complaint, because no official policy could plausibly exist. "[I]n *Monell* and subsequent cases, [the court has] required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citations omitted). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions

of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* at 403-404. "To prevail on this theory under *Monell*, Plaintiff must identify 'formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time.'" *Sanders v. City of Memphis, Tennessee*, No. 221CV02585MSNCGC, 2022 WL 4665867, at *4 (W.D. Tenn. Sept. 30, 2022) (citation omitted).

Plaintiff "must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404. In other words, "a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation and internal quotation marks omitted).

Here, Plaintiff fails to plausibly identify any specific policy of the City, written or otherwise, that authorized the Defendant Officers to act in the reprehensible and outrageous manner alleged in the Complaint. Plaintiff did not point to any "formal rules or understandings" which establish that **the City** instructed its officers to employ the behavior alleged under these same—or any—circumstances "consistently and over time." *See Sanders*, 2022 WL 4665867, at *4.

Instead, Plaintiff baldly asserts that "Tyre ultimately died from his injuries as a direct result of the policies and practices of the City of Memphis, which were the moving force behind [the Defendant Officers'] unconstitutional stop, assault, and use of force upon him." (Compl., ¶ 44.) But the only "policy" to which Plaintiff points is the directive of Chief Davis to MPD

14

officers to seize cars of individuals who are "reckless driving to a point where they ***put other***

***lives in danger***." (*Id.*, ¶ 88 (emphasis added)). Plaintiff's cannot plausibly connect a written or

unwritten directive based on seizing vehicles from individuals who are recklessly driving in

violation of Tennessee Code Annotated § 55-10-205 to the harm that occurred to Nichols.

Moreover, Plaintiff did not point to a specific policy or facts that would show the City

encouraged or authorized any police officer to behave in such a manner—let alone the manner

described in the Complaint. Plaintiff implausibly alleges that the City, through its Chief of

Police, maintained an official policy of authorizing officers to attack, assault, and use excessive

force against a compliant individual, but Plaintiff fails to identify the specific policy that required

its officers to act with impunity and in total disregard of established constitutional law. Such a

policy does not exist. Plaintiff concedes as much by alleging that MPD officers maintained a

"code of silence" for their misconduct. (*See* Compl., ¶¶ 55-63.) If there was an official policy

sanctioning this type of conduct, there would be no need for a code of silence.

In sum, Plaintiff's Complaint illustrates that Officer Defendants were not acting pursuant

to any policy—official or otherwise— but rather that ***the Defendant Officers acted outside their***

***duties as sworn police officers*** in brutally beating Mr. Nichols.

It defies logic to presume that any police department or police chief would implement an

*official policy* of authorizing its officers to unlawfully arrest and detain, assault, and use

excessive force against a compliant individual. *See, e.g.*, *Claiborne Cnty., Tenn. By & Through*

*Claiborne Cnty. Bd. of Educ.*, 103 F.3d at 508 ("[Plaintiff] does not claim that the School Board

had a custom of affirmatively condoning sexual abuse. **Clearly, no municipality could have**

**such a policy**.") Thus, Plaintiff fails to plausibly identify any official policy of the City that gave

rise to the alleged injuries, and Plaintiff's Fourth Amendment claim must be dismissed under

*Monell*.

2.    <u>Plaintiff fails to sufficiently plead a failure to train claim.</u>

Plaintiff fails to sufficiently plead that MPD's training program was inadequate. In fact, Plaintiff fails to make any specific allegations regarding the MPD's training program at all, other than baldly concluding that the City did not train its officers in use of force, use-of-force reporting, use-of-force reviews, and body-worn camera usage. (*See* Compl., ¶ 75). It is well settled that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). To establish municipal liability on this basis, a plaintiff must show "'(1) the training program was inadequate to the task the officer must perform, (2) the inadequacy is a result of the municipality's deliberate indifference, and (3) the inadequacy is closely related to or actually caused the plaintiff's injury.'" *Epperson*, 140 F. Supp. 3d at 684 (citation and quotations omitted). "Deliberate indifference requires a showing of 'prior instances of unconstitutional conduct demonstrating that the municipality has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Id.* (quoting *Bonner–Turner v. City of Ecorse*, 627 Fed. Appx. 400, 414, 2015 WL 5332465, at *13 (6th Cir. 2015).

