**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

|  |  |
|---|---|
| ROWVAUGHN WELLS, | |
| Plaintiff, | Case No. 2:23-cv-02224-MSN-ATC |
| v. | JURY DEMAND |
| THE CITY OF MEMPHIS, *et al.*, | |
| Defendants. | |

## PLAINTIFF'S OMNIBUS RESPONSE IN OPPOSITION TO RULE 12(b)(6) MOTIONS FILED BY VARIOUS DEFENDANTS

Plaintiff submits this response in opposition to motions to dismiss her amended complaint (ECF 277) that were filed by defendants City of Memphis and Memphis Police Department ("MPD") Chief Cerelyn Davis (ECF 303 & 303-1), Michelle Whitaker (ECF 307), JaMichael Sandridge (ECF 308 & 308-1), Robert Long (ECF 300), and Preston Hemphill and Lt. Dewayne Smith (ECF 314 & 314-1).

These motions should all be denied. In her amended complaint Plaintiff has alleged that the MPD officers who accosted Tyre Nichols and eventually beat him to death did so pursuant to an entrenched culture of brutality within the Memphis Police Department, a culture that was enabled and reinforced by a code of silence among MPD line officers and supervisors that covered up the excessive force, and was met with indifference by supervisors, including Chief Davis, who allowed it to continue. Plaintiff has substantiated these allegations with testimony by MPD officers themselves, as well as a compendium of more than two dozen cases of excessive force and coverup by MPD officers and supervisors over multiple years. In addition to the facts showing widespread excessive force and coverup, the complaint describes startling omissions in

1

MPD's formal policies that made accountability optional and did little to combat the entrenched code of silence within the MPD that made the rampant excessive force possible. All of this is set out with specific factual allegations in the amended complaint. And those facts are more than enough to satisfy Plaintiff's pleading obligations under Rule 8 and Rule 12.

The individual defendants who played auxiliary roles in Mr. Nichols' beating and its aftermath (Preston Hemphill and Dewayne Smith) have both tried to escape liability as well, but their arguments are meritless. Officer Hemphill and Lt. Smith claim that the complaint fails to state claims against them for their roles immediately before and after Mr. Nichols' beating, but to make that argument, they ask the Court to make dramatic inferences in *their* favor, and to improperly consider heavily curated snippets of testimony from the *United States v. Bean* trial rather than the complaint's allegations. Accepting that invitation would require the Court to violate bedrock principles of the Rule 12(b)(6) stage, which prohibit defendants from cherry picking evidence they plan to introduce in the case, or relying on inferences they will eventually ask the jury to make in their favor, in conflict with the reasonable inferences of the well-pled facts. The defendants separately ask the Court to dismiss the negligent infliction of emotional distress ("NIED") claim that arises from Lt. Smith's false statements to Plaintiff on the night her son was beaten, but they simply misunderstand the Tennessee Governmental Tort Liability Act, which does not cover NIED claims.

Finally, the three Memphis Fire Department ("MFD") defendants—Whitaker, Long, and Sandridge—ask the Court to dismiss the claims against them for deliberate indifference to Mr. Nichols' medical needs. The complaint alleges those three MFD employees were called to the scene after Mr. Nichols' beating, found him lying on the ground in obvious medical need, but then ignored him. The MFD defendants say they had no duty to provide him with care because

2

he was a free citizen, but that is preposterous: besides being incapacitated by the officers' beating, Mr. Nichols was handcuffed.

The defendants' motions are meritless and should be denied in their entirety.

## I.    The legal standard for pleadings under Rule 8 and assessing motions to dismiss under Rule 12(b)(6).

The Defendants' Rule 12(b)(6) motions seek to prevent Plaintiff from gathering evidence to support her claims and to prove those claims on the merits.  As such, Rule 12(b)(6) motions operate on hostile terrain.  "A motion to dismiss for failure to state a claim is disfavored, especially when one's civil rights are at stake." *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012) (collecting cases).  That hostility is baked into the federal rules.  Rule 8 of the Federal Rules of Civil Procedure provides that a complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  And in analyzing a motion under Rule 12(b)(6) to dismiss asserting that a complaint fails "to state a claim upon which relief can be granted," Rule 8's "pleading standard is generally construed quite liberally." *Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020).  A Rule 12(b)(6) motion is denied so long as a complaint contains "enough 'factual matter' to raise a 'plausible' inference of wrongdoing." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In assessing whether a complaint asserts a plausible claim, the Court must "[1] construe the complaint in the light most favorable to the plaintiff, [2] accept its allegations as true, and [3] draw all inferences in favor of the plaintiff." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  A complaint states a plausible claim for relief merely if "its factual assertions . . . [are] substantial enough to raise a right to relief above a speculative level." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

As the moving parties under Rule 12, furthermore, defendants bear the burden of "proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 433 (6th Cir. 2008). To satisfy this burden, they must point to a deficiency of *Plaintiff's* allegations—defendants cannot combat the sufficiency of a complaint by adding their preferred facts or asking the Court to construe factual allegations in *their* favor. *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (holding district court's grant of Rule 12(b)(6) motion erred by "crediting the defendant's, rather than the plaintiff's version of facts . . . [which] unduly raises the pleading standard beyond the heightened level of *Iqbal* and *Twombly*, forcing the plaintiff's well-pleaded facts to be not only plausible, but persuasive. That is not the appropriate burden at this stage of the litigation.").

Indeed "[f]erreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011). Put differently, under *Twombly* and *Iqbal* "[a complaint's] allegations do not have to give rise to the *most* plausible explanation—they just have to give rise to one of them." *Doe v. Baum*, 903 F.3d 575, 587 (6th Cir. 2018) (emphasis original; citing *Iqbal*). With these ground rules in mind, Plaintiff turns to the defendants' arguments.

## II. The amended complaint alleges ample facts to plead a *Monell* claim against the City of Memphis.

The City of Memphis moves to dismiss Plaintiff's *Monell* claim. To make its argument, however, the City must both ignore what facts are relevant for establishing *Monell* liability, *and* insist that the Court make multiple inferences in the *City's* favor. Those arguments are entirely unavailing. The Court should reject them.

4

A.    Under *Monell*, Section 1983 permits injured parties to sue for constitutional violations that result from municipal customs.

The amended complaint asserts a Section 1983 claim against the City of Memphis. The sufficiency of the complaint's allegations in support of that claim are judged pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). *Monell* stands for a straightforward proposition:  municipalities are "persons" subject to Section 1983, but "[a] municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691) (emphasis original). Instead, municipalities like the City are held liable when they have a "policy or custom" that is the "moving force behind" the violation alleged. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (internal quotation omitted).

Under *Monell*, a qualifying "'municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.'" *D'Ambrosio*, 747 F.3d at 386 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Under this rubric a plaintiff can articulate a municipal policy under a variety of theories. *See Stewart v. City of Memphis, Tennessee*, 788 F. App'x 341, 344 (6th Cir. 2019) (noting various *Monell* theories including 1) the existence of an illegal official policy or legislative enactment; 2) an official with final decision making authority ratifying illegal actions; 3) the existence of a policy of inadequate training or supervision; or 4) a custom of tolerance of federal rights violations.). Notably, "[t]he [municipality's] policies at issue need not be written down; they may instead be commonly accepted practices of the city organization." *Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *8 (6th Cir. May 13, 2024) ((citing *Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019)). And as a number of courts

5

have noted, courts should consider how a municipality's "policies or practices interact with one another" to cause a violation. *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 795 (5th Cir. 2020). *Accord Spearman v. Elizondo*, 230 F. Supp. 3d 888, 893 (N.D. Ill. 2016) (rejecting consideration of different municipal policies and practices in isolation where it was reasonable to infer they were "interrelated, mutually-reinforcing customs or practices, all of which contribute to civil rights violations of the kind alleged by [the *Monell* plaintiff].").  Ultimately, "a municipality's issuance or adoption of a policy, or its unwritten custom, must be the reason the officer violated a plaintiff's constitutional rights." *Cunningham v. Shelby Cnty., Tennessee*, 715 F. Supp. 3d 1058, 1064 (W.D. Tenn. 2024) (citing *D'Ambrosio*, 747 F.3d at 286), *aff'd*, No. 24-5241, 2024 WL 4825338 (6th Cir. Nov. 19, 2024).

