IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| RowVaughn Wells, <br><br> Plaintiff, <br><br> v. <br><br> The City of Memphis *et al.*, <br><br> Defendants. | Case No. 2:23-CV-02224 |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO THE CITY OF MEMPHIS'S MOTION FOR PROTECTIVE ORDER

Plaintiff, through her undersigned counsel, submits this response in opposition to Defendant City of Memphis's Motion for Protective Order (ECF 422).

The City of Memphis asks this Court to halt the crucial *Monell* discovery this Court has ordered the City to produce. The materials at issue here, the Court will recall, are body-worn camera videos and written records related to 880 Memphis Police Department incidents that DOJ investigators reviewed as part of DOJ's pattern or practice investigation into MPD's use of force practices, which DOJ launched following Defendants' fatal beating of Tyre Nichols. The purpose of this discovery is to gather evidence to prove Plaintiff's *Monell* claims—specifically, that the City had a widespread practice of using excessive force and allowing that police brutality to flourish through a code of silence and inadequate supervision within the MPD.

The City gives one reason for its request that this Court reverse its prior order: in late May 2025, after the change in administrations, the DOJ retracted its December 2024 report, in which it had found that the City engages in a pattern or practice of excessive force, and that

1

MPD's lack of supervision and accountability mechanisms contributes to the widespread unconstitutional use of force.

But the Trump administration's retraction of the DOJ Report does not call for any change to the Court's ruling that records of the 880 MPD incidents are relevant to Plaintiff's widespread-practice claim. Those incidents are just as likely to show prior instances of MPD's excessive force today as they were prior to the retraction of the Report.

The retraction was the result of a broad, nationwide policy change enacted by the Trump administration for DOJ to abandon *all* of its civil rights pattern or practice cases in the area of unconstitutional policing. But there is no hint that any of the 73 incidents of excessive force identified in the DOJ Report were fabricated or misinterpreted. On the contrary, there is every reason to believe those materials remain direct evidence of MPD's excessive force. The City's production of the videos and documents for the 880 incidents must proceed.

The City also seeks to avoid producing communications between it and the DOJ related to the DOJ's investigation, which are responsive to Plaintiff's RFPs 129-132. DOJ's retraction of its Report does not make these communications any less relevant. It is reasonable to believe that the communications between a federal agency conducting an investigation of a city and that city's employees—such as emails, written questionnaires, and recorded interview statements—would likely contain statements from the city's employees about the practices the agency was investigating. Those communications are no less relevant today than before the DOJ Report was retracted. The Court should deny the City's Motion for Protective Order in its entirety.

## BACKGROUND

In January 2023 Tyre Nichols was beaten to death by members of the Memphis Police Department's "Scorpion" unit, which specialized in aggressive policing.  Plaintiff filed a

complaint several months later, ECF 1, and her *Monell* allegations against the City centered on the publicly known practices of the MPD's specialized units, like Scorpion. Plaintiff's *Monell* discovery, which also began in 2023, focused on these specialized units as well.

In the fall of 2024, while this discovery was underway, the federal criminal case against Mr. Nichols' killers went to trial. At that trial, multiple MPD officers revealed, for the first time, that the MPD had a culture of imposing a "tax" pursuant to which they beat civilians who annoyed them, and that police covered up this misconduct and their use of excessive force generally through a pervasive code of silence and manipulation of evidence. *See* ECF 248 at 3-6 (summarizing federal criminal trial testimony). Critically, this criminal trial testimony indicated that this culture arose not from the Scorpion unit in particular, but rather was a longstanding and widespread reality within the MPD. *Id.*

Faced with this new information, Plaintiff did three things concurrently. First, she sought a new case schedule that would give her time to gather the additional *Monell* evidence pointed to by the criminal trial testimony. *See* ECF 247. Second, she moved to file an amended complaint that made the broader allegations about the MPD's policies and practices that had been revealed in the criminal trial. *See* ECF 248, ECF 277. Third, she served additional *Monell* discovery on the City that sought to gather evidence to support these broader allegations.

