IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| RowVaughn Wells, <br><br> Plaintiff, <br> v. <br><br> The City of Memphis *et al.*, <br><br> Defendants. | Case No. 2:23-CV-02224 |

**PLAINTIFF'S MOTION TO AMEND SCHEDULING ORDER**

Pursuant to Federal Rule of Civil Procedure 16, Plaintiff, through her undersigned counsel, moves the Court to amend the operative scheduling order in this case, which is set forth in ECF 276. The defendants oppose this motion. In support of her motion Plaintiff states as follows.

I.   **Introduction.**

In the fall of 2024, during the federal criminal trial of the MPD officers who killed Tyre Nichols, multiple police officers took the stand and testified that there was a culture of flagrant excessive force, coverup, and evidence manipulation within the MPD. The officers indicated that this culture encouraged and enabled MPD officers to strike civilians who annoyed them, as Tyre Nichols had done when he tried to run from the MPD officers who would eventually beat him to death. And the officers testified that this culture was not confined to specialized "tactical" units like the one that stopped Mr. Nichols, but rather that it was widespread across the MPD.

Upon learning of these revelations, Plaintiff drafted a new and expanded *Monell* complaint. She drafted new discovery to gather evidence proving her new *Monell* allegations. And she asked the Court to amend the scheduling order in this case, so as to give Plaintiff time to gather evidence to prove her new allegations. The Court's January 3, 2025 order (ECF 276) granted that request, and Plaintiff immediately set about to enforce the new discovery.

1

The City, however, obstructed that effort at every turn.  For months the City interposed delay after delay, something it often did simply by refusing to talk with Plaintiff about how the new *Monell* evidence might be gathered.  Then, once Plaintiff filed a motion to compel and brought the City before the Court, the City insisted on a slow, manual method of gathering the documents responsive to Plaintiff's request.  Despite Plaintiff's unflagging efforts to enforce the new *Monell* discovery, the delays manufactured by the City have consumed virtually the entire time set out in the Court's January 3 scheduling order.  Indeed while Plaintiff served her new *Monell* discovery in November 2024, shortly after the federal criminal trial, it was not until *last week* that the City produced the bulk of the documents responsive to Plaintiff's requests.

Aside from obstructing this new *Monell* discovery, the City's lawyers have also refused to disclose the City's affirmative defenses—which still have not been revealed to Plaintiff.  They have also sought protective orders to prevent Plaintiff from taking discovery from the MPD's police chief as part of Plaintiff's *Monell* discovery, all because the police chief has separately moved for qualified immunity on different claims that were asserted against her.

The upshot of all this has been that there is no time under the current schedule for Plaintiff to complete her *Monell* discovery.  Plaintiff brings this motion to seek a modest extension in order to complete that discovery and prevent the City's obstruction from undoing Plaintiff's efforts to prove her *Monell* claims in this case.

## II.     Background

### A.     Mr. Nichols' beating, initial complaint, dismissal motions, litigation stays, discovery.

On January 7, 2023, five Memphis police officers accosted Tyre Nichols and beat him so savagely that he died in a hospital three days later.  Plaintiff RowVaughn Wells is Tyre Nichols' mother and the administrator of his estate.  She brought this Section 1983 action against those

2

officers three months after his death, in April 2023.  ECF 1.  In addition to suing the officers, Plaintiff's complaint asserted claims against the City of Memphis under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and a supervisory claim against the chief of the Memphis Police Department, Cerelyn Davis. The officers who beat Mr. Nichols were part of an MPD "tactical" unit dubbed "Scorpion," and the supervisory and *Monell* allegations in Plaintiff's complaint focused on Scorpion and similar tactical units, which publicly available information indicated had histories of using excessive force.  ECF 1 ¶¶ 50-105.

Memphis and Chief Davis moved to dismiss the claims against them.  ECF 303.  Those motions were never ruled upon.  As a result, neither Davis nor the City answered the complaint's allegations, and therefore never identified their affirmative defenses.  Meanwhile, the five officers who had beaten Mr. Nichols were indicted on state and federal criminal charges.  They moved for and were granted a discretionary "Fifth Amendment" stay of all proceedings against them.  *See* ECF 110. That stay remains in place to this day.

