## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

ROWVAUGHN WELLS,                    )
     Plaintiff,                    )
                      )
v.                                   )          No. 2:23-cv-02224-SHL-atc
                      )
THE CITY OF MEMPHIS, et al.,          )
     Defendants.                    )

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
## MOTIONS TO DISMISS

---

Before the Court are multiple motions to dismiss filed by Defendants. The motions include those filed by Robert Long (ECF No. 300), Michelle Whitaker (ECF No. 307), and JaMichael Sandridge (ECF No. 308), EMTs with the Memphis Fire Department. Preston Hemphill and Dewayne Smith[1] (ECF No. 314), officers with the Memphis Police Department, filed a joint motion to dismiss. (ECF No. 314.) The City of Memphis filed a motion in which it sought to dismiss claims against it as well as Police Chief Cerelyn Davis and the official capacity claims against Lt. Smith. (ECF No. 303.) Plaintiff RowVaughn Wells filed an omnibus response to the motions. (ECF No. 347.) Sandridge (ECF No. 371), Whitaker (ECF No. 372), Long (ECF No. 374), the City (ECF No. 382), and Hemphill and Lt. Smith (ECF No. 385), each filed replies.

---

[1] Smith's name is spelled multiple ways in his Motion to Dismiss and in other case filings, including "Dwarne," "Dewayne," and "DeWayne." The Court refers to him as Lt. Smith. The case is stayed as to Defendant Justin Smith, and well as his fellow Memphis Police Department Officer Defendants Demetrius Haley, Emmitt Martin III, Desmond Mills, Jr., and Tadarrius Bean. (See ECF No. 461.)

For the reasons that follow, Long, Whitaker and Sandridge's motions are **GRANTED**.

Hemphill and Lt. Smith's motion is **GRANTED IN PART AND DENIED IN PART**.  The City

of Memphis' motion is **GRANTED IN PART AND DENIED IN PART**.

**BACKGROUND**[2]

On January 3, 2025, Wells, individually and as administratrix ad litem of the estate of

Tyre Deandre Nichols, her son, filed the Amended Complaint alleging twenty-nine claims under

42 U.S.C. § 1983 and state law against the City of Memphis and eleven individual Defendants.

(ECF No. 277.)  The Amended Complaint asserts various degrees of culpability against

Defendants arising out of Nichols' death on January 10, 2023, three days after he sustained

injuries at the hands of several Memphis Police Department officers following a traffic stop by

members of the Memphis Police Department's Street Crimes Operation to Restore Peace in Our

Neighborhoods ("SCORPION") unit.  (Id. at PageID 3162–68.)  The Amended Complaint

alleges that the actions were part of a pattern of unconstitutional practices within the Memphis

Police Department, particularly within specialized units like SCORPION.  (Id. at PageID 3142–

44.)

According to the Amended Complaint, the MPD has a longstanding custom of brutalizing

civilians without justification.  (Id. at PageID 3137.)  Examples alleged include the so-called

"run tax," which the Amended Complaint describes as "beatings [that] were routinely

administered on civilians as punishment for running from the police."  (Id.)  The Amended

Complaint alleges that, although the MPD had written policies that prohibit the use of excessive

force against civilians, the MPD's custom of using excessive force was enabled by, among other

---

[2] The Court only discusses the facts that are pertinent to Defendants' motions.  The facts are taken from the First Amended Complaint (the "Amended Complaint") (ECF No. 277), and are accepted as true for purposes of ruling on the motions.

things, a code of silence, fabrication and manipulation of evidence, and failure to report

violations by other officers.  (Id. at PageID 3138–39.)[3]  Ultimately, the MPD's code of silence

was accomplished through inadequate supervision, oversight, and accountability systems, which

was well known to the City of Memphis.  (Id. at PageID 3139–40.)  The Amended Complaint

alleges that these issues surfaced in multiple ways following the incident with Nichols, including

when Lt. Smith, the SCORPION Unit commander, reviewed the body-worn camera videos of the

Nichols incident and "declared his subordinates' flagrantly excessive and unjustified force to be

in line with MPD policy."  (Id. at PageID 3140.)

　　　In spite of an awareness of these deficiencies by the City, the MPD and Chief Davis, little

was done to remedy them.  (Id.)  According to Plaintiff, the MPD "fail[ed] to institute mandatory

audits and oversight over use-of-force reporting, use-of-force reviews, and body-worn camera

usage," which the Amended Complaint alleges "was crucial to MPD's code of silence because it

enabled officers and supervisors to routinely cover up unlawful uses of force."  (Id. at PageID

3141.)  The MPD also "maintained inadequate and improper training on use of force, use-of-

force reporting, use-of-force reviews, and body-worn camera usage."  (Id.)  According to the

Amended Complaint, the officers, particularly those in the MPD's SCORPION and other tactical

units, were emboldened by this culture and the "longstanding deficiencies in policies,

supervision, and training—and the culture of impunity these failures fostered."  (Id. at PageID

3141–44.)

　　　It was against this backdrop that the Nichols incident took place.  The Amended

Complaint alleges that officers pulled Nichols over without justification, forcefully pulled him

---

[3] The Amended Complaint asserts that the City's widespread practices have resulted in numerous instances of police brutality, and offers twenty-one such examples.  (Id. at PageID 3144–61.)

from his car, and escalated the situation by physically assaulting and shouting at a cooperative, non-resistant individual, deploying pepper spray in his face, and attempting to tase him.  (Id. at PageID 3162–67.)  After Nichols ran, members of the SCORPION Unit caught him and "brutally beat and assisted each other in beating Tyre, taking turns punching and kicking him in his face and midsection."  (Id. at PageID 3171.)

The Amended Complaint alleges that, as Nichols passed in and out of consciousness, none of the SCORPION officers who were involved in the incident, or others who had shown up on the scene, "checked Tyre's condition or expressed any concern for the bloodied, dazed, handcuffed man left alone and barely moving in the street."  (Id. at PageID 3174.)  According to the Amended Complaint, EMTs Long, Sandridge, and Whitaker arrived at the scene, but, like the MPD officers already present, failed to provide any aid to Nichols.  (Id. at PageID 3178–79.)  The Amended Complaint alleges that, in spite of their awareness of Nichols' medical condition and plainly obvious injuries, each of the EMTs "deliberately refused to provide necessary medical care."  (Id. at PageID 3179.)

