IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| ROWVAUGHN WELLS, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF TYRE DEANDRE NICHOLS, DECEASED,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF MEMPHIS, TENNESSEE; CHIEF CERELYN DAVIS; EMMITT MARTIN III; DEMETRIUS HALEY; JUSTIN SMITH; DESMOND MILLS, JR.; TADARRIUS BEAN; PRESTON HEMPHILL; ROBERT LONG; JAMICHAEL SANDRIDGE; MICHELLE WHITAKER; AND DEWAYNE SMITH,<br><br>Defendants. | CASE NO. 2:23-CV-02224-SHL-atc<br>JURY DEMAND |

**DEFENDANT CITY OF MEMPHIS'S MOTION FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS AND INCORPORATED MEMORANDUM OF LAW**

Defendant the City of Memphis (the "City"), pursuant to Federal Rules of Civil Procedure 26(b)(2) and 30(a)(2) respectfully moves the Court for an Order allowing the City to take additional depositions in this case. To date, the City has noticed and taken eleven depositions in this matter.

The City seeks leave to take additional depositions to further investigate, *inter alia*, the inconsistent testimony of the medical examiner, Dr. Marco Ross, related to the toxicology report of Tyre Nichols, and the shifting forensic analysis of the forensic neuropathologist, Dr. Rebecca Folkerth. The City also anticipates deposing the toxicologist at St. Francis Hospital in light of Dr.

1

Ross's testimony regarding the unreliability of the hospital's toxicology report. The City further seeks to depose other individuals identified as potential witnesses in Plaintiff's First, Second, and Third Sets of Initial Disclosures.

I.      **The City seeks to depose the toxicologists who analyzed Mr. Nichols's blood samples and determined that his blood contained alcohol.**

Plaintiff deposed the Shelby County Medical Examiner, Dr. Marco Ross, on July 25, 2024, during which Dr. Ross inaccurately testified that the alcohol found in Tyre Nichols's blood sample was created postmortem. Specifically, Dr. Ross testified as follows:

Q. Is there such a thing as postmortem formation of ethanol?

**A. Yes, there is.**

Q. And can you testify with any degree of certainty one way or the other whether or not the ethanol that was found to be in his system from the laboratory was formed after death, or was it ethanol that was present in his system on January 7th?

**A. The -- of the two blood samples, the fact that urine -- excuse me, ethanol was not detected in one of the samples, and some was detected in the other sample, suggests to me that the presence of ethanol is probably a postmortem process, that the blood sample probably was contaminated by bacteria during the collection process. And the introduction of bacteria into the blood, that bacteria would then subsequently begin to metabolize some of the products and part of it -- the result of that metabolism by bacteria is the creation of ethanol.**

(Deposition of Dr. Marco Ross, July 25, 2025, 132:13-133:9, **Exhibit A**).

Six days following his inaccurate testimony, on July 31, 2024, and in advance of the federal criminal trial in which Dr. Ross was about to testify, Dr. Ross notified counsel for Plaintiff of his inaccurate testimony via email. (Email, **Exhibit B**.) There, Dr. Ross stated as follows:

Mr. Romanucci,

I'm meeting with an Assistant US Attorney next week regarding the upcoming federal

2

criminal trial in the Tyre Nichols case. I was reviewing the toxicology results again and discovered a notation that affects my previous interpretation of the ethanol results. This does not change any of my previous opinion regarding the blunt force injuries and the cause and manner of death. The notation indicates the actual collection times at the hospital of the blood samples that were tested. **The blood sample that showed the ethanol result of 49 mg/dL was collected around the time of hospital admission, whereas the other blood sample that did not detect ethanol was collected about 3 to 4 1/2 hours later. This would be consistent with antemortem ingestion of alcohol** (although postmortem formation cannot be entirely excluded, but is probably less likely). The level of alcohol detected is equivalent to a blood alcohol concentration of .049. This is well under the legal limit for DUI which is .080. Please let me know if you would like to discuss this further.

Thank you.

Marco Ross, MD
Chief Medical Examiner

(Ex. B, emphasis added.)

