**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

RowVaughn Wells,

      Plaintiff,

v.

City of Memphis *et al.*,

      Defendants.

Case No. 2:23-cv-02224-SHL-ATC

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
CITY OF MEMPHIS MOTION TO COMPEL**

Plaintiff, through her counsel Romanucci & Blandin LLC ("R&B"), which is the target of

a motion to compel filed by Defendant City of Memphis (*Wells* ECF 567), submits this response

in opposition to that motion.

**INTRODUCTION**

The City of Memphis moves to compel Plaintiff's counsel in this case to sign

authorizations releasing their law firm's data (assuming such data exists) from Read.AI.  The

motion rests on a chain of inferences, each weak on its own, and collectively unsupported by any

credible indication of wrongdoing.

The undisputed, sworn facts tell a single straightforward story. Mr. Mendelson, Plaintiff's

local counsel, inadvertently installed Read.AI on his computer in August 2025 after clicking a

marketing or similar invitation email, a date and time confirmed by an independent computer

expert whose affidavit the City's motion conspicuously ignores. That installation occurred four

months *after* the April 2025 email in which Mr. Weil used the word "recorded," which is the

City's central piece of evidence for its motion—a logical air gap that the City nowhere attempts

to explain. Mr. Weil, moreover, explained that his use of the term "recorded" referred Plaintiff

1

counsel's notes taken of the previous call, and indeed, "recorded" is a demonstrably common term for note-taking in the legal profession. Yet on the strength of that term alone the City accuses him of lying to the Court, under oath.

The City's motion bears the hallmarks of a bad-faith "investigation" that is not intended to find anything, but rather is designed to create an environment in which there is a presumption that Plaintiff counsel's word is not to be trusted and should be treated with doubt instead. That is part and parcel of the City's longstanding strategy to cast doubt on the credibility and integrity of Plaintiff's counsel and distract from the merits of this case. The Court should reject it.

## BACKGROUND

The City's motion to compel relates to two Section 1983 cases filed against it: the present *Wells* case, and *White v. City of Memphis*, No. 2:25-cv-2800-SHL (W.D. Tenn.), which has been consolidated with yet a third case against the City, called *Young v. City of Memphis*, No. 2:25-cv-2799-SHL (W.D. Tenn.). R&B, which has a single office in Chicago and which employs attorneys who specialize in Section 1983 litigation, represents the *Wells* plaintiff and the *White* plaintiff. The Mendelson Law Firm and David Mendelson, which is based in Memphis, also represents the plaintiffs in *Wells* and in *White*, in the capacity of local counsel.

On January 12, 2026, there was a videoconference court hearing in the *Young/White* matter that was held via Microsoft Teams. After the hearing, Mr. Mendelson filed a notice alerting the Court he had learned that a program on his computer called Read.AI had recorded the hearing without his knowledge. *Young/White* ECF 69. Mr. Mendelson explained he had learned about the recording when defense counsel alerted him that the Read.AI program had sent an automated email to all participants containing a "meeting report" for the hearing. *Id.*

2

The City responded the same day, claiming that Mr. Mendelson's recording was not inadvertent.  Rather, said the City, it "confirm[ed]" the City's suspicion that both R&B and the Mendelson Law Firm had long been using an AI tool to transcribe Rule 37 conferences and depositions.  *Young/White* ECF 71.  For evidence, the City pointed primarily to two[1] acts by R&B counsel in the *Wells* litigation: first, in an email on April 7, 2025, Mr. Weil had used the term "recorded" when recounting plaintiff's record of positions the City's counsel had taken during a previous Rule 37 conference,[2] *see id.* at 3, and second, shortly after another Rule 37

---

[1] Though it is not the focus of the present motion, in *Young/White* ECF 71 the City also pointed to Mr. Mendelson.  First it claimed he began attending Rule 37 conferences, depositions, and hearings only after the City raised the illegality of one-party consent recordings under Illinois law in October 2025, the implication being that R&B and Mendelson Law were working together to exploit a difference between Tennessee and Illinois law.  *See Young/White* ECF 71 at 4.  But the City raised the issue of Illinois law in April 2025 when it challenged Mr. Weil's use of the term "recorded."  *Id*.  If Plaintiff's counsel were doing what the City says, that would be the time for Mr. Mendelson to start using AI to record the calls.  The premise of the City's claim is also wrong. Mr. Mendelson has regularly attended videoconference hearings in *Wells* since 2023, *see Wells* ECF 108, 178, 227, 252, 334, 387, 442 (minute entries reflecting Mr. Mendelson's attendance at videoconference hearings from 2023 through July 2025).  And Mr. Mendelson's attendance at depositions has been regular throughout the case.

