**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

**ROWVAUGHN WELLS, individually and as Administratrix ad Litem of the Estate of TYRE DEANDRE NICHOLS, deceased,**

**Plaintiff,**

**v.** **No. 2:23-cv-02224-SHL-atc**

**THE CITY OF MEMPHIS, a municipality,** ***et al.*****,**

**Defendants.**

## ORDER ON PENDING DISCOVERY MOTIONS

Before the Court by Orders of Reference[1] are the following motions:

- Defendant City of Memphis's ("The City") Motion to Compel Plaintiff RowVaughn Wells to Produce Documents from Read AI ("Read AI Motion"), filed on February 17, 2026. (ECF No. 567.) On March 3, 2026, Wells filed a Response to the Motion, as did David Mendelson, one of Wells's attorneys. (ECF Nos. 583, 587.) With leave of Court, the City filed a Reply on March 16, 2026. (ECF No. 594.)
- The City's Motion to Compel Regarding Expert Witness Geoffrey P. Alpert ("Expert Motion"), filed on April 28, 2026. (ECF No. 630.) Wells filed a Response to the Motion on May 12, 2026. (ECF No. 639.)
- Wells's Motion to Claw Back Inadvertently Produced Privileged Document Pursuant to FRE 502(b) and FRCP 26(b)(5)(B) ("Clawback Motion"), filed on May 15, 2026. (ECF No. 640). The City filed a Response to the Motion on May 20, 2026. (ECF No. 644.)

[1] The motions discussed herein were referred to the undersigned for determination at ECF Nos. 576, 625, 632, and 645.

Also before the Court are certain emails provided by the United States for *in camera* review pursuant to the order granting its Motion to Intervene to Prevent Disclosure of Certain Communications ("Motion to Intervene"). (ECF Nos. 622, 675.)

For the reasons set forth below, the Read AI Motion is denied, the Expert Motion is granted in part and denied in part, and the Clawback Motion is granted. The Court addresses the *in camera* emails relating to the Motion to Intervene below.

## I. The Read AI Motion

In the Read AI Motion (ECF No. 567), the City seeks to compel responses to its Eleventh Set of Requests for Production to Plaintiff ("Eleventh Requests"), which asks counsel for Wells to produce information associated with any recordings of meetings between counsel for the parties and/or the Court, as well as other documents relating to counsel's use of Read AI in this case (ECF No. 567-1). Each request also asks counsel to execute a release authorization to Read AI "[t]o facilitate this Request." (*Id.*)

The City maintains that the impetus for the Requests arose in an unrelated case, *Young v. City of Memphis*, No. 2:25-cv-02799-SHL-atc (W.D. Tenn.). A number of the same attorneys participating in this case also appeared in *Young*. Following a status conference in *Young*, attorney David Mendelson filed a notice indicating that he had inadvertently recorded the conference. *See* No. 2:25-cv-02799-SHL-atc, ECF No. 72 (W.D. Tenn. Jan. 14, 2026). Mendelson "explained that he 'unknowingly and unintentionally recorded the January 12, 2026 status hearing that was held virtually via Microsoft Teams, using an artificial intelligence (AI) feature of Microsoft Teams known as Read AI.'" *Id.* at 2 (quoting No. 2:25-cv-02799-SHL-atc, ECF No. 69 (W.D. Tenn. Jan. 12, 2026)). The City responded that the notice "confirm[ed] what counsel for the City ha[d] long suspected": that attorneys from Romanucci & Blandin, LLC and

the Mendelson Law Firm had been using AI to record the interactions among counsel in both *Young* and this case. *Id.* (quoting No. 2:25-cv-02799-SHL-atc, ECF No. 71 (W.D. Tenn. Jan. 13, 2026)). The Court in *Young* found that the recording of the status conference violated Local Rule 83.2(a)(1), expressed "concerns about whether there have been other instances of such violations," and ordered each of the plaintiff's attorneys to file an affidavit identifying any such recording activity. *Id.* at 2–3.

