# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| RowVaughn Wells,<br>Plaintiff,<br>v.<br>The City of Memphis *et al.*,<br>Defendants. | Case No. 2:23-CV-02224-SHL |

**PLAINTIFF'S DISCLOSURE OF RULE 26(a)(2)(C) WITNESSES**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), Plaintiff RowVaughn Wells, by and through her attorneys, discloses the following witnesses:

1. **Dr. Peter Law**
St. Francis Park Hospital, 5959 Park Avenue, Memphis, TN 38119

Dr. Law is a physician board certified in internal medicine, pulmonary medicine, and critical care medicine. He was one of Mr. Nichols's treating physicians in the intensive care unit at St. Francis Hospital following Mr. Nichols's January 7, 2023 admission. Dr. Law was deposed in this case on June 27, 2024 ("Law Dep."). He is expected to offer testimony and opinions about Mr. Nichols's medical condition, his injuries, the care provided to him, and the cause of his death, consistent with his deposition testimony, Plaintiff's Rule 26(a)(1) Disclosure at 23–24 (No. 79), and the entries in Mr. Nichols's St. Francis medical records (WELLS_000001–WELLS_000146 and WELLS_000288–WELLS_001585). Dr. Law's expected testimony is summarized below. It is expected that Dr. Law's testimony will be consistent with his deposition testimony and the St. Francis medical records. The following is a summary of the facts and opinions to which Dr. Law is expected to testify:

a) He received his medical degree from the University of Tennessee Health Science Center College of Medicine in 2007. He completed his internal medicine residency and his pulmonary and critical care fellowship at the University of Tennessee in Memphis in 2013. He has practiced pulmonary and critical care medicine at St. Francis with Mid-South Pulmonary Specialists since 2013, and he was medical director of the St. Francis ICU from approximately May 2017 to November 2021. Law Dep. 17:3–18:4; 20:8–23.

b) He personally examined Mr. Nichols on the morning of January 8, 2023. He signed the admission history and physical (WELLS_000900–WELLS_000902), and wrote one or more progress notes. *Id.* 25:9–27:25; 57:10–17; 80:3–14; 103:10–21.

c) When he examined Mr. Nichols, Mr. Nichols was intubated and had obvious trauma to his body. Mr. Nichols was bruised and had multiple wounds, which Dr. Law observed himself. His right eye was badly swollen, it could not be opened, and blood was oozing from his mouth and nose. *Id.* 26:1–27:10; 32:16–33:8; 104:3–8. Dr. Law assessed that these injuries were consistent with someone being beaten. He testified that Mr. Nichols was a trauma patient, with injuries fitting the description of "assault." *Id.* 28:7–15; 29:1–5; 37:9–38:4.

d) Mr. Nichols was in shock, with metabolic derangement and coagulopathy and acidosis, and he was having multi-organ failure or dysfunction. Multi-organ failure can result from someone being badly beaten. *Id.* 29:6–24.

e) Mr. Nichols's diagnoses in the admission history and physical include cardiac arrest; head trauma; dental trauma (a broken front tooth); abrasions of multiple sites and a right periorbital hematoma; coma, likely hypoxic ischemic encephalopathy; seizure-like activity; acute respiratory failure; acute metabolic acidosis; and acute kidney injury with acute tubular necrosis. *Id.* 67:24–69:16; 71:7–15. The records also document rhabdomyolysis (a breakdown of muscle tissue that can cause kidney failure) and liver failure. *Id.* 83:12–15; 107:7–23. The discharge summary records that a January 10, 2023 maxillofacial CT showed, among other things, incidental intraparenchymal hematomas, which were not present on his initial CT scan and were likely due to coagulopathy related to fulminant liver failure related to his arrest. *Id.* 81:25–82:8. The records list approximately thirty-four diagnoses made by Dr. Law or consulting physicians during the admission. *Id.* 71:25–72:11.

f) Mr. Nichols was on multiple medicines to keep up his blood pressure. After he received plasma transfusions, Dr. Law placed a dialysis catheter and an arterial line. *Id.* 26:1–27:4; 36:1–10. As documented in the discharge summary, Mr. Nichols was on a ventilator, with Levophed, phenylephrine, and vasopressin support, and he was started on CRRT (dialysis). *Id.* 81:14–22.