Without providing any specific details, Plaintiff concludes that "MPD maintained inadequate and improper training on use of force, use-of-force reporting, use-of-force reviews, and body-worn camera usage" and that "[t]he deficient training on these topics compounded the code of silence by ensuring that body-worn cameras, force reporting, and supervisory review of use of force would not be reliable or effective tools for accountability and oversight." (*Id.*, ¶ 75.) Again, Plaintiff's allegations are implausible and contradictory. The only reasonable and plausible reading of Plaintiff's Complaint is that Defendant Officers were trained and, instead, decided to be dishonest and purposely ignore their training. Specific allegations from Plaintiff's Complaint illustrate this point. For example, Plaintiff alleges that:

16

58. Additionally, MPD officers frequently *manipulated* evidence that was
captured by their body-worn cameras.

59. Among other things, MPD officers sometimes did this by intentionally failing
to turn on their cameras for encounters with civilians, or by activating their
cameras but then *intentionally* leaving them inside their police cruisers or in other
locations where the camera would be *unable to record the officer's actual
encounter*.

60. This fabrication and manipulation of evidence was enabled by an entrenched code of
silence within the MPD.

61. The code of silence meant that MPD officers would *fail to report violations* by other
officers and would assist other officers in covering up violations.

(Compl., ¶¶ 58–61.)

Even if taken as true, these are not allegations indicating a failure to train. If officers are

"failing to report violations," "manipulating evidence," and intentionally placing their body

cameras in positions where their actions cannot adequately be recorded, the only plausible

conclusion is that officers knew their conduct was not in line with their training or the policies of

MPD and that there would be repercussions for behaving in such a manner if they did not hide it

from MPD leadership. This does not illustrate a culture of impunity. (*See, e.g.*, Compl. ¶ 76.)

A case from this Court is instructive. In *Boddy v. City of Memphis, Tennessee*, the Sixth

Circuit rejected similar conclusory allegations. No. 22-5259, 2022 WL 12258977, at *3 (6th Cir.

2022). There, the Court described the complaint as "filled with conclusory assertions that the

City does not train or supervise its police officers and sanctions a wide variety of illegal police

practices, ranging from the use of excessive force to the failure to discharge officers who have

repeatedly used excessive force." *Id.* The court concluded that the complaint was "bereft,

however, of any factual allegations that could *plausibly* support these sweeping assertions.

[Plaintiff] does not allege a single fact related to the training the City provides its police

officers[.]" *Id.*; *see also Sweat v. Butler*, 90 F. Supp. 3d 773, 782–83 (W.D. Tenn. 2015)

(granting motion to dismiss on failure to train allegations where the plaintiff focused on the

officer's prior work history, alleged misconduct, and a failure to discipline given that "the allegations [did] not make a failure to train claim plausible because none of them concern[ed] training practices or a lack thereof.") So too, here.

Plaintiff also fails to connect how any level of training could prevent five rogue officers from beating an entirely compliant individual for seven straight minutes, as alleged in the Complaint. The only plausible inference one can make from Plaintiff's allegations is that the Officer Defendants were acting ***outside the bounds of their training*** as MPD officers. Indeed, Plaintiff dedicates an entire section of the Complaint, Section VII, on how Defendant Officers actively covered up their actions. (Compl., ¶¶ 261-270.). This is a far cry from illustrating that Officer Defendants were not trained to know that their actions were improper or that MPD officers believed they could act with "impunity." No amount of training could have prevented five rogue officers from acting outside the scope of their employment and in contravention of Mr. Nichols's rights in such a manner as Plaintiff alleges.

For these reasons, Plaintiff's "failure to train" claim must be dismissed.

            3.      Plaintiff fails to sufficiently plead a failure to supervise claim.

Plaintiff fails to plausibly allege that the City failed to supervise MPD officers. Plaintiff alleges that "[c]entral to MPD's code of silence was the inadequate supervision and oversight within the MPD." (Compl., ¶ 64.) The legal standards for a claim of inadequate supervision and one of inadequate training are essentially the same. *Okolo v. Metro. Gov. of Nashville*, 892 F. Supp. 2d 931, 943 (M.D. Tenn. 2012). Again, Plaintiff broadly concludes that MPD failed to sufficiently supervise the Scorpion unit.