### B.    The complaint pleads that the City has customs of excessive force and police coverup within the MPD that drove and enabled the beating of Tyre Nichols.

The complaint alleges that there "was a well-established and widespread custom within the City of Memphis pursuant to which MPD officers routinely used force against civilians without justification, often because the persons have annoyed, angered, or embarrassed the police in one way or another."  ECF 277 ⁋ 46.  The complaint provides further descriptions of this practice within the MPD, alleging that it was longstanding and widespread.  *Id.* ⁋⁋ 47-54.  The complaint goes on to allege that the MPD's SCORPION unit—the unit whose officers beat Mr. Nichols to death—frequently engaged in excessive force, specializing in hostile and terrifying encounters with civilians for minor traffic violations, in which SCORPION officers often used unjustified violence.  *Id.* ⁋⁋ 77-99.  Many of these tactics, the complaint alleges, were encouraged by MPD policies and Chief Davis personally, who encouraged SCORPION unit officers to engage in aggressive tactics and seize vehicles even if the officers knew the cases would be dropped in court, *id.* ⁋ 88, and to accost residents in a hostile and terrifying manner,

even if they were only suspected of minor violations. *Id.* ¶ 93. SCORPION unit's pattern of excessive force was also encouraged by the City's broad failure to train MPD officers either in lawful use of force or in ensuring accountability. *Id.* ¶ 75-76.

With respect to the MPD's "tax" culture, the complaint alleges

> Multiple MPD officers, including some who took part in beating Tyre, . . . [have] testif[ied] that the officers who savagely beat Tyre did so based on longstanding customs within the MPD in which officers would beat people who annoyed or angered them during the course of a police encounter, jokingly referring to such beatings as a "tax" and similar terms.

*Id.* at 2.

The complaint further alleges that "the MPD's custom of using excessive force (including imposing the "tax" or "run tax" against residents) was allowed to flourish within the MPD for years before Tyre's killing because of a firmly entrenched code of silence within the MPD in which officers lie for each other, manipulate evidence, and refuse to intervene or report wrongdoing, all to cover up violations of MPD policy, including unlawful use of force." *Id.* at 56. The complaint alleges that officers would exaggerate or make up what their victims did in order to make the officers' uses of force appear justified, *id.* ¶¶ 56-57, and that they would manipulate evidence recorded by their body-worn cameras in order to conceal the unlawful force used, *id.* ¶¶ 58-59. The complaint alleges that this was an integral part of the routine practices within SCORPION and the other MPD teams in the "Organized Crime Unit," as those units specialized in escalating encounters with civilians, and using force, for no lawful purpose, *id.* ¶¶ 93-94, all of which was part of a policy of carrying out pretextual stops in "high crime" areas, which was encouraged by Chief Davis and the MPD. *Id.* ¶¶ 83-99.

The complaint alleges that MPD officers observing the code of silence would not report on each other's excessive force for fear of being labeled a "snitch" and facing retaliation. *Id.* ¶¶

61-62.  The complaint further alleges that the code of silence was enabled by inadequate oversight within the MPD.  *Id.* ¶ 64.  Plaintiff alleges that supervisors discouraged line officers from reporting excessive force, and would approve even flagrant misuses of force as being consistent with MPD policy.  *Id.* ¶¶ 66-68.

The MPD's leadership was aware of the lax supervision and the manipulation of body-worn camera evidence, the complaint alleges, but took few, if any, steps to correct these problems.  *Id.* ¶¶ 69-72.  Chief Davis had stated that within the MPD there was "a culture that doesn't have supervision, that doesn't adhere to the policies," and attributed this culture to Mr. Nichols' death. *Id.* ¶ 71.  Before Mr. Nichols' death, high-ranking members of the MPD held "accountability" meetings to discuss the widespread failure of MPD officers to use body-worn cameras, yet the City did little to remedy this problem, both before and after Chief Davis took charge.  *Id.* ¶¶ 72-73. Among other things, the Complaint alleges, penalties for misuse of body-worn cameras or for failing to comply with requirements to record police-civilian interactions were minimal to nonexistent.  *Id.* ¶ 73.  Furthermore, there were no written policies requiring audits or other oversight over supervisor reviews of use of force, nor was there any written requirement to audit body-worn camera footage or use of force reports to ensure officers' compliance with policy and law.  *Id.* ¶ 73.  The complaint alleges that the MPD's failure to establish policies in these areas enabled the MPD's code of silence, as it enabled officers and line supervisors to avoid reporting uses of excessive force, and thereby cover them up.  *Id.* ¶ 74.  The complaint further alleges that

> MPD officers . . . [have] testif[ied] that the police who beat Tyre
> felt free to do so because they were protected by a robust and
> pervasive code of silence within the MPD, in which officers would
> lie and manipulate evidence by various means to cover up their
> beatings of Memphis residents while supervisors knowingly

> looked the other way, and said nothing, reported nothing, and
> behaved as if nothing inappropriate had happened.

*Id.* at 2. The complaint also charges that the City failed sufficiently to discipline or punish its

officers for instances of similar misconduct, further emboldening the police who beat Mr.

Nichols. *Id.* at 3 & ⁋⁋ 281, 291.

The complaint then alleges that the forgoing practices have led to numerous excessive

uses of force by MPD against civilians in Memphis—and it identifies *21 such examples. See id.*

⁋⁋ 100 (a) – (u). Many of these examples are shocking and represent the "tax" described above,

in which MPD officers use flagrant and entirely unnecessary force against civilians who have

done something to anger or annoy the police, but have already been restrained. The examples

paint a picture of a robust cover-up culture as well: officers routinely fail to turn on their body-

worn cameras or turn them off, *see id* ⁋⁋ 100(d)(v); (e)(iii); (f)(iv); (k)(iv); (s)(iii). Supervisors

frequently are actively involved in or approve of officers' physical abuse, *id.* ⁋⁋ (p)(vi); p(ix);

u(v), and make recorded statements reflecting a brazen and open culture of accepting both

abusive force and the subsequent cover-up—such as telling officers who were beating a detainee

to "Go take him to the bathroom, don't do it out here." *Id.* ⁋ 100(u)(v).

The example cases are also notable for the lack of accountability that MPD imposed on

officers using excessive force. In the bulk of the 21 example cases, no discipline is reported at

all. *See Id.* ⁋⁋ 100(a), (b), (c), (e), (g), (h), (i), (k), (*l*), (m), (q), (t). In those where some

discipline is noted, accountability frequently is not initiated by the MPD but rather by an outside

actor. In the case of Kieron Lee, for example, the MPD officer faced accountability only after

the *prosecutor* who was preparing to prosecute Mr. Lee reviewed the body-worn camera video—

which presumably had already been reviewed and approved by MPD supervisors—and raised the

officer's excessive force. *Id.* ⁋ 100(n)(i). In another, discipline occurred after the victim's

girlfriend recorded the incident on her own phone, in which the officer did not record the

interaction at all.  *Id.* ¶¶ 100(s)(iii), (v).  In another the officer was reported because he slapped

an arrestee in the face at an administrative office rather than with his usual MPD colleagues, who

had already abused the arrestee.  *Id.* ¶ 100(f)(v).

In the few cases where discipline was handed out, moreover, it was almost always very

light:  a five-day suspension for punching a civilian in the face after slamming him to the ground.