In crafting this new *Monell* discovery, Plaintiff faced a daunting prospect: gathering evidence to substantiate her amended complaint's broader *Monell* allegations about practices across the MPD would be extraordinarily burdensome if Plaintiff were forced to use brute-force *Monell* discovery requests for thousands of videos and incident reports. That was particularly so given the testimony at the criminal trial that the MPD's culture of excessive force was covered up by a code of silence in which incident reports were falsified.

3

There was a promising alternative, however: several months after Mr. Nichols' death, the U.S. DOJ's Civil Rights Division launched a pattern and practice investigation of the MPD. The DOJ's resources and investigatory powers are unmatched by any civil litigant, and Plaintiff's counsel surmised that the materials gathered in that investigation would be an efficient way to gather evidence of the "tax" and coverup culture within the MPD, if such evidence was to be found. Instead of sweeping requests for thousands of police videos and related documentation, therefore, Plaintiff made targeted Rule 34 requests, asking the City to produce the documents that it had provided to the DOJ, as well as the City's communications with the DOJ relating to the pattern and practice investigation. *See* ECF 422 at 2 (quoting requests, including RFP 133). Plaintiff issued her Rule 34 requests on November 25, 2024, not knowing if or when the DOJ would issue a report, or what the findings of any eventual report would be.

A few days later, on December 4, 2024, the DOJ did issue a pattern and practice report regarding the MPD.[1] In the report, the DOJ related that its investigation had uncovered numerous incidents of both excessive force and coverup. The report detailed dozens such incidents—approximately 73 in total—in which officers had engaged in excessive force or similar inappropriate conduct, and many in which officers had covered up the conduct as well—often with the help or acquiescence of supervisors. Below are several examples:

> In one incident, officers pepper sprayed, kicked, and fired a Taser at an unarmed man with mental illness because he tried to take a $2 soft drink from a gas station. Though the man abandoned the drink and left the store, an officer followed him to the edge of the parking lot, yelling at him to leave the area. As other MPD patrol cars arrived, the man put his hands in the air. Without warning, the officer grabbed his arms and shoved him against a squad car. Two more officers arrived and surrounded the man. One officer kneed him in the side four times, then pulled him to the ground and pressed his forearm into his neck. As the officer struck him, the man screamed, "No, don't kill me!" and

---

[1] The report is on the DOJ's website at: https://www.justice.gov/crt/media/1379096/dl?inline.

4

then tried to run away. The officer fired his Taser at him, which failed to incapacitate him. Another officer then held the man in a chokehold while the first officer pulled the Taser's trigger to shock him again. The officer shocked the man three more times as he screamed in pain, including once after he was facedown with his hands secured behind his back.  DOJ Rpt. at 14.

Officers also use force against people engaging in protected speech when they have no valid reason to stop, arrest, or detain them. After a man referred to a group of officers as "bitch-ass police," one officer complained that he was "sick of his fucking mouth." Shortly afterwards, the officer walked up to the man and pepper sprayed him in the face. In a different encounter, a man shouted, "Solve a crime!" at two officers standing outside a gas station. One officer cut short his phone call, telling the person he was talking to, "I'm about to take someone into custody right now." The officers grabbed the man from behind, lifted him up, and slammed him on the hood of their squad car. One officer told the man, "If you want to come up here and talk some bullshit . . . that's on you."  DOJ Rpt. at 16.

In one case, three officers tackled a man who had littered in a public park, held him down, and applied pressure to the back of his neck for about 20 seconds. The man had done nothing wrong, but was "talking all this shit," according to one officer, and would not tell the officers his name. When the man dropped his drink while leaving the park, four officers surrounded him. The man said he just wanted to go home, and an officer responded, "The way you want it to go, it's not gonna go." Seconds after telling him to put his hands behind his back, the officers converged on the man, piling on top of him and holding him down by the neck. While handcuffed in the patrol car later on, the man told a lieutenant that he was trying to follow the officers' directions, but they had already decided to charge him: "I even offered to pick the can up." DOJ Rpt. at 17.