The case nevertheless proceeded to discovery, with Plaintiff propounding more than a hundred document requests to Memphis and taking more than a dozen depositions, with her *Monell* discovery focused on Scorpion and the MPD's other tactical units. The discovery at issue was considerable; while the Court had initially set a schedule to complete discovery in April 2024, the parties, recognizing the schedule was unworkable, jointly moved to expand the discovery period.  *See* ECF 201. The Court never ruled on that motion.

**B.    Federal criminal trial revelations, Plaintiff's amended complaint, expanded discovery, and amended case schedule.**

In the fall of 2024, while Plaintiff's *Monell* discovery was underway, the federal criminal case against the five officers who beat Mr. Nichols went to trial.  That trial featured blockbuster revelations about multiple, unwritten customs and practices within the MPD.  At the trial,

3

multiple MPD officers testified that there was a custom within the MPD of imposing a "tax" to punish civilians who annoyed police during an encounter—meaning that officers would beat such people without justification, often after they had been subdued. *See* ECF 248 at 3-6 (summarizing federal criminal trial testimony). The trial also featured testimony from MPD officers revealing that the MPD covered up this misconduct and the use of excessive force generally through a pervasive code of silence and manipulation of evidence, including body-worn camera videos. Critically, this criminal trial testimony indicated that the culture of excessive force and coverup arose not from the MPD's tactical units in particular, but rather was a longstanding and widespread practice across the MPD generally. *Id*.

Under *Monell*, these revelations were watershed evidence about the police practices that drove and enabled the savage beating of Mr. Nichols. And as Plaintiff noted in a motion filed at the time, it was not evidence that Plaintiff's counsel or any civil litigant could hope to have obtained on their own. *See* ECF 248 at 6-7. Rather, the testimony was obtained by federal prosecutors who wielded the threat of incarceration to induce multiple MPD officers to admit to the longstanding, illegal practices within the police department. *Id.*

In light of the revelations in the federal criminal trial, in November 2024 Plaintiff did three things concurrently. **First**, she moved the Court to file an amended complaint that made the new, broader allegations about the MPD's policies and practices that had been revealed in the criminal trial. ECF 248. **Second**, she served additional *Monell* discovery on the City that sought to gather evidence to support these broader allegations. *See* ECF 324-1 (copy of *Monell*

4

discovery). ***Third***, she asked the Court to enter a new case schedule that would permit time to gather the evidence requested in her new *Monell* discovery.[1]  *See* ECF 247.

      **C.**      **Amended schedule, Plaintiff's prosecution of *Monell* discovery, obstruction by Defendant City of Memphis.**

On January 3, 2025, the Court held a hearing regarding Plaintiff's motion to amend her complaint and request to amend the scheduling order. *See* ECF 273. At the hearing the Court granted both requests, and set a deadline of July 12, 2025, for written discovery and August 29, 2025 for depositions. ECF 276. The schedule then sequenced deadlines for expert discovery and summary judgment briefing, with a trial set to take place on July 13, 2026. ECF 274, 276.

Beginning immediately after the January 3 hearing, Plaintiff set about enforcing the additional *Monell* discovery she had served in November 2024. Central to that discovery was Plaintiff's Rule 34 Request for Production No. 133. Prompted by Mr. Nichols' beating, the U.S. Department of Justice had announced in July 2023 that it was opening a "pattern and practice" investigation into the Memphis Police Department. In RFP 133, Plaintiff asked Memphis to produce whatever documents the City had provided to the U.S. DOJ pursuant to that investigation. *See* ECF 324-1 ¶ 133 (text of RFP 133). Plaintiff counsel calculated that this was likely to be an efficient and targeted means of gathering city-wide evidence to support the new and broader *Monell* allegations made in Plaintiff's amended complaint.