According to the Amended Complaint, SCORPION Unit commander Lt. Smith, "arrived on the scene at the very end of the beating by his five subordinate SCORPION Officers (Martin, Haley, Smith, Mills, and Bean)."  (Id. at PageID 3180.)  After arriving at the scene, Lt. Smith walked to Nichols' parents' house, about 100 or so yards away, and falsely told Wells that her son was intoxicated, was under arrest for DUI, and withheld his specific location and condition from his mother.  (Id. at PageID 3182–83.)

Nichols was transported to the St. Francis Hospital Emergency Department with no pulse and having suffered cardiac arrest, and fought for his life for the next three days in the Intensive Care Unit.  (Id. at PageID 3185.)  Ultimately, his brain was so swollen from the repeated blows

to his head that it was no longer able to function properly, his autonomic nervous system began to fail, as did his internal organs, and he died in the ICU.  (Id.)  The Amended Complaint alleges that it was the use of excessive force by the MPD officers, and the failure to intervene in the use of excessive force, that led to his death.  (Id.)

Relevant to the motions now before the Court, the Amended Complaint alleges a Fourth Amendment claim against the City of Memphis, asserting that the misconduct described  was undertaken due to its policies and practices.  (Id. at PageID 3185–86.)  The Amended Complaint also alleges Fourth Amendment claims against MPD Chief Davis in her individual capacity, alleging that she knew of the policies and practices that resulted in the conduct of the MPD officers, she was indifferent to them, and, as a result of her acts and omissions, including her failure to supervise, Nichols experienced catastrophic pain, suffering and emotional distress.

The Amended Complaint also alleges a Fourteenth Amendment claim against Lt. Smith in his individual capacity for deliberate indifference to Nichols' serious medical needs, as well as state-law claims for Intentional Infliction of Emotional Distress ("IIED"), Negligent Infliction of Emotional Distress ("NIED"), and Fraudulent Misrepresentation against him in both his individual capacity and as an agent of the City of Memphis.  (Id. at PageID 3262–68.)

As to the EMTs, Long, Sandridge, and Whitaker, the Amended Complaint alleges Fourteenth Amendment violations, asserting that each was deliberately indifferent to Nichols' medical needs.  (Id. at PageID 3253–62.)  Similarly, Fourth Amendment claims are alleged against Hemphill for unreasonable stop, excessive force, and failure to intervene to prevent excessive force.  (Id. at PageID 3241–50.)

Defendants assert multiple, often overlapping, bases for dismissing the claims against them.  Long asserts that she is entitled to immunity under the Tennessee Governmental Tort

Liability Act ("TGTLA"), and she and her fellow EMTs also assert that they are entitled to

qualified immunity. Lt. Smith and Hemphill similarly assert that they are are entitled to

qualified immunity and are immune from suit under the TGTLA for the claims made against

them in their individual capacities. The City, whose arguments Hemphill and Lt. Smith adopt,

asserts multiple grounds for dismissing the claims against it, Chief Davis, and Lt. Smith in his

official capacity. First, they assert that the official capacity claims against Lt. Smith should be

dismissed as redundant with the claims against the City of Memphis. They also assert that Chief

Davis is entitled to qualified immunity for the claims made against her in her individual capacity,

and that the claims against the City should be dismissed because Wells has failed to plead facts

to support a Monell claim against it under § 1983.

## APPLICABLE LAW

A complaint must contain "a short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). It must contain sufficient facts to "state a

claim to relief that is plausible on its face," meaning it includes "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S.

544, 556, 570 (2007)). The complaint need not set forth "detailed factual allegations," but it

must include more than "labels and conclusions," "a formulaic recitation of the elements of a

cause of action," and "'naked assertion[s]' devoid of 'further factual enhancement.'" Id.

(quoting Twombly, 550 U.S. at 555, 557).

Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint for

failure to comply with the requirements of Rule 8(a)(2). Fed. R. Civ. P. 12(b)(6). When

considering a 12(b)(6) motion, the Court must accept all factual allegations in the complaint as

true and construe them in the light most favorable to the plaintiff.  Adkisson v. Jacobs Eng'g Grp., Inc., 790 F.3d 641, 647 (6th Cir. 2015) (internal citation omitted).

Qualified immunity shields government officials performing discretionary functions from civil liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether a government official is entitled to qualified immunity, the Court conducts a two-step inquiry: first, viewing the facts in the light most favorable to the plaintiff, have the plaintiff's allegations shown the officer's conduct violated a constitutional right?  Jones v. Muskegon Cnty., 625 F.3d 935, 941 (6th Cir. 2010).  Second, was the right clearly established at the time of the alleged violation?  Id.

The Sixth Circuit has repeatedly cautioned "that it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity."  Venema v. West, 133 F.4th 625, 632 (6th Cir. 2025) (quoting Hart v. Hillsdale Cnty., 973 F.3d 627, 635 (6th Cir. 2020)).  Instead, "[i]t is preferable to resolve the 'threshold question' of a government officer's entitlement to qualified immunity at 'summary judgment, not dismissal under Rule 12.'"  Id. (citation modified).  This preference exists because "development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law." Hart, 973 F.3d at 635 (quoting Singleton v. Kentucky, 843 F.3d 238, 242 (6th Cir. 2016)).

## THE CITY OF MEMPHIS' MOTION TO DISMISS

The City of Memphis seeks dismissal of the City, Chief Davis, and Lt. Smith in his official capacity.  Each argument is addressed separately below.

## I.    Motion to Dismiss Claims Against the City

The City's Motion to Dismiss is wide-ranging, but begins with the assertion that the Amended Complaint fails to plead facts to support a Monell claim against it under § 1983. "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). "[A]lthough the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Id. at 690–91. While the "custom" need not have received formal approval to be sufficient to establish a § 1983 violation, it cannot merely be an action or injury inflicted by employees or agents. Id. at 691. Instead, liability may attach "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986).