Several weeks after receiving Dr. Ross's recantation of his deposition testimony, Plaintiff produced this email to the City without commentary. The City immediately sought to reopen the deposition of Dr. Ross to explore Dr. Ross's previous inaccurate testimony and his communications with Plaintiff's counsel.

The second iteration of Dr. Ross's deposition finally occurred on November 11, 2025. In the November 11, 2025 deposition, Dr. Ross admitted that the alcohol in Tyre Nichols' blood sample that was evaluated by toxicologist Dr. Anderson *was not created postmortem* because the blood sample in question was taken at the hospital three days *prior to Mr. Nichols' death*.

Dr. Ross confirmed that the blood sample contained alcohol at a level of 49 mg/dl. Dr. Ross testified that, based on the level of ethanol in the blood sample at the time it was drawn, Mr. Nichols's blood alcohol content ("BAC") at time of the incident—hours earlier—was likely between **0.071 and 0.136**, which would be *at or over the legal limit for DUI*—and *not* at the

3

4922-0021-0796

level of **.049** as he indicated to Mr. Romanucci in the July 31, 2024 email. (Deposition of Dr. Marco Ross, November 11, 2025, 32:08-37:01, **Exhibit C**).

On cross-examination by Plaintiff's counsel, however, Dr. Ross agreed with Plaintiff that the alcohol detected in Plaintiff's blood could be a result of contamination at the time of collection or contamination by the testing laboratory, NMS Labs.[1] Based upon Dr. Ross's assertions related to the unreliability of the toxicology analysis of NMS Labs, the City now seeks to depose Mr. Daniel Anderson, the toxicologist from NMS Labs.

Moreover, Plaintiff identified Mr. Anderson as a potential witness in her Initial Disclosures. Plaintiff stated that Mr. Anderson "is a scientist at NMS labs and a toxicologist. He provided a toxicology analysis on various blood samples, tissue samples, and other samples from the body of Tyre Nichols. He will testify regarding the findings made and conclusions reached in the course of preparing his report. *It is expected Mr. Anderson will testify that the materials, findings, and facts reviewed in reaching his conclusions and opinions are those reasonably relied on by professionals in his field*." (Third Initial Disclosures, **Exhibit D**, p. 25, emphasis added.) Because this disclosure conflicts with the testimony Plaintiff's counsel elicited from Dr. Ross, the deposition of the NMS Labs toxicologist is even more important.

Dr. Ross also testified regarding the possible unreliability of the toxicology analysis conducted by SFH Laboratory— the laboratory associated with St. Francis Hospital that conducted the initial toxicology analysis. For the same reasons outlined *supra*, the City seeks to depose the toxicologist from SFH Laboratory.

II. **The City seeks to depose Dr. Rebecca Folkerth, the neuropathologist who corroborated Dr. Ross's determination of cause of death.**

---

[1] In spite of the fact that SFH Laboratory report also showed alcohol in the blood antemortem.

4

The City also seeks to take the deposition of Dr. Rebecca Folkerth, who was the neuropathologist that Dr. Ross engaged to analyze microscopic slides of Mr. Nichols' brain. The City subpoenaed communications between Dr. Ross and Dr. Folkerth, which were ultimately produced on November 10, 2025. These communications raise serious questions about the legitimacy and independence of Dr. Folkerth's report.

The subpoenaed communications between Dr. Folkerth and Dr. Ross show that Dr. Ross was editing Dr. Folkerth's report and that her report was not a true independent analysis. The subpoenaed communications further show that Dr. Folkerth refused to meet with the U.S. Attorney's office in advance of the criminal trial without Dr. Ross being present, which seems to suggest that Dr. Folkerth was uncomfortable with the proposed forensic report.

Plaintiff also disclosed Dr. Folkerth as a potential witness in her Initial Disclosures. Plaintiff asserts that Dr. Folkerth "is likely to have information as to the findings made and conclusions reached in the course of preparing her consultation report." (Ex. D, p. 25.)