Second, the City charged that in December 2025 Mr. Mendelson also tried to surreptitiously record a deposition being taken by Plaintiff's counsel.  *Young/White* ECF 71. The Read.AI running on Mr. Mendelson's computer does appear to have begun recording the deposition, *see Young/White* ECF 76 ¶ 11, but that deposition was already being recorded by stenographer and video.  Recording by Mr. Mendelson would serve no purpose. That fact, if anything, suggests the Read.AI program on Mr. Mendelson's computer was indeed operating without his knowledge.

[2] For context, the following is the portion of Mr. Weil's April 2025 email in which he used the term "recorded":

> On 3/31 Bruce responded, "We stated that if a complaint is not deemed meritorious, it may not appear in the officer's personnel file, but this is not an absolute rule." (emphasis original). *We recorded you saying essentially the same thing on our 4/4 call*, an[d] in my 4/5 email I said that you were uncertain whether complaints that get off the ground are connected with officer IBM numbers. Now you say I'm mischaracterizing something —but what is it? Perhaps we mixed up officer personnel files and IBM numbers? If we did get

conference, Mr. Levin had sent an email to the City recounting the conference that provided a summary of the call which was far more thorough than the City's own notes. *Id.*

In response to the City's filing, the Court ordered counsel for the plaintiffs in *White* (R&B, Mr. Mendelson, and the Miller law firm) to file affidavits about whether they had ever recorded hearings or conferences, depositions, etc. without the knowledge of defense counsel, in either *White* or *Wells*. *Young/White* ECF 72. Mr. Weil and Mr. Levin, the two R&B lawyers on *White*, submitted affidavits averring that they had not made any such recordings (nor had anyone on their behalf), with the exception of Mr. Mendelson's inadvertent recording. *Young/White* ECF 77 (Weil); ECF 78 (Levin).

Responding to the City's charge that the phrase "[w]e recorded you saying" was a slip revealing that Plaintiff's counsel were making audio recordings the Rule 37 conferences, Mr. Weil explained that in February 2025 he had proposed that the parties record their Rule 37 videoconferences to resolve accusations that the conferences were acrimonious, and that after he made that proposal, the City's lawyers had repeatedly asked Plaintiff's counsel whether they were recording subsequent conferences. *Young/White* ECF 77 ¶¶ 5-6. Mr. Weil averred he was aware of nobody making recordings of any such conferences, *id.* ¶¶ 7-11, including the April 2025 conference that was the focus of the City's motion. *Id.* Regarding the phrase "recorded," Mr. Weil averred he was referring to the taking of notes. *Id.* ¶ 12. Mr. Weil had explained the same thing to the City when it originally made this accusation. *See Young/White* ECF 71-3 at 2

---

something wrong, I would like to understand how what you wrote yesterday comports with Bruce's 3/31 email.

*Young/White* ECF 71-3 at 4 (emphasis added).

("Bruce I was referring to our taking notes on what was said during the call."). Mr. Levin likewise averred that he had made no recordings. *Young/White* ECF 78 ¶¶ 4-9.