Counsel complied. As relevant here, attorneys Stephen Weil and Joshua Levin of Romanucci & Blandin, LLC filed affidavits swearing unequivocally that they had not made any recordings of any judicial or non-judicial proceedings in *Young* or this case. No. 2:25-cv-02799-SHL-atc, ECF Nos. 77, 78 (W.D. Tenn. Jan. 21, 2026)). Mendelson filed an affidavit swearing that he did not intend to use any means to record any judicial or non-judicial proceeding in *Young* or this case and did not instruct anyone to do so. No. 2:25-cv-02799-SHL-atc, ECF No. 76 ¶ 3 (W.D. Tenn. Jan. 20, 2026)). He explained that he "inadvertently or unknowingly provided [his] Microsoft Office 365 account login information to Read.AI after being prompted to do so in an email in August 2025" but that he never intended to give Read AI access to his account. *Id.* ¶ 10. He swore that he was unaware of his role in allowing Read AI to collect information during the status conference and that Read AI's access to his account was terminated by January 14, 2026. *Id.* ¶¶ 11, 12.

Following these submissions, no further action relating to Read AI was requested by the parties or taken by the Court in *Young*.

Apparently dissatisfied with that explanation, the City served Read AI with a subpoena requesting information regarding its use by Romanucci & Blandin, LLC and the Mendelson Law Firm. (ECF. No. 567-2.) Read AI objected to the subpoena and refused to produce any

documents, suggesting that the City instead obtain the information from Wells's counsel. (ECF No. 567, at 3.) The City then asked Wells's counsel to execute authorizations for Read AI to release their information, but Wells's counsel declined to do so. (ECF No. 567-4.) The City then served its Eleventh Requests, formally seeking that information and release. (ECF No. 567-1.)

The City maintains that the information requested in the Eleventh Requests is necessary to help discern whether Wells's counsel has engaged in other instances of "improper recordings," as such may justify the imposition of civil contempt or sanctions. (ECF No. 567, at 6.) The parties agree that the obligation to produce the requested information is governed by the standard set out in *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986). "Discovery from an opposing counsel is 'limited to where the party seeking to take the deposition has shown that (1) no other means exists to obtain the information . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.'" *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 628 (6th Cir. 2002) (quoting *Shelton*, 805 F.2d at 1327).

Mendelson is correct that the City is unable to satisfy the first requirement, as "the City has already obtained sworn affidavits from all relevant counsel." (ECF No. 583, at 6.)[2] Mendelson, Weil, and Levin have already sworn to the extent of their use of and involvement with Read AI in *Young* and this case. For Weil and Levin, the extent is none. For Mendelson, the extent was his unintended and unknowing use of Read AI to record a limited number of interactions, most of which resulted in recordings that either were terminated immediately or are

[2] Because the lack of this essential element resolves this matter, the Court declines to take up the parties' other arguments.

now inaccessible. *See* No. 2:25-cv-02799-SHL-atc, ECF No. 76-1 (W.D. Tenn. Jan. 20, 2026)). Though Mendelson's actions in allowing Read AI to record (or attempt to record) those interactions was improper and regrettable, he remedied the situation when it was brought to his attention and has "undertaken to educate and inform [him]self as to Read.AI, and other similar programs to ensure that a similar oversight does not occur in the future." No. 2:25-cv-02799-SHL-atc, ECF No. 76 ¶ 13. The affidavits already submitted in *Young* thus appear to provide the City all the information it needs to determine whether to seek civil contempt or sanctions in that or this case.

The City resists this conclusion because, in short, it does not believe Wells's counsel's representations about the extent of their recording or use of Read AI. (*See, e.g.*, ECF No. 567-4, at 2–3.) As justification for its skepticism, the City contends that Weil "admitted that Plaintiff's counsel had recorded a previous meet and confer." (ECF No. 567, at 8.) The City refers to an email Weil sent as part of a meet-and-confer process in this case, in which he describes a position taken by the City and says "[w]e recorded you saying essentially the same thing on our 4/4 call." (ECF No. 541-2, at Page ID 8403.) As Weil has explained, however, he "was referring to written notes that we (Plaintiff's counsel) had taken on what was said during the Rule 37 conference." No. 2:25-cv-02799-SHL-atc, ECF No. 77 ¶ 12. The City also refers to other, more circumstantial suspicions it has documented regarding Plaintiff's counsel in this case and in *Young*. *See, e.g.*, No. 2:25-cv-02799-SHL-atc, ECF No. 71.