g) Mr. Nichols's prognosis was grave. Dr. Law testified that anyone who sustains a cardiac arrest for greater than 20 minutes, no matter their age, is at high risk for mortality and death, and that with five-plus organs that are not working, a person's chances of survival and leaving the hospital are extremely low. *Id.* 39:10–18. Dr. Law agreed that this was so even under the absolute best of care that a doctor or a hospital could give a patient under those circumstances. *Id.* 39:3–25.

h) As documented in the discharge summary, Mr. Nichols's neurological exam continued to worsen. An EEG showed likely brain death, and a brain flow study on January 10, 2023 confirmed brain death, which is incompatible with life. Time of death was noted at 13:41 on January 10, 2023, and Mr. Nichols was then removed from the ventilator. *Id.* 81:14–82:12; 83:16–84:8.

i) Dr. Law believes a beating can cause cardiac arrest, through brain injury that impairs breathing, bodily trauma, electrolyte disturbances and acidosis, and low oxygen. *Id.* 40:8–41:1. A cardiopulmonary arrest like Mr. Nichols's can lead to multisystem organ failure and death because loss of blood flow and oxygen damages tissues and organs, and, within minutes, that damage can be permanent. *Id.* 29:25–32:15; 42:14–43:20. Asked whether his observations and diagnosis of Mr. Nichols on January 8, 2023 were

related to and/or caused by the beating Mr. Nichols sustained on January 7, 2023, Dr. Law answered, "Yes, I believe so," explaining: "he had multi-organ failure with a high probability of mortality on arrival, and I think he succumbed to his organ damage and failure." *Id.* 85:25–86:19. Asked whether one injury, or the totality of Mr. Nichols's injuries, caused his cardiac arrest, brain death, systemic organ failure, and death, Dr. Law answered**,** "I believe it was not one particular injury but a total -- total of them combined." *Id.* 127:17–128:6.

j) In his review of the admission history and physical (WELLS_000900–WELLS_000901), Dr. Law saw no significant pre-existing medical history that could have caused Mr. Nichols's cardiac arrest, other than the beating. Neither his examination of Mr. Nichols nor his review of the medical records showed any evidence that the cardiac arrest was caused by anything other than the beating. Mr. Nichols's Crohn's disease did not cause his hospitalization, renal failure, cardiac arrest, liver failure, or brain death, and Mr. Nichols did not test positive for opioids. *Id.* 66:18–67:3; 125:19–127:4; 133:5–13; 134:9–14.

k) Dr. Law's opinions are based upon his education, training, and experience in internal medicine, pulmonary medicine, critical care medicine, and his personal involvement in treating Mr. Nichols. Dr. Law's opinions are offered to a reasonable degree of medical certainty within his areas of expertise. Law Dep. 28:16–23.

l) Plaintiff incorporates the testimony Dr. Law gave in his deposition in this matter. He is also expected to testify regarding his background, education, training, field of expertise, and experience.

**2. Dr. Michelle Surbrook**
St. Francis Park Hospital, 5959 Park Avenue, Memphis, TN 38119

Dr. Surbrook is an emergency physician at St. Francis Hospital with more than twenty-five years of experience. She provided care for Mr. Nichols in the St. Francis emergency room on the night of January 7, 2023. She testified about that care at the federal criminal trial arising out of the fatal beating of Mr. Nichols, *United States v. Martin et al.*, 2:23-cr-20191-SHL (W.D. Tenn.) ("*Martin*"), ECF No. 676 at 68–76, produced in this case at WELLS_007903–WELLS_007911 ("Surbrook Tr."). Dr. Surbrook is expected to offer testimony and opinions consistent with the entries in Mr. Nichols's St. Francis medical records (WELLS_000001–WELLS_000146 and WELLS_000288–WELLS_001585), Plaintiff's Rule 26(a)(1) Disclosure at 23–24 (No. 77), and her testimony in *Martin*. Dr. Surbrook's expected testimony is summarized below. That testimony will be consistent with the medical records and her prior testimony, and will include the following facts and opinions:

a) She has worked as an emergency room physician for more than twenty-five years. She was on duty at St. Francis on the evening of January 7, 2023, and she remembers Mr. Nichols coming into the emergency room that evening. Surbrook Tr. 68:22–70:3.