To state a municipal liability claim under an "inaction" theory, such as failure to supervise, Plaintiff must establish: (1) the existence of a clear and persistent pattern of misconduct by the MPD officers; (2) notice or constructive notice on the part of the City of that

misconduct; (3) the City's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the City's custom was the "moving force" or direct causal link in plaintiff's constitutional deprivation. *See Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d at 508. To establish deliberate indifference, Plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the [supervision] in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010).

As an initial matter, Plaintiff's claim that MPD maintained a widespread practice of failing to supervise members of the Scorpion unit is undercut by the fact that Plaintiff asserts that the MPD officers maintained a code of silence and failed to report violations of policy or misconduct generally. *See Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d at 508 (noting that "notice or constructive notice on the part of the municipality of that misconduct" is an element); (*see also* Compl., ¶ 293 ("As a direct and proximate result of Chief Davis's failure to supervise as described in this Complaint, Tyre Nichols experienced catastrophic conscious pain, suffering, and emotional distress")). Plaintiff's claim is also undercut by the fact that Plaintiff acknowledges that Lt. Smith, a supervisor of the Scorpion Unit, arrived on the scene on the night of the incident. (*See* Compl., PageID 3180.)

Plaintiff offers only conclusory statements about the City's alleged failure to supervise. For example, Plaintiff alleges that the "Department's encouragement of unsupervised excessive uses of force by 'proactive' policing units like SCORPION, and then officers and supervisors covered it up in a manner similar to that alleged by Plaintiff." (Compl., ¶ 281.) But then Plaintiff confoundingly alleges that "SCORPION Unit commanders were required to set clear operational goals and 'measurable performance objectives,'" and that "[c]ommanders and supervisors often

19

measured the performance of SCORPION officers by the number of arrests they made and the number of vehicles they seized." (*Id.*, ¶ 86.) These allegations directly contradict Plaintiff's allegation that MPD failed to supervise the SCORPION unit. Further, Plaintiff does not allege any facts to support its allegation that it was the failure to supervise the SCORPION Unit that resulted in the death of Mr. Nichols.

Plaintiff's conclusory allegations that MPD failed to provide supervision do not meet the threshold plausibility standard, thus Plaintiff's Fourth Amendment claim should be dismissed.

4. Plaintiff fails to state a claim for an unlawful custom of tolerance under *Monell.*

Plaintiff fails to show how the City maintained a custom of permitting the constitutional violations alleged in the Complaint. Plaintiff alleges that MPD's had a "custom of brutalizing civilians without justification and MPD's code of silence that protected officers who carried out that custom." (Compl., ¶ 124.) "[A] custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). A "custom" for purposes of *Monell* liability must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691 (internal quotation marks and citation omitted); *see also Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993), *cert. denied*, 510 U.S. 826 (1993). In turn, the notion of "law" must include "[d]eeply embedded traditional ways of carrying out state policy." *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940). It must reflect a course of action deliberately chosen from among various alternatives. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985). In short, a "custom" is a "legal institution" not memorialized by written law. *Feliciano*, 988 F.2d at 655.

Plaintiff's allegations of a "custom" within the MPD are contradictory and implausible. Specifically, Plaintiff alleges that the MPD maintained a custom of brutalizing citizens without

20

justification, but that MPD officers hid their actions from MPD leaders when "officers lie for each other, manipulate evidence, and refuse to intervene or report wrongdoing, all to cover up violations of MPD policy, including unlawful use of force." (Compl., ¶ 56.)

In support of its allegations, Plaintiff cites to twenty-one alleged incidents involving MPD officers spanning a decade. (*See* Compl., ¶ 100.) Specifically, out of these twenty-one incidents, Plaintiff only alleges that *one* of these —occurring a mere four days before the incident giving rise to the Complaint—was reported to the MPD Internal Affairs Unit.  (*See id.*, ¶ 100(c).) Plaintiff acknowledges that in *at least* eight of these instances, the officers were disciplined for their misconduct. (*See id.*, ¶ 100(d), (f), (j), (n), (p), (r), (s), and (u).)  Plaintiff also notes that in at least one of the cited incidents the TBI also investigated the incident. (*See id.*, ¶ 100(e).) Plaintiff also cites to another incident occurring three days prior to the incident giving rise to this case and cites to the lawsuit that was filed *after* the incident giving right to this case. (*See id.*, ¶ 100(b).) Even taking Plaintiff's allegations in Paragraph 100 as true, they are not indicative of a "custom of tolerance" if: (1) the City was not put on notice, and (2) when the City was on notice, it investigated the incident and issued discipline where appropriate.