*Id.* ¶ 100(d)(iii). A two-day suspension for kicking a woman in the stomach four times, after she

had already been handcuffed and placed in the back of a patrol car.  *Id.* ¶ 100(j)(iii).  A six-day

suspension for punching a man three times in the head who was already handcuffed and was

sitting in a wheelchair.  *Id.* ¶ 100(n)(iv).  A three-day suspension for a supervisor who

encouraged an officer who "foamed the [expletive] out of" a man, in the face, who was already

handcuffed and in the back of a patrol car.  *Id.* ¶¶ 100(p)(vi), (xi).  A ten-day suspension for

repeatedly tasing a man who was already handcuffed and on the ground. *Id.* ¶¶ 100(s)(iv)-(vi).

There is no indication of discipline for other officers on the scene who tried to cover up the abuse

by manipulating their body cameras or video evidence.  *See id.* ¶¶ 100(d)(v), e(iii), f(iv), g(iv),

k(iv). And in few if any of the examples does the Complaint indicate that MPD ever referred the

officer to prosecutors.[1]

---

[1]  The City suggests that the Court should ignore several of these events as occurring too
close in time to Mr. Nichols' beating to be probative of a *Monell* claim against the City, including
some that gave rise to lawsuits filed "*after*" Mr. Nichols' beating, ECF 303-1 at 21 (emphasis
original).  There is no merit to this argument, as it is well established that even "subsequent
incidents [can] be probative of what policies, practices, or accepted customs existed []at the time
of the incident at issue, which would be relevant to Plaintiffs' *Monell* claims." *Abdur-Rahim v.
City of Columbus*, No. 2:17-cv-601, 2019 WL 1873222, at *3 (S.D. Ohio Apr. 26, 2019)
(collecting authorities from the 1st, 3rd, 4th, 5th, 6th, 7th, 9th, 10th, and 11th Circuits).

These numerous examples pled in the complaint flesh out the broader policy allegations set out in paragraphs 45 through 99 of the complaint and summarized *supra*, and they paint a disturbing picture of the culture within the MPD:  officers' frequent use of unnecessary physical brutality against civilians, especially as part of traffic stops; a willingness to use extraordinary violence against civilians who annoy the police (especially by daring to attempt flight) after the civilian has already been detained and restrained; a culture of cover-up in which police frequently turn off their cameras and where unjustified police violence often goes unnoticed by any MPD review process; supervisors willing to look the other way or even actively endorse inappropriate violence against civilians; and notably light discipline in nearly all of the few cases where any discipline is imposed at all.  In short, Plaintiff's complaint presents an abundance of factual allegations that would give any juror reasonable cause to conclude that the City of Memphis has a custom of excessive force by MPD officers, who are emboldened and enabled by the lack of accountability within the MPD.

After describing the MPD's policies and practices in detail, the complaint goes on to detail factual allegations showing that the foregoing customs drove and enabled Mr. Nichols' beating specifically.  The complaint describes the officers' initial, terrifying conduct towards Mr. Nichols after an unjustified traffic stop.  *Id.* ¶¶ 101-143.  A terrified Mr. Nichols fled, and the SCORPION officers eventually caught up with and subdued him.  *Id.* ¶¶ 144-160.  Once Mr. Nichols was restrained, the officers proceeded to impose the "run tax"—a term, long accepted within the MPD, that applied particularly to Mr. Nichols' situation—brutalizing a civilian who had attempted to flee the MPD.  *Id.* ¶¶ 45-54; 180-186.  The beating, the complaint alleges, was savage, done in concert by the multiple officers at the scene, and was not justified by anything done by Mr. Nichols, who was restrained and posed no threat to the officers.  *Id.* ¶¶ 160-186.

11

After they had beaten Mr. Nichols, the complaint alleges, the officers, following

longstanding customs within the MPD, proceeded to cover it up.  *Id.* ¶¶ 183-186.  They did so by

falsely claiming that Mr. Nichols was threatening or assaulting them, and by downplaying the

physical force they used against him.  *Id*. ¶¶ 195, 232-235, 261-270.  The officers' effort to cover

up their beating of Mr. Nichols was endorsed by their supervisor, DeWayne Smith, who, as soon

as he arrived on the scene, began to help the officers in manufacturing a false narrative about Mr.

Nichols.  *Id.* ¶¶ 228-260.

The complaint alleges that the officers who imposed the "run tax" on Mr. Nichols by

fatally beating him believed that they could do so with impunity because their lies would be

protected by the MPD's code of silence.  *Id.* ¶¶ 184-185.  And, the complaint alleges, the lies and

fabrications by the defendant officers and their supervisor Smith were "undertaken pursuant to

the MPD's code of silence, which conceals officers' excessive use of force, thereby allowing

excessive force to perpetuate within the MPD."  *Id.* ¶ 270.

## C.    The City's *Monell* arguments misconstrue the complaint's allegations and misunderstand settled Sixth Circuit precedent regarding *Monell* liability.

The foregoing roughs out the amended complaint's allegations against the City.  As

summarized *supra*, those allegations set out a broad and well-settled culture of excessive force,

enabled by a code of silence that covered it up.  And the complaint connects that culture to Tyre

Nichols' beating specifically, setting out how the MPD's "run-tax" and code-of-silence culture

drove and enabled the beating. The City nevertheless moves to dismiss the amended complaint,

arguing that Plaintiff has failed to plead sufficient factual allegations to state a Section 1983

claim against it under *Monell*.  ECF 303-1 at 11-22.

Confronted with the wealth of evidence about these practices that Plaintiff marshals in

her complaint, the City makes the following argument: the City does *not* contest that Plaintiff's

12

factual allegations permit the inference of a widespread practice of excessive force in the MPD.

Instead, it argues that a culture of excessive force within the ranks of the MPD—however

widespread—is irrelevant under *Monell*. That is so, the City argues, because if the numerous

constitutional violations set out in the amended complaint were unreported, the City's

policymakers were not plausibly indifferent to them. *See* ECF 303-1 at 21 ("Plaintiff's

allegations show that 'similar claims' were not reported and were instead covered up. The City

and MPD leaders cannot investigate misconduct of which it has no knowledge."). Putting two

and two together, the City's argument is that the MPD's entrenched and longstanding code of

silence—which the City does not dispute is also adequately alleged in the complaint—is an

*excuse* that permits the City to evade *Monell* liability.

Not surprisingly, the City cites no support for this astonishing argument. And it suffers

from a multitude of fatal flaws. ***First***, the argument simply misunderstands the way in which

*Monell* claims are proved, and what it means for a municipality to be "on notice" of a pattern of

constitutional violations. Under *Monell*, a widespread pattern of constitutional violations permits

the *inference* that a municipality's policymakers are on notice of the custom in question and are

indifferent to it. It is for this reason that the Sixth Circuit has made plain that a widespread

practice claim can be proved with "notice *or constructive notice* on the part of" the municipality

to a "persistent pattern of illegal activity" by the municipality's agents. *Thomas v. City of

Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A municipality is on constructive notice, in

turn, where "there ha[ve] been enough similar incidents to put the [municipality] on notice" of

the custom of "constitutional deprivation." *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247

(6th Cir. 1989). Although there was no direct evidence in *Leach* that the sheriff actually knew of

the unconstitutional conduct at issue, the Sixth Circuit held that because there were 14 similar

incidents, the sheriff *should have known* of the unlawful conduct at issue. *Leach*, 891 F.2d at 1246. This is a bedrock and well-settled principle of *Monell* jurisprudence in this Circuit. *See, e.g.*, *Dye v. City of Roseville*, No. 14-CV-11252, 2014 WL 7184460, at *10 (E.D. Mich. Dec. 16, 2014) (citing *Leach* to hold that "[a]bsent supported allegations that city policymakers actually knew of an unconstitutional policy, custom or practice, plaintiff is required to allege a widespread or significant practice that could support a reasonable inference of constructive knowledge."); *Gibson v. City of Clarksville, Tenn.*, 860 F. Supp. 450, 463 (M.D. Tenn. 1993) (citing *Leach* for the same proposition); *Grose v. Corr. Med. Servs.*, No. 06-cv-15175, 2009 WL 2741515, at *5 (E.D. Mich. Aug. 25, 2009) (citing *Leach* for the same proposition); *Manley v. Corizon Healthcare*, No. 13-cv-13877, 2014 WL 4609862, at *3 (E.D. Mich. Sept. 15, 2014) (citing *Leach* for the same proposition); *Alphabet v. City of Cleveland*, No. 1:05-cv-1792, 2006 WL 3241785, at *14 (N.D. Ohio Nov. 7, 2006) (citing *Leach* for the same proposition). The City's motion fails for this reason alone.