One officer choked, pepper sprayed, and repeatedly struck a handcuffed man with a baton because the man did not immediately follow his directions. Officers arrested the man after responding to a 911 call for domestic assault, handcuffed him, and walked him to a police car. The man stood calmly next to the police car but refused to get into it. The arresting officer became enraged, grabbed him by the shirt, bashed him against the frame of the car, and hit him twice with a baton as he shoved him inside. When the man began to kick the door of the squad car, the officer screamed, "Kick my motherfucking door again!" The man kicked the door again, and the officer charged back,

5

> climbed into the backseat atop the man, and pepper sprayed him in the face at close range. The officer then dragged him out of the car and held him in a chokehold for 20 seconds while the man's family stood screaming at the officers to stop. Officers forced the man back into the squad car and closed the windows. When the man said he could not breathe, the officer who sprayed him responded, "I don't give a fuck." Other officers were present the entire time and did not intervene. MPD supervisors reviewed the incident and found no violations of MPD policy. DOJ Rpt. at 18.
>
> One officer told a man he had arrested for shoplifting that he was going to "beat [his] ass" and take him "to the woods" instead of to jail. He then pepper sprayed him while he was handcuffed and secured in the back of his squad car. His lieutenant responded to the scene and told him, "Next time spray somebody in the sunlight." Though she reviewed the body-worn camera footage, she told her chain of command that the officer had complied with MPD policy. Her report made no mention of the officer's threats. DOJ Rpt. at 18.
>
> [E]ven though MPD policy limits use of dogs to cases with felony suspects, we reviewed an incident in which an officer released his dog to apprehend a man suspected of shoplifting household items. The dog bit the man multiple times, causing injuries that required hospitalization. Supervisors found no policy violations. DOJ Rpt. at 19.

These incident descriptions, and dozens of others like them, corroborate the federal criminal trial testimony about a "tax" and code of silence within the MPD. And each summary strongly indicates that it was based on a review of video footage and police documentation relating to the incident.

      Concurrently with the issuance of the DOJ's report, Plaintiff enforced her November 2024 discovery requests, including RFP 133. The City objected to RFP 133, explaining that its production to the DOJ had consisted of entire police databases and it did not know which documents the DOJ had actually reviewed. To address this objection, Plaintiff offered to use audit trails in the Evidence.com database because they showed which body-worn cameras had been viewed by DOJ investigators, and confine RFP 133 to the videos of those incidents—there

6

turned out to be 880 incidents total—and the documents related to those incidents, such as use of force reports and supervisory reviews.

Eventually this came to a head at a hearing before the Court on April 11, 2025, on a motion filed by Plaintiff to compel the City to produce videos of the 880 incidents along with related documents. *See* ECF 387. At the April 11 hearing, the City conceded that it did not have any "relevance basis" to object to producing the videos or documents related to the 73 incidents described in the DOJ report as instances of excessive force. *See* ECF 389 (April 11 Hr'g Tr.) 7:21-8:1. The City further agreed to produce all videos of all 880 incidents that DOJ investigators reviewed because, as the City conceded and the Court determined, it is reasonable to presume that the 73 excessive force incidents described in the Report were among the 880 incidents that DOJ investigators reviewed. *Id.* at 6:24-7:4, 33:21-34:11. *See also* ECF 388 at 2-3 (April 11 hearing order summarizing the parties' positions with respect to RFP 133). At the hearing, the Court granted Plaintiff's motion to compel and ordered the City to produce the videos and related documents for the 880 incidents. *Id.* That production has been ongoing, and the City has estimated that it will be completed sometime in July.

The City also has pending discovery obligations with respect to RFPs 129 – 132, which ask it to produce certain communications between the City and the DOJ relating to the pattern and practice investigation and to produce documents identifying City employees whom the DOJ interviewed during the investigation. *See* ECF 422 at 2 (quoting requests).