The DOJ's pattern and practice report, which was issued a few days after Plaintiff served RFP 133, vindicated that calculation. In its report, the DOJ recounted that the MPD exhibited a widespread pattern of both excessive force and coverup, identifying approximately 73 specific

---

[1] On December 4, 2024, shortly after Plaintiff did these things, the U.S. Department of Justice issued a report, finding that the MPD engaged in a pattern and practice of excessive force and coverup. Available at https://www.justice.gov/crt/media/1379096/dl?inline (last visited July 11, 2025).

5

instances in which MPD officers had engaged in excessive force, frequently with no accountability.  *See* n. 2 *supra*.  The DOJ's conclusions indicated that among the documents Memphis had provided to the DOJ was evidence that would prove the *Monell* claims in Plaintiff's amended complaint, including videos and written records.  Plaintiff therefore focused intensively on obtaining the documents responsive to RFP 133.

That effort ran up against sustained obstruction by the City.  Plaintiff has detailed the City's conduct with respect to RFP 133 in her motion to compel, ECF 324 at 5-11, as well as a status report filed later with the Court, ECF 378-1.  Plaintiff describes that obstruction herein.  In summary, though Plaintiff served RFP 133 in November 2024, it was not until April 2025 that the City began to take actual steps to gather and produce documents responsive to that request, which occurred only after months of unflagging discovery enforcement by Plaintiff's counsel: a motion to compel; two separate conferences with the Court; Plaintiff's hiring of two different experts in eDiscovery and SQL database queries to prod the City into gathering responsive documents; and innumerable Rule 37 emails and requests to confer issued by Plaintiff over the course of months, many of which the City simply ignored until it was ordered by the Court to confer with Plaintiff about the discovery.

Plaintiff first served RFP 133 on November 24, 2024, making responses due on December 26.  The City first refused even to respond at all, based on its unilateral interpretation of the discovery period.  *See* ECF 324-2.  The parties negotiated, and on January 15 the City finally responded in substance to RFP 133.  ECF 324-3. That response reported that, aside from a handful of policy documents, the City's production to the DOJ consisted of several MPD databases.  Plaintiff immediately requested a Rule 37 conference, which was held on January 22.  At that conference, the City told Plaintiff that it had produced entire databases to Plaintiff and did

6

not know which documents the DOJ had actually reviewed within them. And the City objected to producing the full databases to Plaintiff, on overbreadth grounds. ECF 324-5.

Plaintiff's counsel immediately set about to address this objection, and determined that there was a way to narrow RFP 133 considerably. The body-worn camera videos were stored on a commercial database that logged "audit trails" showing which videos had been reviewed by DOJ investigators. Plaintiff proposed that the parties could use these audit trails as a proxy for the incidents investigated by the DOJ, and then conduct "SQL" searches in the City's *other* databases to find police records (*e.g.* use of force reports, supervisory reviews) related to those same incidents. *See* ECF 324 at 8-10 (describing SQL search proposal). As the City would concede months later, this proposal "significantly narrow[ed] the universe of potentially relevant materials" responsive to RFP 133, focusing the universe of responsive documents down to records for approximately 880 incidents. ECF 378-2 at 3 (April 9 brief by City).

At the time, however, the City refused even to discuss this proposal with Plaintiff. Plaintiff proposed the idea to the City on January 28, and then followed up with emails over the course of nearly a month, repeatedly asking to hold a conference where the parties might discuss the feasibility of the proposal. *See* ECF 324 at 6 (recounting Plaintiff's efforts to confer). The City finally wrote that it was refusing to hold any sort of telephonic conference. Instead, it said, it would respond in writing—but then it never did. *See id.* at 6-7. Plaintiff was left to file a motion to compel, on March 4. *See* ECF 324. Because the City had refused even to discuss the proposal, however, Plaintiff's motion to compel amounted to a request that the Court order the City to *talk* with Plaintiff about the feasibility of the audit-trail search. *See* ECF 324 at 7-11, 17.