"To establish the existence of a municipality's official policy, a plaintiff must prove: '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision[-]making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] . . . or acquiescence [to]

federal rights violations.'"  Stewart v. City of Memphis, 788 F. App'x 341, 344 (6th Cir. 2019)

(quoting D'Ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir. 2014)).

In its Motion to Dismiss, the City asserts that Wells "fails to plausibly identify any

specific policy of the City, written or otherwise, that authorized the Defendant Officers to act in

the reprehensible and outrageous manner alleged in the Complaint."  (ECF No. 303-1 at PageID

4269.)  The City asserts that "Plaintiff did not point to any 'formal rules or understandings'

which establish that **the City** instructed its officers to employ the behavior alleged under these

same—or any—circumstances 'consistently and over time.'"  (Id. (quoting Sanders v. City of

Memphis, No. 2:21-cv-02585-MSN-cgc, 2022 WL 4665867, at *4 (W.D. Tenn. Sept. 30, 2022).)

At bottom, the City asserts that "Plaintiff's Complaint illustrates that Officer Defendants were

not acting pursuant to any policy—official or otherwise—but rather that **the Defendant Officers

acted outside their duties as sworn police officers** in brutally beating Mr. Nichols."  (Id. at

PageID 4270.)

Plaintiff counters that her complaint details "allegations [that] set out a broad and well-

settled culture of excessive force, enabled by a code of silence that covered it up.  And the

complaint connects that culture to Tyre Nichols' beating specifically, setting out how the MPD's

'run-tax' and code-of-silence culture drove and enabled the beating."  (ECF No. 347 at PageID

4753.)

It is true, as the City contends, that the Amended Complaint does not allege that the City

of Memphis has an official policy of authorizing its officers to unlawfully arrest and detain,

assault, and use excessive force against a compliant individual, at least in the sense that there is

no such written policy.  But, as Wells points out, the "policies at issue need not be written down;

they may instead be commonly accepted practices of the city organization."  (ECF No. 347 at

PageID 4746 (quoting <u>Stucker v. Louisville Metro Gov't</u>, No. 23-5214, 2024 WL 2135407, at *8 (6th Cir. May 13, 2024)).)

Plaintiff has sufficiently alleged a variety of commonly accepted practices by the MPD that may constitute constitutional violations, including that its officers routinely use force against civilians without justification, often because the persons have annoyed, angered, or embarrassed the police in one way or another; executing a "run tax"; and observing a code of silence through which they would not report fellow officers' use of excessive force.  (<u>Id.</u> at PageID 4748–49.) These allegations alone are sufficiently allege the existence of the City's official policy that warrants denial of the Motion to Dismiss based on <u>Monell</u>.  Plaintiff relies on those and other allegations to sufficiently state a claim for municipal liability on multiple grounds, including that an official with final decision-making authority ratified illegal actions, that there existed the policy of inadequate training or supervision, and that there was the existence of a custom of tolerance of or acquiescence in federal rights violations.

Plaintiff alleges that the MPD's leadership was aware of the lax supervision and the manipulation of body worn camera evidence, but took few, if any, steps to correct the problems. It also asserts that the tactics were encouraged by MPD policies and Chief Davis personally, and the SCORPION Unit's pattern of the use of excessive force was also encouraged by the City's broad failure to train MPD officers either in lawful use of force or in ensuring accountability.  It then cites to twenty-one instances of behaviors similar to those complained of in the Amended Complaint, which, by their sheer number, imply the existence of a custom of tolerance of or acquiescence in federal rights violations.

Discovery may demonstrate, as the City suggests, that the events from the night of January 7, 2023, were the result of rogue police officers acting outside of their sworn duties, and

not because they were following the MPD's custom or policies. But, at this stage in the litigation, Plaintiff has sufficiently, and plausibly, alleged that their actions were the result of an official policy of the MPD, so that <u>Monell</u> liability may attach. The Motion to Dismiss the City is **DENIED**.

## II.    Motion to Dismiss Claims Against Chief Davis

The City and Chief Davis also seek to dismiss the claims against Chief Davis based on qualified immunity. It asserts that Plaintiff has not adequately alleged that Chief Davis violated any federal statute or constitutional right. They contend that Plaintiff has not alleged that she directly participated in or ordered Mr. Nichols' beating, nor that Chief Davis violated any right through her alleged knowledge of and indifference to MPD practices. Defendants characterize Plaintiff's allegations as conclusory and implausible. Defendants assert in their reply that, just as in <u>Does v. Whitmer</u>, 69 F.4th 300 (6th Cir. 2023), where the Sixth Circuit rejected supervisory claims based on actions that officials merely failed to stop unconstitutional conduct by subordinates enforcing a statute, Plaintiffs allegations are similarly deficient.

Plaintiff counters that this case is more like <u>Peatross v. City of Memphis</u>, 818 F.3d 233 (6th Cir. 2016), which also involved the Memphis Police Department, and where the Sixth Circuit upheld the denial of a motion to dismiss based on qualified immunity. Plaintiff points to allegations that Chief Davis was aware of widespread excessive use of force within MPD, failed to address it, and actively encouraged specialized units like SCORPION, despite their propensity for unconstitutional policing tactics. Plaintiff argues that these allegations, if proven, would establish that Chief Davis engaged in "active unconstitutional behavior" or at least knowingly permitted or approved such behavior.

11

Individual capacity claims based on supervisory liability, like the claim against Chief
Davis, require an allegation of personal liability. Venema, 133 F.4th at 633 (citing Peatross, 818
F.3d at 239). Thus, the "Estate must point to a specific action of [the] individual supervisor to
defeat a qualified immunity claim." Phillips v. Roane Cnty., 534 F.3d 531, 544 (6th Cir. 2008).