The deposition of Dr. Folkerth may serve to support or contradict some or all of the conclusions expressed by Dr. Ross in his deposition. Dr. Folkerth's deposition is even more relevant now that Dr. Ross has produced his communications with Dr. Folkerth leading up to the final draft of the autopsy report. These communications raise serious questions about the legitimacy of Dr. Folkerth's report and Dr. Ross's autopsy findings.

III. **Plaintiff has identified a number of individuals as potential witnesses she may use to support her claims or defenses under Rule 26(a)(1)(A)(i), and the City is entitled to depose these individuals on the record prior to trial.**

Plaintiff identified 129 potential witnesses in her Third Supplemental Initial Disclosures. (*See* Ex. D.). While the City seeks the right to depose any and all of those witnesses, the City specifically seeks to depose the following witnesses.

        1.     Chief George Turner

4922-0021-0796

Plaintiff asserts Chief George Turner was the individual who directed the Atlanta Police Department to disband the RED DOG Unit and that Chief Turner has knowledge as to how the RED DOG Unit "functioned, how its officers were trained, the patterns, practices, and policies of the Unit, and the ultimate decision to disband the RED DOG Unit." (Ex. D, at 26.) Plaintiff alleges in her Amended Complaint that Chief Davis worked in the RED DOG Unit and that "[d]espite Chief Davis's experience with RED DOG in Atlanta, the MPD, under her command, pursued similar tactics with SCORPION Unit in Memphis." (*See* Pl.'s Am. Compl., ECF No. 277, ¶¶ 81–82.)

Thus, Plaintiff's theory is that Chief Davis modeled the SCORPION Unit after the RED DOG Unit, and that Chief Davis knew or should have known that such implementation would lead to constitutional violations for Memphis's citizens. While Plaintiff's theory is grossly inaccurate, it nonetheless makes the deposition of Chief Turner relevant based on his knowledge of the RED DOG Unit.

    2.    <u>Chuck Baker</u>

Mr. Chuck Baker, the lead investigator for the TBI for the incident involving Mr. Nichols, also possesses personal knowledge relevant to this litigation. In the aftermath of the incident, the TBI launched an investigation into Mr. Nichols' death. This investigation involved the officers who are Defendants to this case. Based on this investigation, Mr. Baker possesses knowledge about the facts and circumstances surrounding Mr. Nichols death, which is relevant to this litigation. To be sure, given Mr. Baker's role in the TBI investigation, Plaintiff asserts Mr. Baker is expected to possess relevant knowledge as to the facts and circumstances surrounding Mr. Nichols' death, as well as the "full investigative efforts by the [TBI] of Defendant Officers, Defendant Paramedics, Chief Davis, the City of Memphis, and all related information as it concerns the Subject Occurrence." (Ex. D, at 32.)

Mr. Baker also has knowledge of the stolen credit cards and illegal mushrooms found in Mr. Nichols' car. He also is assumed to have knowledge of how and why the stolen credit cards were given to Plaintiff instead of being returned to their rightful owners.

      3.      <u>Julian "J.B." Burrow</u>

      4.      <u>Charlotte Lewis-Ray</u>

Mr. Burrow and Ms. Lewis-Ray are FedEx employees who worked with Mr. Nichols at FedEx. (*Id.* at 35.) Both are expected to testify about Mr. Nichols' work ethic, dependability, job performance, career aspirations, and their observation of Mr. Nichols with other FedEx colleagues. (*Id.*) Mr. Burrow is also expected to testify about Mr. Nichols' relationship with Mr. Wells. Further, Ms. Lewis-Ray is expected to testify about Mr. Nichols' love and affection for his minor son. (*Id.*)

The depositions of Mr. Burrow and Ms. Lewis-Ray are directly relevant to damages. For instance, Plaintiff states she will testify about "all damages proximately cause by the Subject Occurrence. . . including but not limited to," Mr. Nichols' "life and aspirations," "loss of earning capacity," "loss of enjoyment of life," "strength and capacity to work and for earning money," and "personal habits of sobriety and industry." (*See* Ex. D, at pp. 2–3.) Mr. Burrow and Ms. Lewis-Ray are expected to testify about similar topics, also relevant to damages by Plaintiff's own contention, specifically Mr. Nichols' "work ethic, dependability, [] job performance," and his "career aspirations." (*See id.* at 35.) Moreover, Plaintiff's disclosures list the non-economic damages that have been or will be suffered by Mr. Nichols' minor son, such as the loss of "love, affections, attention, education, guidance, care, protection, training, companionship, and cooperation." (*See id.* at 38.) To that point, Ms. Lewis-Ray is expected to testify about "Mr. Nichols' love and affection for his minor son." (*See id.* at p. 35.)