For his part, Mr. Mendelson submitted an affidavit explaining the presence of Read.AI on his computer without his knowledge, as well as the Read.AI activities he was able to identify after receiving technical assistance from an IT firm. *Young/White* ECF 76 ¶¶ 3-9. Mr. Mendelson averred that his computer records indicated that he had provided login information to Read.AI in August 2025, and that the AI program appeared to have integrated itself into his operating system thereafter. *Id.* ¶ 10. At no point, Mr. Mendelson averred, had he knowingly installed Read.AI, nor had he knowingly authorized it to access his other computer programs, including his videoconference programs. *Id.*

Mr. Mendelson went a step further. His firm retained Mr. Mike Kennene of GTS Technologies to examine his computer and determine how Read.AI had ended up on it. *Id.* ¶¶ 7, 9-11. Mr. Kennene submitted an affidavit to the Court as well. *Young/White* ECF 76-2. Mr. Kennene averred that Read.AI appears to be a Software-as-a-Service, which does not require conventional software installation on a computer, and that the probable scenario for Read.AI ending up on Mr. Mendelson's computer was a response to an email invitation (as opposed to conventional installation of software). *Id.* ¶ 9. Mr. Kennene reported communicating with Read.AI technical staff, who confirmed the program had been installed on Mr. Mendelson's computer on August 19, 2025. *Id.* ¶ 10. The probable scenario suggested by the two affidavits is that Mr. Mendelson clicked on a Read.AI marketing email on August 19, which resulted in the program being installed on Mr. Mendelson's computer without his knowledge or understanding.

The Court has not taken further action on any of these matters since *White* Plaintiff's counsel and Mr. Kennene submitted their affidavits. As the City's motion to compel reveals,

5

however, the City has been hard at work.  First it attempted to subpoena Read.AI directly.  On

January 26, after that had failed, counsel for the City sent Read.AI authorizations to Mr. Levin,

Mr. Weil, and Mr. Mendelson, demanding they sign them. That correspondence, excerpted

below, is set out in an email chain attached hereto as **Ex. 1**.

Mr. Mendelson responded on January 26 asking for some more time to consider.[3]  On

January 27 Mr. Weil responded for himself and Mr. Levin:

> Jennie,
>
> Josh and I are not going to sign these releases.  We have provided sworn affidavits on this subject to the Court.  If our word is not good enough for Judge Lipman she can tell us.  In the meantime your subpoena is entirely out of bounds.
>
> Steve

Ms. Silk responded on January 29.  In so many words, she accused Mr. Weil of lying to the Court

in his affidavit, telling Mr. Weil, "we do not believe you."[4]  Mr. Weil responded on January 30.

And now the City has filed the present motion to compel.

---

[3]  Mr. Mendelson later declined to sign the authorization.

[4]  Plaintiff will leave it for the Court to read the rest of Ms. Silk's accusation, which is set out in her January 29 email.  Plaintiff comments here on one aspect of the email.  Ms. Silk states,

> Secondly, it was only after Bruce notified you that recording us without our permission would violate Illinois law, that you recanted your statement.

This sentence is written to imply Mr. Weil failed to address the use of "recorded" until Mr. McMullen pointed out that a non-consent audio recording would be illegal.  But there was only one email from the City's counsel on the topic at all.  And Mr. Weil answered that email simply by saying that by "recorded" he was referring to the taking of notes during the call, as discussed above.  The April 2025 email exchange is set out in *Young/White* ECF 71-3 at 2.

6

**ARGUMENT**

Mr. Mendelson has filed a response to the City's motion setting out why it should fail. *Wells* ECF 584. Plaintiff's counsel R&B agrees with Mr. Mendelson's reasoning and incorporates it here by reference. There is more, too. The tactic of seeking discovery from opposing counsel "lowers the standards of the profession," *Found. to Support Animal Prot. v. Vital Farms, Inc.*, No. 2:22-mc-23, 2023 WL 3446200, at \*8 (E.D. Va. Apr. 3, 2023) (bracket omitted), "demeans the profession," *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1330 (8th Cir. 1986), and presents an "opportunity for harassment." *Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*, 276 F.R.D. 376, 381 (D.D.C. 2011). In contrast to the normally liberal rules of discovery, Courts disfavor discovery on attorneys themselves. *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003). And they should. The reasons to seek such discovery should be compelling.