Without more, the Court is unwilling to reject the sworn testimony of Wells's counsel as to their limited and unintentional (or nonexistent) recording of interactions among counsel or with the Court. Though the City is concerned that Mendelson expresses uncertainty about when and how Read AI began to access his account, that concern is irrelevant in the face of his

unequivocal sworn statements that he did not intend to allow that access, was unaware of it, and terminated it promptly upon learning of it. In other words, even if Read AI had greater access to Mendelson's account than he is aware of, neither he nor anyone acting on his behalf has attempted to access or use that information. Further discovery is simply unnecessary, and the high standard set by *Shelton* is unmet.[3] Therefore, the Read AI motion is DENIED.

## II. The Expert Motion

In the Expert Motion, the City seeks to compel Wells to reproduce her expert witness, Geoffrey Alpert, Ph.D., for a reopened deposition; produce all communications with Alpert; produce all documents regarding Alpert's compensation; "identify and produce any person that contributed to drafts of Dr. Alpert's report to sit for deposition(s) regarding their use of the AI to draft portions of Dr. Alpert's report"; and produce all drafts of Alpert's report. (ECF No. 630, at 1–2.) Wells counters that each of these requests are unfounded and that no further discovery relating to Alpert is required under the Federal Rules. (ECF No. 639, at 1–2.)

These issues are governed by Rules 26(a)(2)(B), 26(b)(4)(B), and 26(b)(4) concerning expert disclosure. Rule 26(a)(2)(B) provides:

> Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony.
>
> Such a report must contain the following:
>
> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;

[3] The undersigned notes it appears Mendelson has incurred not-insignificant expense in addressing the Read AI issues. For example, he retained a computer expert to investigate the issues (ECF No. 583-1, at 7–9) and legal counsel to file his Response and other submissions (*see* ECF No. 583, at 12).

> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Rule 26(a)(2)(B). Rule 26(b)(4)(B) provides: "Rules 26(b)(3)(A) and (B) [concerning trial preparation materials] protect drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded." Rule 26(b)(4)(C) provides:

> Rules 26(b)(3)(A) and (B) protect communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(B), regardless of the form of the communications, except to the extent that the communications:
>
> (i) relate to compensation for the expert's study or testimony;
>
> (ii) identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or
>
> (iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.

In summary, the Expert Motion seeks additional discovery in the following areas: (1) Alpert's use of AI, (2) Alpert's compensation, (3) drafts of Alpert's expert report, and (4) communications between Alpert and counsel for Wells.

A. <u>Alpert's Use of AI</u>

During his deposition, Alpert was questioned about an incorrect citation in his expert report that was apparently the result of an AI hallucination that occurred when he conducted a Google search, resulting in him misattributing and misciting an article that he relied on for his opinions. (ECF No. 630, at 3–4; ECF No. 639, at 8–9.) The City seeks to reopen his deposition to question him further, insisting that he "refused to directly confirm or deny that he used AI to draft any portion of his report" and gave "evasive response[s]." (ECF No. 630, at 11–12.) A review of the transcript tells a different story:

Q. I'm trying to set some parameters on your methodology so we can continue forward. For your methodology, you cite to this Blokland article, and we've already been through this. You did not bring a copy of that with you.

A. Correct.

Q. Okay. I'm going to represent to you that we could not find that article. We actually tried to find it and we couldn't find it, and the citation points to a different article about safety measures used at Bayer.

A. Now you're challenging me. I will find that article.

Q. Well, the citation that was given points to a different article. It's similar, but it's not the article and not the author, so I'm just wondering, you know, if you used AI to generate any of these citations. Did there—did drafts of this report go back and forth between you and plaintiff's counsel?

A. Did drafts?

Q. Mm-hmm.

A. Yeah.

Q. Okay. Did they make edits to the report?

A. We discussed things.

Q. Did they spend drafts back to you with edits?

A. I think—I think we discussed things.

Q. You don't think that they edited the draft at all.

A. There may have been minor things, but they were more typos. They weren't substantive, but now you've got me going on this one. I will resolve that, and I will get copies.

Q. And we also received—

A. You think I had a hallucination on the—

Q. It appears to be. It appears to be a hallucination. That's what—that's what happens with AI.

A. Trust me, I agree.

MR. LEVIN: Objection, form.

Q. It brings up things that are close but not quite that, what you want it to be.

A. I grade term papers all the time.

Q. So you're familiar. All right. So that's obviously, you know, an issue, one of the reasons why we asked for you to bring the articles.

MR. LEVIN: Objection, form.

Q. But, we didn't bring them and so we're left with what we're left this, which is that what you cite to in the report is incorrect.

MR. LEVIN: Objection to form.