b) Mr. Nichols arrived at the emergency room in full cardiac arrest, his heart was not beating sufficiently to sustain a pulse, and he was not breathing. Cardiac arrest is dangerous because, without breathing and a heartbeat, oxygen is not being delivered to the brain or to the rest of the body. *Id.* 70:4–18.

c) Dr. Surbrook observed that it was unusual to have such a young person come into the emergency room in cardiac arrest. *Id.* 70:4–7.

d) Paramedics reported that Mr. Nichols had been pulled over for a traffic stop, ran from the police, was pepper sprayed and tased, and, while in police custody, became unconscious and went into cardiac arrest. As a medical provider, Dr. Surbrook found it surprising that somebody who was pulled over for a traffic stop would suffer a cardiac arrest. *Id.* 70:19–71:10.

e) Paramedics reported that Mr. Nichols had been down for about 15 to 17 minutes by the time he reached the emergency room. Dr. Surbrook and her team restored a pulse within about five minutes of his arrival. *Id.* 71:11–20; 74:6–13.

f) The longer a person is in cardiac arrest, the higher the likelihood of brain damage from lack of oxygen to the brain, and such brain damage causes death. *Id.* 71:21–72:9.

g) Paramedics reported that, before Mr. Nichols arrived, they had placed an i-gel airway, performed CPR, and given epinephrine under the advanced cardiac life support protocol. They also reported giving him Narcan, with no response. The emergency room gave another dose of Narcan, which Mr. Nichols also did not respond to, indicating that it was very unlikely that he was suffering from an opiate overdose. *Id.* 72:10–73:13.

h) On physical assessment, Mr. Nichols had a broken front tooth, blood in his mouth, swelling and abrasions to the right side of his head and face, and abrasions to his knees. *Id.* 73:14–25.

i) Mr. Nichols was treated in the emergency room for about ninety minutes before being admitted to the St. Francis intensive care unit. *Id.* 74:14–21.

Dr. Surbrook's opinions are based upon her training and experience as an emergency physician, her personal involvement in treating Mr. Nichols, and Mr. Nichols's medical records. She is also expected to testify regarding her background, education, training, field of expertise, and experience.

**3. Sgt. Denetta Craig**
c/o Counsel for Defendant City of Memphis

Sgt. Craig is a sergeant in the Memphis Police Department's Inspectional Services Bureau ("ISB") who had twenty-four years of MPD service at the time of her deposition. She was the lead investigator for the ISB's investigation of the MPD officers' January 7, 2023 encounter with Mr. Nichols and their use of force against him, and she submitted the ISB's investigative report setting forth the ISB's findings from that investigation. *See* COM_0014528–COM_0014845 ("ISB Report"). Sgt. Craig was deposed in this matter on August 12, 2024 ("Craig Dep."), and she was previously disclosed in Plaintiff's Rule 26(a)(1) Disclosure at 28 (No. 97). Sgt. Craig's expected testimony is summarized below. That testimony is expected to be consistent with the ISB Report and her deposition testimony, and is expected to include the following facts and opinions:

a) Lt. Monique Williams assigned her the case. As lead investigator, she compiled most of the case-file documents, took the lead role in interviewing witness officers, principal officers, and civilians, and reviewed all of the video evidence, including the body-worn

camera ("BWC") and pole-camera footage. Craig Dep. 17:10–20; 19:14–20:7; 27:20–28:1; 29:4–16; 30:4–15. The ISB investigated the allegation that SCORPION Team 1 used excessive and unnecessary force against a non-violent subject which caused serious injuries. It applied the MPD regulations in effect on January 7, 2023, and on the preponderance of evidence it sustained 47 violations against 13 MPD employees, whose ranks ranged from patrol officer to lieutenant colonel. ISB Report at COM_0014530–32, COM_0014589–91; Craig Dep. 50:1–11; 51:5–52:12; 192:19–194:21. Lt. Williams reviewed the report, and the ISB's Bureau Commander, Col. Kathleen Lanier, approved it. ISB Report at COM_0014528, COM_0014593.