A custom of tolerance claim does not mean that the officers had a "custom" of behaving in a certain way. It requires a showing that "that there was a pattern of inadequately investigating similar claims." *Burgess*, 735 F.3d at 478. Plaintiff's allegations show that "similar claims" were not reported and were instead covered up. (*See, e.g.*, Compl., ¶¶ 56, 57.) The City and MPD leaders cannot investigate misconduct of which it has no knowledge. That is implausible. *Ashcroft*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") Plaintiff fails to allege a clear and persistent pattern of inadequately investigating misconduct as to MPD officers or notice thereof on part of the City or Chief Davis. Plaintiff did not, and cannot, plead

21

sufficient facts illustrating a "tacit approval of unconstitutional conduct" such that the City's alleged deliberate indifference in its alleged failure to act can be said to amount to an official policy of inaction. As the Supreme Court makes clear in *Monell*, the City's liability cannot be based on hiring tortfeasors. *Monell*, 436 U.S. at 690. Instead, liability must be based on the City's direct actions. Plaintiff's allegations are insufficient to show a ***permanent and widespread custom of tolerance*** or a ***pattern of inadequate investigating*** similar claims. Accordingly, Plaintiff failed to sufficiently plead facts to support a claim for custom of tolerance and Plaintiff's Fourth Amendment claim against the City Defendants must be dismissed.

### E. Plaintiff's State Law Claims Against Lt. Smith as Agent of the City Should Be Dismissed Under Tennessee's Governmental Tort Liability Act.

Plaintiff's intentional tort claims, Counts XXVII; XXVIII; and XXIX, are barred by Tennessee's Governmental Tort Liability Act ("the GTLA")**.** "State law claims against governmental entities and their employees are governed [exclusively] by the GTLA." *Epperson*, 140 F. Supp. 3d at 689 (citing Tenn. Code Ann. § 29-20-101). The GTLA waives common law sovereign immunity and permits litigants to sue municipalities for injuries sounding in negligence. *Partee v. City of Memphis*, 449 F. App'x 444, 447 (6th Cir. 2011) (citing Tenn. Code Ann. § 29–20–205). However, "statutes which waive immunity of the governmental entity from suit are to be construed strictly in favor of the sovereign." *Siler v. Scott*, 591 S.W.3d 84, 104 (Tenn. Ct. App. 2019) (quoting *Hughes v. Metro. Gov't of Nashville & Davidson Cty.*, 340 S.W.3d 352, 368–69 (Tenn. 2011)). All claims for damages brought under the GTLA must strictly comply with the GTLA. *Limbaugh v. Coffee Medical Ctr.*, 59 S.W.3d 73, 82 (Tenn. 2001).

The GTLA contains a list of specific exceptions for which municipalities such as the City retain immunity. *See* Tenn. Code Ann. § 29-20 205(1)- (10). One is the "intentional tort exception," which bars claims for injuries arising out of "[f]alse imprisonment pursuant to a

mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, **deceit**, interference with contract rights, **infliction of mental anguish**, invasion of right of privacy, or civil rights." Tenn. Code Ann. § 29-20-205(2) (emphasis added); *Limbaugh*, 59 S.W.3d at 81. Another exception is the "misrepresentation exception," which bars claims for injuries arising out of "[m]isrepresentation by an employee whether or not such is negligent or intentional." Tenn. Code Ann. § 29-20-205(6); *Justice v. Anderson County*, 955 S.W.2d 613 (Tenn. Ct. App. 1997); *Barnes v. Bradley County Mem. Hosp.*, 161 Fed. App'x 555 (6th. Cir. 2006).

1.  Plaintiff's claim against Lt. Smith as agent of the City for intentional infliction of emotional distress is barred under § 29-20-205(2) of the GTLA.