**Second**, a widespread and entrenched code of silence is *itself* unconstitutional—this Court has said as much, about the City of Memphis in particular. Describing a "code of silence" within the MPD as "binding patrolmen and supervisors alike not to testify against or report on their colleagues," this Court in *Brandon v. Allen*, 645 F. Supp. 1261, 1266 (W.D. Tenn. 1986), held that such a code is "precisely the sort of custom referred to in *Monell*." *Id.* Courts since *Brandon* have held that "allegations of a 'code of silence' may support a *Monell* claim against a municipality," full stop. *See, e.g.*, *Sailor v. City of Cleveland*, No. 1:20-cv-660, 2021 WL 4472113, at *4 (N.D. Ohio Sept. 30, 2021).

Such allegations must be supported with "facts . . . [that] buttress" a code-of-silence allegation. *Id.* But Plaintiff has pled those facts here, alleging that multiple "MPD officers . . .

[have] testif[ied] that the police who beat Tyre felt free to do so because they were protected by a robust and pervasive code of silence within the MPD."  ECF 277 at 2.  Such testimonial "evidence—such as statements by county employees about county practices—may support custom or practice determinations" under *Monell*. *Hunter v. Cnty. of Sacramento*, No. 2:06-cv-00457, 2013 WL 3968663, at *4 (E.D. Cal. July 31, 2013).  *Accord Mwangangi v. Nielsen*, 525 F. Supp. 3d 869, 919 (S.D. Ind.), *decision clarified on reconsideration*, 536 F. Supp. 3d 371 (S.D. Ind. 2021), *and aff'd in relevant part* 48 F.4th 816 (7th Cir. 2022) ("Testimony from municipal employees that a practice was widespread can be sufficient [to support a *Monell* claim]." (collecting cases)); *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) (denying summary judgment on *Monell* claim where, in addition to personal experience, plaintiff offered jail employee testimony about systematic delays in treatment).  Additionally, Plaintiff has pointed to multiple incidents, *supra*, in which MPD officers turned off or otherwise obstructed their body-worn cameras while they or a fellow officer used excessive force against a civilian—a practice that is hard to explain except as part of an established custom of covering up police brutality within the MPD.  That is certainly, at least, a permissible inference to draw from Plaintiff's allegations at the Rule 12 stage.

What is more, the amended complaint alleges that MPD leadership *were* aware of these problems, including officers' manipulation of body-worn cameras, but did little to remedy them. ECF 277 ¶¶ 72-73.  Among other things, Plaintiff alleges that the MPD had no written policies requiring audits or oversight of body-worn camera usage or use-of-force reporting, and did not have adequate training on these topics either.  *Id.* ¶¶ 73-75.  It is certainly permissible at this stage in the case to infer that these policies (and lack of policies) reinforced and enabled the MPD's code of silence and the resulting culture of impunity that enabled excessive uses of force.

The amended complaint, in short, contains ample factual allegations supporting an entrenched code of silence and culture of impunity for excessive force within the MPD sufficient to plead a *Monell* claim against the City.

**Third**, even the premise of the City's argument is incorrect. As Plaintiff has noted above, when discipline *was* imposed—*i.e.*, when the City concedes it was aware of an improper use of force—that discipline was notably light, usually amounting to a slap on the wrist for serious misconduct. *See supra* at 9-10. A pattern of imposing inadequate discipline for misconduct is sufficient to establish *Monell* liability, *Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006), and Plaintiff has pleaded facts permitting the inference that such a pattern exists here. Certainly, the City's counter-proposal—that "when the City was on notice, it investigated the incident and issued discipline where appropriate," *see* ECF 303-1 at 21—requires a multitude of inferences, all in the *City's* favor, not the least of which is that the discipline imposed by the City was sufficient to deter future misconduct, rather than insufficient and reflecting indifference by the City to examples of egregious misconduct that should have resulted in far more serious discipline. At the Rule 12 stage, of course, the Court must draw reasonable inferences in *Plaintiff*'s favor. *See EPLET, LLC v. DTE Pontiac North, LLC*, 984 F.3d 493, 501 (6th Cir. 2021) (noting that "this case is before us at the motion-to-dismiss stage. We must therefore draw all reasonable inferences in favor of [Plaintiff], not Defendants"). The repeated imposition of light discipline for the serious excessive force that is described in the complaint, *see supra* at 9-10, amply justifies a reasonable inference that the City had a policy of imposing inadequate discipline for serious excessive force violations. The light discipline imposed by the City for serious misconduct—on those few cases where the City imposed any discipline at all—supports, rather than undermines, Plaintiff's Section 1983 claim against the City under *Monell*.

16

*** 

The remainder of the City's *Monell* arguments consist of knocking down straw men.  The City's *leading* argument is that Plaintiff has not pleaded facts permitting the inference that "***the City*** instructed its officers to employ the behavior" they displayed in beating Mr. Nichols, ECF 303-1 at 2 (emphasis original)—something Plaintiff has never contended.  The City also purports to identify *Monell* "avenues" and then argue under each separately, ECF 303-1 at 18-22, all while eliding that those theories turn largely on a "pattern of unconstitutional conduct" and the municipality's indifference to it.  *See, e.g.*, *Morgan v. Wayne Cnty.*, 33 F.4th 320, 329 (6th Cir. 2022) (pattern of violations required or failure to supervise claim); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (same, custom of toleration)).  The amended complaint alleges facts permitting the inference that there is indeed a persistent and widespread pattern of excessive force and an entrenched code of silence within the MPD, and that those customs have both motivated MPD officers to abuse civilians and emboldened them with the knowledge that they will face few consequences for doing so.  Particularly at the Rule 12 stage, those allegations are more than enough to state a *Monell* claim against the City.  The Court should deny the City's motion to dismiss Plaintiff's Section 1983 claim against it.

### III.    Chief Davis is not entitled to qualified immunity.

Alongside the City, Plaintiff asserts a supervisory liability claim against the MPD's police chief, C.J. Davis.  Chief Davis asks the Court to dismiss the claims against her on grounds of qualified immunity, arguing both that there is (1) no alleged violation and that (2) any violation is not clearly established under the law at the time of Mr. Nichols' beating.  ECF 303-1 at 8-11.  Plaintiff addresses each argument in turn.