\*   \*   \*

On May 21, 2025, U.S. DOJ, now under the Trump Administration, announced that reversed the DOJ policy under the prior Administration with respect to pattern and practice investigations of police departments across the country, abandoning pattern-and-practice suits

7

against Minneapolis and Louisville and retracting reports issued by the Civil Rights Division regarding six police departments (Phoenix, Trenton New Jersey, Mount Vernon New York, Oklahoma City, the Louisiana State Police, and Memphis).[2] *See* ECF 422 at 4 & n.2. The DOJ took particular issue with the use of "statistical disparities," "flawed methodologies [which the DOJ did not specify]," and "incomplete data" ECF 422 at 4 (quoting DOJ announcement). The DOJ concurrently wrote a letter to the City of Memphis in which it said without elaboration that it had lost "faith" in the DOJ Report and was therefore retracting it. *Id.* (quoting DOJ letter).

Memphis has filed its motion for protective order in light of these announcements. Memphis argues that because the DOJ retracted its pattern and practice report about the MPD, that report is no longer relevant and cannot be used as the basis for discovery requests. ECF 422 at 5-7. Plaintiff addresses those arguments below.

## **ARGUMENT**

As she has set forth above, Plaintiff served RFP 133 and the related discovery requests as an efficient, targeted proxy for sweeping *Monell* discovery that she otherwise would have been required to prosecute in order to substantiate the "tax" and code-of-silence revelations that were made at the Nichols federal criminal trial and which were alleged in her Amended Complaint.

Plaintiff served that discovery before the DOJ ever issued its pattern and practice report, but her calculation proved correct: the DOJ Report recounted 73 incidents of excessive force

---

[2] The City describes the DOJ's May 21 announcement as a reversal of a Biden Administration policy. ECF 422 at 3. In reality the May 21 announcement reverses decades U.S. DOJ policy, under both Democratic and Republican administrations, of investigating and working to reform municipal police departments that exhibit widespread patterns and practices of excessive force. *See, e.g.*, U.S. Dept. of Justice, *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present* (Jan. 2017) at 41-48 (describing 40 pattern-and-practice reform agreements and additional related investigations by the U.S. DOJ between 1994 and 2017). *Available at:* https://oag.ca.gov/sites/all/files/agweb/pdfs/ripa/crd-pattern.pdf.

and coverup, and an audit trail indicated that the DOJ's investigators had reviewed a total of 880 incidents that were likely to include those 73 reported incidents, among others.

As the Court put it at the April 11 hearing, by focusing on the documents gathered by the DOJ, and by further focusing on the 880 incidents that the DOJ had reviewed, Plaintiff had streamlined the *Monell* discovery in this case to a considerable degree:

> We have identified a very small universe of 880 incidents. We all acknowledge that that may be both over and under inclusive of the relevant information that exists in the universe, but Plaintiff has adopted it as a proxy for identifying the most readily identifiable scope of relevant information for their *Monell* claims, and I think that's a reasonable proxy. In fact, it sounds more reasonable to me than a lot of other ways they could have gone about it.

April 11, 2025 Hr'g Tr. 35:10-18.

The City now asks the Court to abandon this targeted approach by effectively pretending both that the DOJ *investigation* never occurred, and the DOJ *report* was never issued. The practical effect of that request would impose massive costs on the City and Plaintiff alike, as Plaintiff would be forced to issue sweeping and far more burdensome discovery requests to gather evidence substantiating the MPD-wide *Monell* allegations in her Amended Complaint, and which her proxy-use of the 880 incidents was designed to help avoid. The result would be an exponential increase in litigation expense and a lengthy extension of the trial in this case, which will already be more than three years old when it is tried under the current schedule. What Memphis asks for, in short, would be disastrous for this litigation, in which the expenditure of resources by both sides is already largely consumed with discovery of Plaintiffs *Monell* claims.