At a March 20 hearing the Court granted that relief, ordering the parties to meet and confer regarding the discovery set out in Plaintiff's motion, and then submit a status report about

7

how to proceed.  *See* ECF 345.  That order did not end the City's foot-dragging.  To prepare for the conference Plaintiff hired an eDiscovery expert to consult with the City about how to conduct the SQL searches for responsive documents.  *See* ECF 378-1 at 4.  The City, however, refused to engage with the expert, claiming on April 6 that his online credentials showed that he lacked sufficient SQL expertise.  ECF 378-1 at 4.  The City was wrong, but even so, by the next day Plaintiff addressed that objection, too: Plaintiff immediately hired a second expert with decades of experience in SQL database queries, and emailed the City on April 7 to propose that they speak with him instead.  *Id.* at 4-5.  The City never responded.  *Id.* at 5.

As these discussions were occurring, the City dragged its feet on the production side, refusing to begin gathering documents that *it* was proposing to produce. After being ordered to confer with Plaintiff, the City proposed to the Court to gather and produce videos for the 880 incidents first, and then have Plaintiff request documents relating to particular incidents seen in the videos later.  ECF 378-2 at 4. (Plaintiff's competing proposal was for simultaneous production of the videos and documents, *see* ECF 378-1 at 7-8.). But even as it made this proposal, the City refused Plaintiff's request that it *begin* gathering those 880 videos while the parties awaited the Court's decision.  *See* ECF 378-1 Ex. D at 4 (PageID 5578) (correspondence from defense counsel stating the City would not begin gathering videos).  It was only after April 11, 2025, when the Court ordered the City to produce both videos and related documents from the 880 incidents, that the City began to gather documents responsive to RFP 133.  In doing so, at the City's insistence (and over Plaintiff's objection), the Court allowed the City to gather each of the documents related to the 880 incidents *manually*—a process that would take months— rather than by using the SQL server bulk query for such documents that Plaintiff had proposed,

8

which could be accomplished in a matter of days, or at most, weeks. *Cf.* ECF 378-1 at 9 (explaining a bulk SQL query).

After receiving the Court's April 11 order, the City began production of documents and videos from the 880 incidents. The production has occurred as follows:

| Date | Number of incidents* with videos produced | Documents produced |
|---|---|---|
| May 11 | 9 | 0 |
| May 16 | 31 | 0 |
| May 22 | 60 | 0 |
| May 27 | 63 | 0 |
| June 2 | 56 | 0 |
| June 9 | 28 | 0 |
| June 15 | 104 | 0 |
| June 16 | 92 | 3,813 pages / 992 documents |
| June 20 | 0 | 3,691 pages / 730 documents |
| June 24 | 198 | 0 |
| June 30 | 145 | 0 |
| July 1 | 85 | 0 |
| July 2 | 0 | 13,299 pages / 3,407 documents |

\* Many of the 880 incidents are recorded on multiple videos. As of July 10, staff working for Plaintiff's counsel had reviewed videos for 662 incidents, which included **6,249 videos**.

Plaintiff's counsel began reviewing documents immediately after the City started production in May, assigning ten staff members to the task. As of the drafting of this motion, that review is ongoing.[2] Staff review each of the videos, some of which last dozens of minutes, and attempt to develop an understanding of what happened during a particular incident. The staff draft written summaries that describe the events in the videos, and they categorize them to organize the events across several different criteria.

---

[2] The City's production of responsive materials, additionally, is still not complete. As of this filing, there are approximately 31 incidents for which no video has been produced. Plaintiff's counsel has also identified multiple incidents for which it appears that no documents have been produced, or documents appear to be missing.

9

This work has not been easy. For one thing, while the City's production has been rolling as the table above indicates, much of the production came later in June and in July. Perhaps more important, the City backloaded production of documents (police reports and related information) to the very end of the production period, producing two-thirds of such documents on July 2.[3]

As a result, until very recently, staff reviewing the videos have not been able to match the videos up against critical evidence in the case: whether written use of force reports diverge from what a video shows; whether supervisors reviewed the video at all; whether supervisors approved of what they saw; whether officers were referred to internal affairs; and whether and what kind of interventions the officers might have received for inappropriate uses of force. The Court said as much in its April production order when it instructed the City to produce videos and related documents simultaneously, explaining that

> review of the videos in isolation would be insufficient without the context of the [documents and information associated with [each] incident] to demonstrate whether, for example, incident reports accurately described the events recorded in the videos or supervisors properly reviewed those incidents. The Court therefore ruled that the Related Information was relevant and should be produced *along with* the videos.