A supervisor cannot be held liable for the constitutional violations of subordinates under
a theory of respondeat superior, meaning that she "cannot be held liable simply because . . . she
was charged with overseeing" subordinate officers who violated a plaintiff's constitutional
rights. Peatross, 818 F.3d at 241. Instead, supervisory liability may attach where there is "a
causal connection between the defendant's wrongful conduct and the violation alleged." Id. at
242. To state a claim of supervisory liability under § 1983, a plaintiff must plausibly allege that
a defendant "authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . .
of his subordinate through the execution of his job functions." Does v. Whitmer, 69 F.4th 300,
306 (6th Cir. 2023) (quoting Peatross, 818 F.3d at 242). While a supervisor must have engaged
in "some active unconstitutional behavior," that behavior need not be "active in the sense that the
supervisor must have physically put [her] hands on the injured party or even physically been
present at the constitutional violation." Peatross, 818 F.3d at 241–42 (citation modified).

For supervisory liability to attach, the plaintiff must allege "more than an attenuated
connection between the injury and the supervisor's wrongful conduct." Whitmer, 69 F.4th at
307 (quoting Peatross, 818 F.3d at 241). In fact, "[s]loppiness, recklessness, or negligence is
insufficient to establish [supervisory] liability." Id. (citing Garza v. Lansing Sch. Dist., 972 F.3d
853, 866 (6th Cir. 2020)). However, "deliberate indifference, knowing acquiescence, tacit or
implicit authorization, or failure to take precautions against likely violation may suffice." Id.
(citations omitted). A causal connection is established when the supervisor's conduct, or lack

thereof, "could be reasonably expected to give rise to just the sort of injuries" that a plaintiff alleges have occurred. Campbell v. City of Springboro, 700 F.3d 779, 790 (6th Cir. 2012).

Moreover, a supervisor may be liable under § 1983 where she "abandon[s] the specific duties of [her] position . . . in the face of actual knowledge of a breakdown in the proper workings of the department. Winkler v. Madison Cnty., 893 F.3d 877, 898 (6th Cir. 2018). The Sixth Circuit has found that a supervisor's failure to properly train and supervise subordinates, failure to properly investigate allegations of excessive force, and covering up unconstitutional conduct in a way that effectively gives a "green light" to future violations can support a plausible inference of supervisory liability under § 1983. Peatross, 818 F.3d at 243. Supervisory liability may also exist where "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and [she] fails to do so." Doe v. City of Roseville, 296 F.3d 431, 440 (6th Cir. 2002) (quoting Braddy v. Fla. Dep't of Labor & Empl. Sec., 133 F.3d 797, 802 (11th Cir. 1998)).

Here, Plaintiff has alleged sufficient facts to plausibly state a claim for a Fourth Amendment violation against Chief Davis, thus defeating, at least for now, her qualified immunity defense. The similarities between this case and Peatross go beyond a common Defendant. In that case, which involved the death of man at the hands of a shooting by two MPD officers, the Sixth Circuit found that the MPD's then-Chief knowingly acquiesced in the unconstitutional conduct of his subordinates, that there was a causal connection between the Chief's acts and omissions and the death of the shooting victim, and that the right was clearly established. 818 F.3d at 242–45.

In Peatross, similar to the allegations in this Amended Complaint, the then-MPD Chief "publicly acknowledged the need for change and failed to follow through with any changes."

13

818 F.3d at 244. The Amended Complaint alleges that Chief Davis (1) knew of the widespread practice of the use of excessive force—referred to by officers as a "run tax" (ECF No. 277 at PageID 3137–39, 3173 ), (2) acknowledged within her first week that MPD was "woefully unsupervised" (ECF No. 277 at PageID 3140), and created, supported, and incentivized a unit whose officers routinely used unconstitutional force (ECF No. 277 at PageID 3141–61).

Here, Plaintiff alleges that Chief Davis acted with similar indifference—or worse, with endorsement—of unconstitutional policies. (ECF No. 277 at PageID 3128, 3140–44.) At this stage, taking the factual allegations as true and drawing all reasonable inferences in Plaintiff's favor, these allegations are sufficient to plausibly claim a constitutional violation under the first prong of the qualified immunity analysis.

This case is distinguishable from Does v. Whitmer, where plaintiffs merely alleged officials failed to stop their subordinates from enforcing an unconstitutional statute. 69 F.4th at 306. Here, Wells alleges that Chief Davis actively created and encouraged a specialized unit with minimal oversight despite her experience with similar failed units, established metrics that incentivized aggressive policing, and failed to address known practices like the "run tax." These allegations go beyond the "mere failure to act" outlined in Whitmer and instead demonstrate the kind of knowing acquiescence that can support supervisory liability as articulated in Peatross.

Defendants also argue that it is implausible that Chief Davis would create a unit that would violate constitutional rights, given her prior experience in Atlanta. That argument is also unpersuasive, as, at this stage of the proceedings, the Court must draw all reasonable inferences in favor of Plaintiff, not Defendants. Marchek v. United Servs. Auto. Ass'n, 118 F.4th 830, 833 (6th Cir. 2024). The plausibility standard does not require that Plaintiff's allegations be the most likely explanation of events, only that they rise above speculation. See Twombly, 550 U.S. at

556.  If nothing else, Defendants' arguments help illustrate why the Sixth Circuit has expressed

an antipathy toward granting qualified immunity at the motion to dismiss stage—the factual

record is insufficiently developed.

Plaintiff has plausibly alleged that Chief Davis violated constitutional rights in her

supervisory role as MPD Chief.  Having satisfied the first prong of the qualified immunity

analysis, the Court turns to the next prong, whether the constitutional right was clearly

established at the time of the alleged violation.  The right to be free from excessive force is

clearly established.  Thomas v. City of Columbus, 854 F.3d 361, 365 (6th Cir. 2017) (citing

Graham v. Connor, 490 U.S. 386, 388 (1989)).  Furthermore, it was clearly established at the

time of these events that a police supervisor could be liable for "at least implicitly authoriz[ing],

approv[ing], or knowingly acquiesc[ing] in the unconstitutional conduct of the offending

officers."  Peatross, 818 F.3d at 242.

Defendants argue that Plaintiff has failed to allege that Chief Davis violated a clearly

established right, asserting that the implementation of specialized units like SCORPION is not

unconstitutional and that no clearly established law prohibits such practices.