      5.      <u>The third-party witnesses alleged to have excessive force experiences with</u>

7

MPD.

The City should be allowed to take discovery on Plaintiff's theory as it relates to the alleged prior instances of similar police misconduct and the contention that the policies and practices of the City led to that purported misconduct because it is directly relevant to Plaintiff's claim. Ex. D, at pp. 21–22, 34–35. (*See also* Pl.'s Am. Compl., ECF No. 277, PageID 3144–61, at ¶ 100(a)–(u).)

In this lawsuit, Plaintiff brings a claim against the City pursuant to 42 U.S.C. § 1983. (*See generally* Pl.'s Am. Compl., ECF No. 277.) Plaintiff alleges, in part, that the "policies and practices of the City of Memphis have led" to these various instances of purported excessive force. (*Id.* at ¶ 100.) Plaintiff likewise alleges that MPD had a "custom of brutalizing civilians without justification and MPD's code of silence [] protected officers who carried out that custom." (*Id.* at ¶ 124.) In the context of a custom of tolerance claim brought pursuant to § 1983, Plaintiff must show "that there was a pattern of inadequately investigating similar claims." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Plaintiff, in her Amended Complaint and/or her Disclosures, identifies the following **twenty-three individuals** as purported exemplars of civilians who have allegedly experienced Memphis Police Department ("MPD") misconduct:

1. Monterrious Harris
2. Cornell Walker, a.k.a. Cornell McKinney
3. Maurice Chalmers-Stokes
4. Sebastian Johnson
5. Kendrick Johnson Ray
6. Davitus Collier
7. Damecio Wilbourn
8. Romello Hendrix
9. Johnny Graham
10. Deangelo Lauderdale
11. Jeremy Henderson
12. LaBryant Burnside
13. Marcus Bills
14. Carla Hamilton
15. Jesus Valles
16. Kieron Lee
17. Marco Locket
18. Drew Thomas
19. Jeremiah Hall
20. Anthony Whitt
21. Antonio Strawder
22. Daniel Jefferson Jr.
23. Kadejah Townes

(Ex. D, at pp. 21–22, 34–35) (*See also* Pl.'s Am. Compl., ECF No. 277, PageID 3144–61, at ¶ 100(a)–(u).)

With respect to all twenty-three individuals, the City issued discovery requests to Plaintiff seeking Plaintiff's (and her attorneys') communications with each individual, all documents exchanged with third parties related to each individual, and all documents in Plaintiff's (and her attorneys') possession that relate to each individual. (*See* ECF No. 454, at Ex. A.) Based on Plaintiff's objections to this discovery, *inter alia*, the City filed a Motion to Compel. (*See* ECF Nos. 453, 454.) Plaintiff has taken the position that the sought discovery is privileged pursuant to the attorney work product doctrine, and that production of a simple privilege log would invade the work product doctrine. (*See* ECF Nos. 466, 476.) While the City strongly disagrees with Plaintiff's position, that position further necessitates the requested relief. The only way remaining for the City to take discovery as it relates to these individuals is by deposition, and discovery related to these individuals is directly relevant to Plaintiff's claims.

The City respectfully requests the Court to permit it to depose these individuals, should the City deem it necessary.

## IV. LAW AND ARGUMENT

It is well understood that, "[t]he scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad." *Goree v. United Parcel Serv., Inc.*, No. 14-cv-2505-SHL-tmp, 2015 WL 11120571, at *5 (W.D. Tenn. Sept. 29, 2015) (citing *Lewis v. ACB Bus. Servs.*, 135 F.3d 389, 402 (6th Cir. 1998)). When considering the appropriate scope of discovery, courts look "to the underlying claims and defenses." *Id.* at *5; *see also Northend Investors, LLC v. Southern Trust Ins. Co.*, 2017 WL 11494659, at *2 (W.D. Tenn. June 15, 2017) (stating "[t]he party seeking the discovery must show the requests are relevant to the claims or defenses in the instant action").