The City's motion to compel offers nothing of the sort. The City claims that Mr. Weil's use of the term "recorded" must mean that he is lying when he says that he was referring to notetaking. But it is common in the legal profession to use "recorded" to refer to note-taking, particularly notes of meetings and conversations,[5] and as at least one court has noted, litigants

---

[5] A search of Westlaw returns scores of examples. Here are a handful. (Emphases added in all.) *First Horizon National Corp. v. Houston Casualty Co.*, 2017 WL 3252238, at \*2 (W.D. Tenn., March 6, 2017) ("First Horizon only disclosed two pages of notes from Desiree Franklin [], its internal legal counsel, **recorded** during a May 16, 2013 meeting . . . ."); *Clark v. Stone*, 998 F.3d 287, 293 (6th Cir., 2021) ("Stone **recorded** in her notes that having conducted interviews and reviewed the evidence, she believed there was a substantial risk of abuse . . . ."); *Jerauld ex rel. Robinson v. Carl*, 405 Fed. Appx. 970, 973 (6th Cir., 2010) ("Kroger **recorded** in his notes that Jerauld was able to smile and laugh and that he exhibited no lability . . . ."); *U.S. v. Rajwani*, 476 F.3d 243, 247 (5th Cir. 2007) ("The most direct evidence of Rajwani's knowledge of and participation in the scheme were the handwritten notes . . . in her purse **recording** the names and addresses of two victims."); *In re: Urethane Antitrust Litigation,* No. 04-md-1616, 2011 WL 13074299, at \*1 (D. Kan. Feb. 14, 2011) ("And the parties agree that the opinions and mental impressions of plaintiffs' counsel **recorded** in notes and memoranda are not subject to

7

should not assume "recorded" refers to audio recordings instead.  *See Barnett v. Kernan*, No. 17-cv-209, 2017 WL 3721691, at *8 (S.D. Cal., Aug. 29, 2017) (recounting court's admonishment to a litigant who had claimed a detective told them there was an *audio* recording of an interview, "The trial court advised Petitioner to recheck his data **because the word 'recorded' could refer to notes and not audio recordings**.").  The City has shown no such caution here.

The City appears to have abandoned its suspicion of Mr. Levin for taking better notes of a Rule 37 call than the City's lawyers did.  That leaves Mr. Mendelson's candid

---

discovery . . . by defendants."); *U.S. ex rel. Fry v. Health Alliance of Greater Cincinnati*, No. 1:03-cv-167, 2009 WL 2004350 at ** 1-2 (S.D. Ohio, July 7, 2009) ("Dr. Hattemer kept a notebook in which he **recorded** notes from these meetings. . . .  Defendants allege that the privileged portions of the notes are **recordings** of the advice of lawyers to THA . . . ."); *United States v. Mohamed*, No. 18-cr-603, 2023 WL 2033806, at *1 (E.D.N.Y., Feb. 16, 2023) ("Unfortunately, none of the participants at the meetings . . . can recall whether Mr. Khaire made the statements **recorded** in the notes."); *In re Acceptance Ins. Cos., Inc. Sec. Litig.*, 352 F. Supp. 2d 940, 951 (D. Neb., 2004) ("I conclude that a portion of Wilkins's notes **recording** what Mace purportedly said at the May 1997 meeting is not admissible because it is hearsay."); *Allah v. Yildiz*, No. 22-cv-1854, 2024 WL 3163061, at *2 (S.D.N.Y. June 25, 2024) ("Mahmud **recorded** his contemporaneous notes from that meeting in a 'Psychiatric Progress Note.'"); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 502 (D. Del. 2005) (noting that a scrivener was "present at these meetings and discussions, and while he was not asked to be a stenographer for the meeting, he contemporaneously **recorded** what transpired"); *United States v. Falcon*, No. 21-cr-0577, 2025 WL 51132, at *6 (E.D.N.Y. Jan. 8, 2025) ("[T]he Court would not characterize the contents of relevant document as 'notes,' as there is no indication that they were **recorded** contemporaneously with the call."); *Lemus v. D.C. Int'l Charter Sch.*, No. 20-CV-3839, 2023 WL 2653416, at *6 (D.D.C. Mar. 27, 2023) ("The Team's agreement on both points was **recorded** in the MDR meeting notes."); *Allen v. Wexford Health Sources, Inc.*, No. 23-cv-3775, 2024 WL 5233073, at *7 (S.D. Ill. Dec. 27, 2024) ("By contrast, the December 1 notes are **recorded** on a plain "progress notes" form that calls for the author to provide an open-ended narrative of the symptoms and plan."); *Jones v. City of Los Angeles*, No. 2:23-CV-04571, 2025 WL 2446560, at *4 (C.D. Cal. July 28, 2025) ("As **recorded** in Hicks' own notes from the meeting, Guillory . . . minimized Plaintiff's role in the crimes . . . ."); *Brown v. Fordyce Concrete Co., Inc.*, No. 22-2084, 2023 WL 8879940, at *3 (D. Kan. Dec. 22, 2023) ("Richardson also **recorded** in her notes that Plaintiff became agitated in this meeting and raised his voice.").