(ECF No. 639-1, at 149:21–151:24.)[4] This exchange demonstrates that Alpert did not refuse to say whether he used AI—indeed, he was not directly asked that question. The City has identified no question that Alpert did not answer. In addition, Alpert has since provided an addendum to his expert report explaining that he was unaware that Google searches can employ AI that can hallucinate search results. (ECF No. 630-4.) He further affirms that he "did not employ AI to generate references for 'incident pattern analysis'" and that he did not otherwise "use AI, as asked and answered in my deposition." (*Id.*)[5] The City has not demonstrated a need for any additional information regarding the use of AI in preparing Alpert's report, and the Motion is DENIED on this issue.[6]

---

[4] For ease of reference all citations herein to Alpert's deposition transcript will be to the version filed at ECF No. 639-1.

[5] The City objects to the submission of the addendum, arguing that it should be excluded because Alpert testified that his original "report contains the entire universe of his opinions as it relates to his case." (ECF No. 630, at 4 n.4.) That request appears to be beyond the scope of the instant motion to compel.

[6] The City also raises the fact that Alpert admitted he Googled "John Gaston Hospital." (ECF No. 630, at 4 (citing ECF No. 639-1, at 216:8–23).) The City maintains that this reference is another example of a source Alpert could not identify. (*Id.*) To the contrary, however, Alpert testified that he was aware of the term and Googled it to obtain publicly available information.

B. Alpert's Compensation

The City has failed to show entitlement to additional discovery on Alpert's compensation, as the information provided before, during, and after his deposition is sufficient. The City maintains that Alpert could not recall details regarding his compensation during his deposition and testified that he deleted most of the documentation regarding his compensation. (ECF No. 630, at 12.) Wells had, however, produced Alpert's fee schedule prior to his deposition and has since produced "all remaining non-privileged communications between counsel and Dr. Alpert in her possession. These consisted of communications regarding Dr. Alpert's initial retention in the summer of 2023, the applicable fee schedule, the retainer payment, and all billing records for work performed on this matter." (ECF No. 639, at 4.)[7] Alpert was questioned and testified about his retainer, fees, and rates, and he provided an estimate of the fees he had been paid to date in the range of $10,000 and $20,000. (ECF No. 639-1, at 105:18–111:16.) Though he could not recall all the information asked of him at the deposition, that information has been supplemented, and the City has identified no information it still requires. No further discovery regarding Alpert's compensation is warranted, and the Motion is therefore DENIED on this issue.

---

(ECF No. 639-1, at 216:8–23.) Counsel for the City responded, "[t]hat's all I needed to know." (*Id.*) The City thus forewent any opportunity to explore that topic further and has not shown that this reference leads to a conclusion that Alpert's report was generated by AI.

[7] The City identifies a produced text message between Alpert and counsel for Wells pertaining to the "logistics of [Alpert's] deposition and payment" that was allegedly cut off. (ECF No. 630, at 5.) Presumably, if this text message was cut off and the remainder relates to Alpert's compensation, it has since been produced with the omitted part included. If not, assuming it is not protected, it should be produced immediately.

C. Drafts of Alpert's Expert Report

The City argues that drafts of Alpert's report should be produced to the extent they show "facts or data that the party's attorney provided and that the expert considered in forming the opinions expressed [or] identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed." (ECF No. 630, at 6–7 (quoting Fed. R. Civ. P. 26(b)(4)(C).) On this issue, the parties primarily cite to *United States. v. Vista Hospice Care*, 319 F.R.D. 498 (N.D. Tex. 2016). (*Id.* at 7–9; ECF No. 630, at 5–6.) In *Vista*, the court considered whether draft expert reports were subject to discovery in the context of Rule 26(b)(4)(C) and concluded that they should be produced to the extent the drafts were written by counsel in the first instance or conveyed facts, data, and assumptions that were relied upon by the expert. *Id.* at 509–11. Importantly, *Vista* recognized that, in general, drafts of expert reports are protected from disclosure, but "facts, data or assumptions provided by an attorney to the expert should not be insulated from production simply because the vehicle of communication was a draft of the report or an attorney's revision to the expert's draft." *Id.* at 507 (quoting *CFTC v. Newell*, 301 F.R.D. 348, 353); *see also Newell*, 301 F.R.D. at 353–54 (collecting cases for the proposition that draft expert reports are not subject to production based on mere speculation or when there is little to suggest that non-protected drafts exist).