b) **Excessive force (DR 301).** The ISB sustained DR 301 Excessive Force/Unnecessary Force against Officers Emmitt Martin, Demetrius Haley, Tadarrius Bean, Desmond Mills Jr., and Justin Smith. It applied the *Graham v. Connor* factors. The crime at issue was a misdemeanor (reckless driving). Although Mr. Nichols ran and would not comply with being handcuffed, he did not pose an immediate threat to the safety of the officers, and his actions were not aggressive towards the officers, nor did he physically strike or cause injuries to an officer. There also was no video evidence or statement to suggest Mr. Nichols was aggressive or threatening to the safety of officers. ISB Report at COM_0014568–70; Craig Dep. 83:17–84:14. The video showed the following at Castlegate Lane and Bear Creek Cove:

- Mills pepper sprayed Mr. Nichols in the face at close range, after which Mr. Nichols was on the ground screaming and calling for his mother. Mills later sprayed him again.
- Martin kicked him twice in the head area while Bean and Smith tried to handcuff him, and Mills struck him three times with an ASP baton while Smith and Bean held him.
- While Smith and Bean held him up, Martin punched him in the face five times with a closed fist, after which he struggled to stand and his speech was slurred. After he fell, Haley kicked him and Martin kicked him a third time.

ISB Report at COM_0014561, COM_0014569. These actions may have contributed to life threatening injuries to Nichols. *Id.* at COM_0014570.

c) Sgt. Craig determined that the kicking, the baton strikes, and the OC spray, as well as the punching, were excessive force, and she agreed that in this case the closed-fist punches were lethal force. Craig Dep. 33:24–35:3; 181:1–12. There was no objective evidence that Mr. Nichols was violent before the stop, assaulted an officer, or reached for a gun. Martin told her he never saw Mr. Nichols's hand on his gun. Martin admitted that his life was not in danger and that Mr. Nichols was not threatening him. A belief that Mr. Nichols was DUI or high on drugs did not justify the force used. *Id.* 105:3–15; 108:12–109:5; 120:16–25; 130:18–132:4; 182:14–24.

d) **Duty to intervene (DR 127).** The ISB sustained DR 127 against Martin, Bean, Smith, and Mills. Martin, Bean, and Smith each watched other officers strike or kick Mr. Nichols and did not intervene. The ISB also sustained DR 127 against Officer Adrian Blakes, whose BWC captured Haley and Martin kicking Mr. Nichols and who failed to report it. ISB Report at COM_0014530–31, COM_0014570, COM_0014590; Craig Dep. 84:15–85:11.

e) **Neglect of duty and failure to render aid (DR 120).** The ISB sustained DR 120 against Martin, Haley, Bean, Mills, Justin Smith, and Lt. Dewayne Smith. It found that each officer failed to instantly disclose to the responding emergency medical personnel that Mr. Nichols was pepper sprayed numerous times. It also found that no officer or supervisor mentioned Mr. Nichols was kicked, punched, or struck with an ASP collapsible baton. Although Mr. Nichols was unable to stay in a seated position after he was handcuffed, none of the involved officers, witness officers, or the scene supervisor rendered aid. ISB Report at COM_0014566–67. Sgt. Craig agreed that his injuries, including blood on his face, called for medical care, and that the officers instead spent their time smoking, taking pictures, bragging, and laughing. Craig Dep. 77:25–78:10; 79:21–80:2; 82:6–21.