Plaintiff's intentional infliction of emotional distress claim, Count XXVII, against the Lt. Smith as agent of the City is expressly barred by the "infliction of mental anguish" category of the intentional tort exception under Tenn. Code Ann. § 29-20-205(2). Plaintiff alleges that Lt. acted "with the intent to deceive, lie to, and manipulate" Plaintiff, and that he "intentionally lied to and withheld information" from Plaintiff on January 7, 2023. (Compl., ¶ 876.) The City retains immunity from all such claims under the GTLA. *See* Tenn. Code Ann. § 29-20-205(2); *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 853 (E.D. Tenn. 2011*); Stapp v. Wall*, No. 3:08-cv-0101, 2008 WL 11510613, at *7 (M.D. Tenn. Oct. 6, 2008) ("[T]he reference to 'infliction of mental anguish' in the GTLA applies . . . to intentional infliction of emotional distress [claims]") (citing *Sallee v. Barrett*, 171 S.W.3d 822 (Tenn. 2005)).

Additionally, Plaintiff's intentional infliction of emotional distress claim against Lt. Smith as agent of the City is barred by the "deceit" category of the intentional tort exception. *See* Tenn. Code Ann. § 29-20-205(2) ("Immunity from suit of all governmental entities is removed … except if the injury arises out of … *deceit* …".). Thus, Plaintiff's intentional infliction of

23

emotional distress claim against Lt. Smith as agent of the City must be dismissed.

2.    Plaintiff's claim of fraudulent misrepresentation is also barred by the GTLA.

The Court should dismiss Plaintiff's fraudulent misrepresentation claim, Count XXIX, against Lt. Smith as agent of the City because it is barred under the "misrepresentation exception" in § 29-20-205(6) of the GTLA.

Here, Plaintiff's Complaint alleges that Lt. Smith knowingly made false representations to Plaintiff on January 7, 2023 regarding the condition of her son. (*See* Compl, ¶¶ 899-911.) Under the GTLA, however the City is immune from claims for injuries arising from "misrepresentation by an employee whether or not such is negligent or intentional." Tenn. Code Ann. § 29–20–205(6). Since it is alleged that Lt. Smith was acting as an agent of the City when he allegedly made the fraudulent misrepresentations, the City is immune from any such fraudulent misrepresentations under Tenn. Code Ann. § 29–20–205(6).

3.    Plaintiff's negligent infliction of emotional distress claim is essentially a negligent misrepresentation claim framed as a claim for negligent infliction of emotional distress.

The Court should dismiss Plaintiff's claim for negligent infliction of emotional distress, Count XXVIII, because it is essentially a claim for negligent misrepresentation disguised as a claim for negligent infliction of emotional distress. Plaintiff's negligent infliction of emotional distress claim against Lt. Smith as an agent of the City of Memphis is based on the same alleged misrepresentations to Ms. Wells on January 7, 2023 that gave rise to her fraudulent misrepresentation claim. As such, it is barred by the misrepresentation exception contained in Tenn. Code Ann. § 29-20-205(6).

Plaintiff cannot circumvent the immunity provided by the GTLA immunity by couching her misrepresentation claim as one of negligent infliction of emotional distress. To support a claim for negligent infliction of emotional distress, Plaintiff must adequately allege that

24

"*defendant's negligence* 'caused a serious or severe emotional injury,'" *Brown v. Regions Bank*, No. 2:19-CV-2356-JPM-TMP, 2019 WL 13297196, at *4 (W.D. Tenn. Nov. 14, 2019), not that defendant's *negligent misrepresentation* caused her injury. This is so because the City is immune from claims for injuries arising from "misrepresentation by an employee *whether or not such is negligent or intentional*." Tenn. Code Ann. § 29–20–205(6) (emphasis added). Accordingly, Plaintiff's negligent infliction of emotion distress claim must be dismissed.

## IV.    CONCLUSION

For these reasons, the City respectfully requests this Court to grant its Motion and dismiss Plaintiff's First Amended Complaint with prejudice.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.**

*s/ Bruce McMullen*
Bruce McMullen (#18126)
Jennie Vee Silk (#35319)
Freeman B. Foster (#23265)
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone: (901) 526-2000
bmcmullen@bakerdonelson.com
jsilk@bakerdonelson.com
ffoster@bakerdonelson.com

*Attorneys for Defendant City of Memphis, Chief Cerelyn Davis in her Official Capacity, and Dewayne Smith as Agent of the City of Memphis*

4924-8102-7597

**<u>CERTIFICATE OF SERVICE</u>**

I, Bruce McMullen, hereby certify that on February 17, 2025, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, and that upon filing, such system will serve a copy of the foregoing upon all counsel of record in this action.

*s/ Bruce McMullen*
Bruce McMullen

4924-8102-7597