A. **The amended complaint sufficiently alleges Chief Davis's liability as a supervisor.**

The defendants first argue that Plaintiff has failed to plead that Chief Davis violated any federal law. ECF 303-1 at 9-10. Defendants first emphasizes that Chief Davis did not directly participate in or order Mr. Nichols' beating. *Id.* at 9. Plaintiff, of course, makes no such allegation. Next, the defendants even if Chief Davis was aware of the widespread unconstitutional practices alleged in the amended complaint, "Plaintiff did not—and cannot—plausibly allege that Chief Davis, as Chief policymaker for MPD[,] violated any federal . . . right through her alleged knowledge of and indifference to" those widespread practices. *Id.*

This argument misunderstands both complaint's allegations about Chief Davis and the law governing supervisory liability. Plaintiff does allege that Chief Davis was aware of and was indifferent to the widespread unconstitutional customs and practices within the MPD that led to Mr. Nichols' death, that she was indifferent to them, and that she failed to take reasonable steps to correct them. *See, e.g.*, ECF 277 ¶¶ 69-76 (describing Chief Davis's awareness of widespread practices and her failure, along with other policymakers, to address them). Plaintiff also alleges that Chief Davis encouraged the use of "proactive" policing by SCORPION units and endorsed their tactics. *Id.* ¶¶ 82, 97. She did so even though the similar "RED DOG" units she had been involved with in the Atlanta PD were disbanded because they fell out of favor, even though such "proactive" units had fallen out of favor for their propensity to abuse civilians, and even though the SCORPION and other specialized units that Chief Davis encouraged within the MPD operated with minimal oversight, were given what were in effect quotas (called "objective performance measures") that encouraged aggressive policing, and were allowed to engage in dangerous conduct, like high speed chases, that were prohibited within the MPD. *Id.* ¶¶ 77-99.

18

Under the law governing supervisory liability, either set of allegations—Chief Davis's awareness of and failure to address the pattern of widespread constitutional violations within the MPD, or Chief Davis's encouragement of policing tactics despite their propensity to lead to constitutional violations—is sufficient to state a Section 1983 supervisory liability claim. The leading Sixth Circuit case regarding such claims is *Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016), which was brought against one of Chief Davis's predecessors, MPD police chief Toney Armstrong. In *Peatross* the family of a man who was shot and killed by two MPD officers brought suit against Chief Armstrong under a theory of supervisory liability, alleging that he "condoned, encouraged, or a least implicitly authorized" unlawful practices by the ranks of the MPD's officers, and failed "to properly hire, train, supervise, monitor, and discipline [MPD] officers," and "consciously disregarded the known and foreseeable consequences of failing to correct deficiencies in the [MPD]," all of which foreseeably led to the shooting. *Peatross*, 818 F.3d at 238.

Armstrong moved to dismiss these claims, but *Peatross* rejected his arguments. The court explained that "supervisory liability requires some "active unconstitutional behavior" on the part of the supervisor," but explained that "active behavior" could include "encouragement, authorization, approval, and knowing acquiescence," "all [of which are] sufficient to confer liability." *Id.* at 241-242 (citations and quotations omitted). A supervisor could also be held liable where the supervisor "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* at 242 (quotation omitted). This liability could be shown by pointing either to "acts" *or* "omissions" in the "execution of [the supervisor's] job function." *Id.* (citation omitted). Under these criteria, *Peatross* held, Armstrong could be held liable for failing to do *his* job as chief, including by "fail[ing] to train

19

and supervise the officers to avoid the use of excessive force, fail[ing] to investigate the allegations of excessive force properly," and by "exonerating" officers involved in excessive force cases, thereby covering up their culpability." *Id.* at 243. *Peatross* pointed out that Armstrong had acknowledged the need to make improvements in dealing with the MPD's problem of excessive force, yet "no improvements were made." *Id.* "At bottom," *Peatross* concluded, these allegations sufficiently alleged that "Armstrong gave MPD officers the 'green light' to violate the civil rights of citizens." *Id.* Indeed, *Peatross* noted, a supervisor could be said to "implicitly authorize" their subordinates' misconduct by "fail[ing] to punish their wrongful conduct after repeated violations of the same type." *Id.* (citing *Leach*, 891 F.2d at 1246).

The allegations against Chief Davis easily satisfy the standard for supervisory liability set out in *Peatross*. Indeed they are notably similar to the allegations in that case. Plaintiff alleges that, like Chief Armstrong, Chief Davis was aware of widespread excessive use of force, inadequate supervision, and a "culture" that ignored the MPD's written policies designed to protect civilians from constitutional violations. Like Chief Armstrong in *Peatross*, it was Chief Davis's job function to put a stop to these problems. But, the complaint alleges, she did not—and in failing to supervise and deter that misconduct, she tacitly approved of it. Those allegations, summarized above, are sufficient to state a claim for supervisory liability under *Peatross*. What is more, Chief Davis actively encouraged the deployment of SCORPION "proactive" units, even though such units operated lawlessly and had fallen out of favor across the country for their propensity to violate the rights of civilians. Chief Davis's *active* promotion of such units, notwithstanding these problems, is also sufficient to state a claim for supervisory liability under Section 1983.

**B.    The acts and omissions alleged against Chief Davis have long been established as unlawful.**

The Defendants also seek dismissal of the complaint against Chief Davis on the second prong of qualified immunity, arguing that she is not alleged to have violated a right that was clearly established.  ECF 303-1 at 10-11.  But this argument, which is set out in cursory fashion, fails.  The defendants' argument focuses only on Chief Davis's promotion of the SCORPION units, and then focuses only on the purported *purpose* of the units, arguing that "Plaintiff does not—and cannot—allege that tactical units focusing on repeat-offenders and violent crime have been clearly established as unconstitutional."  ECF 303-1 at 10.  Plaintiff has alleged no such thing, of course.  That specialized units like SCORPION or RED DOG were intended to address violent crime or repeat offenders was not what the complaint contends was unlawful about Chief Davis's conduct.  Rather, the complaint alleges that Chief Davis (like Chief Anderson in *Peatross*) (1) failed to oversee and combat widespread use excessive force and a lack of accountability within the MPD, thereby tacitly giving a "green light" to it; and (2) actively promoted of specialized units like SCORPION even though the tactics and practices of those units amounted to unconstitutional policing. *See supra* at 18-19.

*Those* are the constitutional supervisor-level violations alleged against Chief Davis.  And to assess whether the unlawfulness Plaintiff alleges was clearly established when Mr. Nichols was killed (or even before, when Chief Davis was hired by Memphis in 2021, *see* ECF 277 ⁋ 12), one need look no further than *Peatross*, which was decided in 2016.  As set out above, that decision held on no uncertain terms that a police chief in a city like Memphis who "knowingly acquiesce[s] in widespread unconstitutional conduct by the chief's subordinates, including by "acts" and "omissions" in failing to address and take reasonable steps to stop that conduct, violates the law and is liable as a supervisor under Section 1983.  *Peatross*, 818 F.3d at 242.  The

*Peatross* decision addressed factual allegations so strikingly similar to the ones alleged in this

case, addressing the same department and some of the same cultural indicators and supervisory

failures, one would expect it to be required reading for any incoming MPD chief.  Chief Davis is

not entitled to qualified immunity.

**IV.    Plaintiff's state law negligence claims against the City of Memphis are properly
pleaded and should not be dismissed.**

Separate from the civil rights claims, the amended complaint also alleges state law

claims against Lt. Smith, as an agent of the City of Memphis.[2] ECF 277 ¶¶ 886-898.  Lt. Smith

did not participate in the beating of Mr. Nichols, but following the incident walked the 100

yards to Mr. Nichols' home. ECF 277 ¶¶ 241-51. Fully aware of Mr. Nichols' condition nearby,

Lt. Smith told Plaintiff that that her son was intoxicated and was being arrested for a DUI.

*Id.* ¶¶ 242-243.  When Plaintiff asked Lt. Smith for information on her son, Smith lied to her

by stating that Tyre would be going to jail after receiving medical care and he could be picked

up there.  *Id.* ¶¶ 248-250.  Lt. Smith knew that Tyre Nichols would not be transported to jail

because he was nearly dead.  *Id*. ¶ 240.