It would be one thing such an outcome were required because the incidents described in the report did not actually occur. But nothing in the DOJ's May 2025 announcement (or the City's argument) suggests that is so. The Trump Administration's nationwide retraction of the

DOJ's existing pattern and practice reports certainly reflects a *policy* disagreement with prior administrations about the desirability of pattern or practice investigations in the area of police misconduct, and perhaps an difference of opinion, albeit unspecified, about how to interpret statistical data gathered in those investigations. But that policy disagreement does not erase the underlying evidence *reviewed* by DOJ investigators (as relevant here, the 880 incidents), nor does it suggest that the 73 specific incidents recounted in the DOJ Report did not in fact occur.

Nothing in the DOJ's "retraction" of the Report suggests, for example, that DOJ investigators were wrong when they reported that "[i]n one incident, officers pepper sprayed, kicked, and fired a Taser at an unarmed man with mental illness because he tried to take a $2 soft drink from a gas station." Or in another incident, that "three officers tackled a man who had littered in a public park, held him down, and applied pressure to the back of his neck for about 20 seconds" for "talking all this shit" according to one officer. Or in another, that an MPD officer "choked, pepper sprayed, and repeatedly struck a handcuffed man with a baton because the man did not immediately follow his directions." Or that "[s]upervisors found no policy violations" when "an officer released his dog to apprehend a man suspected of shoplifting household items" requiring hospitalization, even though "MPD policy limits use of dogs to cases with felony suspects." *See* DOJ Report excerpts, *supra*.

These incidents, and numerous others, recount specific events, and it is these and other specific factual scenarios that Plaintiff seeks to discover through the production of documents and videos relating to the 880 incidents reviewed by the DOJ's investigators. Nothing in the Trump Administration's "retraction" of the DOJ Report suggests that these incidents did not occur—and these are the exact types of incidents that are central to the *Monell* doctrine, which requires plaintiffs to come forward with evidence of a widespread pattern of constitutional

10

violations sufficient to show that the City has unconstitutional "custom[s] . . . 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell*).

For its part, the City contends the Trump Administration's retraction renders the DOJ Report "legally meaningless," and that as such, "[t]he MPD Investigation Requests cannot produce any document or communication that could serve as credible evidence in this case." ECF 422 at 6. The City, however, never explains what it means by this phrase, and indeed it cites not a single case or legal authority supporting this argument at all. That is for good reason: courts have made clear that at least during the discovery phase, a complaint, investigation, or related finding, *even if later withdrawn*, are a relevant and appropriate subject of discovery—particularly in *Monell* pattern and practice cases like this one.

The authorities on this point are legion. *See, e.g.*, *Walls v. City of New York*, 502 F. Supp. 3d 686, 693 (E.D.N.Y. 2020) ("Courts [in *Monell* cases] have found misconduct complaints relevant where related investigations resulted in other findings including 'exonerated' and 'unfounded,' or where the complaints have been withdrawn, abandoned or conciliated."); *Unger v. Cohen*, 125 F.R.D. 67, 70 (S.D.N.Y. 1989) ("[C]omplaints that were abandoned or conciliated may not be admissible at trial, but that does not make them undiscoverable"); *Bradley v. City of New York*, No. 04CIV8411, 2005 WL 2508253, at *1–2 (S.D.N.Y. Oct. 3, 2005) ("[C]ourts have repeatedly directed production of [civilian] complaints, whether substantiated or unsubstantiated or even withdrawn, as well as records of complaints reflected in the CPI and IAB investigative records, and that documentation has frequently played a role in the courts' analysis of the merits of an array of claims under section 1983."); *Cox v. McClellan*, 174 F.R.D. 32 (W.D.N.Y. 1997) ("[T]he fact that a prior complaint was determined to be unfounded does not bar its discovery.

11

Whether the incident resulted in a conviction, a dismissal, a settlement or a lawsuit does not negate the existence of the occurrence itself."); *Lamon v. Dir., California Dep't of Corr.*, 2009 WL 1911699, at *1 (E.D. Cal. July 1, 2009) ("[C]ourts have found prior suits or disciplinary proceedings or prior civilian complaints . . . to be discoverable . . . . even if the complaints sought were not substantiated.").