ECF 388 at 2.[4] Without the documents associated with the incidents, moreover, it has not even possible to identify the names of the officers or civilians involved or, in most instances, whether the incident involved officers in the Scorpion unit.

---

[3] Throughout the City's production period, Plaintiff repeatedly raised concerns to the City about the small number of documents being produced in light of the quickly approaching fact-discovery deadline, including in emails on May 31, 2025, June 3, 2025, and June 13, 2025.

[4] Plaintiff likewise predicted in April that producing videos of incidents, without the written records relating to those incidents, would create exactly this problem. *See* ECF 378-1 at 5-7.

The manner in which the City produced the responsive materials has also required time-consuming, manual work to correlate each incident with its respective documents. The City did not produce the documents in a manner that is grouped or otherwise organized by incident, and many of the documents do not contain the unique "CAD number" identifier or even the incident date, leaving counsel to manually determine which incidents the documents relate to, based on other indicators like officer names and narrative descriptions. In some instances, it has been impossible to make this determination. On July 2, 2025, when Plaintiff's counsel raised this issue with the City and requested an index that correlated documents with incidents, the City, claiming that the "incidents are easily identifiable," refused to provide an index.

Plaintiff continues to devote ten staff to review videos and related documents. Plaintiff expects that review to occupy the remainder of July; as these reviews are being completed Plaintiff counsel is attempting to identify relevant incidents for further investigation, including follow-up discovery. That process is expected to extend into August.

### D. Litigation stays, motions for protective order, and defendants' objections to disclosure of their affirmative defenses.

While the foregoing *Monell* discovery has played out, Plaintiff attempted to expedite other facets of discovery. Defendants have opposed all of them.

*Affirmative defenses*. During the January 3, 2025 hearing, the City and several other defendants indicated that they would be filing motions to dismiss Plaintiff's amended complaint. That created a problem for discovery in this case: several defendants, including the City, had never answered a complaint in the case, and therefore had never pleaded their affirmative defenses. Plaintiff thus did not know what the affirmative defenses might be, and could not take discovery to interrogate them. With renewed motions to dismiss on the way, Plaintiff faced the prospect of not knowing what affirmative defenses these defendants might assert until discovery

11

had already closed. In an attempt to remedy this problem, Plaintiff, after first proposing the idea to the defendants, filed a motion asking the Court to set a schedule for those defendants to plead their affirmative defenses while the motions to dismiss were pending. *See* ECF 293. The City and Chief Davis opposed that motion, *see* ECF 312, as did the other defendants who filed dismissal motions. *See* ECF 313, 315, 317, 318. Plaintiff's motion has not yet been ruled upon, and these defendants have not yet disclosed their affirmative defenses.

***Chief Cerelyn Davis motion for plenary discovery bar based on qualified immunity claim***. On February 17 Chief Davis filed a motion to dismiss Plaintiff's complaint on grounds that she is entitled to qualified immunity. ECF 303-1 at 8-11. In light of that filing, Chief Davis also moved for a protective order to bar Plaintiff's Rule 34 requests, ECF 348, and moved to quash the subpoenas that Plaintiff propounded on Chief Davis pursuant to Rule 45, ECF 409. These motions argued not only that Davis should be protected from *party* discovery requests (Rule 33, 34, etc.) directed at her while her qualified immunity claim is pending—a position Plaintiff did not dispute, *see* ECF 386 at 2-3—but also that Plaintiff should be barred from directing with *third-party* Rule 45 subpoenas to her as part of Plaintiff's *Monell* discovery against the City of Memphis. ECF 409.