Plaintiff responds that the constitutional violations alleged against Chief Davis include

both her failure to oversee and combat widespread excessive force and lack of accountability

within the MPD, thereby tacitly giving a "green light" to it, and her active promotion of

specialized units like SCORPION, despite their propensity to engage in unconstitutional policing

tactics.  To assess whether the unlawfulness was clearly established, Plaintiff points to Peatross

and emphasizes the factual allegations are "strikingly similar to the ones alleged in this case,

addressing the same department and some of the same cultural indicators and supervisory

failures."  (ECF No. 347 at PageID 4763.)

15

The Court finds that Plaintiff has adequately alleged a violation of a clearly established right.  Despite Defendants' argument, Plaintiff does not allege that specialized police units are per se unconstitutional.  Instead, Wells alleges that Chief Davis encouraged and incentivized aggressive tactics by such units despite knowing of their propensity to violate constitutional rights.  And, as the Sixth Circuit established in Peatross, a police supervisor's failure to address known patterns of excessive force and tacit approval of such violations is clearly established as unconstitutional.  Peatross, 818 F.3d at 243.

Plaintiff has plausibly alleged a violation of clearly established rights by Chief Davis. These findings satisfy both required prongs of the qualified immunity analysis.  Chief Davis' Motion to Dismiss is **DENIED**.[4]

## III.    Motion to Dismiss Official Capacity Claims Against Lt. Smith and State-Law Claims Against the City

The City asserts that, to the extent Plaintiff asserts claims against Lt. Smith in his official capacity, they should be dismissed as redundant with the claims against the City of Memphis. As Defendants point out, official capacity claims against Lt. Smith are redundant where, as here, the City is also a named Defendant.  See J.H. v. Williamson Cnty., 951 F.3d 709, 723 n.4 (6th Cir. 2020) ("Where the entity is named as a defendant, an official-capacity claim is redundant." (quoting Foster v. Michigan, 573 F. App'x 377, 390 (6th Cir. 2014))).  The City correctly asserts that "Plaintiff's claims against Lt. Smith as an agent of the City should be construed as claims against the City[.]"  (ECF No. 303-1 at PageID 4266.)  Therefore, the Motion to Dismiss the claims against Lt. Smith in his official capacity is **GRANTED**.

---

[4] Because this Order finds that Chief Davis is not entitled to qualified immunity, her Motion for Protective Order which "seeks a protective order staying discovery against her during the pendency of her Motion to Dismiss based on the doctrine of qualified immunity" (ECF No. 348 at PageID 4777), is **DENIED AS MOOT**.

16

To the extent state-law claims are construed as claims against the City, the City asserts that they are also dismissible under the TGTLA.  The Court starts with Plaintiff's claim for IIED, which Defendants argue is barred under the TGTLA's provision governing "infliction of mental anguish."  (ECF No. 303-1 at PageID 4278 (citing Tenn. Code Ann. § 29-20-205(2).)  As for fraudulent misrepresentation, it asserts that claim is barred under the "misrepresentation exception" in Tennessee Code Annotated § 29-20-205(6).  Plaintiff fails to address either of these arguments.  Not only is the City's position correct, but Plaintiff's failure to address the arguments also warrants granting the Motion to Dismiss these claims as to the City.  See Doe v. Univ. of Memphis, No. 2:18-cv-2032-MSN-cgc, 2021 WL 6752166, at *13 (W.D. Tenn. July 16, 2021) ("When a party fails to respond to a motion or argument therein, the Sixth Circuit has held that the lack of response is grounds for the district court to assume opposition to the motion is waived and grant the motion." (quoting Humphrey v. U.S. Att'y Gen.'s Office, 279 F. App'x 328, 331 (6th Cir. 2008))).  Accordingly, the Motion to Dismiss the claims against the City for IIED and fraudulent misrepresentation is **GRANTED**.

The City also asserts that "[t]he Court should dismiss Plaintiff's claim for negligent infliction of emotional distress . . . because it is essentially a claim for negligent misrepresentation disguised as a claim for negligent infliction of emotional distress."  (ECF No. 303-1 at PageID 4279.)  The City argues that, ultimately, the claim would also be barred under § 29-20-205(6)'s misrepresentation exception, which makes it immune whether the employee's misrepresentation is negligent or intentional.  (ECF No. 382 at PageID 5619.)  The City asserts that, to the extent "the NIED claim is not considered to be a claim for negligent misrepresentation, it is a claim of deceit, which is specifically listed as an intentional tort for

which the City retains immunity."  (Id. at PageID 5619 (citing Tenn. Code Ann. § 29-20-205(2)'s intentional tort exceptions).)

Plaintiff counters that the argument that the City is entitled to immunity as to the NIED claim against it relies on a "misunderstand[ing of] the Tennessee Governmental Tort Liability Act, which does not cover NIED claims."  (ECF No. 347 at PageID 4743.)  According to Plaintiff, this is not a claim for negligent misrepresentation, because "fraudulent misrepresentation is a completely different claim, requiring a completely different mental state." (Id. at PageID 4764.)

To prove a claim for NIED under Tennessee law, one must (1) satisfy the five elements of ordinary negligence: duty, breach of duty, injury or loss, causation in fact, and proximate or legal cause (2) establish a "serious" or "severe" emotional injury, and (3) support his or her serious or severe injury with expert medical or scientific proof.  Marla H. v. Knox Cnty., 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011) (internal citations omitted).  At the same time, proving negligent misrepresentation requires a plaintiff to "establish by a preponderance of the evidence that the defendant supplied information to the plaintiff; the information was false; the defendant did not exercise reasonable care in obtaining or communicating the information and the plaintiff [ ] justifiably relied on the information."  BancorpSouth Bank v. Herter, 643 F. Supp. 2d 1041, 1055 (W.D. Tenn. 2009) (quoting Ingram v. Cendant Mobility Fin. Corp., 215 S.W.3d 367, 371 (Tenn. Ct. App. 2006)).