9

"Parties may obtain discovery on any matter that is not privileged and is relevant to any party's claim or defense if it is reasonably calculated to lead to the discovery of admissible evidence." *Goree*, 2015 WL 11120571, at *5 (citing Fed. R. Civ. P. 26(b)(1)). Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Goree*, 2015 WL 11120571, at *5 (citing Fed. R. Evid. 401).

Once the party seeking discovery shows the relevance of the discovery sought, "the burden shifts to the party opposing discovery to show, with specificity, why the requested discovery is not proportional to the needs of the case." *Fusion Elite All Stars v. Varsity Brands, LLC*, Nos. 20-cv-02600-SHL-tmp and 20-cv-02892-SHL-tmp, 2022 WL 945605, at *2 (W.D. Tenn. Mar. 29, 2022) (citing *Johnson v. CoreCivic, Inc.*, No. 18-CV-1051-STA-tmp, 2019 WL 5089086, at *2 (W.D. Tenn. Oct. 10, 2019)). Accordingly, if the party seeking discovery "demonstrates relevancy, the party resisting discovery bears the burden of demonstrating why the request is unduly burdensome or otherwise not discoverable under the Federal Rules." *Waddell v. Greyhound Lines, Inc.*, No. 08-2014-Pa/P, 2008 WL 4982633, at *1 (W.D. Tenn. Nov. 19, 2008) (citing *MJS Janitorial v. Kimco Corp.*, No. 03-2102, 2004 WL 2905409, at *6 (W.D. Tenn. Apr. 19, 2004)). Pursuant to the Federal Rules of Civil Procedure, there are six factors relevant to the issue of proportionality: (1) "the importance of the issues at stake in the action," (2) "the amount in controversy," (3) "the parties' relative access to relevant information," (4) "the parties' resources," (5) "the importance of the discovery in resolving the issues," and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

With respect to depositions, the Federal Rules of Civil Procedure provide guidance as to

10

the City's requested relief. Specifically, Federal Rule of Civil Procedure 30 states:

> **(a) When a Deposition May Be Taken.**
>
> . . .
>
> **(2)** *With Leave.* A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2):
>
> **(A)** if the parties have not stipulated to the deposition and:
>
> **(i)** the deposition would result in more than 10 depositions being taken under this rule or Rule 31 by the plaintiffs, or by the defendants, or by the third-party defendants; [. . . .]

Fed. R. Civ. P. 30(a)(2)(A)(i) (emphasis in original).

Accordingly, when a defendant seeks to take more than 10 depositions, and the parties have not stipulated to those excess depositions, leave of court is required. *See id.* Relatedly, Federal Rule of Civil Procedure 26 authorizes a court to "alter the limits in these rules on the number of depositions . . . under Rule 30." Fed. R. Civ. P. 26(b)(2)(A). Thus, a district court may exercise its broad discretion over discovery matters and allow a party to take more than 10 depositions, even if the other parties to litigation do not agree. *See id.*

It should be noted that Plaintiff herself sought to take depositions in excess of ten depositions in March 2024. First, Plaintiff sought 35 depositions. (ECF No. 163.) The Court denied that request but allowed Plaintiff to take 30 depositions. (Order, ECF No. 179, PageID 1376.) Now, Plaintiff seeks to increase her number of depositions to 45 depositions, despite the Court's previous order. Confoundingly, Plaintiff opposes the City's request for additional depositions.

Once the party seeking discovery shows the relevance of the discovery sought, "the burden shifts to the party opposing discovery to show, with specificity, why the requested discovery is not proportional to the needs of the case." *Fusion Elite All Stars*, 2022 WL 945605,

11

at *2.