acknowledgement in his affidavit that he unknowingly installed Read.AI on his computer. Here the City has a problem. Mr. Weil sent the "recorded" email on which the City focuses in April 2025. But the Read.AI program was not installed on Mr. Mendelson's computer until August 2025. The logical connection between the two events is nonexistent—and the City offers none. Instead, the City tries to deal with this fact by saying that Mr. Mendelson's affidavit reflects that he has "uncertainty regarding how and when" Read.AI came to be installed on his computer, *Wells* ECF 567 at 3. But there is no uncertainty on the timing question. Mr. Mendelson hired a computer expert, Mr. Kennene, to examine his computer, and that expert swore out an affidavit in which he reported his finding that the Read.AI program came to be installed precisely on August 19, 2025, at 2:45 p.m. *Young/White* ECF 76-2 ¶ 10. That the City's motion ignores the existence of Mr. Kennene's affidavit should be read as an admission that it has no answer to it— and no logical way to explain how Mr. Weil's "recorded" email in April 2025 would connect with the installation of Read.AI on Mr. Mendelson's computer four months later. As best Plaintiff's counsel can tell, the City's reasoning requires not only that Mr. Weil be lying in his affidavit, but that Mr. Kennene be lying in in his affidavit as well. But there is simply nothing to support this, at all.

The City's response to all this is that, if Mr. Weil and Mr. Levin have nothing to hide, why not just sign the forms? The answer is simple: it would be one thing if the City were embarked on a good-faith, well-founded investigation, albeit a misguided one. But it is not. The affidavits submitted in response to the Court's order point to an obvious, and innocent, explanation about how the Read.AI program came to be installed on Mr. Mendelson's computer—and they disprove the connection between that installation and Mr. Weil or Mr. Levin. The fact that the City has nevertheless filed this motion to compel points to another, far

9

less innocuous reason for continuing its "investigation" of this matter:  this is part of a project by the City to insinuate to the Court that the word of Plaintiff's counsel is not to be trusted and requires investigation instead, even though the City has no actual reason to think that such investigation will uncover any wrongdoing.

The City made that project clear enough in March 2025, regarding an entirely different matter: the production of exhibits from the *United States v. Bean* trial in the *Wells* case.  *Bean* was the federal criminal trial of three Memphis police officers who had beaten Tyre Nichols, which is the subject of the *Wells* litigation.  After the *Bean* trial concluded, Plaintiff's counsel contacted the clerk's office to request a copy of the *Bean* transcript and trial exhibits. The clerk's office sent it to Plaintiff's counsel.  In turn, on March 10, 2025, Plaintiff produced the transcript to the defendants in the case, including counsel for the City. *See* ECF 349 ¶ 1.

The clerk's production to Plaintiff's counsel contained an error:  some of the *Bean* trial exhibits had been sealed, but the clerk's office included them in its transmission of the *Bean* materials to Plaintiff's counsel anyway.  That sort of mistake—the inadvertent failure to redact or otherwise withhold documents—is a common one in litigation involving electronic documents, one so frequent that claw-back provisions are now a standard feature of most protective orders. It is a problem familiar to any modern litigator, and in virtually all cases the cause of such disclosures is simple inadvertence.

At 11:19 a.m. on March 21, 2025, counsel for the City, Bruce McMullen, wrote to *Wells* Plaintiff's counsel about the sealed exhibits from the *Bean* trial.  The correspondence is in an email chain attached as **Ex. 2**.  The sensible thing would have been to alert Plaintiff's counsel that sealed exhibits had been included so that counsel could address the problem.  This is the norm in litigation, and opposing counsel typically express gratitude when they are alerted to such

an inadvertent disclosure.  A less trusting attorney might also ask where the transcripts and sealed

exhibits had been obtained.