The problem for the City is that Alpert testified that, when drafts were exchanged, the edits from counsel for Wells were a matter of correcting "minor things, but they were more typos. They weren't substantive . . . ." (ECF No. 639-1, at 150:21–151:4.) Though Alpert testified that counsel "directed [him] very specifically to certain things" (*id.* at 117:21–24), Alpert did not testify that counsel conveyed facts, data, or assumptions through drafts of his report. Instead, he testified that communication about information such as which specific

incidents to focus on occurred "probably on the phone." (*Id.* at 118:3–19.) And Wells has affirmatively represented that she "has no drafts that identify attorney-provided facts, data, or assumptions." (ECF No. 639, at 4.) Because the City has come forward with nothing more than speculation, the Expert Motion is DENIED with respect to draft expert reports.[8]

D. Communications between Alpert and Wells

Finally, the City seeks to reopen Alpert's deposition because counsel for Wells improperly instructed him not to answer questions. (ECF No. 630, at 13–14.) The only such instance the City identifies is when counsel for the City asked Alpert how he was able to identify the individual officers in the bodycam footage:

> Q. So how do you know how to identify these officers, one from the other? How do you know, when you look at these officers who are all five black men, at night, all wearing the same thing, how are you able to determine one from the other?
>
> A. If my memory serves me correctly, I got a lot of this information from reports as well as the body cams.
>
> Q. So when you viewed the video, you didn't make this analysis. You're reporting from somebody else's analysis. Is that fair?
>
> A. Well, yeah, I mean a lot of the information comes from reports and from other documents.
>
> Q. And was it from the attorneys that told you this information?
>
> MR. LEVIN:· Objection to work product privilege. Don't answer the question.
>
> . . .
>
> Q. Do you stand by that statement?

[8] The City also seeks to depose Wells's legal team with respect to the draft reports and concedes that such a determination is governed by the *Shelton* test discussed above. (ECF No. 630, at 15–17.) Similar to the Read AI Motion analysis above, the City's request fails at the first step, as it already has the discovery it is entitled to with respect to draft expert reports.

A. Well, I must have gotten it from somewhere.

Q. But you don't know where.

A. That's correct.

Q. And you didn't get it from your own viewing of the video; is that correct?

A. It—it had to come from—from reports or something I read.

Q. You don't know.

A. I don't know.

(ECF No. 639-1, at 169:13–170:6.)

On this point, the City is correct, and the instruction was improper. This question falls squarely into a Rule 26(b)(4)(C) exception, as it relates to attorney-provided facts, data, or assumptions that Alpert relied on in forming his opinions. It appears that, notwithstanding the instruction, Alpert actually answered the question, but his answer may have been tempered by the instruction. Thus, the Expert Motion is GRANTED on this narrow issue. The City may reopen Alpert's deposition for the limited purpose of re-asking this question, without objection, and Alpert shall answer it. The re-opened deposition must take place by September 3, 2026.

## III. The Clawback Motion

In the Clawback Motion, Wells seeks the return of an inadvertently produced email, bearing Bates number Wells_010352, that she contends is protected by the work-product doctrine. (ECF No. 640.) Wells became aware of the inadvertent production after the City filed the email "as Exhibit 2 to ECF No. 636-2 on May 11, 2026. Plaintiff's legal team learned of this filing while traveling to a court hearing in Memphis the day at which the filing was discussed." (*Id.* at 2.) The City argues that Wells waived the work-product doctrine when she failed to

timely raise the issue and that the email itself is not subject to work-product protection. (ECF No. 644, at 6–12.)

A. <u>Work Product</u>

The work-product doctrine was first adopted in *Hickman v. Taylor*, where the Supreme Court explained that "[n]ot even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." 329 U.S. 495, 510 (1947). In describing the contours of the doctrine, the Court stated that

> it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.

*Id.* at 510–11.

The work-product doctrine has been codified in Rule 26(b)(3)(A). With certain exceptions, "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). At the same time, "[d]ocuments prepared in the ordinary course of business are not covered. Thus, a document will not be covered if it would have been prepared in substantially the same manner irrespective of the anticipated litigation." *Volkswagon AG v. Dorling Kindersley Pub., Inc.*, No. 05-cv-72654-DT, 2007 WL 188087, at *3 (E.D. Mich. Jan. 22, 2007) (citing *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006)). The Sixth Circuit applies the so-called "because of" test as the standard for determining whether documents were prepared in anticipation of litigation, that is, whether they were "prepared or obtained

*because of* the prospect of litigation." *Roxworthy*, 457 F.3d at 593 (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)).