f) **Truthfulness (DR 108) and personal conduct (DR 104).** The ISB sustained DR 108 against Martin, Haley, Hemphill, and Blakes, whose reports or statements were not corroborated by, or were inconsistent with, the video. Martin's Response to Resistance report omitted that he kicked Mr. Nichols three times and punched him five times. Martin's, Haley's, and Hemphill's reports claimed or suggested that Mr. Nichols grabbed for Martin's gun, which the video did not corroborate. ISB Report at COM_0014565–66; Craig Dep. 62:8–15; 108:12–109:5; 173:25–175:5. The ISB sustained DR 104 against Martin, Haley, Bean, Mills, and Smith based on, among other things, the officers' assaultive statements at the initial stop and their laughing and bragging in a huddle after Mr. Nichols was handcuffed. It also sustained DR 104 against Hemphill. ISB Report at COM_0014564–65; Craig Dep. 73:11–74:3; 182:25–183:16.

g) **Other violations.** The ISB also sustained BWC violations against nine employees, including Lt. Smith, who told her that he never wore his BWC as SCORPION Team 1's supervisor. It sustained a Taser violation against Hemphill and a DR 603 violation against Haley for photographing the handcuffed and injured Mr. Nichols and sharing the photos. It sustained a DR 607 violation against Lt. Smith for telling Mrs. Wells that her son was under arrest for DUI, which was unverified information. It also sustained violations against Maj. Christopher Mohney and Lt. Col. Charles Morris for failing to respond to the scene. ISB Report at COM_0014530–31, COM_0014571–79, COM_0014584–86; Craig Dep. 49:5–25; 59:22–61:8; 64:1–13; 111:8–113:5; 177:25–178:6.

h) **Adherence to law (DR 105).** On January 26, 2023, a Shelby County grand jury indicted Martin, Mills, Haley, Bean, and Smith for second degree murder, aggravated kidnapping, official misconduct, official oppression, and aggravated assault (acting in concert). The ISB found that they violated DR 105, and the five officers were all terminated on January 20, 2023. ISB Report at COM_0014589; Craig Dep. 85:13–86:13.

Sgt. Craig's testimony is based upon her training and experience as an MPD officer and ISB investigator and upon her investigation, including her review of the video evidence, the interviews she conducted, and the MPD policies described in the ISB Report. Plaintiff incorporates the testimony Sgt. Craig gave in her deposition in this matter. She is also expected to testify regarding her background, education, training, field of expertise, and experience.

**RESERVATION OF RIGHTS**

Plaintiff further discloses any witness disclosed by any other party pursuant to Rule 26(a)(2)(C) and reserves the right to call any such witness. Plaintiff reserves the right to call additional witnesses to rebut or respond to any testimony presented by Defendants' witnesses or experts. Plaintiff reserves the right to supplement this disclosure in accordance with the Federal Rules of Civil Procedure and the orders of the Court.

Dated: September 24, 2026

Respectfully submitted,

*/s/ Joshua M. Levin*

Antonio M. Romanucci* (Ill. Bar No. 6190290)
Sarah Raisch* (Ill. Bar No. 6305374)
Joshua M. Levin* (Ill. Bar No. 6320993)
Stephen H. Weil* (Ill. Bar No. 6291026)
Sam Harton* (Ill. Bar No. 6342112)
Colton Johnson Taylor* (Ill. Bar No. 6349356)
ROMANUCCI & BLANDIN, LLC
321 N. Clark St., Ste. 900
Chicago, IL 60654
(312) 458-1000
aromanucci@rblaw.net
sraisch@rblaw.net
jlevin@rblaw.net
sweil@rblaw.net
sharton@rblaw.net
cjohnson@rblaw.net

David L. Mendelson (Tenn. Bar No. 016812)
Benjamin Wachtel (Tenn. Bar No. 037986)
MENDELSON LAW FIRM
799 Estate Place
Memphis, TN 38187
(901) 763-2500 (ext. 103)
dm@mendelsonfirm.com
bw@mendelsonfirm.com

Benjamin Crump (Tenn. Bar No. 038054)
Brooke Cluse* (Tex. Bar No. 24123034)
BEN CRUMP LAW, PLLC
717 D Street N.W., Suite 310
Washington, D.C. 20004
(337) 501-8356

court@bencrump.com
brooke@bencrump.com

* Admission pro hac vice

**CERTIFICATE OF SERVICE**

The undersigned certifies that on September 24, 2026, the foregoing was served by email on all counsel of record.

*/s/ Joshua M. Levin*