Defendants incorrectly claim that Plaintiff's claim for negligent infliction of

emotional distress ("NIED") against Lt. Smith as an agent of the City is barred by

the  Tennessee Governmental Tort Liability Act ("the TGTLA"). Defendants argue that

Plaintiff's NIED claim  must be dismissed because it is essentially a claim for fraudulent

misrepresentation disguised as a claim for NIED.  ECF 303-1 at 22-25. Defendants'

---

[2]  This portion of the response only addresses Lt. Smith as an agent of the City.  Lt. Smith's
motion to dismiss the individual claims against him is addressed *infra*.

characterization is incorrect, as fraudulent misrepresentation is a completely different claim, requiring a completely different mental state.[3]

A claim for NIED requires Plaintiff to prove "the basic elements of negligence: duty, breach, causation, and damages" and "that the defendant's negligence caused a serious or severe emotional injury." *Brown v. Regions Bank*, No. 2:19-cv-2356, 2019 WL 13297196, at *4 (W.D. Tenn. Nov. 14, 2019) (internal quotations omitted). Plaintiff has so pleaded. ECF 277 ¶¶ 886-898. There is no "knowing" or "intentional" mental state requirement for NIED—only negligence by the Defendant.

The TGTLA specifically removes immunity for government entities when injury is "proximately caused by a negligent act or omission" of its employees—including negligent infliction of emotional distress. *See Greenwood v. City of Memphis*, No. W2016–00897–COA–R3–CV, 2017 WL 5151378, at *4 (Tenn. Ct. App. Nov. 6, 2017) (holding the TGTLA "does generally *remove* the City's immunity for negligence and negligent infliction of emotional distress."). The TGTLA further enumerates specific torts for which government entities are immune, and NIED is *absent* from that list—meaning it was not contemplated as a tort which government employees should be immune. Tenn. Code Ann. § 29-20-205(2). *See also Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 84 (Tenn. 2001) ("[S]ection 29–20–205 of the TGTLA *removes* immunity for injuries proximately caused by the negligent act or omission of a governmental employee except when the injury arises out of *only those specified torts enumerated in subsection (2)*." (emphasis added)).

---

[3]   In making a claim for fraudulent misrepresentation, a plaintiff must show that the defendant made false material representation, that "the defendant either *knew it was false or made it recklessly* without knowledge of its truth," that "the representation was made *with the intent that the plaintiff would act upon it*" and finally that "the plaintiff did act, which caused the plaintiff to suffer damages." *Dugan v. Vlcko*, 307 F. Supp. 3d 684, 696–97 (E.D. Mich. 2018).

Courts, indeed, have expressly stated that NIED is not considered as "infliction of mental anguish" within the bounds of § 29-20-205. *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 853 (E.D. Tenn. 2011). Nor is Plaintiff's NIED claim a civil rights allegation, which would be barred by the TGTLA, as they do not arise from the same facts. *Cf. Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 852–53 (E.D. Tenn. 2011) ("Because the claims arise out of the same facts—and are based upon the same arguments—Plaintiffs' negligence claims . . . are barred under the 'civil rights' exception of the TGTLA, T.C.A. § 29–20–205(2)."). For the civil rights exception to apply, the tortious conduct must "clearly arise out of and directly flow from the allegations that the police officer deprived [plaintiff] of [her] civil rights . . . ." *Butler v. City of Englewood*, No. 1:07-cv-184, 2008 WL 4006786, at *13 (E.D. Tenn. Aug. 25, 2008). That is plainly not the case here; Plaintiff was not present for or aware of the civil rights violations committed against her son.

Accordingly, the City of Memphis's motion to dismiss Plaintiff's NIED claim against Lt. Smith as an Agent of the City should be denied, as that claim is not barred by the TGTLA.[4]

## V. The motion to dismiss by Defendants Hemphill and Lt. Smith should be denied

### A. The complaint's allegations state claims against both Hemphill and Lt. Smith.

Defendants Officer Preston Hemphill and Lt. Dewayne Smith played bookend roles in Mr. Nichols' beating. Hemphill was involved in the officers' initial stop and mistreatment of Mr. Nichols, but he did stayed behind when Mr. Nichols fled and did not participate directly in his fatal beating. Lt. Smith was a SCORPION supervisor; he arrived on the scene after Mr. Nichols' beating, ignored Mr. Nichols' medical needs, and later told Mr. Nichols' mother, falsely, that Mr.

---

[4] Because Plaintiff's NIED claim is appropriately pleaded and viable, the Court should also reject the City's request to dismiss Lt. Smith as an "agent" of the City, *see* ECF 303-1 at 11.

Nichols was high on drugs.  Both defendants move to dismiss all the claims against them, but their arguments fail.

> ### 1.    The amended complaint sufficiently alleges constitutional violations against both Hemphill and Lt. Smith.

*Hemphill allegations.* The amended complaint alleges that on the evening of January 7, 2023 Hemphill was on patrol with several other SCORPION officers.  ECF 277 ⁋ 103.  He was one of the officers "responsible for carrying out [an MPD] directive to make stops, even without a constitutional basis for doing so." *Id.* ⁋ 104.  After seeing Mr. Nichols, a young Black man driving a car, Hemphill set out with the other officers to stop him, even though he and the other SCORPION officers had no basis for doing so.  *Id.* ⁋⁋ 106-107; 109-110.  Even though Mr. Nichols was not suspected any crime, Hemphill was one of the officers who took part in an aggressive, unjustified maneuver to encircle Mr. Nichols while he waited at the traffic light to make a lawful left turn.  *Id.* ⁋⁋ 112-115.  As other officers pulled Mr. Nichols out of his car and put him on the ground, Hemphill "sprinted out of his unmarked squad car with his gun drawn, held sideways, and pointed squarely at" Mr. Nichols—an unjustified and terrifying use of deadly force, exercised even as Mr. Nichols was trying to cooperate and asking why the police were accosting him.  *Id*. ⁋⁋ 127-129.  Then, Hemphill took part in restraining, pulling, and striking Mr. Nichols, even though Mr. Nichols was offering no resistance.  *Id.* ⁋ 136.  Mr. Nichols then fled, and even though this act posed a threat to nobody, Hemphill fired a taser at him.  *Id.* ⁋ 148.  After Mr. Nichols had fled, Hemphill stayed back but said, "I hope they stomp his ass!"  *Id.* ⁋ 153.  Plaintiff alleges Hemphill made an unreasonable stop, used excessive force in accosting Mr. Nichols, and failed to intervene during the first encounter.  ECF 277 ⁋⁋ 711-787.

*Lt. Smith allegations.* The amended complaint alleges that Lt. Smith, as supervisor of the SCORPION unit that killed Mr. Nichols, was "supposed to oversee the use of force by their

subordinates," but that "in practice" he "failed to carry out this function and enabled a culture of impunity to flourish." *Id*. ¶¶ 65-67. Additionally, the complaint alleges that Lt. Smith arrived on the scene of Mr. Nichols' beating as it was ending. *Id.* ¶ 227. It alleges Lt. Smith was one of many officers who stood around and offered no assistance to Mr. Nichols even though he was in obvious medical need. *Id.* ¶¶ 228, 232, 237-240. The complaint alleges that after the beating, Lt. Smith used his supervisory role to cover up the assault, reviewing the body-worn camera footage and falsely reporting that there had been no violations. *Id.* ¶¶ 68, 267-269. Lt. Smith did this, the complaint alleges, pursuant to the MPD's code of silence. *Id.* ¶ 270. He then went to the home of Mr. Nichols' mother and lied about his condition to her. ECF 277 ¶¶ 241-251

> ## 2.    Hemphill and Lt. Smith improperly add new "facts" to the complaint and invite the Court to construe the allegations in *their* favor.

Hemphill and Lt. Smith do not argue that *these* allegations fail to state claims against them.[5]  That is for good reason; the allegations against them make out straightforward claims against both men.  Instead they repeatedly invite the Court to gloss the complaint's allegations in *their* favor, making suggestions about their own mental state or what they "reasonably" believed. What is more, Hemphill and Lt. Smith also import snippets of testimony (or their glosses of that testimony) from the *United States v. Bean* trial, and invite the Court to import that "evidence" in construing the facts alleged in the complaint.