The reason for this rule is simple. As the Court put it in *Austin v. Redford Township Police Department*, No. 2:08-CV-13236, 2011 WL 13324125, *14 (E.D. Mich. Mar. 18, 2011), "[p]rior civilian complaints . . . of excessive force . . . are clearly discoverable in § 1983 actions . . . . [T]he fact that a prior complaint was determined to be unfounded does not bar its discovery. Whether the incident resulted in a conviction, a dismissal, a settlement or a lawsuit *does not negate the existence of the occurrence itself*." (quotation omitted; emphasis added). It is for this reason that "any proceeding—whether administrative, civil or criminal—in which one of the defendants was charged with or investigated for possible abuses of the type alleged by plaintiff could yield relevant information," particularly "prior or subsequent instances of misconduct." *Hurley v. Keenan*, No. 79 CIV. 4772, 1984 WL 358, at *3 (S.D.N.Y. May 8, 1984).

Plaintiff's **RFP 133** seeks to gather precisely such information, which may be used at trial, whether or not the DOJ's Report remains retracted at that time. The discoverability information relating to the 880 incidents has not changed with the retraction of the DOJ Report, and thus the proportionality analysis of the Court should remain unchanged as well—Plaintiff's RFP 133 remains an efficient means of gathering *Monell* evidence that would otherwise require sweeping discovery from the City.

Plaintiff's **RFP's 129-132** remain appropriate as well—this discovery seeks communications between the DOJ and the City relating to the DOJ's pattern and practice

investigation. *See* ECF 422 at 4 (quoting requests). These communications are relevant for purposes of discovery because it is reasonable to believe that communications between a federal agency conducting an investigation of a city and city employees would contain statements from city employees that are admissions/descriptions of the practices the agency was investigating. Here, those practices were excessive force, failure to supervise, tampering with BWC—the very same practices that comprise Plaintiff's *Monell* claim. Admissions that City personnel may have made to DOJ during the course of DOJ's investigation regarding excessive force, failure to supervise, tampering with BWC, and the like do not become any less relevant to Plaintiff's widespread practice claim just because a subsequent administration has overturned the overarching findings of the prior administration's investigation. They are thus equally discoverable, now as before.

## CONCLUSION

For the reasons stated above, the Court should deny the City's Motion for Protective Order (ECF 422) in its entirety.

Dated: June 20, 2025    Respectfully submitted,

*/s/ Stephen H. Weil*
Antonio M. Romanucci* (Ill. Bar No. 6190290)
Sarah Raisch* (Ill. Bar No. 6305374)
Joshua M. Levin* (Ill. Bar No. 6320993)
Stephen H. Weil* (Ill. Bar No. 6291026)
Sam Harton* (Ill. Bar No. 6342112)
Colton Johnson Taylor* (Ill. Bar No. 6349356)
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark St., Ste. 900
Chicago, IL 60654
P: (312) 458-1000
aromanucci@rblaw.net
sraisch@rblaw.net
jlevin@rblaw.net
sweil@rblaw.net

13

sharton@rblaw.net
cjohnson@rblaw.net

David L. Mendelson (Tenn. Bar No. 016812)
Benjamin Wachtel (Tenn. Bar No. 037986)
**MENDELSON LAW FIRM**
799 Estate Place
Memphis, TN 38187
+1 (901) 763-2500 (ext. 103), Telephone
+1 (901) 763-2525, Facsimile
dm@mendelsonfirm.com
bw@mendelsonfirm.com

Benjamin Crump (Tenn. Bar No. 038054)
Brooke Cluse* (Tex. Bar No. 24123034)
**BEN CRUMP LAW, PLLC**
717 D Street N.W., Suite 310
Washington, D.C. 20004
+1 (337) 501-8356 (Cluse), Telephone
court@bencrump.com
brooke@bencrump.com

*Attorneys for Plaintiff*

* Admission *pro hac vice*