Plaintiff has opposed both Davis's motions, *see* ECF 386, ECF 419. Neither has been ruled upon. As a result, Plaintiff has been unable to obtain any discovery from Chief Davis—the final policymaker with respect to MPD's policies and practices regarding use of force and oversight, which are all central components of Plaintiff's *Monell* claims against the City.[5]

---

[5] In opposing Chief Davis's motions to quash and for protective order, Plaintiff predicted that barring Plaintiff from taking *any* discovery from Chief Davis would likely make it impossible to keep the current scheduling order and trial date. *See* ECF 386 at 4; ECF 419 at 2.

12

*The officer defendants*.  Since the outset of this case, the five officer defendants have enjoyed a Fifth Amendment stay that protects them from all discovery in this case.  ECF 110.  On June 6, 2025, Plaintiff moved to lift that stay as to each officer once they have been sentenced.  ECF 426.  Defendants Haley, Justin Smith, and Martin have opposed the stay, *see* ECF 427, 428, 435, with Haley and Smith arguing that the stay should continue until they exhaust all their criminal appeals, even if that results in a stay lasting "many years" past sentencing.  *See* ECF 427 at 5; ECF 428.  At the time of Plaintiff's motion to lift the stay, sentencings of the defendants had been set for mid-June 2025.  *See* ECF 426 at 1.  Those sentencings have now been continued to an uncertain date.  The Court has not yet ruled on Plaintiff's motion to lift the stay.

> E. **Current status:  pending stays, Plaintiff's proposed amended schedule and defense objections.**

On June 16, in light of the foregoing realities, Plaintiff's counsel emailed defense counsel to discuss an amendment of the schedule in this case.  In an attempt to preserve the July 2026 trial date, Plaintiff's counsel first proposed an amendment that would extend the close of fact discovery from August 29, 2025 to December 5, 2025, with some of the expert discovery schedule overlapping with the dispositive motion deadlines.  In doing so, Plaintiff's counsel noted that the City's production responsive to RFP 133 still was ongoing, and that multiple defendants (including the City, Chief Davis, and the officer defendants) had not yet answered Plaintiff's complaint and thus had not yet pleaded their affirmative defenses, and that the Fifth Amendment stays for the convicted defendants remained in place.

Counsel for the City objected on June 17, asserting that Plaintiff had had "ample time to take discovery," and objecting to the proposed schedule's overlap of the expert discovery and summary judgment dates (the device necessary to preserve the July 2026 trial date).

13

In response, Plaintiff's counsel wrote back on June 26 with a second proposed schedule. This new proposal also extended fact discovery but did not propose to overlap expert discovery and summary judgment. That required moving the trial date by several months, from July to November 2026. (Plaintiff sets out that proposed schedule below.)

On June 26, counsel for the City objected to this proposal too, writing, "We oppose any further extension to the trial date. it's time to get on with it." Counsel for Justin Smith, who had objected to lifting the Fifth Amendment stay for years until Mr. Smith has exhausted all his appeals, voiced his objection the same day, writing that it was time to "grip it and rip it. what is everyone so afraid of?" Counsel for other defendants voiced their opposition as well.

This motion follows.

### III. Legal Standard.

Rule 16(b) of the Federal Rules of Civil Procedure requires the Court to set timetables for pretrial matters by entering a scheduling order. The Court has broad discretion in amending scheduling orders. *E.E.O.C. v. AutoZone, Inc.,* 248 F.R.D. 542 (W.D. Tenn. 2008). Under Rule 16(b)(4) a party must show "good cause" to amend deadlines. "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management orders and requirements." *Id.* (quoting *Andretti v. Borla Performance Indus., Inc.,* 426 F.3d 824, 830 (6th Cir.2005)). Untimely discovery responses by the opposing party also play a role. *See, e.g.*, *Morgan v. Blust & Driscoll Holdings, LLC*, No. 08-cv-15027, 2010 WL 1524002, at *2 (E.D. Mich. Apr. 15, 2010) (granting Plaintiff's motion to extend discovery where Plaintiff "demonstrated that despite her diligence, she could not complete discovery prior to the discovery deadline due to Defendant['s] untimely responses to discovery requests"); *Hemphill v. City of Taylor*, No. 14-CV-14958, 2016 WL 2957928, at *3 (E.D. Mich. May 23,

14

2016 (granting an extension where the moving party moved for an extension within the discovery deadlines and demonstrated diligence to comply, and the opposing party failed to explain how the extension would cause prejudice).