The acts that form the basis for Plaintiff's NIED claim are as follows: "Telling RowVaughn Wells that Tyre was driving under the influence with no evidence or support"; "Telling RowVaughn Wells that Tyre was intoxicated with no evidence or support"; "Lying to RowVaughn Wells about the reasons why Tyre was being arrested"; "Withholding the reasons

18

why Tyre was being arrested from RowVaughn Wells"; "Lying to RowVaughn Wells about Tyre's medical condition"; "Failing to tell RowVaughn Wells that Tyre was around the corner from her home and on the verge of dying"; and "Withholding Tyre's medical condition from RowVaughn Wells."  (ECF No. 277 at PageID 3264–65.)

Plaintiff is correct that the "TGTLA specifically removes immunity for government entities when injury is 'proximately caused by a negligent act or omission' of its employees— including negligent infliction of emotional distress."  (ECF No. 347 at PageID 4764 (citing Greenwood v. City of Memphis, No. W2016–00897–COA–R3–CV, 2017 WL 5151378, at *4 (Tenn. Ct. App. Nov. 6, 2017)).)  However, the actions Lt. Smith took that form the basis for Wells' NIED claim are, as the City suggests, best characterized as negligent misrepresentations or as deceit.  While the City would not be immune from an NIED claim under the TGTLA, it is immune from these claims, in spite of Plaintiff's characterization of them, because the facts sound in negligent misrepresentation, not negligent infliction of emotional distress.  Accordingly, the Motion to Dismiss the NIED claim as to the City is **GRANTED**.

## THE EMTS' MOTIONS TO DISMISS

Wells asserts in the Amended Complaint that EMTs Long, Sandridge, and Whitaker violated Nichols' Fourteenth Amendment rights based on their deliberate indifference to his medical needs.  Although the EMTs' motions to dismiss vary slightly, the thrust of each is that Plaintiff's claims against them should be dismissed based on qualified immunity.  In making their qualified immunity argument, each relies on the well-settled Sixth Circuit law that provides that it is not a constitutional violation for a state actor to render incompetent medical assistance or fail to rescue those in need.  (See ECF No. 300-1 at PageID 4231; ECF No. 307 at PageID 4431; ECF No. 308-1 at PageID 4464.)  The EMTs all additionally assert that the two exceptions

to that general rule—the custody exception and the state-created danger exception—are inapplicable here.

Plaintiff counters that there is a simple, fatal flaw to the argument: "Mr. Nichols <u>was</u> in custody," therefore, pursuant to the custody exception, the EMTs owed Nichols a duty. (ECF No. 347 at PageID 4773.) Wells asserts that the allegations in the complaint explain that "the police beat Mr. Nichols so badly that when the MFD defendants arrived on the scene, Mr. Nichols was incapable even of standing, much less walking off to get care on his own," and that "[h]e was also handcuffed," making it inarguable that he was "within the State's custody when the MFD defendants arrived on the scene and proceeded to ignore his medical needs." (<u>Id.</u> at PageID 4773–74.)

As a general rule, "[i]t is not a constitutional violation for a state actor to render incompetent medical assistance or fail to rescue those in need." <u>Jackson v. Schultz</u>, 429 F.3d 586, 590 (6th Cir. 2005) (citing <u>DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 196 (1989)). Courts recognize two exceptions to the rule—the custody exception and the state-created danger exception. <u>Id.</u> (citing <u>DeShaney</u>, 489 U.S. at 199–201). The custody exception, which Plaintiff relies on, "triggers a constitutional duty to provide adequate medical care to incarcerated prisoners, those involuntarily committed to mental institutions, foster children, pre-trial detainees, and those under 'other similar restraint of personal liberty.'" <u>Id.</u> (quoting <u>DeShaney</u>, 489 U.S. at 200).

In addressing the applicability of the custody exception to the claims against them, the EMTs do not appear to dispute, generally, whether Nichols was in custody. Instead, they focus on whether he was in <u>their</u> custody, such that the custody exception would have triggered a duty for <u>them</u> to provide Nichols with adequate medical care. (<u>See, e.g.</u>, ECF No. 300-1 at PageID

4239 ("There is nothing in Plaintiffs' amended complaint that establishes that Mr. Nichols injuries occurred while in the custody of Defendant Long."); ECF No. 374 at PageID 5506 ("Plaintiff has alleged absolutely no facts that Mr. Long affirmatively placed Mr. Nichols in custody or in any way acted to deprive Mr. Nichols of his liberty."); ECF No. 307 at PageID 4438 ("The custody exception does not apply here, because like the EMTs in <u>Jackson</u>, Ms. Whitaker did not cause Mr. Nichols' injuries, nor did she restrain him or cause his incapacity in any way."); ECF No. 308-1 at PageID 4466 ("Plaintiff did not allege that Defendant Sandridge assaulted, harmed or caused any injury to Mr. Nichols.  Additionally, Plaintiff did not allege that Defendant Sandridge restrained Mr. Nichols.");  ECF No. 371 at PageID 5489 ("There is absolutely no allegation in any form whatsoever that Mr. Sandridge at any time 'restrained' or put Mr. Nichols in 'custody'.").)

Plaintiff counters with the general rule that the Government has a constitutional obligation to provide medical care to those whom it detains, and that it is a violation of the Fourteenth Amendment "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety.'"  (ECF No. 347 at PageID 4774 (quoting <u>Griffith v. Franklin Cnty., Ky.</u>, 975 F.3d 554 (6th Cir. 2020)).)  Ultimately, Plaintiff asserts that a straightforward application of that general rule results in the following conclusion: "police injured a person in the course of arresting him, and once he was detained and in their custody, they summoned the three MFD defendants to provide medical care for him.  In January 2023 those MFD defendants had a well and clearly established duty to provide Mr. Nichols with adequate medical care when they arrived and found him in need of it.  But they refused to do so, in violation of clearly established law."  (<u>Id.</u>)

But Plaintiff has not cited any cases, and the undersigned has not found any, that suggest that the circumstances here, where EMTs arrive at a scene where someone had earlier been placed into custody by other state actors, that the custody exception would be triggered as to the EMTs. The Court surmises, without deciding, that the custody exception would likely apply to the officers who actually detained Nichols prior to the arrival of the EMTs. For that reason, the Jackson decision, where the court determined an unconscious patient was not in the EMTs' custody after they moved him into an ambulance, is not perfectly analogous to these circumstances. Nevertheless, it is informative. There, "the EMTs did nothing to restrain decedent. The EMTs did not cause decedent to be shot nor did they render him unconscious. There is no allegation that the EMTs restrained or handcuffed the decedent." Jackson, 429 F.3d at 591. Ultimately, the court in Jackson found that the custody exception was inapplicable.