As illustrated above, the requested depositions are relevant to this case. As such, the burden shifts to Plaintiff "to show, with specificity, why the requested discovery is not proportional to the needs of the case." *Id.* (citing *Johnson*, 2019 WL 5089086, at *2). The proportionality analysis requires consideration of six factors: (1) "the importance of the issues at stake in the action," (2) "the amount in controversy," (3) "the parties' relative access to relevant information," (4) "the parties' resources," (5) "the importance of the discovery in resolving the issues," and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Plaintiff cannot overcome her burden on this issue because at least five factors undoubtedly weigh in favor of the City.

### *The Importance of the Issues at Stake in the Action and the Amount in Controversy.*

The additional depositions are directly relevant to the City's liability and defenses, including shedding light on why Mr. Nichols did not stop, the reason he fled, and his cause of death.

Likewise, Plaintiff seeks an immense amount of compensatory and punitive damages in this action. Thus, the amount in controversy, on its own, weighs heavily in favor of permitting discovery.

Further, Plaintiff's demand is enough to possibly bankrupt the City of Memphis—which Plaintiff's counsel stated they intend to do. In light of Plaintiff's significant demand for damages, and the relevance of many of the requested depositions have to the City's liability, this discovery is important to the issues at stake in the action.

### *The Parties' Relative Access to Relevant Information and the Parties' Resources.* The

12

City has attempted to obtain much of the information sought herein through written discovery, but Plaintiff objected to producing the requested information, particularly as to the **Twenty-Three Individuals**. Because the information is relevant to this case, the City should be permitted to seek the information via other discovery mechanisms, such as depositions.

Moreover, the resource of Plaintiff that would be affected by these depositions is her attorney's time needed to prepare for and attend the depositions. However, as stated previously, use of this resource could be significantly reduced if Plaintiff were to simply respond to the written discovery already propounded to her. In other words, the City could likely narrow its list of depositions needed if Plaintiff would respond (at a minimum, with a privilege log) to the City's discovery, particularly related to the Twenty-Three Individuals.

***The Importance of the Discovery in Resolving the Issues.*** Here, the issue on which the City seeks discovery is information and testimony Plaintiff may seek to use to support her *Monell* claims against the City and information the City Defendants may use to defend against the Plaintiff's *Monell* claims.

***Whether the Burden or Expense of the Proposed Discovery Outweighs Its Likely Benefit.*** To be sure, the City recognizes that depositions cost time and expense for all parties involved, but in light of Plaintiff's public statements requesting damages of $550 million and the enormous public interest in the case, the additional burden and expense of additional depositions is minimal.

V.  **CONCLUSION**

For these reasons, the City seeks permission from the Court to take additional to include the individuals identified herein.

Dated: November 17, 2025.

13

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**

*s/ Bruce McMullen*
Bruce McMullen (#18126)
Jennie Vee Silk (#35319)
Kelsey W. McKinney (#40434)
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone: (901) 526-2000
bmcmullen@bakerdonelson.com
jsilk@bakerdonelson.com
kmckinney@bakerdonelson.com

*Attorneys for Defendant City of Memphis,
Chief Cerelyn Davis in her Individual
Capacity, and Dewayne Smith as Agent of
the City of Memphis*

## CERTIFICATE OF CONSULTATION

I, Bruce McMullen, certify that on September 24, 2025, Jennie Silk, counsel for the City of Memphis, conferred with counsel for all parties via email regarding the relief sought in this Motion. In response, Joshua Levin, counsel for Plaintiff, responded that Plaintiff would not object to the additional depositions if the City would agree to allow Plaintiff to take an additional 32 depositions, which would bring Plaintiff's total number of depositions to 50 depositions. The City reminded Plaintiff that the Court had already ruled on her request for additional depositions, limiting her total depositions to thirty, and the City rejected Plaintiff's counterproposal.

On November 12, 2025, Ms. Silk again emailed the parties notifying them of forthcoming subpoenas for ten witnesses' depositions. That same day, Mr. Levin, stated that Plaintiff would not agree to the additional depositions. No other party responded to the request for consultation.

<i>s/ Bruce McMullen</i><br>Bruce McMullen

4922-0021-0796