Here is what Mr. McMullen wrote instead:

Counsel,

We intend to file a motion at Noon today asking the Court for leave to take
discovery regarding the circumstances surrounding Plaintiff having obtained
sealed documents from the federal criminal trial of *United States v. Bean, et
al*. For purposes of consultation, please let us know if you oppose this motion
by Noon.

Thanks,
Bruce A. McMullen

Mr. Levin was able to respond by 11:55 a.m., within the 41-minute window that Mr.

McMullen had provided. Mr. Levin wrote:

Bruce,

Following up on my voicemail just now. After the criminal trial was over, we
requested a copy of the transcript and exhibits from the Court. The Court sent
these exhibits to us. Given that the Court gave them to us as a member of the
public, we have assumed they are publicly available. If you believe that is
incorrect, we are happy to seek direction from the Court.

I am gathering the receipt we received from the Court after we ordered the
transcript and exhibits, and will send that to you shortly. We're available to
discuss further if you have questions.

Thanks,

Josh

The explanation provided by Mr. Levin was entirely plausible.  After all, the most likely source

of the *Bean* trial transcript and exhibits would have been the clerk's office, and an inadvertent

production of a sealed document by the clerk's office, while certainly a serious matter, would

hardly have been extraordinary.  But even if the City's counsel did not trust what Mr. Levin said,

Mr. Levin had provided a ready means to verify his explanation: simply call up the clerk's office,

11

ask whether the *Bean* transcript and exhibits had been sent to Plaintiff's counsel, and ask whether

the clerk's office had included the sealed exhibits in the transmission.

That is not what the City did.  Instead, at 12:12 p.m., Mr. McMullen wrote back:

Josh,

I appreciate your email, but there are some concerns with it.

You are proposing to produce documents you should have already produced to us pursuant to the City's RFP No. 127.  Obviously, you purposefully withheld these documents and only inadvertently produced responsive documents.  Now, you are offering to produce additional documents responsive to that request.  You can understand how there is break down in trust between us at this point.  This is yet another reason why we are seeking leave to take discovery related to this issue.  We will note Plaintiff's opposition to the motion.

Bruce A. McMullen

Mr. McMullen's 12:12 email is hard to follow, as his focus shifts from the sealed exhibits to RFP

127, which calls for production of communications between Plaintiff's counsel and the Court.

There were a handful of emails between a court clerk and one of plaintiff counsel's paralegals

about transmitting and paying for the transcripts, and as Mr. Levin's 11:55 email indicated

Plaintiff's counsel were quickly gathering and producing those communications. But how,

exactly, did any of this amount to the bad faith that Mr. McMullen was insinuating? Why would

Plaintiff's counsel "purposely with[o]ld" a handful of clerical emails about paying for the trial

transcript? What had been produced "inadvertently"? The *Bean* transcript? The sealed exhibits?

Why would Plaintiff *not* produce a transcript of trial testimony about the beating, since such

production would be called for under Rule 26(a)(1)?

None of it was clear, but the City did not wait around for more.  At 12:15 p.m., three

minutes after Mr. McMullen's email, *see* **Ex. 3**, the City filed ECF 349, asking the Court for

"permission to take the deposition of Plaintiff's counsel and the person or person(s) whom

communicated with and transmitted the documents to Plaintiff's counsel," ECF 349 at 2, as well as serving interrogatories on Plaintiff's counsel "to require Plaintiff to provide a verified explanation of the circumstances in which Plaintiff came into possession of these sealed documents." *Id.* at 3. There is one thing the City's motion did not mention: ***Mr. Levin's explanation that Plaintiff's counsel had received the sealed exhibits from the clerk's office.***