Courts have generally found two types of work product: opinion and fact work product. *Bose v. Rhodes Coll.*, No. 16-cv-02308-JTF-tmp, 2017 WL 4479258, at *9 (W.D. Tenn. Oct. 6, 2017), *aff'd sub nom. Bose v. De La Salud Bea*, 2017 WL 11358732 (W.D. Tenn. Nov. 9, 2017)). Opinion work product, which applies to "an attorney's mental impressions, opinions, conclusions, judgments, or legal theories," is not discoverable absent a waiver. *Id.* (citations omitted). Fact work product is only discoverable "upon a showing of substantial need and inability to otherwise obtain [the evidence] without material hardship." *Id.* (quoting *Columbia/HCA*, 293 F.3d at 294) (alteration in original).

The email in question is clearly opinion work product. The email was exchanged between members of Wells's legal team in November 2023, discussing the strategic value of a document filed in the criminal case related to this matter. However blithe counsel's comment may have been, it is undisputable that they consisted of "an attorney's mental impressions, opinions, conclusions, judgments, or legal theories." Though the earlier email from the DOJ to Wells's counsel is not protected, comments about the DOJ correspondence among counsel concerning its potential value in the case are.

B. Waiver

The email is thus subject to work-product protection unless that protection has been waived. Federal Rule of Evidence 502(b) governs inadvertent disclosures, providing:

> When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if:
>
> (1) the disclosure is inadvertent;
>
> (2) the holder of the privilege or protection took reasonable steps to prevent

> disclosure; and
>
> (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Here, the parties do not dispute that the disclosure was inadvertent, but the City argues that Wells fails to show either the second or third factor. (ECF No. 644, at 7–12.)

With respect to the second factor, Wells provides the affidavit of one of her attorneys, Colton Johnson Taylor. (ECF No. 640-1.) The affidavit discusses that he "performed multiple rounds of review of the documents that Plaintiff's counsel identified as potentially responsive to RFP 128" but that, "[d]espite conducting a thorough privilege review, [he] inadvertently overlooked a portion of an email threat that was both privileged and nonresponsive, and therefore should not have been produced." (*Id.* ¶¶ 5, 6.) The City counters that the review could not have been thorough "because the production was narrow: only eighteen documents totaling 197 pages, with the challenged email appearing in a thirty-one page document." (ECF No. 644, at 7.) The affidavit establishes, however, that counsel took reasonable steps to prevent an inadvertent disclosure and that, nonetheless, a mistake occurred. Wells has satisfied the second factor.

With respect to the third factor—the promptness of Wells's counsel in demanding return of the document and filing the Clawback Motion—the parties largely agree on the overall timeline: (1) the email was produced on April 30, 2026; (2) the City included the email in a filing on May 11, 2026, and, shortly thereafter, Wells first learned of the inadvertent production; (3) counsel subsequently appeared at a hearing in this case later that day; (4) Wells demanded the return of the email on May 14, 2026; and (5) Wells filed the Clawback Motion on May 15, 2026. (ECF No. 640, at 4–5; ECF No. 644, at 3–5.) The City contends that this passage of time precludes relief under Rule 502(b), as twelve days passed between the email's inadvertent

production on April 30th and Wells's discovery of the mistake on May 11th, and then three more days passed before she demanded the return of the email on May 14th.

Both parties cite to *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 263 (D. Md. 2008), in support of their conflicting arguments regarding promptness. Though *Victor Stanley* does briefly discuss issues related to the promptness of the discovery of an inadvertent disclosure and a clawback demand, that case is concerned almost exclusively with whether the producing party had taken responsible steps to prevent disclosure and whether it had sufficiently asserted a basis of work-production protection in the context of a complex ESI document production; "this case does not present an instance of a single document slipping through the cracks." *Id.* at 259–67. So, *Victor Stanley* is of little help here.