The upshot of these maneuvers is that brief submitted by these two defendants is larded with factual assertions that appear nowhere in the complaint.  Consider:

For Hemphill:

- "When Hemphill arrived, Martin and Haley were already shouting *and struggling with [Mr.] Nichols*." ECF 314-1 at 3.

---

[5] Lt. Smith, furthermore, does not address the supervisory allegations against him at all.

- "*Unsure of the situation*, Hemphill initially approached with his weapon drawn but soon holstered it and began *assisting Martin and Haley in trying to restrain Nichols*." *Id.* at 3.

- "*The Officers continued to struggle, trying to get Nichols into custody*, but Nichols was eventually able to loosen himself from their hold and run." *Id.* at 4.

- "*At all times material, Defendant Hemphill relied on the information relayed to him by his fellow officers*." *Id.* at 4 (no citation to any source).

- "*Hemphill reasonably relied on Martin's statement*" that Mr. Nichols was trying to get Martin's weapon—cited statement was made after encounter in charging documents.  *Id.* at 4 n.4 (no citation to any source for "reasonably relied" claim).

For Lt. Smith:

- "*According to BWC video, SCORPION I Supervisor, [Lt.] Smith arrived on the scene sometime after EMTs were on the scene with Nichols*." *Id.* at 5.

- "*The officers were not forthcoming with Lt. Smith and failed to provide him with any information about beating Nichols or his resulting injuries*." *Id.* (citation to *Bean* criminal trial evidence).

- "*Mills falsely told his supervisor that they had done "everything by the book" although Mills knew that this was untrue.*" *Id.* (citation to *Bean* criminal trial evidence).

- "As with EMTs, the officers led Lt. Smith to believe Nichols was high on drugs." *Id.* (citation to *Bean* criminal trial evidence).

- "*Lt. Smith was led to believe Nichols was on drugs and relied on this information when communicating with the Wells about Nichols' condition*." *Id.* at 6.

The italicized portions of each of the foregoing statements do not appear in the complaint.  They are ambitious re-framings of the complaint's allegations to favor the defendants; citations to evidence in the *Bean* trial or other outside documents; our outright manufactured claims with no source at all.  Adding facts and asking the Court to "credit[] the defendant's, rather than the plaintiff's version of facts," is flatly improper at the Rule 12 stage.  *Mediacom Se. LLC*, 672 F.3d at 400.  Yet throughout their brief Hemphill and Lt. Smith insist that the Court do exactly this.

In introducing trial testimony and BWC, additionally, these two defendants seem to misunderstand anther basic rule at the pleading stage: the fact that a trial transcript (or a plea agreement) is a "public record" does not mean statements made in those documents are "matters

of public record"—*i.e.*, undisputed facts of which the court can take judicial notice.  As the Court of Appeals has explained, while a court considering a motion to dismiss may take judicial notice of a "public record," this rule "generally allows a court to conclude only that the record exists; the exception does not allow the court to treat all information in the record as true." *Blackwell v. Nocerini*, 123 F.4th 479, 487 (6th Cir. 2024).  Indeed "[a]t most, courts may take judicial notice of facts in a public record that 'are not subject to reasonable dispute'—such as the court's ultimate resolution of a prior case." *Id.* 123 F.4th at 487–88.  Hemphill and Lt. Smith invite the Court to venture far beyond this narrow rule.  They have introduced voluminous outside evidence, including testimony and similar statements of multiple police officers involved in Mr. Nichols' beating, and insisted that the Court accept all of it as true at the pleading stage.  That is flatly improper.  Their motion should be denied for this reason alone.

### 3.    The amended complaint states a claim under IIED.

The amended complaint also states an intentional infliction of emotional distress claim against Lt. Smith for his detour to Plaintiff's home, where he falsely told her that her son was being arrested for DUI, and could be picked up at jail.  ECF 277 ¶¶ 241-251; 875-885. This allegation, is easily satisfied by the outrageous nature of Lt. Smith's conduct: he had every reason to believe Mr. Nichols was innocent and had just been savagely beaten by his colleagues, but as Mr. Nichols lay dying Mr. Smith walked over to his mother's house and lied to her about her son—effectively discouraging her from running the short distance to see her son alive and conscious for the last time. *See* ECF 277 ¶ 880 (describing the nature of Lt. Smith's conduct).

Drawing all inferences in favor of Plaintiff, Lt. Smith engaged in patently outrageous conduct.  The motion should be denied for that reason.  (Lt. Smith also, improperly, supplies additional, self-serving facts to his brief, claiming that he went to speak with Plaintiff as part of

his job duties, *see* ECF 314-1 at 15 ("[Lt. Smith] visited [Plaintiff] in order to gain additional information about [Mr.] Nichols' history.").  At the Rule 12 stage the Court should ignore such improper attempt to misdirect its consideration of the allegations in the complaint.)

## VI.    The amended complaint alleges deliberate indifference against the three MFD defendants—Whitaker, Sandridge, and Long.

After the police beat Mr. Nichols, they put out a call for medical assistance and three EMTs from the Memphis Fire Department ("MFD") arrived.  Plaintiff alleges that after arriving, those EMTs—Whitaker, Sandridge, and Long—"proceeded to disregard Tyre's condition and failed to provide" him with the medical help he clearly needed.  ECF 277 ¶ 204.  The complaint alleges instead of attending to Mr. Nichols, that two of the MFD EMTs—defendants Robert Long and JaMichael Sandridge—instead "joined the [MPD] officers milling around Tyre."  *Id.* ¶ 205.  Long and Sandridge could see Mr. Nichols slumped over and could see he needed help, but for nearly 20 minutes neither of them made any effort to provide him with medical assistance. *Id.* ¶¶ 207-223.  During this same time, MFD Lieutenant Whitaker, who had also been called to the scene, could see Mr. Nichols from where she sat in her fire engine, was informed of the incident, was aware of Mr. Nichols' condition, and could see he was not being helped, but never left the fire engine to provide medical care to Mr. Nichols, or get others to do so.  *Id.* ¶¶ 206, 218. It was not until two new EMTs arrived at the scene 20 minutes later and began providing care to Mr. Nichols that he received any medical care at all.  *Id.* ¶¶ 224-226.

Plaintiff has sued Sandridge, Long, and Whitaker for deliberate indifference to Mr. Nichols' medical needs.  *Id.* ¶¶ 807-874.  The three defendants have each moved to dismiss the claims against them, filing separate briefs.  *See* ECF 300 & 300-1 (Long), ECF 307 (Whitaker), and ECF 308 (Sandridge).  Their arguments all fail, for the reasons set out herein.

*First*, one of the MFD defendants—Lt. Whitaker, who sat in her fire engine instead of attending to Mr. Nichols—attempts to refute Plaintiff's factual allegations by disputing them. Attaching MFD records to her motion, *see* ECF 307-1, Lt. Whitaker contends that the factual allegations against her "are false." ECF 307 at 3. To support this contention, Lt. Whitaker attached MFD records to her brief that she says are exonerating. ECF 307 at 4-6 (making multiple citations to ECF 307-1). These records, she claims, paint a different picture of what happened. *Id.*

The Court need not interrogate this argument too deeply. It is not exactly clear how the narrative Lt. Whitaker draws from the MFD report actually contradicts the complaint's allegations, though Plaintiff assumes that the report would at least *appear* exonerating at some level—after all, it was drafted and signed by Long, Sandridge, and Whitaker themselves. *See* ECF 307-1 at PageID 4449-51. The narrative in that report is not the sort of fact of which the Court may take "judicial notice," as Plaintiff has explained with respect to the submissions made by Hemphill and Lt. Smith, *supra*. Determining the truth of the narrative in the MFD report and the defendants' account of what they did that evening is the very purpose of discovery, and it is precisely for this reason that courts ignore such documents when assessing the sufficiency of a complaint at the motion to dismiss stage. *See Blackwell*, 123 F.4th at 487, *supra*. [6] Whitaker's introduction of the MFD report does not provide grounds to dismiss.