IV.     **Proposed amended schedule.**

Plaintiff respectfully proposes the following amended schedule:

| Deadline | Current | Proposal |
|---|---|---|
| *Fact Discovery* | | |
| **Completion of document production, ROGs, RFAs** | 7/12/25 | 12/14/25 |
| **Completion of depositions/all discovery** | 8/29/25 | 1/5/26 |
| **R26(e)(1) Supplementation Deadline** | 9/29/25 | 1/29/26 |
| *Expert Discovery* | | |
| **Disclosure of Plaintiff's Experts** | 9/19/25 | 1/19/26 |
| **Disclosure of Defendants' Experts** | 10/10/25 | 2/10/26 |
| **Depositions of All Parties' Experts** | 11/7/25 | 3/9/26 |
| *Motion Deadlines* | | |
| *Daubert* **Motions** | 12/19/25 | 4/20/26 |
| **Filing SJ Motions** | 12/19/25 | 4/20/26 |
| **Responses to SJ Motions** | 1/19/26 | 5/19/26 |
| **Replies to SJ Motions** | 2/9/26 | 6/9/26 |
| *Trial* | | |
| **Joint Proposed Pretrial Order Due** | 6/19/26 | 10/19/26 |
| **Pretrial Conference** | 6/26/26 | 10/26/26 |
| **Jury Trial** | 7/13/26 | 11/9/26 |

V.      **Argument.**

The essential facts are set out in the Background section above. In short, despite Plaintiff's unflagging efforts to enforce the discovery allowed by the Court at the January 3, 2025 hearing, the City obstructed that discovery for months and only made substantial production in response to Plaintiff's November 2024 discovery by July 2025.

In another setting, of course, all of this might be water under the bridge. Plaintiff won her motion to compel the City to respond to RFP 133. After the Court ordered it to do so, the City did produce documents responsive to that request, even if that production occurred at a far

15

slower pace than under the method Plaintiff had proposed. And while the City's production is not yet complete, and Plaintiff has not yet had the chance to complete her review of the materials produced to date, the production is inarguably substantial.

The problem, however, is time. The City's months of intransigence has burned through the time that Plaintiff requested, and the Court granted at the January 3 hearing, to take the discovery necessary to prove the new *Monell* allegations pleaded in Plaintiff's amended complaint. That has created precisely the situation Plaintiff warned about in April. As Plaintiff explained then, the City's anticipated production schedule, which contemplated completing the RFP 133 production in mid-July, promised to

> leave Plaintiff no time at all to serve follow-up discovery requests, like the disciplinary records of officers among the 880 incidents who appear to have engaged in misconduct. It would leave Plaintiff virtually no time to identify civilians involved in the incidents, find them, talk with them, and disclose them as potential trial witnesses under Rule 26(a)(1), as Plaintiff is required to do. It would leave Plaintiff no time to complete her review of the incidents, draft and serve a Rule 30(b)(6) notice on the City in light of the information she gathers, meet and confer regarding deposition topics, and take the City's deposition regarding the information reflected in the incidents. And it would leave no time at all for Rule 37 discovery enforcement if, for example, the parties disagreed about what constituted "Related Information" or if some responsive information appeared to be missing.

ECF 396 at 2. Each of these predicted problems has come to pass. If anything, the situation is worse than Plaintiff predicted, as the City backloaded its production of written records to the very end of its production, *supra*, meaning that Plaintiff has just now been able to begin matching videos with police records that will permit her to identify witnesses and will begin to show how the City reacted to videos reflecting troubling uses of force against Memphis civilians.