Because Nichols was not placed into custody by the EMTs and thus the custody exception is inapplicable, it was not a constitutional violation for the EMTs to render incompetent medical assistance or fail to rescue those in need.[5] The EMTs are therefore entitled to qualified immunity. Their motions to dismiss are **GRANTED**.

## THE MOTIONS TO DISMISS THE CLAIMS AGAINST HEMPHILL AND LT. SMITH IN THEIR INDIVIDUAL CAPACITIES

Hemphill and Lt. Smith assert that they, too, are entitled to qualified immunity as to the § 1983 claims asserted against them. They argue that "[t]he majority of Plaintiff's allegations against Hemphill and Smith are no longer supported by the undisputed evidence in the wake of the criminal proceedings." (ECF No. 314-1 at PageID 4498.) According to Lt. Smith, the state-law claims against him in his individual capacity cannot survive for the same reasons articulated

---

[5] The Court takes no position on whether the EMTs would be subject to other causes of action outside of this constitutional claim.

by the City in its Motion to Dismiss, as well as the fact that "no claim can be brought against him individually for negligent acts or omissions committed by him within the scope of his employment," and none of his actions satisfied the high threshold of "outrageous conduct" required for a IIED claim. (Id. at PageID 4501–03.)[6] He also asserts that he is entitled to qualified immunity from Plaintiff's Fourteenth Amendment claim that he was deliberately indifferent to Nichols' medical needs, as Lt. Smith was a latecomer to the scene and relied, as he is entitled to under the law, on the representations of his fellow officers.

Hemphill similarly asserts that when the conduct he engaged in that is allegedly violative of the Fourth Amendment is evaluated outside the context of the actions of the other officers on the scene, which the Court must do under the law, he is entitled to qualified immunity. He argues that he was the third officer on the scene, never left the first scene, and relied on his fellow officer's representations that a traffic stop was supported by reasonable suspicion or exigent circumstances.

Plaintiff asserts that, in order to find that Lt. Smith and Hemphill are entitled to qualified immunity, the Court would have to "make dramatic inferences in their favor, and to improperly consider heavily curated snippets of testimony from the United States v. Bean[7] trial rather than the complaint's allegations," which would "violate bedrock principles of the Rule 12(b)(6) stage." (ECF No. 347 at PageID 4743.)

As a starting point, Plaintiff does not address Lt. Smith's argument that he is entitled to immunity under the TGTLA for the NIED claim against him in his individual capacity. Under

---

[6] Although Lt. Smith incorporates the City's arguments for dismissal of the claims against him, all of those arguments relate to the claims made against him in his official capacity. Moreover, Lt. Smith does not address the fraudulent misrepresentation claim against him in his individual capacity. Thus, that claim is not subject to the Motion to Dismiss.

[7] See United States v. Bean, et al., No. 2:23-cr-20191-SHL (W.D. Tenn).

23

the TGTLA, the City has waived its immunity for claims that its employees committed acts of negligence.  Robinson v. City of Memphis, 340 F. Supp. 2d 864, 873 (W.D. Tenn. 2004) (citing Tenn. Code. Ann. § 29-20-205).  While the City is not immune for the acts of its employees, "municipal employees are granted immunity from suit" in their individual capacities.  Id. (citing Tenn. Code. Ann. § 29-20-310(b)).  Accordingly, the Motion to Dismiss the NIED claim against Lt. Smith in his individual capacity is **GRANTED**.

Plaintiff does address the IIED claim against Lt. Smith in his individual capacity, however.  Wells asserts that Lt. Smith's actions rise to the level of outrageous behavior, as "he had every reason to believe Mr. Nichols was innocent and had just been savagely beaten by his colleagues, but as Mr. Nichols lay dying Mr. Smith walked over to his mother's house and lied to her about her son—effectively discouraging her from running the short distance to see her son alive and conscious for the last time."  (ECF No. 347 at PageID 4769.)  Lt. Smith again relies upon the argument that his actions were "based upon information he was provided by the officers at the scene."  (ECF No. 314-1 at PageID 4502.)

Lt. Smith outlines the requirements under Tennessee law to demonstrate outrageous conduct:  "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury."  (Id. (quoting Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997)).).  He asserts that "[t]here is simply no evidence that Defendant Dewayne Smith's behavior rose to such a level that it could be deemed 'outrageous' under Tennessee Law, and therefore an[y] such claim against him should be dismissed."  (Id. at PageID 4503.)

However, when the Court accepts the allegations in the Amended Complaint as true, there is a question as to what Lt. Smith knew, when he knew it, and, correspondingly, the

veracity of the information that he communicated to Wells regarding her son, including the alleged crimes Nichols' committed, how he had been treated on the scene, and his condition. Because, as the Court must assume to be true based on the allegations in the Amended Complaint, Lt. Smith "intentionally lied to and withheld information from RowVaughn Wells on January 7, 2023 . . . that was certain to foreseeably cause severe emotional distress to RowVaughn Wells" (ECF No. 277 at PageID 3262), dismissing the IIED claim at this stage in the proceedings is inappropriate.

What remains then, is Lt. Smith and Hemphill's claims that they are entitled to qualified immunity as to the Fourth Amendment claims against them.  Lt. Smith is alleged to have been deliberately indifferent to Nichols' serious medical needs, and Hemphill is alleged to have violated Nichols' Fourth Amendment rights based on an unreasonable stop, excessive force, and failure to intervene to prevent excessive force.  They offer similar arguments as to their entitlement to qualified immunity, which include that they were not among the initial officers on the scene, and they were entitled to rely upon the information conveyed to them at the scene by their fellow officers.  Lt. Smith asserts that it was reasonable for him to rely upon the representations the officers on the scene made to him, even though they later turned out to be untrue.  (ECF No. 314-1 at PageID 4500–01.)  Hemphill asserts that the force he used was reasonable, particularly when it is viewed independently of the other officers on the scene, and particularly when considering the information that other officers conveyed to him upon his arrival on the scene, even if that information later turned out to be false.  (Id. at PageID 4498–5000.)