The City's motion, with its revelation that Plaintiff's counsel was in possession of embargoed documents, but its omission of Mr. Levin's explanation of where the documents came from, gave the air of uncovering serious misconduct by Plaintiff's counsel. It also intimated that this was misconduct Plaintiff's counsel was trying to hide. The motion understandably put the Court on an emergency footing. Within hours the Court issued ECF 352, a sealed order instructing Plaintiff's counsel to submit affidavits focused on whether Plaintiff's counsel had obtained the documents from a third party, and if so who, and also to assure the Court, affirmatively, that Plaintiff's counsel did not possess any other sealed documents. *See* ECF 352. Plaintiff's counsel put aside other work, including preparing for a deposition in this case (and a large part of a family vacation), in order to comply with the Court's order, *see* ECF 355. The list of affidavit items ordered by the Court did not provide an occasion to point out the troubling omission in the City's motion, and Plaintiff's counsel, focused as they were on litigating the case, chose to move on.

Plaintiff submits that the City's conduct on March 21, 2025 should inform the Court's assessment of the City's current motion to compel. Mr. McMullen's 11:19 a.m. email reflects a lack of collegiality in communicating with opposing counsel. His 12:12 p.m. response to Mr. Levin combines a lack of collegiality with poor judgment, given the ease with which he could have verified what Mr. Levin had told him by calling the clerk's office. But Mr. McMullen's

13

12:15 p.m. filing of ECF 349 is far worse. It reflects rank bad faith and an intent to mislead the Court—suggesting to the Court that Plaintiff's counsel had engaged in grave and surreptitious misconduct, while omitting Mr. Levin's readily verifiable explanation that the transmission of the sealed documents was the result of a common clerical error committed by the Court's own staff. What else could be the purpose behind omitting Mr. Levin's explanation from the City's motion? No experienced lawyer, and certainly not the City's seasoned and sophisticated outside counsel, could think they were doing anything other than misleading the Court.

The City's "investigation" regarding Read.AI bears all the hallmarks of the same, bad-faith program of casting doubt on the integrity of Plaintiff's counsel without good cause. The City has every reason to do this—as trial nears and Plaintiff's *Monell* evidence mounts, the City's lawyers understandably would hope that the Court develops a distrust for Plaintiff's counsel, which would pay out dividends to the City in ways large and small. But that does not mean that the undersigned must abet that lamentable strategy.

Mr. Levin and Mr. Weil have sworn under oath that they have not recorded any of the proceedings or calls in this case using AI or any other means. If the Court doubts that they are telling the truth, by all means they will sign waivers permitting the gathering of information from Read.AI. But the Court should be aware of what the City is doing with this motion to compel and why it is doing it. It is Plaintiff's hope that the Court puts an end to that conduct now.

**CONCLUSION**

Plaintiff opposes the City's motion and awaits the Court's direction.

Dated: March 3, 2026                           Respectfully submitted,

                                               */s/ Stephen H. Weil*

                                               */s/ Joshua M. Levin* [with consent]

14

David L. Mendelson
(Tenn. Bar No. 016812)
Benjamin Wachtel
(Tenn. Bar No. 037986)
MENDELSON LAW FIRM
799 Estate Place
Memphis, TN 38187
+1 (901) 763-2500 (ext. 103), Telephone
+1 (901) 763-2525, Facsimile
dm@mendelsonfirm.com
bw@mendelsonfirm.com

Benjamin Crump
(Tenn. Bar No. 038054)
Brooke Cluse* (Tex. Bar No. 24123034)
BEN CRUMP LAW, PLLC
717 D Street N.W., Suite 310
Washington, D.C. 20004
+1 (337) 501-8356 (Cluse), Telephone
court@bencrump.com
brooke@bencrump.com

Antonio M. Romanucci*
(Ill. Bar No. 6190290)
Sarah Raisch* (Ill. Bar No. 6305374)
Joshua M. Levin* (Ill. Bar No. 6320993)
Stephen H. Weil* (Ill. Bar No. 6291026)
Colton Johnson Taylor*
(Ill. Bar No. 6349356)
ROMANUCCI & BLANDIN, LLC
321 N. Clark St., Ste. 900
Chicago, IL 60654
P: (312) 458-1000
aromanucci@rblaw.net
sraisch@rblaw.net
jlevin@rblaw.net
sweil@rblaw.net
cjohnson@rblaw.net


Attorneys for Plaintiff

* Admission *pro hac vice*