The Court has been unable to locate case law establishing a bright-line rule concerning promptness; rather, courts adopt a common-sense approach considering the totality of the circumstances surrounding the inadvertent production and subsequent discovery. *See, e.g.*, *Bd. of Tr., Sheet Metal Workers' Nat. Pension Fund v. Palladium Equity Partners*, 722 F. Supp. 2d 845, 851 (E.D. Mich. 2010) (finding that the discovery of an inadvertent disclosure "late in the day on Friday" and making a clawback demand the following Monday was sufficiently prompt to prevent waiver); *LifeBio, Inc. v. Eva Garland Consolt., LLC*, 672 F. Supp. 3d 512, 523–24 (S.D. Ohio 2023) ("[C]ounsel waited over 300 days . . . after Defendant used the documents in a fully briefed summary judgment motion . . . to attempt to clawback the documents, 'long after the proverbial cat was out of the bag.'" (quoting *Coorstek, Inc. v. Reiber*, No. 08-cv-01133-KMT-cbs., 2010 WL 1332845, at *10 (D. Colo. Apr. 5, 2010))); *In re Actos Antitrust Litig.*, 703 F. Supp. 3d 468, 472 (S.D.N.Y. 2023) ("Thus, the question is whether [the producing party] acted reasonably promptly once the [document] was brought to light at the deposition. [The

producing party] did not assert privilege over the [document] at the deposition. Nor did it seek to claw back the [document] within a day or two. Rather, it waited eight days to do so. In these circumstances, the Court finds that [the producing party] failed to promptly take reasonable steps to rectify its error, and, as such, any privilege associated with the [document] has been waived." (citing Fed. R. Evid. 502(b)(3))).

"The period after the producing party realizes that privileged information has been disclosed is the relevant period for measuring whether the privilege has been waived." *Actos*, 703 F. Supp. 3d at 471–72 (quoting *United States v. Lax*, No. 18-cv-04061, 2022 WL 17987043, at *7 (E.D.N.Y. Dec. 29, 2022)). Here, that period is three days. Considering the circumstances of the discovery on May 11th, that counsel was travelling for the hearing during that period, and that counsel made the demand upon returning to the office and assessing the filings and the basis of the work-product assertion, the Court finds that the three-day delay between discovery and demand was not so unreasonable as to constitute waiver. The Clawback Motion is therefore GRANTED, and the City shall return or destroy the document and not use it further in this litigation. The Clerk is directed to temporarily seal ECF Nos. 636, 636-2, 644, and 644-1. The City is ORDERED to transmit to the Clerk's Office, by August 27, 2026, replacement versions of those docket entries that redact the email as proposed by Wells at ECF No. 640-2 and redact quotations to the protected portion of the email for replacement on the docket.

## IV. The *In Camera* Documents

On March 31, 2026, the undersigned granted in part the City's Motion to Compel Plaintiff Pursuant to the City's Fourth, Fifth, and Ninth Requests for Production of Documents. (ECF No. 609.) As relevant here, Wells was ordered to produce her and her counsel's "communications with the DOJ that relate to this lawsuit and the DOJ's pattern and practice

investigation of the MPD." (*Id.* at 15.) In its Motion to Intervene, the United States seeks the Court's guidance regarding "limited communications with Plaintiff's counsel concerning a matter that is currently the subject of a separate criminal investigation. The matter under investigation does not concern MPD or any of the named defendants in the civil case or the criminal case." (ECF No. 622, at 2.) The United States further asserts that it "does not believe these limited communications are within the scope of Magistrate Judge Christoff's Order." (*Id.*)

For the reasons discussed at the August 11, 2026 hearing, the Motion to Intervene was granted, and the United States provided the subject emails to the undersigned for *in camera* review. (ECF No. 675.) Based on the Court's *in camera* review of those emails and limited background information provided by counsel for the United States to put the emails in context (as the emails themselves are largely non-substantive), the undersigned finds that the United States's characterization of the emails is correct, they are not related to this lawsuit or the DOJ's pattern and practice investigation, and they do not come within the scope of the March 31st Order. Nor are the emails relevant to any claim or defense at issue in this case. As a result, the Court ORDERS that the emails need not be produced by Wells or the United States.

**CONCLUSION**

For the reasons discussed above, the Read AI Motion (ECF No. 567) is DENIED, the Expert Motion (ECF No. 630) is GRANTED IN PART AND DENIED IN PART, and the

Clawback Motion (ECF No. 640) is GRANTED. The emails relating to the Motion to Intervene (ECF No. 609) need not be produced by Wells or the United States.[9]

SO ORDERED this 13th day of August, 2026.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

[9] Also pending before the Court is the City's Motion to Unseal (ECF No. 532). That Motion will be addressed in a subsequent order.