*Second*, all three MFD defendants argue that the claims against them should be dismissed because, even if Mr. Nichols had a serious medical need, none of them had a duty to provide medical care to Mr. Nichols. *See* ECF 300-1 at 11-17; 307 at 8-13; 308-1 at 6-9. That is so, each

---

[6] Neither Long nor Sandridge dispute the factual allegations in the complaint. Rather, they focus only on the legal sufficiency of those allegations.

of these defendants argues, because, as defendant Long put it, "Mr. Nichols was a free member of society, [so] he had no right to adequate medical care" from any of the MFD defendants. ECF 300-1 at 17. To make this argument, the MFD defendants all rely on multiple decisions articulating the rule that " 'there is no constitutional right to adequate medical care for individuals who are not in custody of the state.' " ECF 300-1 at 12 (quoting *Linden v. City of Southfield*, 75 F.4th 597, 602 (6th Cir. 2023)). Plaintiff briefly summarizes those decisions here.

In *Linden*, (cited by MFD defendants at ECF 300-1 at 15; ECF 307 at 13; ECF 308 at 5, 10), the decedent's mother called 911 after she found her daughter unresponsive in her bedroom. Plaintiff claimed EMTs wrongfully placed decedent in a body bag, even though she was still alive, and that it was suffocation in the body bag that caused her death. 75 F.4th at 601-02. The court held that the plaintiff could not state a claim for deliberate indifference because the plaintiff conceded the decedent was not in state custody when adequate medical care was denied; and there is no constitutional right to adequate medical care for individuals who are not in state custody. *Id.* at 602.

In *Peete v. Metro. Gov't*, 486 F.3d 217 (6th Cir. 2007) (cited by MFD defendants at ECF 300-1 at 15; ECF 307 at 10), EMTs responded a call for a person having a seizure and placed their bodyweight on decedent in an effort to provide care. *Id.* The court rejected the plaintiff's federal deliberate indifference claim because "[t]he paramedics did not unreasonably seize him for the purpose of interfering with his liberty. They responded to [a] call that he was experiencing an epileptic seizure and needed medical attention." *Id.* at 222. As such, no constitutional right attached. *Id*.

In *Jackson v. Schultz*, 429 F.3d 586 (6th Cir. 2005) (cited by MFD defendants at ECF 300-1 at 11, 16; ECF 307 at 10), a man was shot at a bar and EMTs were called, but after they

31

put him in the ambulance they failed to take him to the hospital, and he died. 429 F.3d at 588. The court held that the man had no constitutional right to care since "[t]here is no allegation that the decedent was not free to leave the ambulance or be removed from the ambulance. Decedent's liberty was 'constrained' by his incapacity, and his incapacity was in no way caused by the defendants." *Id.* at 591.

In *Baker v. City of Detroit*, 217 Fed. App'x 491, 492 (6th Cir. 2007) (cited by MFD defendants at ECF 300-1 at 23; ECF 307 at 9), a patient with difficulty breathing called for an ambulance, where she received inadequate care. *Id.* at 493. The court held that no constitutional right attached because the "[EMT's] actions, whether medically correct or negligent, were not the sort of actions giving rise to a conclusion that Baker was in custody." *Id.* at 495.

In *Willis v. Charter Twp. of Emmett*, 360 Fed. App'x 596 (6th Cir. 2010) (cited by MFD defendants at ECF 307 at 12), a man in a car accident was left for dead by firefighters, and when it was discovered hours later that he was still breathing it was too late to save him. *Id.* at 598. The court held that the man had not been in custody and thus had no right to medical care: "the custody exception does not apply in this case because Christopher was restrained by the circumstances of the car accident, not by the defendants' actions." *Id.* at 600.

Based on these and similar decisions, the MFD defendants argue they had no duty to provide medical care for Mr. Nichols. ECF 300-1 at 12-17; ECF 307 at 6-13; ECF 308-1 at 6-10.

There is a simple, fatal flaw to this argument: Mr. Nichols *was* in custody. The complaint makes plain that the police beat Mr. Nichols so badly that when the MFD defendants arrived on the scene, Mr. Nichols was incapable even of standing, much less walking off to get care on his own. *See* ECF 277 ¶¶ 199-203. He was also *handcuffed*. *Id.* ¶¶ 188-89. Mr. Nichols was inarguably within the State's custody when the MFD defendants arrived on the scene and

proceeded to ignore his medical needs.  And as the Sixth Circuit noted in *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554 (6th Cir. 2020), "[t]he Supreme Court has long recognized that the government has a constitutional obligation to provide medical care to those whom it detains." 975 F.3d at 566 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), as well as *Rhinehart v. Scutt*, 894 F.3d 721, 736-37 (6th Cir. 2018) and *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).  Indeed, *Griffith* elaborated, both the "Eighth and Fourteenth Amendments are violated 'when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety.'" *Id.* (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)) (other citations omitted).  This duty, *Griffith* further notes, is implicated by the Fourteenth Amendment "following arrest," at which point "due process rights to medical care 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

Applying this rule to the case at hand is straightforward: police injured a person in the course of arresting him, and once he was detained and in their custody, they summoned the three MFD defendants to provide medical care for him.  In January 2023 those MFD defendants had a well and clearly established duty to provide Mr. Nichols with adequate medical care when they arrived and found him in need of it.  But they refused to do so, in violation of clearly established law.  None of the MFD defendants is entitled to qualified immunity.

**Third**, defendant Long argues that he is entitled to immunity pursuant to the TGTLA. ECF 300-1 at 10-11.  Defendant Long does not say precisely which claim against him should be dismissed, but he does not appear to argue that the TGTLA would afford him any immunity from

33

the Section 1983 claims that have been asserted against him.  Indeed, the TGTLA appears to

contemplate immunity only for state law claims, not federal claims arising under Section 1983.

*See, e.g.*, *Stewart v. City of Memphis*, No. 2:16-CV-02574, 2017 WL 627467, at *7 (W.D. Tenn.

Feb. 15, 2017) (discussing interaction of TGTLA and Section 1983 claims).  It does not provide

an avenue for dismissing the civil rights claims that have been asserted against defendant Long

or any of the other defendants in this case.

## CONCLUSION

For the foregoing reasons the Court should deny each of the defendants' motions to

dismiss in their entirety.


Dated: March 20, 2025                                Respectfully submitted,


    /s/ *Stephen H. Weil*
_____

Antonio M. Romanucci* (Ill. Bar No. 6190290)
Sarah Raisch* (Ill. Bar No. 6305374)
Joshua M. Levin* (Ill. Bar No. 6320993)
Stephen H. Weil* (Ill. Bar No. 6291026)
Sam Harton* (Ill. Bar No. 6342112)
Colton Johnson Taylor* (Ill Bar No. 6349356)

**ROMANUCCI & BLANDIN, LLC**
321 N. Clark St., Ste. 900
Chicago, IL 60654
+1 (312) 458-1000, Main
+1 (312) 458-1004, Facsimile
aromanucci@rblaw.net
sraisch@rblaw.net
jlevin@rblaw.net
sweil@rblaw.net
sharton@rblaw.net
cjohnson@rblaw.net


David L. Mendelson (Tenn. Bar No. 016812)

Benjamin Wachtel (Tenn. Bar No. 037986)
**MENDELSON LAW FIRM**
799 Estate Place
Memphis, TN 38187
+1 (901) 763-2500 (ext. 103), Telephone
+1 (901) 763-2525, Facsimile
dm@mendelsonfirm.com
bwachtel@mendelsonfirm.com

Brooke Cluse* (Tex. Bar No. 24123034)
**BEN CRUMP LAW, PLLC**
717 D Street N.W., Suite 310
Washington, D.C. 20004
+1 (337) 501-8356
brooke@bencrump.com

*Attorneys for Plaintiff*

* Admission *pro hac vice*