It would be one thing if this predicament was the result of Plaintiff's indolence in enforcing RFP 133 or in reviewing the City's eventual production. But it is hard to imagine how

16

Plaintiff could have been more diligent in enforcing this discovery or devoted more resources to processing it. It was the City, rather, that ground discussions to a halt repeatedly, forcing Plaintiff to file a motion to force the City to *talk* with Plaintiff's counsel. This is to say nothing of the City's objection to identifying its affirmative defenses during the existing discovery period, or the pending motions by Chief Davis (who is represented by the City's lawyers) that have prevented Plaintiff from gathering any *Monell* discovery against the City that might oblige her—the MPD's final policymaker—to produce documents or sit for a deposition relating to those *Monell* claims. Meanwhile, the position of the defendant officers who beat Mr. Nichols to death—who insist that Plaintiff should be forced to move forward to trial while they continue to enjoy a discretionary Fifth Amendment stay, even after they are sentenced—would be risible if it were not so callous in its disregard of Plaintiff's simple effort to obtain some civil accounting for the killing of her son.

Plaintiff asks for a four-month extension of the fact discovery period and the various subsequent deadlines, including the trial date. That four-month period roughly corresponds to the multiple months burned up by the City's obstruction and foot dragging in response to Plaintiff's November 2024 *Monell* discovery. Plaintiff believes that this period will be sufficient to complete that discovery, as well as the discovery needed from the officer defendants (assuming the Fifth Amendment stay is lifted no later than upon sentencing), from Chief Davis, and from the City (assuming the City identifies its affirmative defenses in time).

The defendants certainly will not be prejudiced by an amendment of the schedule. If anything their various intransigent positions practically insist on one. The Court has discretion to grant this relief. Plaintiff respectfully submits, for the reasons set forth above, that it would be

17

an appropriate exercise of the Court's discretion to do so, and to issue an order adjusting the schedule in this case.

## VI.    Conclusion.

For the reasons set forth in this motion, Plaintiff respectfully requests that the Court issue an order amending the schedule in this case as set forth in Section IV above.

Dated: July 11, 2025                                         Respectfully submitted,

                                                             /s/ Stephen H. Weil

David L. Mendelson (Tenn. Bar No. 016812)    Antonio M. Romanucci* (Ill. Bar No. 6190290)
**MENDELSON LAW FIRM**                        Sarah Raisch* (Ill. Bar No. 6305374)
799 Estate Place                              Joshua M. Levin* (Ill. Bar No. 6320993)
Memphis, TN 38187                             Stephen H. Weil* (Ill. Bar No. 6291026)
+1 (901) 763-2500 (ext. 103), Telephone       Sam Harton* (Ill. Bar No. 6342112)
+1 (901) 763-2525, Facsimile                  **ROMANUCCI & BLANDIN, LLC**
dm@mendelsonfirm.com                          321 N. Clark St., Ste. 900
                                              Chicago, IL 60654
Benjamin Crump*                               +1 (312) 458-1000, Main
Brooke Cluse* (Tex. Bar No. 24123034)         +1 (312) 458-1004, Facsimile
**BEN CRUMP LAW, PLLC**                       aromanucci@rblaw.net
717 D Street N.W., Suite 310                  sraisch@rblaw.net
Washington, D.C. 20004                        jlevin@rblaw.net
+1 (337) 501-8356                             sweil@rblaw.net
brooke@bencrump.com                           sharton@rblaw.net

                                              *Attorneys for Plaintiff*

                                              * Admitted *pro hac vice*

## CERTIFICATE OF CONSULATION

      Pursuant to Local Rule 7.2, Plaintiff certifies that she attempted to confer with the City regarding the matters raised in this motion. The consultation was unsuccessful for the reasons set forth herein. Every defendant who responded opposed the relief Plaintiff seeks in this motion. Consultation occurred via email on June 16 and 17. Recorded positions were as follows:

| | |
|---|---|
| City of Memphis | Oppose |
| Chief Davis | Oppose |
| Justin Smith | Oppose |
| Emmitt Martin | Oppose |
| Tadarrius Bean | Oppose |
| Preston Hemphill | Oppose |
| Michelle Whitaker | Oppose |
| Other defendants | No response noted |

                                                                                          /s/ Stephen H. Weil

                                                                                  *Counsel for Plaintiff*