Neither of the arguments is persuasive.  As noted above, whether a government official is entitled to qualified immunity involves a two-step inquiry: whether, viewing the facts in the light

most favorable to the plaintiff, the allegations show that the officer's conduct violated a constitutional right, and whether that right was clearly established.  Jones, 625 F.3d at 941.

The arguments Lt. Smith and Hemphill offer appear to focus on the first prong, that is, that their behaviors did not violate Nichols' constitutional rights.  As a starting point, the rights Wells complains Hemphill and Lt. Smith violated are all clearly established constitutional rights not defined at a high level of generality, "whose contours were 'sufficiently clear' such that 'every reasonable official would have understood' that the officer's actions violated it."  Moore v. Oakland Cnty., 126 F.4th 1163, 1167 (6th Cir. 2025) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011); see also e.g., Srisavath v. City of Brentwood, 243 F. App'x 909, 918 (6th Cir. 2007) ("Terry, which requires reasonable suspicion for investigative detentions, had been clearly established since 1968."); Crawford v. Geiger, 656 F. App'x 190, 199 (6th Cir. 2016) ("[I]n order to hold an officer liable for the use of excessive force, a plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." (citation modified)); Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997) ("Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.").

Hemphill relies on a series of cases that indicate that, as an officer who arrived in the heat of an ongoing altercation between his fellow officers and a suspect, he was allowed to assist them, and he was allowed to rely upon the information they conveyed.  See, e.g., Jones v. City of Elyria, 947 F.3d 905, 916 (6th Cir. 2020); United States v. Lyons, 687 F.3d 754, 769 (6th Cir.

26

2012).  Although that is an accurate recitation of the law, it downplays Hemphill's involvement in the Nichols incident, at least as it is depicted in the Amended Complaint.

The Amended Complaint alleges that Hemphill was involved in the unreasonable stop from the outset, alleging that he searched for, but found "no reasonable, articulable suspicion that Tyre Nichols was engaged in criminal activity" that would justify stopping Nichols.  (ECF No. 277 at PageID 3241.)  Specifically, Hemphill sprinted out of his car, gun drawn, held sideways, "ready to deploy deadly force on a non-resistant individual without any justification."  (ECF No. 277 at PageID 3164.)  This "unreasonably escalated the situation by threatening deadly force against a cooperative, non-violent, non-resistant individual."  (Id. at PageID 3165.)  Hemphill and two of his fellow officers were then alleged to have "restrained, pulled, and struck Tyre trying to force him further into the ground, and yanked his arms behind his back, all in keeping with MPD's custom of brutalizing civilians without justification."  (Id. at PageID 3166.)  Hemphill is also alleged to have deployed his taser at Nichols "without reasonable justification."  (Id. at PageID 3167.)

As alleged in the Amended Complaint, Hemphill's conduct violated Nichols' constitutional rights, and each of the rights he is accused of violating was clearly established so he would have been on notice of the violative nature of his actions.  The rights at issue are not, in other words, defined in the sort of general terms that would not place him on notice.  Because qualified immunity is inapplicable, Hemphill's Motion to Dismiss based on qualified immunity is **DENIED**.

The same is true as to Lt. Smith's argument for qualified immunity based on the claim that he was deliberately indifferent to Nichols' serious medical needs.  Although he arrived late to the scene, according to the Amended Complaint, Lt. Smith "could see Tyre's obvious injuries

and distress," "walked away despite Tyre's obvious injuries and distress," "knew Tyre Nichols was in critical medical condition," and "offer[ed] no aid to Tyre as Tyre lay battered, beaten, and propped up against the police car."  (Id. at PageID 3180–81.)

A claim of deliberate indifference to medical needs has both objective and subjective components.  Hollenbaugh v. Maurer, 221 F. App'x 409, 415 (6th Cir. 2007) (citation omitted). The objective component requires a showing that the alleged deprivation is sufficiently serious, and the subjective component "must also show that the officers subjectively had 'a sufficiently culpable state of mind in denying . . . medical care."  Id. at 415–16 (citation omitted).  Here, Wells' Amended Complaint sufficiently alleges both the objective and subjective components. The deprivation of care for Nichols by Lt. Smith was sufficiently serious, as alleged in the Amended Complaint, and, given the actions that Lt. Smith had after his interactions with Nichols, Lt. Smith had a culpable state of mind in denying him medical care.  Accordingly, Wells has alleged that Lt. Smith violated Nichols' constitutional rights.

Moreover, that right was clearly established, as "[i]n the context of deliberate indifference, we have held that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'"  Hollenbaugh, 221 F. App'x at 419–20 (quoting Estate of Carter v. City of Detroit, 408 F.3d 305, 313 (6th Cir. 2005)).  Accordingly, Lt. Smith is not entitled to qualified immunity as to the claim that he was deliberately indifferent to Nichols' serious medical needs.  His Motion to Dismiss this count is **DENIED**.

## CONCLUSION

Given the foregoing, the Long, Whitaker and Sandridge's motions are **GRANTED**. Hemphill and Lt. Smith's motion is **GRANTED IN PART AND DENIED IN PART**.  The City

of Memphis' motion is **GRANTED IN PART AND DENIED IN PART**.  The motion to dismiss the claims against the City for intentional infliction of emotional distress, negligent infliction of emotional distress, and fraudulent misrepresentation is **GRANTED**.  The motion to dismiss the official capacity claims against Lt. Smith is **GRANTED**.  The motion to dismiss the claims against Chief Davis in her individual capacity is **DENIED**.  The motion to dismiss the City pursuant to Monell is **DENIED**.

   **IT IS SO ORDERED,** this 30th day of September, 2025.

         s/ Sheryl H. Lipman
         SHERYL H. LIPMAN
         CHIEF UNITED STATES DISTRICT JUDGE